Duane M. Geck
Cal. State Bar No. 114823
dmg@severson.com
Donald H. Cram
Cal. State Bar No. 160004
Tex. State Bar No. 05000300
dhc@severson.com
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Secured Creditor
FORD MOTOR CREDIT COMPANY LLC

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF TEXAS

### LUBBOCK DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **REAGOR-DYKES MOTORS, LP** | § | **Case No. 18-50214-rlj11** |
| | § | |
| Debtor. | § | |
| **IN RE:** | § | |
| | § | |
| **REAGOR-DYKES IMPORTS, LP** | § | **Case No. 18-50215-rlj11** |
| | § | |
| Debtor. | § | |
| **IN RE:** | § | |
| | § | |
| **REAGOR-DYKES AMARILLO, LP** | § | **Case No. 18-50216-rlj11** |
| | § | |
| Debtor. | § | |
| **IN RE:** | § | |
| | § | |
| **REAGOR-DYKES AUTO COMPANY, LP** | § | **Case No. 18-50217-rlj11** |
| | § | |

10872.0173/11324793.1

OPPOSITION TO EMERGENCY MOTION FOR AUTHORITY TO USE CASH COLLATERAL

|  | § | |
|---|---|---|
| Debtor. | § | |

| IN RE: | § | |
|---|---|---|
| | § | |
| **REAGOR-DYKES PLAINVIEW, LP** | § | **Case No. 18-50218-rjl11** |
| | § | |
| Debtor. | § | |

| IN RE: | § | |
|---|---|---|
| | § | |
| **REAGOR-DYKES FLOYDADA, LP** | § | **Case No. 18-50219-rlj11** |
| | § | |
| Debtor. | § | |

## FORD MOTOR CREDIT COMPANY LLC'S OPPOSITION TO EMERGENCY

## MOTION FOR AUTHORITY TO USE CASH COLLATERAL

Secured Creditor, Ford Motor Credit Company LLC ("Ford Credit"), submits its Opposition to Reagor-Dykes Motors, LP's and other related debtor entities' ("Debtor") emergency motion for authority to use cash collateral, respectfully showing the Court as follows:

### INTRODUCTION

Ford Credit is the "floor plan" or "inventory" lender and financed Debtor's inventory of cars and trucks for resale to consumers. Ford Credit has a perfected, first priority security interest in Debtor's inventory of vehicles as well as all parts, furniture, fixtures, equipment and general intangibles (primarily the franchise value), and the income generated by the sale of those assets. Ford Credit has not consented to Debtor's use of its cash collateral, which consists primarily of proceeds from the sale of vehicles, and has specifically demanded that Debtor segregate and account for all cash collateral sales proceeds since the filing of its bankruptcy. petition. Ford Credit believes there is no equity in the collateral and no "equity cushion" for adequate protection.

Ford Credit's inventory Wholesale Agreement requires Debtor to repay the individual loan advance for each vehicle as that vehicle is sold. This payment requirement is a critical term of the inventory Wholesale Agreement because each time Debtor sells a car, Ford Credit's

collateral is diminished. Ford Credit is dependent upon the proceeds from the sale of vehicles to pay down the loan balance owed by Debtor.

Before filing its bankruptcy petition, Debtor sold or transferred a substantial number of vehicles and failed to pay Ford Credit. These vehicles total *over $41 million* in unpaid loan advances for which the vehicle collateral is gone. The principal balances owed to Ford Credit is approximately $116 million. Debtor's value of the vehicles remaining in inventory is unknown as Debtor has yet to file its Bankruptcy Schedules. However, it is nowhere near $116 million. Ford Credit estimates that the value of the remaining vehicle collateral is approximately $66 million. Ford Credit values the remaining non-vehicle collateral comprised of parts and accessories, furniture, fixtures and equipment at less than $3.5 million. Based on the foregoing values, Ford Credit believes it is substantially undersecured given that the remaining collateral has a total value of less than $116 million. Ford Credit believes there is no equity in the collateral and no "equity cushion" for adequate protection.

The motion is unclear whether Debtor is attempting to continue to sell vehicles without repaying Ford Credit the amounts advanced for the vehicles. There is no explicit representation by Debtor as to what is to be done with the amounts owing to Ford Credit upon the sale of a vehicle. Debtor's offer of adequate protection consists providing Ford Credit with a "replacement lien" but is silent as to what collateral the replacement lien attaches to. This amounts to no adequate protection at all.

Debtor has no post-petition financing, so it is unable to acquire new inventory on a post-petition basis. There is no basis for any value attributable to the franchises because any franchise value can only be realized through a sale of dealership assets and a corresponding assignment of the franchise executory agreements with the various manufacturers.

Debtor's proposed use of Ford Credit's cash collateral significantly shifts the risk of any reorganization or sale of assets onto Ford Credit by spending Ford Credit's cash collateral without any future promise to repay Ford Credit. This risk shifting is not countenanced by the Bankruptcy Code and should not be permitted by the Court.

Absent an imminent sale or a debtor-in-possession financing facility, Chapter 11 is not a workable option for automobile dealerships. Like the Debtor, by the time a petition is filed, the dealership is so undercapitalized that it is unable to comply with the terms of its inventory loan agreement and pay for normal operating expenses. This usually results in the dealership selling vehicles in default and "selling out of trust," further eroding the inventory lender's collateral position. Debtor finds itself in this exact position apparently for some time. Debtor is not a viable entity even at this early stage in its Chapter 11 case. Debtor has no means to pay its ordinary business expenses except through the use of Ford Credit's cash collateral.

## STATEMENT OF FACTS

1.  On August 1, 2018 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").

2.  Debtor is an automobile dealership engaged in the business of selling and leasing vehicles to retail customers and servicing vehicles for customers.

