Duane M. Geck
Cal. State Bar No. 114823
dmg@severson.com
Donald H. Cram
Cal. State Bar No. 160004
Tex. State Bar No. 05000300
dhc@severson.com
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Secured Creditor
FORD MOTOR CREDIT COMPANY LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF TEXAS

LUBBOCK DIVISION

| IN RE: | § | |
|---|---|---|
| REAGOR-DYKES MOTORS, LP | § § § § | Case No. 18-50214-rlj11 |
| Debtor. | § | |
| IN RE: | § § | |
| REAGOR-DYKES IMPORTS, LP | § § | Case No. 18-50215-rlj11 (Jointly Adminstered Under Case No. 18-50214) |
| Debtor. | § | |
| IN RE: | § § | |
| REAGOR-DYKES AMARILLO, LP | § § | Case No. 18-50216-rlj11 (Jointly Adminstered Under Case No. 18-50214) |
| Debtor. | § | |
| IN RE: | § § | |
| REAGOR-DYKES AUTO COMPANY, LP | § § | Case No. 18-50217-rlj11 (Jointly Adminstered Under |

| | | |
|---|---|---|
| Debtor. | § § | Case No. 18-50214) |
| IN RE: | § § | |
| REAGOR-DYKES PLAINVIEW, LP | § § | Case No. 18-50218-rlj11 (Jointly Adminstered Under |
| Debtor. | § | Case No. 18-50214) |
| IN RE: | § § | |
| REAGOR-DYKES FLOYDADA, LP | § § | Case No. 18-50219-rlj11 (Jointly Adminstered Under |
| Debtor. | § | Case No. 18-50214) |

## DECLARATION OF PAUL A. BOUDREAU IN SUPPORT OF FORD MOTOR CREDIT COMPANY LLC'S MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE AND FOR MOTION FOR RELIEF FROM THE AUTOMATIC STAY

I, Paul A. Boudreau, declare as follows:

1. I am employed by Ford Motor Credit Company LLC ("Ford Credit"), as its General Manager responsible for the Central Market Area of Ford Credit.

2. I am familiar with the manner and procedures by which the records, letters and memoranda contained in Ford Credit's files are prepared and maintained. Those records, letters and memoranda are prepared by agents or employees of Ford Credit in performance of their regular business duties. Those records, letters and memoranda are made either by persons with knowledge of the matters they record or from information supplied by persons with such knowledge. It is Ford Credit's regular business practice to maintain such records, letters or memoranda in the course of its business. The documents herein contained and referenced are business records produced and maintained in this above described manner. Except as otherwise specifically stated in this Declaration, the facts set forth herein are based on my review of the files to this account and if called as a witness I could and would be competent to testify to those facts.

## AGREEMENTS BETWEEN DEBTOR AND FORD CREDIT

A. **The Wholesale Financing and Security Agreements**

3. On various dates, Reagor-Dykes Motors, LP, Reagor-Dykes Imports, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Plainview, LP and Reagor-Dykes Floydada, LP (collectively "Debtor") executed and delivered to Ford Credit separate Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement (the "Wholesale Agreements"). Copies of the Wholesale Agreement are attached as Exhibits A, B, C, D, E and F.

4. Debtor executed Wholesale Agreements to induce Ford Credit to extend a wholesale lines of credit to Debtor, to be used to finance new and used motor vehicles (commonly known as floor-plan financing).

5. The Wholesale Agreements required Debtor to pay to Ford Credit the balance of any advance, plus unpaid interest and flat charges, with respect to any financed motor vehicle on or before the date on which it was sold. *See id.* at ¶ 3.

6. In exchange for the financing provided under the RD Plainview Wholesale Agreement, RD Plainview granted Ford Credit a security interest in the motor vehicles financed, their proceeds, and any rebates or refunds owed to RD Plainview. *See id.* at ¶ 4.

7. Further, RD Plainview agreed to keep the vehicles "free from all taxes, liens and encumbrances." *See id.* at ¶ 5.

B. **The Security Agreements**

8. Debtors executed and delivered Security Agreements to Ford Credit (the "Security Agreement"). A copies of the Security Agreements are attached as Exhibits G, H, I, J, K and L.

9. Pursuant to the Security Agreements, Debtor granted Ford Credit a security interest in:

> (a) All equipment, fixtures, furniture, demonstrators and service vehicles, supplies and machinery and other goods of every kind;

    (b)    All motor vehicles, tractors, trailers, service parts and accessories and other inventory of every kind and any accessories thereto; and

    (c)    All accounts, instruments, chattel paper, general intangibles, contract rights, documents and supporting obligations thereto.

## C. The Master Loan and Security Agreement

10. Debtors executed and delivered to Ford Credit a Master Loan and Security Agreement along with various amendments and supplements (the "Master Loan Agreement"). A true and correct copy of the Master Loan Agreement including amendments and supplements are attached as Exhibit M.

11. Pursuant to the Loan Agreement, Ford Credit agreed to provide the Borrowers with a revolving line of credit of $1,500,000.00.

12. An "Event of Default" is defined by the Loan Agreement as, among other things:

    (1)  <u>Default under Other Agreements</u>. If a default shall occur under the Security Documents, the Other Loans or any other agreement between Borrower and Lender, or if any other indebtedness of Borrower to Lender shall be accelerated, or if payment of any other indebtedness of Borrower to Lender which is payable on demand shall
be demanded.

    (2)  <u>Payment of Indebtedness</u>. If Borrower shall default in the due and punctual payment of all or any portion of any installment of the Indebtedness and such default shall continue for a period of ten days after written notice thereof by Lender to Borrower.

