Marcus A. Helt (TX 24052187)
C. Ashley Ellis (TX 00794824)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: 214.999.3000
Facsimile: 214.999.4667

**PROPOSED COUNSEL TO DEBTORS**
**REAGOR-DYKES MOTORS, LP** *et al.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | |
|---|---|
| **IN RE:** | § |
| | § |
| **REAGOR-DYKES MOTORS, LP,** *et al.*[1] | §   **Case No. 18-50214-rlj-11** |
| | §   **Jointly Administered** |
| Debtor. | § |

## MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING: (A) BID PROCEDURES; (B) STALKING HORSE BIDDER AND OVERBID PROTECTIONS; AND (C) FORM AND MANNER OF NOTICES; (II) SCHEDULING AN AUCTION AND SALE HEARING; (III) APPROVING THE SALE OF SUBSTANTIALLY ALL THE ASSETS OF THE DEBTORS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; <u>AND (IV) GRANTING RELATED RELIEF</u>

Reagor-Dykes Motors, LP; Reagor-Dykes Imports, LP; Reagor-Dykes Amarillo, LP;

Reagor-Dykes Auto Company, LP; Reagor-Dykes Plainview, LP; Reagor-Dykes Floydada, LP

(collectively, "***Reagor-Dykes***" or the "***Debtors***"), as debtors and debtors-in-possession in the

above-styled and captioned case hereby file this *Motion for Entry of an Order (I) Authorizing*

*and Approving: (A) Bid Procedures; (B) Stalking Horse Bidder and Overbid Protections; and*

*(C) Form and Manner of Notices; (II) Scheduling an Auction and Sale Hearing; (III) Approving*

---

[1] The Debtors are Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), and Reagor-Dykes Floydada, LP (Case No. 18-50219).

*the Sale of Substantially All of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (IV) Granting Related Relief* (the "**Motion**") seeking the entry of an order, substantially in the form attached as **Exhibit A**, (a) approving the Bid Procedures, (b) approving the Stalking Horse Bidder and Overbid Protections (each defined below), (c) approving form and manner of notices, (d) scheduling an auction and sale hearing, (e) approving the sale of substantially all of the assets of the Debtors free and clear of all liens, claims, encumbrances and interests pursuant to an asset purchase agreement consistent with the terms and conditions set forth on the LOI (as defined below), (f) approving the assumption and assignment of the "Assigned Contracts" as defined in the LOI, and (g) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

## I.
## PRELIMINARY STATEMENT

1.       After considering available options within the context of the current status of their operations, the Debtors determined in their business judgment to conduct a competitive bid-and-sale process for the orderly sale of all or substantially all of the Debtors' assets (the "**Assets**") under § 363(b) and (f) of the Bankruptcy Code and transition of the Dealerships to a new ownership group. After extensive and arms-length negotiations, the Debtors negotiated a LOI (defined below) to sell the Assets and transition the Dealerships to KamKad Automotive Holdings, LLC ("**KamKad**") pursuant to preliminary terms and conditions identified in the LOI ("**KamKad Proposal**").

2.       The terms and conditions identified in the LOI and the to-be-finalized buy-sell agreement ("**Buy Sell**" or "**Stalking Horse APA**") between KamKad and the Debtors are subject to higher and better bids at an auction. However, to induce KamKad to serve as the "stalking-horse" bidder in the Court-approved sale process, the Debtors have agreed to certain bid

procedures and protections, including a "break-up" fee.  Under this Motion, the Debtors seek

court approval of the sale procedures, sale, and bid protections as set forth herein.

## II.
## JURISDICTION

3.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and venue is

proper under 28 U.S.C. §§ 1408 and 1409.

4.     The legal predicates for the relief requested in this Motion are §§ 105(a), 363,

365, 503(b), 507(a), 541, 1107(a), and 1108 of chapter 11 of title 11 of the United States Code,

11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"), and rules 2002, 6004, 6006, 9007, and 9014

of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

## III.
## BACKGROUND

5.     On August 1, 2018 (the "***Petition Date***"), the Debtors filed voluntary petitions for

relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), thereby

initiating the above-captioned, jointly-administered bankruptcy cases (the "***Chapter 11 Cases***")

in the Bankruptcy Court for the Northern District of Texas (the "***Court***") and creating their

bankruptcy estates (the "***Estates***").  Together with two non-debtor entities, Reagor Auto Mall,

Ltd. and Reagor Dykes Snyder, LP, the Debtors operate eight (8) dealerships with thirteen (13)

locations – twelve (12) in West Texas and one (1) location in Dallas – as a consolidated group

(collectively, the "***Dealerships***").

6.     The Debtors continue to operate and to manage their businesses as "debtors-in-

possession" pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  However, on August 30,

2018, BlackBriar Advisors, L.L.P. ("**BlackBriar**") was approved on a final basis by the Court as Chief Restructuring Officer of the Debtors.

7.     On August 30, 2018, this Court approved Mullin Hoard & Brown, L.L.P.'s withdrawal as counsel to the Debtors effective as of August 21, 2018.