3.  Prior to the Petition Date, Ford Credit provided Debtor financing for Debtor's vehicle inventory to be used in its dealership operations. Generally speaking, Debtor entered into wholesale financing agreements and other loan agreements with Ford Credit, as well as security agreements granting Ford Credit a lien in the inventory financed, as well as the proceeds, products, rents, issues and profits of such inventory. The financing agreements, security agreements and all related ancillary documents entered into in financing individual vehicles are hereafter referred to as the "Loan Documents". The collateral pledged to secure the Loan Documents is hereinafter referred to as the "Collateral". The titles and dates of the Loan Documents are identified in Exhibit A hereto.[1]

---

[1] Exhibit A consists of the Declaration of Rene Leal which was filed on July 31, 2018 with the District Court in the Northern District of Texas in connection with the case of *Ford Motor Credit Company LLC v. Reagor-Dykes Amarillo, L.P., et al.*, Case No. 5:18-cv-00186-C. Ford Credit would ask the Court to take judicial notice of this document pursuant to Evidence Code § 201.

4.      The interests granted to secure the amounts financed by Ford Credit are evidenced by UCC-1 Financing Statements filed in the State of Texas, and thus, Ford Credit holds a properly perfected lien in the Collateral. The filing numbers and dates of the UCC-1's are also set forth on Exhibit A hereto.

5.      Debtor is indebted to Ford Credit in an amount that exceeds $116 million with interest and other charges continuing to accrue. The indebtedness owing to Ford Credit is secured as Ford Credit holds a pre-petition lien, in first position, in Debtor's assets including Debtor's vehicle inventory, parts and supplies, furniture, machinery and fixtures, receivables, intangibles, including Debtor's franchises and any proceeds therefrom.

6.      Debtor's operating revenue is primarily generated through the sales and leasing of the financed vehicles. Such proceeds constitute Ford Credit's Cash Collateral as such term is used in Section 363 of the Bankruptcy Code ("Cash Collateral"), and absent the consent of Ford Credit or an order of this Court after notice and hearing, Debtor is prohibited from using such Cash Collateral.

7.      Due to pre-petition events of default and other fraudulent acts of Debtor, Ford Credit asserts it is undersecured in the approximate amount of $41 million arising from sales of vehicle Collateral and failure to pay Ford Credit for those sales under the terms of the Loan Documents.[2] The Debtor misrepresented when vehicles were actually sold – namely, a significant number of vehicles were sold months prior to when the sale was reported to Ford Credit.[3]

---

[2] The Debtor is in default of its obligations to Ford Credit under their respective Loan Agreements with Ford Credit because as of July 31, 2018, the Debtor has sold a substantial number of vehicles and has failed to repay Ford Credit the amounts advanced by Ford Credit to Debtor to acquire those vehicles totaling $41,734,000. This creates a sales-out-of-trust or "SOT" condition. This is a serious breach of the Loan Agreements because Ford Credit has lost its vehicle collateral and the Debtor has received the proceeds from the sale or lease of those vehicles and used the money for other purposes—effectively reducing Ford Credit's Collateral that secures its loans to the Debtor.

[3] See Exhibit B – Declaration of James Conlan which was filed on July 31, 2018 with the District Court in the Northern District of Texas in connection with the case of *Ford Motor Credit* (footnote continued)

OPPOSITION TO EMERGENCY MOTION FOR AUTHORITY TO USE CASH COLLATERAL

8.     Prior to the filing of this bankruptcy petition, as a result of Debtor's default, Ford Credit has suspended Debtor's credit lines to acquire vehicles.

9.     Ford Credit asserts that Debtor has no other source of funds to conduct its business other than the sales proceeds generated from the sales of Vehicles and other Collateral.

10.     Immediately after the filing of this bankruptcy petition Ford Credit, through its counsel, notified counsel for Debtor that it opposed the use of its cash collateral.

11.     All of Debtor's income is generated through the sales of vehicles and parts which all represent the cash collateral of Ford Credit.  Once Debtor sells a vehicle or part to a consumer, Ford Credit loses its security interest in the item sold and can look only to the proceeds of the item sold for its replacement collateral.  If Debtor is permitted to use Ford Credit's cash collateral as proposed, then there is no adequate protection afforded to Ford Credit for the loss of its cash collateral.

## ARGUMENT

### A.     Debtor's Cash is Part of Ford Credit's Collateral

Debtor has no source of income to operate its business.  Its income is generated only through the sales of the vehicles and parts.  The proceeds from the sales of new and used vehicles and parts constitute the Cash Collateral of Ford Credit as such term is used in Section 363 of the Bankruptcy Code.

In addition, Debtor has a service department that can generate a modest amount of income.  Once Debtor sells a vehicle or part to a consumer, Ford Credit loses its security interest in the item sold and can look only to the proceeds of the item sold for its replacement collateral. If Debtor is permitted to use the cash collateral of Ford Credit as proposed, then there is no adequate protection afforded to Ford Credit for the loss of its cash collateral.

Debtor carries the burden of proof on the issue of adequate protection. 11 U.S.C. §363(p). In considering the issue of whether to permit use of cash collateral, the debtor's prior conduct

---

*Company LLC v. Reagor-Dykes Amarillo, L.P., et al.,* Case No. 5:18-cv-00186-C.  Ford Credit would ask the Court to take judicial notice of this document pursuant to Evidence Code § 201.