    (3)  <u>Performance of Obligation</u>. If Borrower shall default in the due observance or performance of any of the Obligations other than payment of money and such default shall not be curable, or if curable shall continue for a period of thirty days after written notice thereof from Lender to Borrower.

**D.     The Cross-Default Agreement**

13.    The Debtor executed and delivered to Ford Credit a Cross-Default and Cross-Collateralization Agreement and several amendments (the "Cross-Default Agreement"). A copy of the Cross-Default Agreement including amendments is attached as Exhibit N.

14.    The Cross-Default Agreement applied to the Debtor's indebtedness under the Wholesale Agreements, the Loan Agreement, and any other loans Ford Credit made thereafter to the Debtor.

15.    The Cross-Default Agreement provided that "[a]n Event of Default with respect to any Loan shall be an Event of Deafault with respect to all Loans, and upon the occurrence of an Event of Default, Lender shall have the right to exercise andy and all remedies granted to Lender under the Security Documents in accordance with the terms and conditions of such Secruity Documents. The collateral securing each of the Loans shall secure all the other Loans."

**E.     Perfection of Security Interest**

16.    Ford Credit perfected its security interests in its Collateral by filing UCC-1 Financing Statements with the Office of the Secretary of State of Texas including all required amendments and continuation statements thereafter as follows:

a) UCC-1 Financing Statements filed with the Texas Secretary of State on October 14, 2014 as Document No. 14-0032742912 and all continuations, and amendments;

b) UCC-1 Financing Statements filed with the Texas Secretary of State on October 14, 2014 as Document No. 14-0032743660 and all continuations, and amendments;

c) UCC-1 Financing Statements filed with the Texas Secretary of State on March 4, 2008 as Document No. 08-0007673445 and all continuations, and amendments;

d) UCC-1 Financing Statements filed with the Texas Secretary of State on October 11, 2010 as Document No. 10-29340403 and all continuations, and amendments;

e) UCC-1 Financing Statements filed with the Texas Secretary of State on October 9, 2015 as Document No. 15-0032542032 and all continuations, and amendments;

f) UCC-1 Financing Statements filed with the Texas Secretary of State on June 25, 2015 as Document No. 15-0020004335 and all continuations, and amendments.

Copies of Ford Credit's UCC-1 Financing Statements are attached as Exhibit O.

## THE DEBTOR'S PREPETITION DEFAULTS

17. After a June 2018 audit of the inventory of the Debtor, Ford Credit undertook an initial analysis of the audit results and sales and registration data from the Texas DMV and other publicly available sources.

18. In the course of Ford Credit's initial analysis of sales data for the Debtor, Ford Credit reviewed sales information for one hundred fifty (150) reported sales by those dealerships.

19. Based upon both Texas DMV and other publicly-available sales and registration sources, Ford Credit determined that the sales dates reported by Debtor for one hundred forty-seven (147) of these vehicles did not match the sales and/or registration dates reported by the Texas DMV and/or other publicly-available sources. This analysis is ongoing.

20. Based upon Ford Credit's initial analysis, substantial variances existed between Debtor's reported sales dates and the other records that Ford Credit reviewed, with an average violation discrepancy of fifty-five (55) days (across all of the dealerships).

21. In other words, the initial analysis that Ford Credit performed indicated that one hundred forty-seven (147) of the one hundred fifty (150) vehicles sold by the Debtor were sold, on average, fifty-five (55) days before the date upon which the Debtor paid them off.

22. As a result, the Debtor was able to delay making payments to Ford Credit for extended periods of time, well beyond the seven (7) processing days permitted under their agreements with Ford Credit.

23. In addition, Ford Credit's initial analysis identified multiple instances where the Debtor double-floored vehicles.

24. In those instances, the Debtor submitted information to Ford Credit to obtain floorplan (vehicle inventory) financing at one of the dealerships, and then did so again at a second dealership – thereby obtaining double financing from Ford Credit.

25. In fifteen (15) other instances, Ford Credit's initial analysis indicated that the Debtor sold a vehicle and then, after it was sold, floorplanned that vehicle with Ford Credit even though it was no longer in inventory, thus obtaining financing payments from Ford Credit under false pretenses.

26. Although this analysis is ongoing, Ford Credit discovered after the filing of the instant bankruptcy, Debtor had double floored at least 85 vehicles with both GM Finance and Ford Credit.

27. By providing Ford Credit with false and/or incorrect information concerning the sales date of certain vehicles, the Debtor was able to avoid and/or delay paying Ford Credit the amounts owed to it for such vehicles.

28. On July 26 and 27, 2018, a further audit of the vehicle inventory at the various Debtor locations revealed that each dealership was out of trust, having sold vehicles that were subject to Ford Credit's security interests without remitting proceeds from those sales to Ford Credit.

29. Selling vehicles out of trust is a violation of Debtor's agreements with Ford Credit, and constitutes a default under those agreements.

30. After these defaults were discovered, Debtor authorized electronic funds transfers ("EFTs") to Ford Credit totaling over $41 million.

31. Several of the EFTs were returned for insufficient funds and/or because payment on at least some of them has been stopped by Defendants.

32. As of July 31, 2018, the estimated total amounts owed by Debtor to Ford Credit totaled $116,168,000.00, and the amounts currently due are believed to exceed $40,000,000.00.

33. As of the date of this complaint, the Reagor-Dykes Guarantors have not paid the amounts currently due.

I hereby declare under penalty of perjury under the law of the Unites States of America that the foregoing is true and correct. Executed on August 9, 2018 at \_\_\_Plano\_\_\_, Texas.

_____
Paul A. Boudreau