8.     Subject to this Court's approval, the Debtors hired the undersigned as (replacement) counsel to the Debtors effective as of August 22, 2018. On September 10, 2018, the Debtors filed their *Application for an Order Pursuant to 11 U.S.C. § 327(a) and Bankruptcy Rules 2014 and 2016 Authorizing Employment and Retention of Foley Gardere, Foley & Lardner LLP, as Counsel to the Debtors and Debtors-in-Possession Effective August 22, 2018* [Docket No. __].

9.     Subject to this Court's approval, the Debtors hired John Thompson at Elm Tree Advisors V, LLV ("**Elm Tree**") as their investment banker and strategic-alternative advisor. On September 10, 2018, the Debtors filed their *Application for Authority to Employ Elm Tree Advisors V LLC as Investment Bankers and Transaction Advisors* [Docket No. ___]. Elm Tree's director, Mr. John Thompson ("**Thompson**"), will manage the day-to-day operations of the proposed sale process and report to BlackBriar on the same. **Any party interested in the proposed Sale process should contact Elm Tree, c/o Mr. Thompson, at the following email address and phone number: 512.423.1243, jthompson@elmfund.com, and Elm Tree Advisors V, LLV, c/o John Thompson, 3112 Windsor Road, A-365, Austin, Texas 78703**.

10.     BlackBriar and Elm Tree have begun a marketing process of the Assets and the Dealerships, which includes the following:

(a)     Establishing a data room with relevant documents about the Dealerships, financial status, and operations;

(b)    Negotiating and executing non-disclosure agreements with interested parties;

(c)    Preparing a confidential information presentation;

(d)    Approaching strategic and financial buyers with industry and/or "special-situations" experience;

(e)    Marketing the Debtors (i) as an entire portfolio, (ii) by individual market, and (iii) by individual facility;

(f)    Having numerous informal discussions with bidders regarding the Dealerships and bidder due diligence;

(g)    Holding management presentations with parties;

(h)    Conducting site visits with parties;

(i)    Filing the to-be-finalized Buy Sell on this Court's docket and providing the same in Word format to any party interested in making a Qualified Bid who executes a non-disclosure agreement with the Debtors; and

(j)    Analyzing bids, selecting the stalking-horse bidder, negotiating the form buy-sell agreement, and recommending to the Debtors the highest or best offer(s) for the Assets.

11.    BlackBriar and Elm Tree have each spent substantial time communicating with parties interested in the Assets and the Dealerships, including KamKad. All parties interested in buying the Assets and the Dealerships should contact Elm Tree.

12.    No trustee, examiner, or statutory committee of unsecured creditors has been appointed in these Chapter 11 Cases.

## IV.
## RELIEF REQUESTED

13.    By this Motion, the Debtors seek approval of (a) the competitive bid process and procedures outlined in and attached to the proposed bid procedures order ("***Bid Procedures Order***"); (b) KamKad as the "stalking-horse bidder" (the "***Stalking-Horse Bidder***") and its

entitlement to a break-up fee assuming entry of the Bid Procedures Order, approval of the Bid Procedures (defined below), execution of a buy-sell agreement by the Debtors and KamKad and performance by KamKad in connection with the buy-sell agreement (including, without limitation, the terms of the Trade-In Purchase Arrangement as provided in the LOI); and (c) the sale of the Assets and Dealerships to the highest or best offer(s).

14. Specifically, the Debtors seek entry of an order substantially in the form of the Bid Procedures Order, which is attached as **Exhibit A**:

(a) approving the bidding procedures, in the form attached as **Exhibit 1** to the Bid Procedures Order and incorporated by reference herein (the "*Bid Procedures*"), inclusive of the overbid and break-up fee protections set forth therein for the Stalking Horse Bidder (the "*Overbid Protections*") to facilitate the orderly sale (the "*Sale*") of substantially all of the Assets;

(b) approving the form and manner of notice of the hearing to approve the Sale (the "*Sale Hearing*," and the notice thereof, the "*Sale Notice*") attached as **Exhibit 2** to the Bid Procedures Order and incorporated by reference herein;

(c) subject to modification as necessary, fixing certain dates and deadlines relating to the Bid Procedures, the auction (if one is necessary), the Sale Hearing, and filing of certain related objections:

i **Good-Faith Deposit Deadline for the Stalking-Horse Bidder**: **3:00 p.m. prevailing Central Time on September 21, 2018**, as the deadline by which the Stalking-Horse Bidder will pay the $1,000,000 good-faith deposit.

ii **APA Filing Deadline for the Stalking-Horse Bidder**: **October 18, 2018**, as the deadline by which the Stalking Horse Bidder and the Debtors will execute and file the Stalking Horse APA and the proposed form of the Sale Order;

iii **Assumption and Assignment Notice Deadline: October 24, 2018**, as the deadline by which the Debtors will file with the Court a notice identifying

the proposed cure amounts for all unexpired leases and executory contracts;

iv     **Bid Deadline**: **4:00 p.m. prevailing Central Time on <u>November 16, 2018</u>,** as the deadline (the "***Bid Deadline***") by which Qualified Bidders (as defined in the Bid Procedures) must deliver written copies of their bidding materials consistent with the Bid Procedures to the Debtors and others entitled to receive such copies;