OPPOSITION TO EMERGENCY MOTION FOR AUTHORITY TO USE CASH COLLATERAL

may be relevant. *In re Colonial Ctr., Inc.*, 156 B.R. 452, 463 (Bankr. E.D. Pa. 1993). Prior to filing its petition, Debtor sold a substantial number of vehicles without paying Ford Credit, and as of the date of the petition these vehicles remained SOT. Debtor has failed to offer Ford Credit adequate protection. Ford Credit asserts that the vehicles and other collateral simply have insufficient value to generate operating capital and to pay Ford Credit the amounts that Debtor owes it.

### B.    Substitute Collateral Does Not Afford Adequate Protection

Debtor is not proposing adequate protection for Debtor's continuing use of the vehicles and the proceeds generated therefrom while Ford Credit's secured position deteriorates from Debtor's continued use of Cash Collateral. Debtor has not carried its burden on the issue of adequate protection, and Debtor does not appear to be in a position to provide Ford Credit with adequate protection.

The Wholesale Agreements are not revolving lines of credit. Payment for the amount advanced for a particular vehicle is due upon the sale of that vehicle. Further, selling a vehicle without paying Ford Credit for the amount it advanced for the vehicle significantly harms Ford Credit's collateral position. In determining whether to allow Debtor to use Ford Credit's cash collateral, the Bankruptcy Court is tasked with establishing the value of Ford Credit's security interest in its collateral and then to identify the risks to Ford Credit's value through the Debtor's proposed use of cash collateral.

> [a] debtor, in structuring a proposal of adequate protection for a secured creditor, "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." *American Mariner*, 734 F.2d at 435. Although the adequate protection standard and its requirement of indubitable equivalence remains constant, whether adequate protection exists in a given case depends upon the nature of the collateral and the nature of the debtor's proposed use of that collateral.

*In re Martin*, 761 F.2d 472, 476 (8th Cir. 1985).

It is unclear from Debtor's motion whether Debtor is attempting to continue to sell vehicles without repaying Ford Credit the amounts advanced for the vehicles. There is no

OPPOSITION TO EMERGENCY MOTION FOR AUTHORITY TO USE CASH COLLATERAL

explicit representation by the Debtor as to what is to be done with amounts owing to Ford Credit upon the sale of a vehicle.

Courts have generally only permitted a debtor to use proceeds from vehicle sales for operations, to purchase new inventory without paying the secured creditor the amounts advanced for the vehicles sold where the secured creditor is oversecured, and where the vehicles in question tended to appreciate over time. *In re Thomas Parker Enterprises, Inc.*, 8 B.R. 207, 212-213 (Bankr. D. Conn. 1981). Courts have generally required, as adequate protection, that a dealership, upon sale of a vehicle, pay the secured creditor the amount advanced for the vehicle sold in accordance with its contract. *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019-1020 (11th Cir. 1984).

### C.     The Value of the Franchises is Too Speculative to be Adequate Protection

Any attempt to pledge the value of Debtor's franchises is not adequate protection. This value can only be realized through a sale of the dealership and a corresponding assignment of the franchise executory agreements with the respective manufacturers. Finally, Ford Credit already has a security interest in all of Debtor's general intangibles, which includes these franchises.

There is no pending motion to approve a sale or any motion to assume and assign the Debtor's franchises. As such, any value attributable to the dealerships is too speculative to provide adequate protection for use of cash collateral. There is no apparent imminent sale. Under the circumstances of this case, the speculative value of Debtor's franchises cannot serve as adequate protection.

### D.     The Risk of Sale Should not be Shifted to Ford Credit.

Debtor has identified no source of income to operate its business other than from the sales of vehicles and parts. The sources themselves are speculative given that the projections in the budget are based upon fraudulent sales. According to the proposed budget attached to Debtor's motion, Debtor is requesting permission to spend Ford Credit's Cash Collateral at a clip of about $2.3 million per month without paying Ford Credit any adequate protection payments. There is no adequate protection offered by Debtor that will repay Ford Credit for its lost collateral proceeds used to operate the business.

OPPOSITION TO EMERGENCY MOTION FOR AUTHORITY TO USE CASH COLLATERAL

In addition to a $41 million SOT and the evidence of prepetition fraud, Debtor is asking the Court to require that Ford Credit bear the risk of a future sale or reorganization. Debtor wants to use Ford Credit's Cash Collateral but offers no adequate protection in return. Ford Credit is undersecured. There is no equity cushion. Ford Credit's secured position will deteriorate as more vehicles are sold and the proceeds are used to pay operating expenses rather than repay Ford Credit. Where future value is based upon speculation, Courts are reluctant to shift the risk of realizing that value from the Debtor to a secured creditor if the equity cushion for the creditor is slim or nonexistent. *In the Matter of St. Petersburg Hotel Assoc., Ltd.*, 44 B.R. 944, 946 (Bankr. M.D. Fla. 1984) (Court denied authority to borrow post-petition for improvements to acquire franchise where secured creditor was undercollateralized and future value of franchise speculative); *In re Diaconx Corporation*, 69 B.R. 333, 340 (Bankr. E.D. Penn. 1987) (Court denied use of cash collateral where value of personal guarantees were speculative and equity cushion was slim).

## CONCLUSION

Ford Credit fully appreciates the consequences of Debtor not being permitted to use Cash Collateral. However, Debtor is not offering Ford Credit adequate protection. Ford Credit needs adequate protection for Debtor's ongoing use of the proceeds from the sales of the vehicle and parts inventories. Ford Credit's security position deteriorates and declines through Debtor's use of Ford Credit's Cash Collateral. Based upon the forgoing, Ford Credit requests that Debtor's motion be denied or in the alternative, that Ford Credit be afforded adequate protection so that its secured position is not further deteriorated through cash collateral use.