v     **Auction: <u>10:00 a.m. prevailing Central Time on November 20, 2018</u>,** as the date on which an auction for the Assets (the "***Auction***"), if one is necessary, will commence at the offices of Foley Gardere, 2021 McKinney Avenue, Suite 1600, Dallas, TX 75201;

vi     **Sale Objection Deadline: <u>4:00 p.m. prevailing Central Time on November 21, 2018</u>,** as the deadline (the "***Sale Objection Deadline***") by which objections, if any, to the entry of the order approving the Sale Order (defined below) must be filed and served consistent with the Bid Procedures;

vii     **Objections to Cure Amounts**:   **<u>4:00 p.m. prevailing Central Time on November 21, 2018</u>**, as the deadline by which objections, if any, to the proposed cure amounts related to the assumption and assignment of unexpired leases and executory contracts must be filed and served consistent with the Bid Procedures; and

viii     **Sale Hearing**: **<u>November 28, 2018, or such other date selected by the Court</u>** on which the Sale Hearing will be held in the United States Bankruptcy Court for the Northern District of Texas, Lubbock Division, 1205 Texas Avenue, Room 306, Lubbock, Texas, 79401.

(d)     granting related relief.

15.     Further, the Debtors seek entry of an order (the "***Sale Order***"), approving (a) the sale of substantially all of the Assets free and clear of all liens, claims, encumbrances, and interests, together or in one or more asset packages (an "***Asset Package***"), and (b) the assumption

and assignment of certain executory contracts and unexpired leases related to and utilized in connection with the Assets to either (x) the Stalking Horse Bidder or (y) the Qualified Bidder who submits the highest or best bid in accordance with the Bid Procedures (either, the "*Successful Bidder*").

**V.**
**FACTUAL BACKGROUND**

16.     To maximize value of the Assets and the Dealerships, the Debtors have obtained a non-binding letter of intent (the "*LOI*"), which is attached as __Exhibit B__, setting forth a "stalking-horse" bid from KamKad for the purchase of substantially all of the assets of the Debtors, including the Dealerships and certain related assets used in the operation of the dealerships (the "*Dealerships*") for a cash purchase price of $25,321,520.00, the assumption of certain liabilities, and the payoff of a to-be-determined amount owed to Ford Motor Credit Company ("*FMCC*") for the inventory subject to FMCC's floor-plan liens.  As part of the LOI, KamKad agreed to act as the Stalking Horse Bidder and incur the expenses associated with such a role, subject to the inclusion of the Overbid Protections in the Bid Procedures.  With the Stalking Horse Bidder and a minimum purchase price now in place, the Debtors believe that it is a proper exercise of their business judgment to implement the competitive bidding process outlined in the Bid Procedures and promptly effectuate a Sale, either to the Stalking Horse Bidder or to another Qualified Bidder(s) who submits a higher or better Qualified Bid(s) for the Assets and the Dealerships. The proposed Sale transaction is fair and appropriate and will maximize the value of the Assets and the Dealerships for the stakeholders of the Estates.  Accordingly, the Debtors seek this Court's approval of a proposed Sale transaction and related Bid Procedures so that it could solicit competing offers for the Assets and the Business.

## VI.
## BASIS FOR THE RELIEF REQUESTED

**A.      The Court Should Approve the Proposed Bid Procedures.**

17.      The proposed Bid Procedures are attached to the Bid Procedures Order, which is

**Exhibit A** to this Motion.  Any person interested in making an offer to purchase the Assets must

comply with the Bid Procedures when they are approved by the Court.   Generally, the Bid

Procedures provide:

> (a) If approved as the stalking-horse bidder, KamKad will pay the
> $1,000,000 good-faith deposit into an interest-bearing escrow
> account, which will either be (i) applied to the purchase price at
> a closing on the Sale if KamKad is the purchaser or (ii)
> refunded to KamKad if KamKad is not the ultimate buyer of
> the Assets, subject to the terms and conditions in the LOI and
> the Stalking Horse APA.
>
> (b) If prior to approval of the Bid Procedures through entry of the
> Bid Procedures Order, another party approaches the Debtors,
> BlackBriar or Elm Tree ("**Sale Team**") through Thompson
> with a proposal that the Sale Team determines in the Debtor's
> business judgment to be more valuable and a better proposal
> than the LOI, the Debtors reserve the right to amend the Bid
> Procedures Motion to incorporate such proposal as a higher or
> better proposal than the KamKad Proposal, on such terms as
> the Debtors determine through such use of their business
> judgment.
>
> (c) Elm Tree shall provide written notice to all parties with whom
> it has executed non-disclosure agreements concerning the
> marketing of the Assets of the Stalking Horse APA executed
> between the Debtors and KamKad within twenty-four (24)
> hours after filing of the executed the Stalking Horse APA and
> shall provide to the Debtors a certificate of such notice.
>
> (d) If the Bid Procedures order is entered and thereafter no other
> Qualified Bid is received prior to the Bid Deadline, then the
> KamKad Proposal, as formalized through the Stalking Horse
> APA, shall constitute the Successful Bid.
>
> (e) If other Qualified Bid(s) are received by the Bid Deadline, then
> the Debtors shall conduct the Auction and select the highest or

otherwise best Qualified Bid or Qualified Bids for the Assets
and the Dealerships as the Successful Bid(s).