DATED: August 3, 2018

SEVERSON & WERSON
A Professional Corporation


By: _____/s/ Donald H. Cram_____
Donald H. Cram

Attorneys for Secured Creditor
FORD MOTOR CREDIT COMPANY LLC

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| FORD MOTOR CREDIT COMPANY LLC, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| REAGOR-DYKES AMARILLO, L.P., | § | |
| REAGOR DYKES AUTO COMPANY, L.P., | § | |
| REAGOR-DYKES II, L.L.C., | § | Civil Action No.: |
| REAGOR-DYKES FLOYDADA, L.P., | § | |
| REAGOR-DYKES IMPORTS, L.P., | § | |
| REAGOR AUTO MALL I, L.L.C., | § | |
| REAGOR-DYKES MOTORS, L.P., | § | |
| REAGOR-DYKES PLAINVIEW, L.P., | § | |
| REAGOR-DYKES III, L.L.C., | § | |
| BART REAGOR AND RICK DYKES | § | |
|     Defendants. | | |

## DECLARATION OF RENE LEAL

RENE LEAL, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. I am the Financial Services Manager for the Central Market Area for plaintiff Ford Motor Credit Company LLC ("Ford Credit").

2. I have personal knowledge of the facts stated in this declaration and in Ford Credit's Complaint being filed on July 31, 2018, based upon my review of the books and records of Ford Credit and my dealings with defendant automobile dealerships Reagor-Dykes Amarillo, L.P., Reagor Dykes Auto Company, L.P., Reagor-Dykes Floydada, L.P., Reagor-Dykes Imports, L.P., Reagor-Dykes Motors, L.P., and Reagor-Dykes Plainview, L.P. (the "dealerships" or "Reagor-Dykes Dealerships").

3.    Unless defined otherwise herein, capitalized terms have the same meaning as in Ford Credit's Complaint, being filed on July 31, 2018.

4.    Ford Credit seeks the Order requested to protect its interests as the holder of a first priority, perfected security interest in Collateral (including vehicle inventory) that is currently in the possession of the Reagor-Dykes Dealerships.

5.    Ford Credit seeks this Order because, among other reasons, the dealerships have sold vehicles in which Ford Credit has a security interest without remitting required payments to Ford Credit (and is, therefore, out of trust), have repeatedly submitted false or inaccurate information to Ford Credit and its representatives, are otherwise in default under their financing and security agreements with Ford Credit, have failed to cure their defaults in spite of the opportunity to do so, and have not voluntarily surrendered collateral in their possession that is subject to Ford Credit's security interests.

6.    Ford Credit also seeks a temporary restraining order, pending the issuance of the Order requested, to protect against further depletion or dissipation of its Collateral and the proceeds of the same.

7.    Ford Credit has made repeated efforts to resolve this matter with the dealerships, short of applying the Order requested, but those efforts have failed.

8.    The continued deterioration of the Reagor-Dykes Dealerships' financial position, and their inability to cure defaults that are believed to exceed forty million dollars ($40,000,000.00), leaves Ford Credit with no choice but to seek the requested Order in order to recover its collateral and otherwise protect its rights as a secured creditor.

9. All of the documents attached to Ford Credit's Complaint, being filed July 31, 2018, are business records of Ford Credit, and the copies attached thereto are true and correct copies of such records.

## THE DEALERSHIPS' AGREEMENTS WITH FORD CREDIT

### A. RD Plainview Agreements and Guaranties

10. On or about June 22, 2015, RD Plainview executed and delivered to Ford Credit an Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement (the "RD Plainview Wholesale Agreement"). A copy of the RD Plainview Wholesale Agreement is attached as Exhibit A to Ford Credit's Complaint.

11. On or about June 22, 2015, RD Plainview executed and delivered a Security Agreement to Ford Credit (the "RD Plainview Security Agreement"). A copy of the RD Plainview Security Agreement is attached as Exhibit B to Ford Credit's Complaint.

12. On or about June 19, 2015, RD III executed and delivered a Security Agreement to Ford Credit (the "RD III Security Agreement"). A copy of the RD III Security Agreement is attached as Exhibit C to Ford Credit's Complaint.

13. On or about June 19, 2015, Bart Reagor and Rick Dykes, as individuals, and as managers and members of RD III, executed and delivered to Ford Credit a Continuing Guaranty (the "RD Plainview Guaranty"). A copy of the RD Plainview Guaranty is attached as Exhibit D to Ford Credit's Complaint.

14. Bart Reagor as president for RD III executed a Limited Liability Certificate in connection with the RD Plainview Guaranty on October 12, 2015 (the "RD III Certificate"). A copy of the RD III Certificate is attached as Exhibit E to Ford Credit's Complaint.

15.    On or about June 19, 2015, and in order to induce Ford Credit to extend financing to RD Plainview under the RD Plainview Wholesale Agreement, Bart Reagor and Rick Dykes, as individuals, and as managers and members of RD III executed and delivered to Ford Credit a Wholesale Financing Guaranty (the "RD Plainview Wholesale Guaranty"). A copy of the RD Plainview Wholesale Guaranty is attached as Exhibit F to Ford Credit's Complaint.

**B.    RD Imports Agreements and Guaranties**

16.    On or about October 13, 2014, RD Imports executed and delivered to Ford Credit an Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement (the "RD Imports Wholesale Agreement"). A copy of the RD Imports Wholesale Agreement is attached as Exhibit G to Ford Credit's Complaint.

17.    On or about October 13, 2014, RD Imports executed and delivered a Security Agreement to Ford Credit (the "RD Imports Security Agreement"). A copy of the Security Agreement is attached as Exhibit H to Ford Credit's Complaint.

18.    On or about October 13, 2014, Bart Reagor, and Rick Dykes, as individuals, and as members of Reagor Auto Mall, executed and delivered to Ford Credit a Continuing Guaranty.