18.     This Court should approve the proposed Bid Procedures because they will promote active bidding from interested parties and will identify the best or highest offer(s) for the sale of the Assets.  The proposed Bid Procedures will allow the Debtors to conduct the sale process and Auction, if necessary, in a controlled, fair, and open fashion that are designed to encourage active participation by financially-capable bidders who have the ability and the desire to close the transaction.  The Debtors believe that the Bid Procedures, inclusive of the Overbid Protections for the Stalking Horse Bidder, are (a) sufficient to encourage active bidding for the Assets; (b) consistent with other procedures previously approved by bankruptcy courts; and (c) appropriate under relevant standards governing auction proceedings and bidding incentives in bankruptcy cases.

19.     Once a debtor articulates a valid business justification for proposed Bid Procedures incident to an auction and sale, bankruptcy courts evaluate that justification under the business-judgment rule, which is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Il. 1995); *see also In re Broughton Ltd. P'ship*, 474 B.R. 206, 218 (Bankr. N.D. Tex. 2012) (citing *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[T]he court relies on an estate representative's sound business judgment in approving acts outside the ordinary course of business."); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D. N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D. N.Y. 1986) ("A presumption of reasonableness attaches to a Debtor's management decisions.").

20. Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate. *See, e.g., In re Redwine Res.*, 2010 WL 5209287 at *2 (Bankr. N.D. Tex., June 24, 2010) (approving the debtor's proposed Bid Procedures where finding the debtors "have exercised sound business judgment and presented sound business reasons for approval of the [b]id [p]rocedures."); *Integrated Res.*, 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

21. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988) ("It is a well-established principle of bankruptcy law that the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").

22. Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See, e.g., Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), ("court-imposed rules for the disposition of assets ... [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

23.     Here, the Bid Procedures contain terms typical for a process through which a sale of bankruptcy estate assets and businesses is consummated, and will increase the likelihood that the Estates will receive the greatest possible consideration and value, because they will ensure a competitive and fair bidding process. Further, the Debtors believe that the consideration offered by the Stalking Horse Bidder in the LOI for the Assets is fair and adequate under the circumstances, and the Debtors are prepared to proceed to a sale to KamKad for such consideration after the final terms and conditions are finalized in the Stalking Horse APA. However, to ensure that the Debtors maximize the value of the Assets and the Dealerships, the Debtors with the guidance of BlackBriar as CRO and Elm Tree as investment banker and transaction advisor have identified sound business justifications for seeking approval of the Bid Procedures at this time to determine whether the consideration offered in the LOI is the highest and best consideration for the Assets and the Dealerships. The Debtors believe that the presence of the Stalking Horse Bidder will not chill competitive bidding. To the contrary, the Debtors believe that the presence of a stalking horse bidder combined with a fair and open process will increase interest and value of the Assets and the Dealerships for the stakeholders. In fact, prior to approval of the Bid Procedures, the Debtors remain free to consider proposals other than the KamKad Proposal to determine if such proposals are higher or better than the KamKad Proposal and may supplant the KamKad Proposal as the one to propose as the Stalking Horse Bid, if, in the Debtors' business judgment, such other proposal is higher or better than the KamKad Proposal.

24.     In consideration for acting as the Stalking Horse Bidder and in consideration of the extensive time and diligence costs incurred and to be incurred by KamKad, the Debtors request that the Court approve the Overbid Protections, including the proposed break-up fee of

$750,000 (which is approximately 3% of the cash purchase price as defined in the LOI), a minimum initial bid of $1,000,000 more than the consideration to be paid by KamKad under the LOI and to-be-finalized Stalking Horse APA. Break-up fees and reimbursements are a normal and, in many cases, necessary component of significant sales conducted under § 363 of the Bankruptcy Code: "[b]reak-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the . . . corporation ha[s] a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize values." *Integrated Resources,* 147 B.R. at 659-60. Specifically, "break-up fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assoc., L.P.,* 96 B.R. 24, 28 (Bantu. S.D.N.Y. 1989) (quotations omitted). *Accord Integrated Resources,* 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Industries, Inc.,* 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence"). Courts in the Northern District of Texas have likewise found on multiple occasions that break-up fees and expense reimbursements and proper and necessary tools to ensure lively bidding, protect the auction process, and avoid potential litigation. *See e.g. In re Texas Rangers Baseball Partners,* 431 B.R. 706, 715 (Bankr. N.D. Tex. 2010).

25.    As a consequence, bankruptcy courts frequently approve break-up fees and expense reimbursements in connection with proposed bankruptcy sales. In the process, courts generally consider "(1) whether the relationship of the parties who negotiated the fee is marked

by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is reasonable in relation to the proposed purchase price." *In re Twenver, Inc.,* 149 B.R. 954, 956 (Bankr. D. Colo. 1992); *In re Bidermann Industries U.S.A., Inc.,* 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997).