19.    On or about November 13, 2014, RD Auto Co., RD Motors, and RD Amarillo executed and delivered to Ford Credit a Continuing Guaranty. Copies of the RD Imports Guaranties are attached as Exhibits I and J to Ford Credit's Complaint.

20.    Bart Reagor and Rick Dykes, as managing members of Reagor Auto Mall, executed a Limited Liability Certificate in connection with the RD Imports Guaranty on October 13, 2014 (the "LLC Certificate"). A copy of the LLC Certificate is attached as Exhibit K to Ford Credit's Complaint.

- 4 -

C.    <u>The RD Motor Agreements and Guaranties</u>

21.    On or about March 3, 2008, RD Motors executed and delivered to Ford Credit an Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement (the "RD Motors Wholesale Agreement"). A copy of the RD Motors Wholesale Agreement is attached as Exhibit L to Ford Credit's Complaint.

22.    RD Motors executed and delivered to Ford Credit a Security Agreement on or about March 3, 2008, and a Master Security Agreement (Ford/Lincoln Rent-A-Car) (the "RD Motors Master Security Agreement") on or about December 15, 2011 (collectively, the "RD Motors Security Agreements"). Copies of the RD Motors Security Agreements are attached as Exhibit M to Ford Credit's Complaint.

23.    On or about November 21, 2011, RD Motors executed and delivered to Ford Credit a Master Loan and Security Agreement (the "Master Loan Agreement"). A true and correct copy of the master Loan Agreement is attached as Exhibit N to Ford Credit's Complaint.

24.    On or about November 21, 2011, RD Motors also executed and delivered to Ford Credit a Loan Supplement to Master Loan and Security Agreement (Revolving Line of Credit) (the "Loan Supplement"). A copy of the Loan Supplement is attached as Exhibit O to Ford Credit's Complaint.

25.    On or about April 30, 2014, RD Motors further executed and delivered to Ford Credit a Loan Supplement Master Loan and Security Agreement (Revolving Line of Credit Amendment) (the "Second Loan Supplement"). A copy of the Second Loan Supplement is attached as Exhibit P to Ford Credit's Complaint.

26.    On or about November 24, 2014, RD Motors, RD Auto, RD Imports, RD Amarillo, executed and delivered to Ford Credit an Amendment (Master Loan and Security

Agreement) (the "Amendment"). A copy of the Amendment is attached as Exhibit Q to Ford Credit's Complaint.

27. On or about November 24, 2014, RD Motors, RD Auto, RD Imports, and RD Amarillo executed and delivered to Ford Credit a third Loan Supplement (Master Loan and Security Agreement) (Revolving Line of Credit Increase) (the "Third Loan Supplement"). A copy of the Third Loan Supplement is attached as Exhibit R to Ford Credit's Complaint.

28. On or about January 14, 2017, RD Motors, RD Auto, RD Imports, RD Amarillo, RD Plainview, and RD Floydada (collectively the "Borrowers") executed and delivered to Ford Credit a Second Amendment (Master Loan and Security Agreement) (the "Second Amendment"). A copy of the Second Amendment is attached as Exhibit S to Ford Credit's Complaint.

29. On or about January 14, 2017, the Borrowers, executed and delivered to Ford Credit a Fourth Loan Supplement (Master Loan and Security Agreement) (Revolving Line of Credit – Amendment) (the "Fourth Loan Supplement"). A copy of the Fourth Loan Supplement is attached as Exhibit T to Ford Credit's Complaint.

30. On or about November 21, 2011, RD Motors, Bart Reagor and Rick Dykes executed and delivered to Ford Credit a Cross-Default and Cross-Collateralization Agreement ("the Cross-Default Agreement"). A copy of the Cross-Default Agreement is attached as Exhibit U to Ford Credit's Complaint.

31. On or about November 24, 2014, RD Motors, RD Auto, RD Imports, RD Amarillo, Bart Reagor and Rick Dykes executed and delivered to Ford Credit a second Cross-Default and Cross-Collateralization Agreement (the "Second Cross-Default Agreement"). A

copy of the Second Cross-Default Agreement is attached as Exhibit V to Ford Credit's Complaint.

32. On or about January 14, 2017, the Borrowers, Bart Reagor, and Rick Dykes executed and delivered to Ford Credit an Amended and Restated Cross-Default and Cross-Collateralization Agreement (the "Amended Cross-Default Agreement"). A copy of the Amended Cross-Default Agreement is attached as Exhibit W to Ford Credit's Complaint.

33. On or about November 21, 2011, and in order to induce Ford Credit to extend financing to the dealerships under the Loan Agreement, Bart Reagor and Rick Dykes executed, and delivered to Ford Credit, a Continuing Guaranty (the "Loan Guaranty"). A copy of the Loan Guaranty is attached as Exhibit X to Ford Credit's Complaint and is incorporated by reference.

34. Mr. Reagor and Mr. Dykes reaffirmed their Loan Guaranty on April 30, 2014, November 24, 2014 and January 14, 2017 by executing, and delivering to Ford Credit Reaffirmations of Guaranties (the "Reaffirmations"). Copies of the Reaffirmations are attached as Exhibit Y to Ford Credit's Complaint.

35. On or about November 13, 2014, RD Auto and RD Amarillo executed and delivered to Ford Credit a Continuing Guaranty (the "11/13/14 RD Motors Guaranty").

36. On or about October 12, 2015, RD Auto executed and delivered to Ford Credit a Continuing Guaranty (the "10/12/15 RD Motors Guaranty").

37. Collectively, the 4/5/07 RD Motors Guaranties, 11/13/14 RD Motors Guaranty, and 10/12/15 RD Motors Guaranty are referred to as the "RD Motors Guaranties," and are attached as Exhibit Z to Ford Credit's Complaint.