26.    The Debtors believe that the proposed break-up fee is reasonable and appropriate in these Chapter 11 Cases for, among others, the following reasons:

> (a) the Break-Up Fee is well within the range approved by bankruptcy courts in similar circumstances;
>
> (b) the Break-Up Fee would be paid by any successful higher bidder at the Auction through the initial overbid, as opposed to being paid directly by the Estate;
>
> (c) there is no self-dealing or manipulation, but rather arms-length negotiations; and
>
> (d) the dollar amount of the bid by the Stalking Horse Bidder sets a floor price – not a ceiling – for the sale of the Assets, which will ensure that the Estates preserve and hopefully maximize value of the Assets and the Dealerships.

27.    As additional support, § 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  In the Debtors' business judgment, the best option for maximizing the value of the Assets is through a sale of the Assets pursuant to the proposed Bid Procedures.  Accordingly, the Debtors request that the Court permit KamKad to act as the Stalking Horse Bidder pursuant to the Bid Procedures, and the Debtors further request that KamKad have the protections afforded by the Overbid Protections, including authorization to pay the Break-Up Fee if KamKad is not the Successful Bidder and the Break-Up Fee is otherwise due.

**B.     The Sale Is An Exercise of Sound Business Judgment And Should Be Approved.**

28.     § 363 of the Bankruptcy Code authorizes a debtor to sell assets of the estate other than in the ordinary course of business and provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate ...." 11 U.S.C. § 363(b)(1).  Courts approve proposed sales of property pursuant to § 363 if the transaction represents the reasonable business judgment of the debtor. *See Inst. Creditors of Cont'l. Air Lines, Inc. v. Cont'l. Air Lines, Inc. (In re Cont'l. Air Lines)*, 780 F.2d 1223, 1226  (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty … there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) ("A sale of assets under § 363 … is subject to court approval and must be supported by an articulated business justification, good business judgment, or sound business reasons."); *In re Delaware & Hudson Rv. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the preconfirmation sale of assets); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a Chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith"); *see also Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986).

29.     If a valid business justification exists for the sale – as it does in these Chapter 11 Cases – a debtor's decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) ("The business judgment standard in section 363 is flexible and encourages discretion."); *GBL Holding Co.v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005) ("Great judicial deference is given to the [t]rustee's exercise of business judgment" [in approving a proposed sale under section 363].). Therefore, any party objecting to the proposed sale must make a showing of "bad faith, self-interest or gross negligence." *In re Integrated Res., Inc.*, 147 B.R. at 656 (citing *Smith v. Van Gorkom*, 488 A.2d 858, 872-73 (Del. 1985)); *see also Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D. N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

30.     In determining whether a proposed § 363(b)(1) sale satisfies the "business-judgment standard," courts consider the following: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the price is fair and reasonable; and (d) whether the parties have acted in good faith. *See, e.g., In re N. Am. Techs. Group, Inc.*, 2010 Bankr. LEXIS 5834, *7 (Bankr. E.D. Tex. Aug. 16, 2010) (citing *In re Condere*, 228 B.R. 615, 626 (Bankr. S.D. Miss. 1998)); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987). The Debtors will show that the proposed sale of the Assets satisfies all these factors.

31.     First, sound business justification exists for the Sale. The Debtors liquidity is currently limited, and the Debtors face challenges to fix that limitation in the near future. Accordingly, at this time, the proposed orderly sale of the Assets is the only viable alternative to maximize value of the Assets and the Dealerships. The Debtors submit that the proposed Sale of the Assets is supported by a number of sound business reasons, and the facts support an expeditious but regulated and controlled sale of the Assets to preserve value.

32.     Second, marketing efforts will continue and the Debtors will provide adequate and reasonable notice of the Sale. Notice will be given to interested parties of the Bid Procedures, the Auction, and the date of the Sale as required in the Bid Procedures Order. The Debtors submit that that such notice constitutes adequate and reasonable notice to interested parties, as set forth in the Bid Procedures Order, under the circumstances and should be approved.

33.     Third, the ultimate purchase price for the Assets will be dictated by the market and (presumptively) fair and reasonable. Whether sold to the Stalking Horse Bidder for the price contemplated in the KamKad Proposal, or to a Qualified Bidder willing to pay more, the value to be received by the Estates pursuant to the Bid Procedures and Auction is necessarily the highest possible value.

34.     Fourth, under the Bid Procedures, the Debtors will have acted in good faith to canvas the market to ensure that the ultimate sales price for the Assets is the highest value possible. The Debtors submit that the approval of the proposed Sale is appropriate and warranted under § 363 of the Bankruptcy Code.

**C.    The Sale of the Assets Will Be Free and Clear of Liens, Claims, Encumbrances, and Interests.**

35.    § 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances in property of an entity other than the estate if

      (a)  applicable nonbankruptcy law permits a sale of such property free and clear of such interest;

      (b)  such entity consents;

      (c)  such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

      (d)  such interest is in *bona fide* dispute; or

      (e)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

36.    Because § 363(f) of the Bankruptcy Code is drafted "in the disjunctive," satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. *In re Nature Leisure Times, LLC*, 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007); *see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D. N.Y. Mar. 6, 1992) ("[S]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D. N.Y. 1986). The Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to § 105 of the Bankruptcy Code, even if § 363(f) did not apply. *See Matter of Selby Farms*, 15 B.R. 372, 375 (Bankr. S.D. Miss.