38. Bart Reagor, as president for Reagor Auto, executed a Limited Liability Certificate in connection with its RD Motors Guaranties on September 29, 2016 (the "Reagor Auto Certificate"). A copy of the Reagor Auto Certificate is attached as Exhibit AA to Ford Credit's Complaint.

### D. The RD Amarillo Agreements and Guaranties

39. On or about October 13, 2014, RD Amarillo executed and delivered to Ford Credit an Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement (the "RD Amarillo Wholesale Agreement"). A copy of the RD Amarillo Wholesale Agreement is attached as Exhibit BB to Ford Credit's Complaint.

40. On or about October 13, 2014, RD Amarillo executed and delivered to Ford Credit a Security Agreement (the "RD Amarillo Security Agreement"), and a Master Security Agreement (the "RD Amarillo Master Security Agreement") (collectively, the "RD Amarillo Security Agreements"). Copies of the RD Amarillo Security Agreements are attached as Exhibit CC to Ford Credit's Complaint.

41. On or about October 13, 2014, Bart Reagor and Rick Dykes, individually, and Reagor Auto Mall, executed and delivered to Ford Credit a Continuing Guaranty and a Wholesale Financing Guaranty (collectively, the "RD Amarillo Guaranties I"). Copies of the RD Amarillo Guaranties are attached as Exhibit DD to Ford Credit's Complaint.

42. On or about November 13, 2014, RD II, L.L.C., RD Motors, and RD Imports executed and delivered to Ford Credit a Continuing Guaranty (the "RD Amarillo Guaranty II"). A copy of the RD Amarillo Guaranty II is attached as Exhibit EE to Ford Credit's Complaint.

43. Bart Reagor and Rick Dykes, as managing members of Reagor Auto Mall executed a Limited Liability Certificate in connection with its RD Amarillo Guaranties on October 1, 2014 (the "Reagor Auto Mall Certificate"). A copy of the Reagor Auto Mall Certificate is attached as Exhibit FF to Ford Credit's Complaint.

**E.    The Floydada Agreements and Guaranties**

44. On or about October 1, 2015, RD Floydada executed and delivered to Ford Credit an Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement (the "RD Floydada Wholesale Agreement"). A copy of the RD Floydada Wholesale Agreement is attached as Exhibit GG to Ford Credit's Complaint.

45. On or about October 1, 2015, RD Floydada executed and delivered a Security Agreement to Ford Credit (the "RD Floydada Security Agreement"). A copy of the RD Floydada Security Agreement is attached as Exhibit HH to Ford Credit's Complaint.

46. On or about January 8, 2016, Bart Reagor and Rick Dykes, as individuals, and Reagor Auto Mall, executed and delivered to Ford Credit a Continuing Guaranty (the "RD Floydada Guaranty").

47. The individuals and entity who executed the RD Floydada Guaranty are referred to collectively as the "RD Floydada Guarantors." A copy of the RD Floydada Guaranty is attached as Exhibit II to Ford Credit's Complaint.

48. Bart Reagor and Rick Dykes, as the Members/Managers/Officers of Reagor Auto Mall, executed a Limited Liability Certificate in connection with the RD Floydada Guaranty on October 1, 2015 (the "Limited Liability Certificate"). A copy of the Limited Liability Certificate is attached as Exhibit JJ to Ford Credit's Complaint.

**F.    The RD Auto Agreements and Guaranties**

49.    On or about October 13, 2014, RD Auto executed and delivered to Ford Credit an Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement (the "RD Auto Wholesale Agreement").  A copy of the RD Auto Wholesale Agreement is attached as Exhibit KK to Ford Credit's Complaint.

50.    On or about October 13, 2014, RD Auto executed and delivered to Ford Credit a Security Agreement (the "RD Auto Security Agreement") and a Master Security Agreement (the "RD Auto Master Security Agreement") (collectively, the "RD Auto Security Agreements").  A copy of the RD Auto Security Agreements are attached as Exhibit LL to Ford Credit's Complaint.

51.    On or about October 13, 2014, Bart Reagor and Rick Dykes, as individuals, and Reagor-Dykes II, L.L.C., executed and delivered to Ford Credit a Continuing Guaranty (the "RD Auto Guaranty I").  A copy of the RD Auto Guaranty I is attached as Exhibit MM to Ford Credit's Complaint.

52.    On or about November 13, 2014, Reagor-Dykes Amarillo, L.P., Reagor-Dykes Motors, L.P., and Reagor-Dykes Imports, L.P. executed and delivered to Ford Credit a Continuing Guaranty (the "RD Auto Guaranty II").  A copy of the RD Auto Guaranty II is attached as Exhibit NN to Ford Credit's Complaint.

53.    Bart Reagor and Rick Dykes, as the Members/Managers/Officers of Reagor-Dykes II, L.L.C. executed a Limited Liability Certificate in connection with the RD Auto Guaranty II on October 13, 2014 (the "RD Auto Limited Liability Certificate").  A copy of the RD Auto Limited Liability Certificate is attached as Exhibit OO to Ford Credit's Complaint.

54.    On or about October 13, 2014, Bart Reagor and Rick Dykes, as individuals, and Reagor-Dykes II, L.L.C. executed and delivered to Ford Credit a Wholesale Financing

Guaranty (the "RD Auto Guaranty III"). A copy of the RD Auto Guaranty III is attached as
Exhibit PP to Ford Credit's Complaint.

### FORD CREDIT'S SECURITY INTERESTS

55.     The RD Plainview Collateral, RD III Collateral, RD Imports Collateral, RD
Motors Collateral, RD Amarillo Collateral, RD Floydada Collateral, and RD Auto Collateral are
referred to collectively as the "Reagor-Dykes Collateral."