1981) ("The power of the Bankruptcy Court to sell property free and clear of liens has long been recognized." (citing *Van Huffel v. Harkelrode*, 284 U.S. 225, 227-28 (1931))); *In re Trans World Airlines. Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("Bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)."); *see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

37.     With regard to the sale of the Assets, the Debtors believe that at least one of the tests in § 363(f) will be satisfied.  In particular, the Debtors believe that §§ 363(f)(2) and (f)(5) will be satisfied first, because (a) FMCC and any other party asserting a lien on the Assets to be sold will have consented to this Motion and (b) absent such consent, Ford Credit and any other party asserting a lien on the Assets to be sold could be compelled to accept a monetary satisfaction of its security interest in the Assets.  Further, all liens of any secured party against the Assets will attach to the proceeds from the sale of the Assets to the same extent and priority as such liens exist in the Assets.

### D.     The Assumption And Assignment of Contracts Is Authorized By § 365 of The Bankruptcy Code

38.     §§ 365(a) and (b) of the Bankruptcy Code authorize a debtor-in-possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor.[2] In turn, § 365(b)(1) of the Bankruptcy Code codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing as follows:

---

[2]     *See generally* 11 U.S.C. § 365(a) and (b); *In re Idearc Inc.*, 423 B.R. 138, 162 (Bankr. N.D. Tex. 2009) (recognizing that, "[u]nder section 365 of the Bankruptcy Code, a debtor may assume an executory contract or unexpired lease"); *In re Jamesway Corp.*, 201 B.R. 73, 76 (Bankr. S.D. N.Y. 1996).

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
>
> A) cures or provides adequate assurance that the trustee will promptly cure, such default …;
>
> B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> C) provides adequate assurance of future performance under such contract or lease.[3]

In analyzing whether the assumption or rejection of an executory contract or unexpired lease pursuant to § 365(a) should be approved, courts apply the "business-judgment" test, which requires a determination that the requested assumption or rejection be "advantageous to the estate and the decision be based on sound business judgment."[4] In making this determination, courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract.[5]

---

[3]     11 U.S.C. § 365(b)(1).

[4]     *In re McCommas LFG Processing Partners, LP*, 07-32219-HDH-11, 2007 WL 4234139, at *14 (Bankr. N.D. Tex. Nov. 29, 2007). *See, e.g., In re Group of Institutional Investors, Inc. v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co.*, 318 U.S. 523, 550 (1943) ("The question [of assumption] is one of business judgment."); *In re Idearc, Inc.*, 423 B.R. at 162 ("Courts apply the 'business judgment test' [to a debtor's decision to assume and executory contract or lease], which requires a showing that the proposed course of action will be advantageous to the estate…."); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098-99 (2d Cir. 1993) (holding that, when deciding whether to grant a motion to assume, a court must put itself in the trustee's position and determine whether such assumption would be a good decision or a bad one).

[5]     *See In re McCommas LFG Processing Partners, LP*, 2007 WL 4234139, at *15 ("In the absence of a showing of bad faith or an abuse of business discretion, the debtor's business judgment will not be altered." (citing *NLRB v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir.), aff'd, 465 U.S. 513 (1984))). *See, e.g., In re Paolo Gucci*, 193 B.R. 411, 414 (S.D.N.Y. 1996); *Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *In re III Enter., Inc.*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the

39. Here, the Debtors' assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder as set forth in the LOI or the to-be-finalized Stalking Horse APA – or the ultimate Successful Bidder after an Auction – meets the business-judgment standard and satisfies the requirements of § 365 of the Bankruptcy Code. First, the scope of the Assigned Contracts is focused and reasonable. As noted in the LOI, the Assigned Contracts identified by the Stalking Horse Bidder are the contract rights, leases of dealership locations, and leases of real and personal property related to the Dealerships to be sold in the Sale. As mentioned, the Debtors' liquidity is challenged, and the Sale transactions contemplated by this process will preserve and maximize value of the Assets and the Dealerships. Because the Debtors cannot obtain such preservation and maximization without the assumption and assignment of the Assigned Contracts, the assumption of these Assigned Contracts is a sound exercise of the Debtors' business judgment.

40. Further, a debtor-in-possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with § 365(a), and provides adequate assurance of future performance by the assignee, "whether or not there has been a default" under the agreement. 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.[6] The meaning of "adequate assurance of

---

contract is an exercise of sound business judgment – a standard which we have concluded many times is not difficult to meet.").

[6]    *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D. N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding); *In re Old S. Coors*, 27 B.R. 923, 926 (Bankr. N.D. Miss. 1983) (finding that the assignees' "long and successful business experience and financial strength" satisfied the "reasonable standards of adequate assurance of future performance").

future performance" depends on the facts and circumstances of each case, but it should be given "practical, pragmatic construction."[7]

41.     Here, all monetary defaults that must be cured under § 365(b) as a pre-condition to the assumption and assignment of the Assigned Contracts will be cured prior to the proposed closing.  By October 24, 2018, which is over one (1) month prior to the proposed Sale hearing, the Debtors will file with the Court and serve on each non-debtor party to an executory contract or unexpired lease a notice setting forth the amount of cure owed thereunder according to the Debtors' books and records (the "*Cure Notice*").  The Cure Notice shall state the cure amount that the Debtors believe is necessary to assume such contract or lease pursuant to §365 of the Bankruptcy Code (the "*Cure Amount*"), and notify each non-debtor party that such party's lease or contract may be assumed and assigned to the Stalking Horse Bidder or to the successful bidder identified at the conclusion of the Auction, if any.