56.     Throughout its history with the Reagor-Dykes Dealerships and other
entities, Ford Credit has maintained a first priority, perfected security interest in the Reagor-
Dykes Collateral by filing financing statements, continuations, and amendments with the Texas
Secretary of State.

57.     Ford Credit filed initial financing statements in Texas to perfect its security
interests in the Reagor-Dykes Collateral. Copies of Ford Credit's financing statements are
attached as Exhibit QQ to Ford Credit's Complaint. A copy of Exhibit QQ is also attached to
this declaration.

### THE DEALERSHIPS' DEFAULTS AND BREACHES
### OF THEIR AGREEMENTS WITH FORD CREDIT

58.     After a June 2018 audit of the inventory of the Reagor-Dykes Dealerships,
Ford Credit undertook an initial analysis of the audit results and sales and registration data from
the Texas DMV and other publicly available sources.

59.     In the course of Ford Credit's initial analysis of sales data for the Reagor-
Dykes Dealerships, Ford Credit reviewed sales information for one hundred fifty (150) reported
sales by those dealerships.

60.     Based upon both Texas DMV and other publicly-available sales and
registration sources, Ford Credit determined that the sales dates reported by the dealerships for

one hundred forty-seven (147) of these vehicles did not match the sales and/or registration dates reported by the Texas DMV and/or other publicly-available sources. This analysis is ongoing.

61. Based upon Ford Credit's initial analysis, substantial variances existed between the dealership's reported sales dates and the other records that Ford Credit reviewed, with an average violation discrepancy of fifty-five (55) days (across all of the dealerships).

62. In other words, the initial analysis that Ford Credit performed indicated that one hundred forty-seven (147) of the one hundred fifty (150) vehicles sold by the dealerships were sold, on average, fifty-five (55) days before the date upon which the dealerships paid them off.

63. As a result, the dealerships were able to delay making payments to Ford Credit for extended periods of time, well beyond the seven (7) processing days permitted under their agreements with Ford Credit.

64. In addition, Ford Credit's initial analysis identified several instances where the Reagor-Dykes Dealerships double-floored vehicles (this analysis is ongoing).

65. In those instances, the Reagor-Dykes Dealerships submitted information to Ford Credit to obtain floorplan financing at one of the dealerships, and then did so again at a second dealership – thereby obtaining double financing from Ford Credit.

66. In fifteen (15) other instances, Ford Credit's initial analysis indicated that the Reagor-Dykes Dealerships transferred a vehicle that was being sold from one dealership to another and then, after the vehicle was sold, floorplanned that vehicle with Ford Credit even though it was no longer in inventory, thus obtaining financing payments from Ford Credit under false pretenses.

67. By providing Ford Credit with false and/or incorrect information concerning the sales date of certain vehicles, the Reagor-Dykes Dealerships were able to avoid and/or delay paying Ford Credit the amounts owed to it for such vehicles.

68. On July 26 and 27, 2018, a further audit of the vehicle inventory at the various Reagor-Dykes Dealerships' locations revealed that each dealership was out of trust, having sold vehicles that were subject to Ford Credit's security interests without remitting proceeds from those sales to Ford Credit.

69. Selling vehicles out of trust is a violation of the Reagor-Dykes Dealerships' agreements with Ford Credit, and constitutes a default under those agreements.

70. After these defaults were discovered, the Reagor-Dykes dealerships authorized electronic funds transfers ("EFTs") to Ford Credit totaling over $41 Million.

71. EFTs are now being returned for insufficient funds and/or because payment on at least some of them has been stopped by Defendants.

72. Upon information and belief, as of July 31, 2018, and subject to Ford Credit's continuing investigation, the estimated amounts owed by each dealership are set below:

| Dealership | Estimated Amount Outstanding | Amount currently due |
|---|---|---|
| RD Motors | $ 38,983,000.00 | $ 8,472,000.00 |
| RD Amarillo | $ 9,565,000.00 | $ 4,207,000.00 |
| RD Imports | $ 12,895,000.00 | $ 6,728,000.00 |
| RD Auto | $ 19,747,000.00 | $ 5,410,000.00 |
| RD Plainview | $ 15,805,000.00 | $ 4,993,000.00 |
| RD Floydada | $ 19,173,000.00 | $11,924,000.00 |

| | $116,168,000.00 | $41,734,000.00 |
| --- | --- | --- |

73. Ford Credit has demanded that the Reagor-Dykes dealerships cure their defaults, and pay all amounts currently due to Ford Credit, but they have failed to do so.

74. On or about July 31, 2018, Ford Credit also delivered Voluntary Surrender Agreements to counsel representing the Defendants, requesting that Defendants voluntarily surrender the Reagor-Dykes Collateral to Ford Credit. Copies of the Voluntary Surrenders are attached as Exhibit RR to Ford Credit's Complaint.

75. As of the filing of this Complaint, the Reagor-Dykes Collateral has not been surrendered.

76. As of the date of Ford Credit's complaint, the Reagor-Dykes Guarantors have also failed to pay the amounts currently due.

## **CONCLUSION**

77. Based on all of the above, Ford Credit has instituted this action to seek sequestration of its Collateral, interim injunctive relief, and recovery of any resulting deficiency after Ford Credit's Collateral is liquidated.

78. Ford Credit respectfully submits that it is likely to be successful on its claims against Defendants, and that it knows of no defense to its claims.

79. Defendants' indebtedness to Ford Credit, and Ford Credit's right to immediate possession of the Collateral, is amply demonstrated by the documentary evidence attached to Ford Credit's Complaint and by the accompanying Declarations of Gary Byrd and James Conlan.