42.     In this Motion, the Debtors will request that this Court order that, no later than seven (7) days prior to the Sale Hearing, any objection to the Cure Amount must be filed with the Court (the "*Cure Amount Objection Deadline*").  Any objection to the Cure Amount must state with particularity what alternative cure amount the non-debtor party believes is required with appropriate supporting documentation and the legal and factual bases for that belief.  If no objection is timely received, the Bid Procedures Order will provide that Cure Amount set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any executory contract, unexpired lease, or other document that exists on the date of the Cure Notice; the non-

---

[7]     *In re Liljeberg Enters, Inc.*, 304 F.3d 410, 438-39 (5th Cir. 2002) ("[T]o determine if the debtor in possession has provided 'adequate assurance of future performance'… courts must look to 'factual conditions,' including 'consider[ation of] whether the debtor's financial data indicated its ability to generate an income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry, and the presence of a guarantee.") (internal citations omitted); *EBG Midtown South Corp. v. McLaren/Hart Environmental Eng'g. Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993).

debtor party to the executory contract or unexpired lease shall be deemed to have stipulated that the Cure Amount set forth in the Cure Notice is correct; the non-debtor party shall be forever barred, estopped, and enjoined from asserting or claiming that any additional amounts are due or other defaults exist under the unexpired lease or executory contract, that conditions to assignment must be satisfied or that there is any objection or defense to the assumption and assignment of such contract or lease, including any argument that there exist conditions to assumption and assignment that must be satisfied or that any required consent to assignment has not been given.

43.     At the Sale Hearing, the Debtors will demonstrate that the Stalking Horse Bidder or other ultimately Successful Bidder has sufficient assets to continue performance under any Assigned Contract. The Debtors submit that the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

44.     To assist in the assumption and assignment of the Assigned Contracts, the Debtors request that the Court enter an order providing that any anti-assignment provisions, if any, in the Assigned Contracts shall not restrict, limit, or prohibit the assumption and assignment of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of § 365(f) of the Bankruptcy Code.  § 365(f)(1) of the Bankruptcy Code permits a debtor-in-possession to assign unexpired leases and executory contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .[8]

---

[8]     11 U.S.C. § 365(f)(1).

45. By operation of law, § 365(f)(1) invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease.[9] § 365(f)(3) goes beyond the scope of § 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.[10]

46. Other courts have recognized that provisions that have the effect of restricting assignments also cannot be enforced.[11] Similarly, in *In re Mr. Grocer, Inc.*, the court noted that:

> [The] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.[12]

Accordingly, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption and assignment of the Assigned Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of § 365(f) of the Bankruptcy Code.

---

[9] *See In re Pin Oaks Apartments*, 7 B.R. 364, 367 (Bankr. S.D. Tex. 1980) (finding that § 365(f)(1) grants the debtor "rights to assign a lease to a third party who becomes fully liable thereunder, notwithstanding any contrary contractual provisions which restrict, prohibit or condition any such assignment"). *See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("[N]o principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365.").

[10] *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D. N.Y. 1996) (finding that § 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

[11] *See In re Rickel Home Centers, Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."); *see also In re U.L Radio Corp.*, 19 B.R. 537, 543 (Bankr. S.D. N.Y. 1982) ("Any lease provision, not merely one entitled 'anti-assignment clause,' would be subject to the court's scrutiny regarding its anti-assignment effect.").

[12] 77 B.R. 349, 354 (Bankr. D. N.H. 1987).

**E.     The Ultimate Purchaser Will Be Entitled to Protections as a Good-Faith Purchaser**

47.     Bankruptcy Code § 363(m) states, in relevant part:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

48.     This Court has upheld § 363 purchase agreements "negotiated, proposed, and entered into … in good faith, without collusion … [resulting from] arm's-length bargaining with … parties represented by independent counsel." *In re TriDimension Energy, L.P.*, 2010 Bankr. LEXIS 4838, *13 (Bankr. N.D. Tex. Nov. 19, 2010). A sale to a good-faith purchaser cannot be avoided under § 363(m), unless the sale authorization was stayed pending appeal. *See* 11 U.S.C. § 363(m) ("The reversal or modification of an authorization under subsection (b) of this section of a sale … does not affect the validity of [the] sale … to an entity that purchased … the property in good faith…."). However, "[t]he trustee may avoid a sale … if the sale price was controlled by an agreement among potential bidders…." *Id.* § 363(n). Additionally, for the sale to be considered in good-faith, consideration must: (1) be fair and reasonable; (2) be the highest and best offer for the property, and; (3) constitute reasonably equivalent value, fair value, and fair consideration. *In re TriDimension Energy, L.P.*, 2010 Bankr. LEXIS 4838, at *13.