80. Defendants' failure to voluntarily surrender the Collateral is irreparably harming Ford Credit, inasmuch as the value of the Collateral is rapidly depreciating.

81. In addition, given the Reagor-Dykes Dealerships' recent history of selling vehicles out of trust, as well as submitting false or inaccurate information to Ford Credit that has avoided or delayed payments to Ford Credit and has allowed the Reagor-Dykes Dealerships to obtain loans from Ford Credit by false pretenses, Ford Credit has every reason to believe that, absent the intervention of this Court, the Reagor-Dykes Dealerships will continue to transfer, remove, or otherwise dispose of the Collateral, all of which will result in substantial losses to Ford Credit.

82. Accordingly, Ford Credit requests that this Court issue the Order requested.

83. A schedule of new and used motor vehicles financed pursuant to the agreements list above, and believed to be located at each dealerships' respective premises is attached as Exhibit SS to Ford Credit's Complaint. A copy of Exhibit SS is also attached to this declaration.

84. Ford Credit is prepared to post any undertaking deemed necessary by the Court.

85. Further, Ford Credit requests that, pending the issuance of the Order requested, the Court impose strict interim controls and other measures to protect Ford Credit's Collateral (as outlined in Ford Credit's Order to Show Cause), and grant such other and further relief as is necessary to protect Ford Credit's interests.

86. No prior application for this relief has been made.

Dated: July 31, 2018

RENE LEAL

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| FORD MOTOR CREDIT COMPANY LLC,<br>    Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | |
| REAGOR-DYKES AMARILLO, L.P.,<br>REAGOR DYKES AUTO COMPANY, L.P.,<br>REAGOR-DYKES II, L.L.C.,<br>REAGOR-DYKES FLOYDADA, L.P.,<br>REAGOR-DYKES IMPORTS, L.P.,<br>REAGOR AUTO MALL I, L.L.C.,<br>REAGOR-DYKES MOTORS, L.P.,<br>REAGOR-DYKES PLAINVIEW, L.P.,<br>REAGOR-DYKES III, L.L.C.,<br>BART REAGOR AND RICK DYKES<br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.: |

**DECLARATION OF JAMES CONLAN**

JAMES CONLAN, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1.      I am an employee with plaintiff Ford Motor Credit Company ("Ford Credit") in its Quality and Process Management Department and a 6-Sigma Black Belt.

2.      I have personal knowledge of the facts stated in this Declaration.

3.      In my role with Ford Credit, I was asked to undertake an analysis of the most recent vehicle inventory audit of the Reagor-Dykes Dealerships, and to compare the sales information reported to the auditors by the Reagor-Dykes Dealerships to registration and sales data available from the Texas DMV and other publicly-available sources.

4.      I was asked to undertake that analysis as part of Ford Credit's ongoing effort to monitor vehicle sales information reported through vehicle inventory audits, and to identify dealerships that may be inaccurately or falsely reporting sales data.

- 2 -

5.      My review of the audit results for the Reagor-Dykes Dealerships, in particular, was triggered because its sales data suggested a high percentage of vehicles that were potentially sold before the dates reported by the dealerships to the auditors, without the dealerships having made timely payment to Ford Credit upon the sale of those vehicles.

6.      In the case of the Reagor-Dykes Dealerships, Ford Credit previously allowed those dealerships seven (7) processing days to make payments due to Ford Credit for any vehicles that were sold by the Reagor-Dykes Dealerships and upon which they owed money to Ford Credit.

7.      In the course of my initial analysis of sales data for the Reagor-Dykes Dealerships, I reviewed sales information for one hundred fifty (150) reported sales by those dealerships.  Based upon both Texas DMV and other publicly-available sales and registration sources, I determined that the sales dates reported by the dealerships for one hundred forty-seven (147) of these vehicles did not match the sales and/or registration dates reported by the Texas DMV and/or other publicly-available sources.  This analysis is ongoing.

8.      Based upon my initial analysis, substantial variances existed between the dealership's reported sales dates and the other records that I reviewed, with an average violation discrepancy of fifty-five (55) days (across all of the dealerships).

9.      In other words, the initial analysis that I performed indicated that one hundred forty-seven (147) of the one hundred fifty (150) vehicles sold by the dealerships were sold, on average, fifty-five (55) days before the date upon which the dealerships paid them off.

10.     As a result, the dealerships were able to delay making payments to Ford Credit for extended periods of time, well beyond the seven (7) processing days permitted under their agreements with Ford Credit.

11.     In addition, my initial analysis identified several instances where the Reagor-Dykes Dealerships double-floored vehicles (this analysis is ongoing).

12.     In those instances, the Reagor-Dykes Dealerships submitted information to Ford Credit to obtain floorplan financing at one of the dealerships, and then did so again at a second dealership – thereby obtaining double financing from Ford Credit.

13.     In fifteen (15) other instances, my initial analysis indicated that the Reagor-Dykes Dealerships transferred a vehicle that was being sold from one dealership to another and then, after the vehicle was sold, floorplanned that vehicle with Ford Credit even though it was no longer in inventory, thus obtaining financing payments from Ford Credit under false pretenses.

14.     Given the above, I recommended that Ford Credit perform a further physical audit of the vehicle inventory of all of the Reagor-Dykes Dealerships.

15.     That further physical audit took place on Thursday, July 26, 2018 and Friday, July 27, 2018.

16.     Ford Credit is still attempting to reconcile the results of that most-recent audit with records obtained both from the Reagor-Dykes Dealerships and the Texas DMV and other publicly-available sources. While that effort remains ongoing, the information that I have reviewed to date indicates that the problems identified by my initial analysis affect all of the Reagor-Dykes Dealerships, are pervasive, and are continuing.

Dated: July 31, 2018

JAMES CONLAN