49.     First, the Debtors will show at the Sale Hearing that they negotiated with the Stalking Horse Bidder at arm's-length, in good faith, and in an effort to achieve the best offer for the Assets.  The Debtors will show that the Stalking Horse Bidder who was represented by independent counsel, recognized the need for and actively encouraged transparency in, the solicitation of competing bids via the Bid Procedures.  As such, the Debtors will show that the

Stalking Horse Bidder is entitled to the protections of a good-faith purchaser under § 363(m) of the Bankruptcy Code, and the sale of the Assets does not constitute an avoidable transaction pursuant to § 363(n).

50.     Similarly, if KamKad is not the successful purchaser of the Assets, the ultimate purchaser of the Assets will have, by definition, participated in a good faith manner if such prospective purchaser complies with the Bid Procedures and submits a Qualified Bid. An Auction conducted in accordance with the Bid Procedures will further ensure that the sale of the Assets will be the result of arm's length, good faith negotiations between the Debtors and each party submitting a Qualified Bid. The Bid Procedures, coupled with the prospect of an open Auction, definitively preclude any conduct that would cause or permit the sale to be set aside under § 363(n) of the Bankruptcy Code.

51.     Finally, the Debtors reiterate that any agreement executed with or related to the sale of the Assets will provide substantial, essential value to the bankruptcy estates because it will facilitate an efficient liquidation for fair and reasonable consideration. *See In re TriDimension Energy, L.P.*, 2010 Bankr. LEXIS 4838, at *9 (finding that reasonably equivalent value existed under the Bankruptcy Code); *Mellon Bank, NA. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991) (same), *cert. denied,* 503 U.S. 937 (1992); *see also Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.I., Inc.)*, 92 F.3d 139 (3d Cir. 1996); *Salisbury v. Texas Commerce Bank-Houston, N.A. (In re WCC Holding Corp.)*, 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994) (reasonably equivalent value under Texas law) (citing *Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488, 1495 (5th Cir.), *cert. denied.* 510 U.S. 821 (1993) and *Southmark Corp. v. Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (Bankr. N.D. Tex. 1992)); *In re China Resource Prod. Ltd. v. Favda Intern., Inc.*, 856 F. Supp. 856, 866 (D. Del.

1994) (citing *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 792 (Del. Ch. 1992)). Through the Bid Procedures, exposure of the Assets will not be limited or constricted, but the Assets will instead be subjected to an open process, subject to review by the Court, that recognizes the rights of all parties-in-interest while providing the estates with reasonably equivalent value in exchange for the Assets. The Debtors believe that the to-be-determined ultimate purchaser of the Assets is therefore a "good faith" purchaser within the meaning of Bankruptcy Code, and will be entitled to the full protections afforded by § 363(m). Accordingly, the Debtors request that the Sale Order contain findings and protections pursuant to Bankruptcy Code § 363(m).

**F.     Cause Exists To Eliminate Any Stay Imposed By The Bankruptcy Rules.**

52.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006 provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

53.     The Debtors request that any order approving this Motion (or authorizing a transaction to sell the Assets) be effective immediately, thereby waiving the 14-day stays imposed by Bankruptcy Rules 6004 and 6006. These waivers or eliminations of the 14-day stays are necessary for the Sale to close and the funding to be received as expeditiously as possible. The Debtors respectfully submit that it is in the best interest of the Estates to close the Sale as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors request that the Court eliminate the 14-day stays imposed by Bankruptcy Rules 6004 and 6006.

**WHEREFORE**, the Debtors respectfully request that this Court enter the Bid Procedures Order in substantially the form attached as **<u>Exhibit A</u>** and thereby:

  (a)  approve the Bid Procedures;

  (b)  approve the Stalking Horse Bidder, including the Overbid Protections;

  (c)  approve the form and manner of Notice of the Bid Procedures and the Auction;

  (d)  approve the procedures for objections to this Motion;

  (e)  schedule the Auction and the Sale Hearing: and

  (f)  grant the related relief set forth herein.

Further, the Debtors respectfully request at the conclusion of the Sale Hearing that this Court enter the Sale Order, thereby:

  (a)  authorize and approve the sale of the Assets to (i) the Stalking Horse Bidder in accordance with the terms and conditions of the Stalking Horse APA; or (ii) to the party or parties that timely submit the highest and best Qualified Bid in compliance with the Bid Procedures that, in the Debtors' business judgment, constitutes the highest or best offer, in either case, free and clear of all claims, encumbrances, liens, and other interests; and

  (b)  for such other and further relief as the Debtors may show themselves justly entitled.

DATED: September 10, 2018     Respectfully submitted by:

           */s/ Marcus A. Helt*
           Marcus A. Helt (TX 24052187)
           C. Ashley Ellis (TX 00794824)
           **FOLEY GARDERE**
           **FOLEY & LARDNER LLP**
           2021 McKinney Avenue, Suite 1600
           Dallas, TX 75201

Telephone:  214.999.3000
Facsimile:  214.999.4667

**PROPOSED COUNSEL TO DEBTORS
REAGOR-DYKES MOTORS, LP *et al.***

### CERTIFICATE OF SERVICE

I hereby certify that, on September 10, 2018, a true and correct copy of the foregoing document was served electronically by the Court's PACER system, and in the form and manner as set forth hereinabove.

*/s/ Marcus A. Helt*
Marcus A. Helt