Susan N.K. Gummow (admitted Pro Hac Vice)
Igor Shleypak (admitted Pro Hac Vice)
FORAN GLENNON PALANDECH PONZI & RUDLOFF P.C.
222 N. LaSalle St., Ste. 1400
Chicago, IL 60601
Tel: (312) 863-5000
Fax: (312) 863-5099
Email: sgummow@fgppr.com
       ishleypak@fgppr.com

Tommy J. Swann
State Bar No. 19552820
Michael S. Uryasz
State Bar No. 24082440
MCCLESKEY, HARRIGER, BRAZILL & GRAF, LLP
501 University Ave, 5th Floor
Lubbock, Texas 79413
Tel: (806) 796-7340
Fax: (806 796-7365
Email: tswann@mhbg.com
       muryasz@mhbg.com

*Counsel for Universal Underwriters Service Corporation*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBBOCK DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **REAGOR-DYKES MOTORS, LP et al,**[1] | § | **Case No. 18-50214-rlj11** |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |

### MOTION FOR RULE 2004 EXAMINATION (DOCUMENTS ONLY) OF DEBTORS

Universal Underwriters Service Corporation (hereinafter "Universal") hereby respectfully requests that this Honorable Court enter an order permitting a Fed. R. Bankr. P. 2004 examination, for documents only, with respect to Reagor-Dykes Motors, LP and its affiliated debtors and debtors-in-possession in the above captioned bankruptcy proceeding (collectively the "Debtors"). Pursuant to Local Rule 2004-1, counsels for Universal have reached out to counsel for the Debtors.

---

[1] Per court order, this case is jointly administered with In re Reagor-Dykes Imports, LP (Case No. 18-50215), In re Reagor Amarillo, LP (Case No. 18-50216), In re Reagor-Dykes Auto Company, LP (Case No. 18-50217), In re Reagor-Dykes Plainview, LP (Case No. 18-50218), and In re Reagor-Dykes Floydada, LP (Case No. 18-50219).

Despite numerous requests, counsel for the Debtors has been unable to provide Universal with the requested documents. At this time, counsel for Universal believes that the mere production of the requested documents will be sufficient, however, in event that examination of the Debtors will be necessary, Universal reserves its right to supplement this request.

In support of this motion, Universal respectfully submits the following:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory basis for the relief requested herein is Bankruptcy Rule 2004.

## BACKGROUND

2. The Debtors own and operate a business of selling and leasing motor vehicles to retail customers. As part of said business, the Debtors offers its consumers a number of protection products sold in conjunction with the sale of motor vehicles. These products include, but are not limited to, vehicles services contracts, debt cancellation contracts, theft deterrent contracts, and limited warranty contracts (hereinafter, the "Products").

3. The Products, however, are not provided or administered by the Debtors. Rather, Universal provides and administers the Products per the F&I Master Dealer Agreement made by the Debtors and Universal on or about June 15, 2016, attached hereto as Exhibit A (hereinafter, the "Agreement").

4. The Agreement granted the Debtors authority to solicit the sale of Universal's Products. Agreement ¶ 3. Once one or more of the Products were sold, a contract was formed between the customer and Universal. The Debtors were under strict guidelines as to what can be included in said contract. Agreement, ¶ 2.

5. The amounts that the Debtors collected from their customers from the sale of the Products were referred to as the "Remit." Agreement, ¶ 2. The Debtors were to hold the Remit in trust on behalf of Universal. Specifically, paragraph 5.D of the Agreement provides that the Debtors were required "[t]o hold all funds received on behalf of [Universal] in a fiduciary capacity. Under no circumstances will [the Debtors] make any personal or other use of funds. . . . Nothing shall be held to waive assertion of the fiduciary relationship as to funds collected by [the Debtors]."

6. Per the Agreement, the Debtors maintained an electrical submission system which the Debtors used to transmit the Remit and which Universal could use to verify the Products sold. Since the Debtors filed for Chapter 11 bankruptcy, this system has been turned off and Universal has no means of ascertaining or verifying 1) if its Products were sold, 2) the amount of the Remit, and 3) whether customers have requested a cancellation of the Product and refund of the purchase price.

7. On August 01, 2018, the Debtors filed their bankruptcy petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*

8. On August 02, 2018, the Debtors brought a motion, on an emergency basis, seeking approval to use certain cash collateral. Dkt. 8.[2] On August 8, 2018, the Court granted the Debtors authority to use cash collateral on an interim basis through August 16, 2018. Dkt. 30 ("First Interim Order"). The Court later granted three extensions of the use of cash collateral: 1) through August 30, 2018, Dkt. 134 ("Second Interim Order"), 2) through September 18, 2018, Dkt. 192 ("Third Interim Order"), and 3) through October 19, 2018[3] ("Fourth Interim Order," and, together with the Second Interim Order and Third Interim Order, the "Cash Collateral Orders").

---

[2] All docket references refer to docket entries made in the main bankruptcy case, 18-50214-rlj11.
[3] As of the date of this motion, the fourth interim order had yet to be entered, however it is Universal's belief that the fourth interim order will have terms similar to the other Cash Collateral Orders.

9. The Cash Collateral Orders allowed the Debtors to collect and use Ford Motor Credit Company, LLC's ("Ford") cash collateral and in return Ford will be provided adequate protection, including remittance of certain sale proceeds, payment of amounts due under Ford's loan, a replacement lien on all of the Debtors' assets, both currently existing or after acquired, and granting Ford an administrative priority claim to the extent necessary. *See* Dkt. 30, ¶¶ 3-6; Dkt 134, ¶¶ 3-6; Dkt. 192, ¶¶ 3-6.

10. After the Court granted the First Interim Order, Universal brought a limited objection to the Debtors' use of cash collateral. Dkt. 44. While Universal had no objection to the Debtors' use of Ford's cash collateral, Universal nonetheless wanted to ensure that the Remit was not included within the scope of any cash collateral order.

11. To that end and by agreement of the parties, the Cash Collateral Orders included the following language: "To the extent funds held by the Debtor are determined to be held by the Debtor on behalf of or in fiduciary capacity for Universal as the sole property of Universal and not property of the Debtor's estates, then said funds ("Universal Claimed Funds") are expressly excluded from the scope and effect of this Interim Order." Dkt. 134, ¶ 18; Dkt. 192, ¶ 18.

12. Universal acted under the belief that the Remit (or the "Universal Claimed Funds" as it is described in the Second Interim Order") was maintained by the Debtors in a segregated account. However, after discussions with Debtors' previous counsel, Universal learned that the Remit was not segregated, but rather incorporated into the Debtors' general operating account (the "Operating Account").

13. It is Universal's belief that this is the same account which the Debtors are using to fund their ongoing operation through their bankruptcy proceeding, as well as the account containing funds that Ford claims to be its cash collateral. Universal has asserted, and continues to assert, that

said funds are not property of the Debtors' bankruptcy estate. However, Universal requires information from the Debtors regarding the funds that the Debtors collected from the sale Universal Products.

14. Universal's need of these documents now more than ever given the Court's September 20, 2018 Order (I) Authorizing and Approving: (A) Bid Procedures; (B) Stalking Horse Bidder and Overbid Protections; and (C) Form and Manner of Notices; and (II) Scheduling an Auction and Sale Hearing, Dkt. 296 ("Sales Procedure Order"), which, amongst other relief, set forth the procedure by which the Debtors contemplate assuming and assigning executory contract. Universal needs these documents to verify the cure amounts in event the Agreement is to be assumed and assigned, and to make objections to the cure amount if necessary.

15. Given the complexities of this case, the allegations that have been asserted by other parties, and the scope of Universal's request, it is understandable that it would take some time for the Debtors compile and provide Universal with the requested documents. However, it has been over two months since Universal initially reached out to the Debtor and nothing has been produced.[4]

16. To ensure that its rights are preserved and that it can comply with the deadlines set forth in the Sales Procedure Order, Universal now brings this motion seeking an order requiring the production of certain documents by the Debtors pursuant to Fed. R. Bankr. P. 2004.

## **ARGUMENT**

17. Rule 2004 of the Federal Rules of Bankruptcy Procedures provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a). Under the Rule, the examination may relate "to the acts, conduct, or property or to the liabilities

---

[4] Universal reached out to Debtors' counsel on August 23, 2018. At the time, Debtors' counsel appeared amicable to Universal's request.

and financial condition of the debtor[.]" Fed. R. Bankr. P. 2004(b). Additionally, in the case of a Chapter 11 debtor, the examination "may also relate to the operation of any business . . . source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan[.]" *Id.* Rule 2004(c) also contemplates for the production of documents in connection with any examination.

18. Bankruptcy Rule 9016 makes Rule 45 of the Federal Rules of Civil Procedure applicable to bankruptcy cases such that a subpoena may be issued by the Court to require production of documents and to compel the attendance of witness to give testimony. Fed. R. Bankr. P. 9016.

19. Courts have interpreted the scope of this Rule broadly:

> The scope of Rule 2005 is unfettered and broad and the rule itself is peculiar to bankruptcy law and procedure because it affords few of the procedural safeguards that an examination under Rule 26 of the Federal Rules of Civil Procedure does. Examination under Rule 2004 are allowed for the purpose of discovering assets and unearthing frauds and have been compared to a fishing expedition.

*In re Table Talk*, 51 B.R. 143, 145 (Bankr. D. Mass. 1985) (citations and quotations omitted).

20. Universal's request fits squarely within Bankruptcy Rule 2004. Universal is a party in interest that entitled to information concerning the acts and conduct of the Debtors in regards to property that the Debtors held in a fiduciary capacity for Universal. The Debtors possess information and documents necessary to determine the location and accounting of the Remit belonging to Universal. Universal has argued that these amounts are not property of the Debtors estate. The information requested by Universal is crucial to ensure a) that the Remit is readily located, b) that these funds are not being used in a manner in contravention of the Cash Collateral Orders, c) that the Remit not used in manner in contravention to the Agreement, d) verify whether further Products have been sold and/or whether Products have been cancelled by consumers, and

e) to allow Universal to ascertain and verify the "cure amounts" in event that the Agreement will be assumed and assigned per section 365 of the Bankruptcy Code.

21. Based on the foregoing, cause exists to permit Universal to subpoena the following documents from the Debtors:

    i.    List of all bank accounts held by the Debtors.

    ii.    All bank records for said accounts for the 60 days preceding filing of the bankruptcy petition, which indicate all transactions made in that time period.

    iii.    All records, documents, or evidence of Universal Products sold within the 60 days preceding filing and all sales post-petition.

    iv.    All records, documents, or evidence of deposit of proceeds from the sale of Universal Products within the 60 days preceding the filing of the bankruptcy petition.

    v.    All records, documents, or evidence of deposit of proceeds from the sale of Universal Products made post-petition.

    vi.    Accounting of all bank accounts open as of the petition date and the amounts contained therein.

    vii.    List of all Universal products that were cancelled by consumers within 60 days preceding the filing of the bankruptcy petition, as well as any post-petition cancellations.

    viii.    Documentation demonstrating or evidencing Debtors compliance with the funding requirement for Universal Products cancelled within 60 days preceding filings and any post-petition cancellations.

22. Given the amount of time that has transpired since Universal first requested documents from the Debtors, and the looming deadlines as set forth in the Sales Procedure Order, Universal requests that production be made on or before November 9, 2018.

## NOTICE

23. Notice of this Motion was provided to the Debtor, the United States Trustee, and all parties that are receiving notifications via ECF. Universal respectfully submits and requests that no further notice is or should be required.

## CONCLUSION

WHEREFORE, Universal respectfully requests entry of an order granting the application its entirety; authorizing Universal to examine the Debtors pursuant to Fed. R. Bankr. P. 2004; authorizing Universal to subpoena the proposed documents from the Debtors pursuant to Fed. R. Bankr. P. 2004; and, granting such further and additional relief as deemed warranted by the Court.

Dated: October 30, 2018

Respectfully Submitted,

FORAN GLENNON PALANDECH PONZI & RUDLOFF P.C.

By: /s/ Susan N.K. Gummow
Susan N.K. Gummow (admitted Pro Hac Vice)
Igor Shleypak (admitted Pro Hac Vice)


MCCLESKEY, HARRIGER, BRAZILL & GRAFF, LLP

By: /s/ Michael S. Uryasz
Tommy J. Swann, State Bar No. 19552820
Michael S. Uryasz, State Bar No. 24082440

*Counsels for Universal Underwriters Service Corporation*

# EXHIBIT A



# F&I Master Dealer Agreement

Universal Underwriters Service Corporation
7045 College Boulevard, Overland Park, Kansas 66211-1523

## F&I MASTER DEALER AGREEMENT

This F&I Master Dealer Agreement ("Agreement"), made and entered into and effective this **15** day of _June_____, 20 **16** among and between Universal Underwriters Service Corporation, whose principal office is located at 7045 College Boulevard, Overland Park, Kansas 66211 (hereinafter referred to as "Company") and _Reagor Auto Mall, LTD_____ whose principal address is 1211 19th Street, Lubbock, Texas 79401_____ ("Dealer"), along with the enrolled affiliated and/or subsidiary dealerships set out on Exhibit A, as updated from time to time, attached hereto and incorporated herein by reference.

WHEREAS, Company provides or administers a number of products sold in conjunction with automobile and other motor vehicle sales to consumers and businesses, including but not limited to vehicle service contracts, debt cancellation contracts, theft deterrent contracts, road hazard protection contracts, maintenance plan contracts and limited warranty contracts (hereinafter individually a "Product" and collectively, "Products"); and

WHEREAS, Dealer desires to offer one or more of the Products to its customers.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, it is agreed by Company and Dealer as follows:

1. **PRODUCT SELECTIONS**

   The Products that Dealer elects to offer must be indicated on Exhibit B and any amendments to Exhibit B. Dealer may add Products at a later date by requesting the applicable Product Schedule(s) from Company which may include Product-specific terms and conditions.

2. **DEFINITIONS**

   "Contract" means the Product agreement of which terms include, but not limited to, the identity of the entity obligated to provide benefits to the customer, the type and amount of coverage that is warranted upon purchase of the Product, the length in time of the coverage, the limitations of the coverage and the manner in which a claim must be made.

   Provided that in each case such Contract:

   i.   is solicited by Dealer on a Contract form previously approved by Company;
   ii.  is issued on a vehicle, loan or lease eligible for coverage according to the qualifications specified and approved by Company, and issued in accordance with this Agreement; and
   iii. has been approved and accepted by Company.

   "Remit" means the amount paid by Dealer to Company for each Contract issued under this Agreement and shall be based on Company's most recent Remit schedule with the most current edition date or the electronic rating tool, exclusive of any amounts that Dealer has designated to be added to the Remit Schedule.

   "Product Schedule" means a Product-specific schedule to this Agreement identifying one or more Products and containing any additional Product-specific terms.

3. **APPOINTMENT AND AUTHORITY**

   Company hereby grants authority to Dealer to solicit the sale of Contracts on behalf of Company provided the vehicle, loan or lease meets the eligibility requirements prescribed at the time of sale. The Dealer may fill in the blank spaces on the forms in accordance with the Company requirements, but shall not have the power to supplement, modify or waive the applicability of the terms and conditions thereof.

   Dealer shall act as an independent contractor. Dealer shall be responsible for obtaining any authorization or approvals to conduct business for each Contract type selected in Exhibit B in all states where Dealer transacts such business. Nothing contain herein shall be construed to create the relationship of employer and employee between Company and Dealer nor to grant an exclusive agency. The sale of Contracts to other resellers, dealers or Dealer's affiliates is strictly prohibited. Dealer shall only solicit Contracts in face-to-face transactions from Dealer's physical dealership locations, and shall not market or sell Contracts using any websites or mail order catalogs without Company's prior written consent. Dealer has no relationship with or authority to bind Company other than specifically provided in this Agreement.

## 4. COMPANY AGREES

A. To obtain and maintain in force insurance protection to cover all sums that are legally payable by the obligor of the Contract under the terms of in force Contracts sold or provided by Dealer under this Agreement.

B. To install, maintain and administer an approved Contract program.

C. To furnish Dealer with Contract forms, registers, remit schedules, manuals, program materials, advertising material, promotional materials and such other forms as necessary in the quantities needed.

D. To administer Contract programs according to the terms and conditions of the Contract, this Agreement, and the claim adjustment instructions and policies of Company. Company reserves the right to adjust, settle, compromise and negotiate any claim arising from any Contract sold under this Agreement.

E. To promptly refund to Dealer any unearned portion of Company's Remit in the event of cancellation of an in force Contract.

F. To hold harmless, indemnify and defend Dealer against all claims, demands and actions for loss, damage, costs and expenses (including attorney's fees) to the extent caused by the negligent act, error or omission of Company or its employees, as any such claim, demand or action relate to alleged regulatory non-compliance of the program and/or claim administration unless Dealer is implicated in any wrongdoing.

## 5. DEALER AGREES

A. To perform faithfully in every way its duties under this Agreement and as instructed by Company or any governmental agency having supervisory authority over the transaction of Contract business, including but not limited to, the compliance with all requirements pertaining to the collection, dissemination and disclosure of information deemed private under the Gramm-Leach-Bliley Act and other federal and state authority, and any duties imposed by Company pertaining to such information.

B. To keep true and complete records and accounts of all transactions with Contract holders, including signed copies of Contracts, for a period of not less than three (3) years after the latest expired term of the Contracts sold by Dealer pursuant to this Agreement, which shall be open at all reasonable times to the inspection of duly authorized representatives of Company.

C. To transmit to Company within ten (10) days after the close of each month (unless unnecessary due to Dealer's use of an electronic business submission system):

   1) a listing, on Company supplied registers, of all Contracts sold by Dealer during the preceding period;
   2) the Company's copy of the completed Contracts sold;
   3) all voided or spoiled Contracts; and
   4) the amount of the Remit due Company for each Contract listed on the registers.

D. To hold all funds received on behalf of Company in a fiduciary capacity. Under no circumstances will Dealer make any personal or other use of funds. The keeping of an account with Dealer on Company books as a creditor and debtor account is declared a record memorandum of business transacted. Nothing shall be held to waive assertion of the fiduciary relationship as to funds collected by Dealer.

E. To hold harmless, indemnify and defend Company, its parent company and related companies, their directors, officers, attorneys or agents, and its employees and representatives against all claims, demands and actions for loss, damage, costs and expenses (including attorney's fees) caused by the act, error or omission of Dealer or its employees, or resulting from acts of Company performed at the request of Dealer or its employees.

F. That in the event of cancellation or other reduction in the purchase price of a Contract, to immediately refund to contract holder or to lienholder, if applicable, the unearned purchase price less any applicable cancellation or service fee. After making the refund to the contract holder or lienholder, as applicable, Dealer shall obtain reimbursement from Company the unearned portion of the Remit for such cancellation.

G. To comply with all applicable laws and regulations and to maintain any required licenses in good standing. Dealer agrees to comply with any state regulation or Company filed rate limiting Dealer's retail mark-up and in no event will Dealer charge a rate that would be considered legally excessive, predatory or discriminatory by any state or federal regulator.

H. To be solely responsible for the collection and remittance - to the respective states' Department of Revenue (or similar title denoting sales tax collection) - of any sales or use tax or other applicable fees or taxes due on all Contracts issued by Dealer under this Agreement.

## 6. INSPECTION AND AUDIT

The Company may examine and audit Dealer's books and records, including signed copies of Contracts, at any time during the term of this Agreement and for a period of three (3) years after the expired term of the last Contract issued by Dealer, as far as they relate to the subject matter of this Agreement.

### 7. ASSISTANCE AND COOPERATION OF DEALER

Dealer shall fully cooperate with Company, and upon its request, shall make vehicles, repair records, and parts available for inspection by the Company. In the event of litigation or other legal proceedings, Dealer agrees to assist Company, including but not limited to, attending hearings, depositions, mediations, arbitrations and trials, assisting in making settlements, securing and giving evidence, or obtaining the attendance of witnesses.

### 8. REPAIR DESIGNATION

Dealer acknowledges that Company or the Contract holder may designate other repair facilities to provide repairs and replacements under Contracts without Dealer's consent or remuneration to Dealer. If the vehicle is repaired by a repairer other than Dealer, Company may settle directly with that repairer or with the Contract holder named on the Contract.

### 9. CLAIMS

Company agrees to process all undisputed claims within a reasonable time upon the receipt of claim documentation and any other documentation that Company may reasonably request. Company shall not be obligated to make any reimbursement under this Agreement unless Dealer or Dealer's designated repair facility has fully complied with all the terms of this Agreement and the Contract. However, in no event shall Dealer initiate an action for reimbursement against Company any earlier than ninety (90) days from the date of receipt of claim documentation by Company.

### 10. SUPPLIES

All Contract forms and supplies furnished by Company to Dealer shall remain the property of Company and shall be returned to Company promptly upon request.

### 11. ADVERTISING

Dealer shall not advertise in any media, nor shall Dealer issue or circulate any pamphlet, booklet, advertising or other printed matter unless specifically authorized by Company. The Dealer also agrees to not advertise or solicit Contract sales to the general public via electronic means or otherwise unless specifically authorized by Company.

### 12. COMPANY TRADEMARKS AND INTELLECTUAL PROPERTY

Dealer acknowledges that Company (including for purposes hereof Company's affiliates) has exclusive ownership rights and retains such rights to all trademarks, servicemarks, logos, brands in connection with the Company's Products. Dealer may not use any of Company's trademarks, servicemarks, logos, brands, without Company's prior written consent. Dealer shall not remove or destroy any of Company's copyright notices, trademarks, servicemarks, or other proprietary markings on Contracts, Product documentation or other materials relating to the Products without Company's prior written approval.

### 13. LIMITATION OF LIABILITY

Company's total liability arising out of or relating to this Agreement shall be limited to the actual amounts paid by Dealer to Company, where applicable, for the Products which may give rise to such damages, and shall in no event include loss of profits, cost of procuring substitute goods or services or any incidental, indirect or consequential damages of any kind, even if Company is aware of the possibility of such damages.

### 14. COLLECTION OF TAXES

Dealer agrees to be solely responsible for the collection and remittance - to the respective states' Department of Revenue (or similar title denoting sales tax collection) - of any sales or use tax or other applicable fees or taxes due on all Contracts issued by Dealer under this Agreement.

### 15. EXPENSES

Company shall not be responsible for any expenses of Dealer including, but not limited to: rentals, transportation, facilities, clerk hire, solicitors' fees, attorneys' fees, postage, advertising, local license fees, taxes or any other expenses of whatever kind or description.

### 16. CHANGES

No Dealer may alter, waive, modify or discharge this Agreement or any condition of any Contract except by written agreement of Company, signed by an authorized representative. Company may modify the Contract, rate and Remit schedule, vehicle eligibility, and rate classifications or any provision of this Agreement at any time upon written notice to Dealer. As each change is put into use, it shall replace that which was previously used.

### 17. RIGHT TO OFFSET

Dealer agrees and authorizes Company to automatically offset any amounts payable to Dealer against amounts that Dealer or its affiliates may owe Company or its parents, its affiliates and subsidiaries, including but not limited to Dealer's or its affiliates' continuing liability for any refunds. Any collection costs and expenses incurred by Company

in its collection efforts, including but not limited to reasonable attorneys' fees, shall be fully borne by Dealer.

## 18. TERMINATION

A. Dealer's authority under this Agreement, and/or any Product Schedule(s), shall cease upon termination of this Agreement or the affected Product Schedule(s), as the case may be. This Agreement, or any Product Schedule(s), may be terminated at any time by either Party hereto, upon written notice to the other Party stating when such termination shall be effective.

B. This Agreement shall terminate automatically, without notice, in the event of any of the following:

   1) Dealer's authority to engage in Contract sales is terminated or suspended by any governmental entity with authority to regulate the business of Dealer; or

   2) the filing by Dealer of a voluntary petition in bankruptcy or the execution of Dealer of an assignment for the benefit of creditors; or

   3) the filing of a petition to have Dealer declared bankrupt which is not vacated within thirty (30) days; or

   4) the appointment of a receiver or trustee for Dealer, provided such appointment is not vacated within thirty (30) days; or

   5) upon sale or transfer of the majority interest of Dealer's business or its consolidation with a successor; or

   6) upon fraud, insolvency, willful misconduct, or breach of any of the terms of this Agreement.

C. This Agreement, or any Product Schedule(s), may be terminated upon written notice to Dealer at the election of Company, if Dealer fails to include the Remit due Company with Dealer's required reporting of Contract transactions as provided in Section 5C.

D. Notwithstanding the foregoing, (i) termination of less than all Dealers shall only terminate such terminating or terminated Dealer's participation in this Agreement, and not the Agreement itself; (ii) termination of less than all Product Schedules shall only terminate such terminating or terminated Product Schedule(s), and not the Agreement itself; and (iii) this Agreement may be terminated immediately by Company if Dealer violates any applicable law or lawful regulation of any duly constituted authority, or fails to fulfill any of its material obligations under this Agreement.

E. Upon termination of this Agreement, and/or any Product Schedule(s), Dealer shall promptly account for and pay to Company all Remits due Company upon Contracts sold or provided by Dealer. Dealer further agrees to continue to render the Dealer's services provided for in the Product Schedule(s). Dealer agrees and acknowledges its continuing liability to immediately make refunds to the Contract holder, or if applicable, the lienholder, on cancelled Contracts, for and during the term of all Contracts issued by Dealer.

F. Dealer further agrees, upon termination of this Agreement, to return by delivery to Company or, if requested, to its authorized representative, all property, unused Contracts and Company supplies furnished by the Company to Dealer. In the event the unused Contracts or cancelled Contracts cannot be accounted for by Dealer, Dealer hereby agrees to indemnify, defend and save Company harmless from any and all claims, demands, and liabilities whatsoever on said Contracts, including reasonable attorney's fees.

For as long as there shall be any unexpired term of Contracts sold pursuant to this Agreement, the following provisions shall survive termination of this Agreement:  Sections 4A, D & E, 5A, F & G, 6 – 9, 17, 18E & F and 19-22. The following provisions survive termination of this Agreement for the longest statute of limitation period applicable to this Agreement or applicable to any cause of action that may arise from the Contracts sold by Dealer: Sections 5B and E.

## 19. ARBITRATION

Any dispute arising out of the interpretation, performance or breach of this Agreement shall be submitted to arbitration, in the city, county where the Dealer is located and/or the city, county where such Contract was sold.  The parties agree that in addition to deciding any controversy or claim arising out of this Agreement, the arbitrator(s) shall decide all threshold issues regarding the validity of this arbitration clause or any questions regarding the arbitrability contemplated herein of any dispute or controversy.  This arbitration shall be conducted pursuant to the arbitration rules that the parties agree to in writing.  The cost of the arbitration shall be borne equally between the parties.  If Company has reason to believe that the Dealer has engaged in fraud, Company has the discretion to proceed in the State or Federal Courts of Kansas.

## 20. LEGAL PROCEEDING

Dealer shall not undertake any legal proceeding against any Party other than the Company pertaining to a Contract without the written consent of an executive officer of Company.

Except as otherwise provided in Section 18E & F or 19, in the event of suit or other legal proceedings, the unsuccessful party agrees to pay all costs, including reasonable attorney fees and expenses, to the prevailing party.

This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Kansas without giving any effect to its conflict of laws principles.  Any lawsuit filed by either party against other arising from

this Agreement shall be filed in the state or federal courts in and for Johnson County, Kansas.

21. **THIS AGREEMENT**

This Agreement shall not be assignable by either Party, except with the written consent of the other party. This Agreement shall be binding upon, inure to the benefit of, and shall be enforceable by the heirs, executors, administrators, personal representatives, trustees, and successors of the respective Parties hereto.

The failure of Company to exact strict compliance with the terms and conditions of this Agreement or failure to declare any default hereunder when same shall become known to Company shall not operate as a waiver of such terms and conditions or release Dealer from the obligation to perform this Agreement strictly in accordance with its terms and conditions.

If any one or more of the provisions of this Agreement is held invalid for any reason, such provisions shall be severed from the Agreement and shall not affect in any way the remaining provisions.

This Agreement and any amendment hereto may be executed in counterparts and by each party hereto on a separate counterpart, each of which, when so executed and delivered shall be an original, but all of which together shall constitute but one and the same instrument. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought. Additionally, the parties acknowledge and recognize that an electronically reproduced signature shall be similarly treated and recognized as an original signature.

This Agreement supersedes all previous agreements whether written or oral between Company and Dealer and this Agreement may not be altered or amended except in writing as provided for in this Agreement.

22. **DEALER(S) SIGNING AUTHORITY; JOINT AND SEVERAL DEALER LIABILITY**

The undersigned Dealer(s) represents and warrants that he/she is authorized, with requisite authority, to sign this Agreement on behalf of each dealership listed on attached Exhibit A, if applicable, and any dealerships hereafter acquired, with the intention to bind each Dealer entity listed on Exhibit A to this Agreement (including for purposes hereof all 'in force' schedules and related documents), jointly and severally. Consequently, each Dealer shall be jointly and severally liable for all Dealer obligations under the Agreement including without limitation collection costs and reasonable attorney fees and costs.

IN WITNESS WHEREOF, Company and Dealer by their respective representatives have caused this Agreement to be executed.

Dealership Legal Entity Name (from page 1): Reagor Auto Mall, LTD

Corporate Officer Signature: _____

Corporate Officer Title: CFO _____ Date: 06/09/2016

Witness to Signature: _____

(Attach Exhibit A of affiliated and/or subsidiary dealerships with corporate officers' signatures.)

Company: UNIVERSAL UNDERWRITERS SERVICE CORPORATION

Company Representative Signature: Kathi Ingha _____

Company Officer Title: _____ Date: 7/1/31/6

Witness to Signature: Kim Hernandez _____

**Exhibit A**: List of Affiliated and Subsidiary Dealerships

Effective on Original Agreement Date if Date of Enrollment is blank, or Date of Enrollment.

Dealer group name: Reagor Dykes Auto Group

| | | Date of Enrollment | Date of Cancellation |
|---|---|---|---|
| Dealership Legal Name: | Reagor-Dykes Motors, L.P. ✓ | 06/20/2016 | |
| dba (if applicable): | Reagor Dykes Auto Mall of Midland | | |
| Address: | 2200 W. Wall Street | | |
| City/State/Zip: | Midland, TX 79701 | | |
| Federal Tax ID: | 20-5922264 | | |
| Corporate Officer Title: | CFO | | |
| Corporate Officer Signature: | | | |

| | | Date of Enrollment | Date of Cancellation |
|---|---|---|---|
| Dealership Legal Name: | Reagor Dykes Auto Company, L.P. ✓ | 06/20/2016 | |
| dba (if applicable): | Reagor Dykes Ford Lincoln | | |
| Address: | 808 N. IH 27 | | |
| City/State/Zip: | Plainview, TX 79072 | | |
| Federal Tax ID: | 27-1878703 | | |
| Corporate Officer Title: | CFO | | |
| Corporate Officer Signature: | | | |

| | | Date of Enrollment | Date of Cancellation |
|---|---|---|---|
| Dealership Legal Name: | Reagor-Dykes Imports, L.P. ✓ | 06/20/2016 | |
| dba (if applicable): | Reagor-Dykes Mitsubishi Lubbock | | |
| Address: | 6540 82nd Street | | |
| City/State/Zip: | Lubbock, TX 79424 | | |
| Federal Tax ID: | 27-1878497 | | |
| Corporate Officer Title: | CFO | | |
| Corporate Officer Signature: | | | |

| | | Date of Enrollment | Date of Cancellation |
|---|---|---|---|
| Dealership Legal Name: | Reagor-Dykes Amarillo, L.P. ✓ | 06/20/2016 | |
| dba (if applicable): | Reagor-Dykes Mitsubishi Amarillo | | |
| Address: | 4710 Canyon Drive | | |
| City/State/Zip: | Amarillo, TX 79109 | | |
| Federal Tax ID: | 46-2877716 | | |
| Corporate Officer Title: | CFO | | |
| Corporate Officer Signature: | | | |

**Exhibit A:** List of Affiliated and Subsidiary Dealerships

Effective on Original Agreement Date If Date of Enrollment is blank, or Date of Enrollment.

Dealer group name: Reagor Dykes Auto Group

|  |  | Date of Enrollment | Date of Cancellation |
|---|---|---|---|
| Dealership Legal Name: | Reagor-Dykes Plainview, L.P. ✓ | 06/20/2016 | |
| dba (if applicable): | Reagor-Dykes Toyota | | |
| Address: | 1220 South IH 27 | | |
| City/State/Zip: | Plainview, TX 79072 | | |
| Federal Tax ID: | 46-3969779 | | |
| Corporate Officer Title: | CFO | | |
| Corporate Officer Signature: | | | |

|  |  | Date of Enrollment | Date of Cancellation |
|---|---|---|---|
| Dealership Legal Name: | Reagor-Dykes Floydada, L.P. ✓ | 06/20/2016 | |
| dba (if applicable): | Reagor-Dykes Chevrolet | | |
| Address: | 221 S. Main Street | | |
| City/State/Zip: | Floydada, TX 79235 | | |
| Federal Tax ID: | 47-4241887 | | |
| Corporate Officer Title: | CFO | | |
| Corporate Officer Signature: | | | |

|  |  | Date of Enrollment | Date of Cancellation |
|---|---|---|---|
| Dealership Legal Name: | Reagor Auto Mall, LTD. ✓ | 06/20/2016 | |
| dba (if applicable): | Reagor Dykes Direct Auto of Dallas | | |
| Address: | 16280 Midway Road | | |
| City/State/Zip: | Addison, TX 75001 | | |
| Federal Tax ID: | 20-0275022 | | |
| Corporate Officer Title: | CFO | | |
| Corporate Officer Signature: | | | |

|  |  | Date of Enrollment | Date of Cancellation |
|---|---|---|---|
| Dealership Legal Name: | Reagor-Dykes Imports, L.P. | 06/20/2016 | |
| dba (if applicable): | Reagor Dykes of South Lubbock | | |
| Address: | 10307 HWY 87 | | |
| City/State/Zip: | Lubbock, TX 79423 | | |
| Federal Tax ID: | 27-1878497 | | |
| Corporate Officer Title: | CFO | | |
| Corporate Officer Signature: | | | |

**Exhibit A:** List of Affiliated and Subsidiary Dealerships

Effective on Original Agreement Date if Date of Enrollment is blank, or Date of Enrollment.

Dealer group name: Reagor Dykes Auto Group

|  | | Date of Enrollment 06/20/2016 | Date of Cancellation |
|---|---|---|---|
| Dealership Legal Name: | Reagor Auto Mall, LTD | | |
| dba (if applicable): | | | |
| Address: | 1211 19th Street | | |
| City/State/Zip: | Lubbock, TX 79401 | | |
| Federal Tax ID: | 20-0275022 | | |
| Corporate Officer Title: | CFO | | |
| Corporate Officer Signature: | | | |

|  | | Date of Enrollment 06/20/2016 | Date of Cancellation |
|---|---|---|---|
| Dealership Legal Name: | Reagor Auto Mall, LTD. | | |
| dba (if applicable): | Reagor-Dykes of Levelland | | |
| Address: | 2379 E. State Road 114 | | |
| City/State/Zip: | Levelland, TX 79336 | | |
| Federal Tax ID: | 20-0275022 | | |
| Corporate Officer Title: | CFO | | |
| Corporate Officer Signature: | | | |

|  | | Date of Enrollment 06/20/2016 | Date of Cancellation |
|---|---|---|---|
| Dealership Legal Name: | Reagor Auto Mall, LTD.   Duplicate | | |
| dba (if applicable): | Prime Capital Auto Lease of Dallas | | |
| Address: | 16280 Midway Road | | |
| City/State/Zip: | Addison, TX 75001 | | |
| Federal Tax ID: | 20-0275022 | | |
| Corporate Officer Title: | CFO | | |
| Corporate Officer Signature: | | | |

|  | | Date of Enrollment 06/20/2016 | Date of Cancellation |
|---|---|---|---|
| Dealership Legal Name: | Reagor-Dykes Motors, L.P.   Duplicate | | |
| dba (if applicable): | Spike Dykes Ford Lincoln | | |
| Address: | 1700 Lubbock Highway | | |
| City/State/Zip: | Lamesa, TX 79331 | | |
| Federal Tax ID: | 20-5922264 | | |
| Corporate Officer Title: | CFO | | |
| Corporate Officer Signature: | | | |

Exhibit A

**Exhibit B**: Available Products

Dealer agrees to offer the Product(s) marked below:

Effective on Original Agreement Date if Date Added is blank, or Date Added with Signed Product Schedule.

| Product | Date Added | Canceled Date |
|---|---|---|
| ☒ VEHICLE SERVICE CONTRACT | 06/20/2016 | |
|    - Includes Service Payment Plan (SPP) | 06/20/2016 | |
|     ☒ LIMITED WARRANTY | 06/20/2016 | |
|      LIFETIME LIMITED WARRANTY | 06/20/2016 | |
|     ☒ SELECT CARE | 06/20/2016 | |
| | | |
| ☒ PREPAID MAINTENANCE | 06/20/2016 | |
|      PAC PROGRAM | 06/20/2016 | |
| | | |
| ☒ GUARANTEED ASSET PROTECTION | 06/20/2016 | |
| | | |
| ☒ ROAD HAZARD TIRE & WHEEL | 06/20/2016 | |
|      ROAD HAZARD TIRE & WHEEL LIMITED WARRANTY | 06/20/2016 | |
| | | |
|    UNIVERSAL SECURITY GUARD | 06/20/2016 | |
| | | |
| ☒ SELECT PROTECTION | 06/20/2016 | |
| | | |
| ☒ LEASE WEAR AND USE PROTECTION | 06/20/2016 | |

Dealer Initials: _____ Date: 06/09/2016

**Product Schedule**: VEHICLE SERVICE CONTRACT, LIMITED WARRANTY and LIFETIME LIMITED WARRANTY

The Product-specific terms and conditions set forth in this Product Schedule (hereinafter "Schedule") are in addition to, and not in lieu of, the terms and conditions of this Agreement. However, any language contained in the Agreement that specifically contradicts the language of the Schedule is amended to accommodate the language in this Schedule if possible or otherwise voided, for purposes of the specific product identified in this Schedule, but only to the most limited extent necessary and the language of this Schedule shall control.

The following additional terms and conditions apply if VEHICLE SERVICE CONTRACT, LIMITED WARRANTY or LIFETIME LIMITED WARRANTY was elected in Exhibit B of the Agreement:

1. **DEFINITION**
   Contract means a Vehicle Service Contract (hereinafter "VSC").

2. **DEALER AGREES**
   That prior to solicitation to sell a Contract, or in the case of a Limited Warranty to provide a Limited Warranty, on a vehicle, (i) that such vehicle has been inspected and all noted deficiencies from such inspection, if any, have been repaired or replaced and that written documentation remain on file of such inspection and repairs; (ii) that any necessary reconditioning has been completed by a competent mechanic; and (iii) that all parts are functioning properly at the time of sale. Company reserves the right to deny reimbursement to Dealer or repair facility for a Contract claim when it has been determined by Company that the condition existed prior to the purchase of the Contract. All used vehicles must also have an engine oil change, oil filter change, and a cooling system service (if applicable) prior to issuance of a Contract. Dealer further agrees that if Company in its sole discretion pays a claim on a vehicle that Dealer knew or should have known was ineligible at the time of sale, Dealer will reimburse company all costs, expenses and claim payments for that settlement.

3. **DEALER PROVIDED REPAIRS AND REPLACEMENT**
   A. When it has been determined that required repairs or replacements may be covered by a Contract, and the repairs or replacements are to be made by Dealer, Dealer will:
      1) run an oil consumption test consistent with factory requirements if excessive use of engine oil is reported. This should include obtaining manufacturer's standards of what is considered excessive oil consumption for the current mileage on the suspect engine;
      2) permit an inspection by Company before repairs are completed if requested by Company;
      3) determine that all claims submitted are for repairs to or replacement of only those covered items which have failed in accordance with the provisions of the Contract;
      4) determine the nature of repair and obtain Company authorization prior to commencing the repair work for any claim covered under the terms of the Contract which will exceed $500.00. Dealer acknowledges that it is not entitled to any reimbursement for non-covered claims of any amount, or for claims over $500.00 that have not been pre-authorized by Company;
      5) perform repairs and replacements in accordance with the instructions of the manufacturer of the vehicle;
      6) collect deductible, applicable taxes, and any charges not covered under the Contract, if any, from the Contract holder;
      7) send Company claim documentation within thirty (30) days after date of repair or replacement, attaching thereto the signed repair order, service receipts showing the recommended maintenance, and any receipts for substitute transportation and/or towing;
      8) unconditionally warrant all repairs or replacement for a period equal to the lesser of ninety (90) days or 4,000 miles; and
      9) act in accordance with the rules, standards or regulations issued by Company.

   Company shall have the right to refuse reimbursement for any claim when the procedures described above have not been followed.

   B. Dealer stipulates that the customer labor rate for which reimbursement is sought from Company under this Agreement shall be the ordinary and customary labor rate of the repair facility and that such rate shall not exceed the customary labor rate charged by comparable repair facilities in Dealer's trade area.
      1) Dealer agrees that, subject to coverage limits stated in the Contract, reimbursement for any repair or replacement for losses covered will be made on the following basis:
         Parts – The Manufacturer's Suggested Retail Price as published by the Manufacturer ("MSRP"). However, during the first thirty (30) days of coverage any parts reimbursement for any repair or replacement made by

Dealer under Service Contracts written on used vehicles will be made only on the basis of MSRP minus 25%.

Labor – Dealer's normal customer rate for labor, multiplied by the labor time not to exceed the time established by the publisher of a national labor estimate time guide previously approved by Company.

2) Any request from Dealer to change the retail labor rate will be made in writing to Company and will become effective only upon written acceptance by Company.

3) At Company's option, after this Agreement has been in effect twelve (12) months or after the termination of this Agreement, Company may elect to measure on a monthly basis Dealer's loss ratio, for Contracts generated by Dealer. For purposes of this subsection, (i) loss ratio is defined as the ratio of incurred losses divided by the earned portion of the Remit allocated for claims and claims adjustment expense, and (ii) incurred losses is defined as all amounts paid to meet the contractual obligations under Contracts since inception-to-date. This also includes allocated and unallocated costs incurred for the adjustment of such contractual obligations, plus certain amount for reserves designated for incurred but not reported and for claims in course of settlement.

In the event Dealer's cumulative loss ratio from inception-to-date on any and all Contract business written for Company is ninety-five (95%) or greater, upon receipt of written notice by Company, Dealer agrees to accept as reimbursement for future repairs or replacement adjusted as follows:

    (a) Parts will be made on the basis of MSRP minus 25%.

    (b) Labor - an amount not greater than the ordinary and customary customer labor rate as defined herein, multiplied by the "Manufacturer's Warranty Labor Time" as published in the Manufacturer's "suggested flat rate manual".

When Dealer achieves a cumulative loss ratio of ninety percent (90%) or lower, the reimbursement adjustments shall resume at the original levels for future repairs and replacements as set forth in paragraph Section 3B.1) of this section.

C. In the event of any payment under this Agreement, Company shall be subrogated to all the Dealer's rights of recovery therefor against any person or organization, and the Dealer shall execute and deliver instruments and papers and do whatever else is reasonably necessary to secure such rights. Dealer shall do nothing to prejudice such rights.

## 4. SURVIVAL

For as long as there shall be any unexpired term of Contracts sold pursuant to this Agreement, Section 2 of this Schedule shall survive termination of this Agreement.

In addition to Sections 1, 2, 3 and 4 of this Schedule, the following additional terms and conditions only apply if LIMITED WARRANTY was elected in Exhibit B of the Agreement:

## 5. DEALER AGREES

A. To appoint, and hereby does appoint, Company its attorney-in-fact for the purpose of obtaining and maintaining in force reimbursement insurance protection to cover all sums the Dealer is legally obligated to pay under the terms of in force Limited Warranties issued by Dealer.

B. To be solely responsible for the compliance of the Federal Trade Commission Used Car Rule, including, but not limited to, the placing of a Limited Warranty Buyer's Guide window label on all used cars offered for retail sale to Dealer's customers.

C. To provide Limited Warranty at no extra charge to all customers purchasing a vehicle prescribed by company as eligible.

D. To endeavor to upgrade every Limited Warranty to a VSC, except vehicle subject to Manufacturer's programs. Dealer shall have the sole discretion whether or not to offer a VSC to a customer.

E. To use only the forms supplied by the Company for the Limited Warranty program and to make no alterations on these forms, in particular the Limited Warranty used car label required by the Federal Trade Commission, without written approval from Company.

F. To endeavor to comply with any applicable state and federal laws, regulations, or other authority relating to the repair of used motor vehicles.

G. To acknowledge that Limited Warranties are non-cancelable once the sale of the vehicle is completed and warranty coverage begins.

In addition to Sections 2, 3 and 4 of this Schedule, the following additional terms and conditions only apply if LIFETIME LIMITED WARRANTY was elected in Exhibit B of the Agreement:

6. **DEALER AGREES**

   A. To appoint, and hereby does appoint, Company its attorney-in-fact for the purpose of obtaining and maintaining in force reimbursement insurance protection to cover all sums the Dealer is legally obligated to pay under the terms of in force Lifetime Limited Warranties issued by Dealer.

   B. To acknowledge that the Lifetime Limited Warranties issued by Dealer pursuant to this Agreement is not designed to and does not fully comply with all applicable federal and state laws and regulations relating to the sale of vehicles.

   C. To comply with all applicable federal and state laws and regulations relating to (i) the sale of vehicles, including but not limited to (a) Federal Trade Commission rules and regulations and (b) the respective states' used car disclosures, and (ii) the repair of motor vehicles.

   D. To provide Lifetime Limited Warranty at no extra charge to all customers purchasing a used vehicle prescribed by company as eligible.

   E. To use only the forms supplied by the Company for the Lifetime Limited Warranty program and to make no alterations on these forms, in particular the Lifetime Limited Warranty used car label required by the Federal Trade Commission, without written approval from Company.

   F. To endeavor to comply with any applicable state and federal laws, regulations, or other authority relating to the repair of used motor vehicles.

   G. To acknowledge that Lifetime Limited Warranties are non-cancelable once the sale of the vehicle is completed and warranty coverage begins.

Dealer Initials: _____ Date: 06/09/2016

**Service Schedule:** SERVICE CONTRACT FINANCING PROGRAM

The Service-specific terms and conditions set forth in this Service Schedule (hereinafter "Schedule") are in addition to, and not in lieu of, the terms and conditions of this Agreement. However, any language contained in the Agreement that specifically contradicts the language of the Schedule is amended to accommodate the language in this Schedule if possible or otherwise voided, for purposes of the specific service identified in this Schedule, but only to the most limited extent necessary and the language of this Schedule shall control.

The following additional terms and conditions apply if VEHICLE SERVICE CONTRACT was elected in Exhibit B of the Agreement:

WHEREAS, Dealer sells service contracts which are administered by Company.

WHEREAS, Dealer wishes to participate in an extended payment plan program (program) for service contracts which is offered by Service Payment Plan, Inc., (SPP) an Illinois corporation, having a principal place of business at 303 E. Wacker Dr., Suite 230, Chicago, Illinois 60601.

WHEREAS, Company wishes to allow Dealer to provide extended payment plans (plans) for customers purchasing the Dealer's service contracts administered by Company under the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the aforesaid recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

7.  DUTIES OF DEALER
    A.  Dealer will offer service contracts with plans to persons (Purchasers) purchasing automobiles, trucks, or vans only on forms which have been approved in writing by Company for use in SPP's program.
    B.  Dealer agrees to follow the policy and procedures set forth in the Dealer Guide Manual issued by Company, and to properly use and complete the forms provided by Company and any revisions or amendments thereto.
    C.  SPP shall receive for its services a fee (the "service fee", and sometimes referred to herein as the "SPP Fee"), which shall be paid by Dealer. The chart below sets for the fee schedule effective as of February 1, 2015.

| SPP Payment Plan Option | Fee Structure for Amount Financed | | | | Minimum terms of coverage |
|---|---|---|---|---|---|
| | $0.01-$999.99 | $1,000 -$1,699.99 | $1,700.00 - $2,699.99 | $2,700.00 - $10,000.00 | |
| 12-Month | $55 ($25 refund)* | 24 Months & 24,000 Miles | $170 ($70 refund)* | 7% of Amount Financed (50% refunded)* | 24 Months & 24,000 Miles |
| 18-Month | $85 ($35 refund)* | 36 Months & 36,000 Miles | $270 ($120 refund)* | 10% of Amount Financed (50% refunded)* | 36 Months & 36,000 Miles |
| *Refund by SPP to Dealer if service contract is cancelled before the 3rd installment payment | | | | | |

The size of the SPP Fee and the other operating procedures may be amended from time to time by SPP and Company, and generally shall be communicated to Dealer upon at least 30 days prior written notice to Dealer. If a particular service contract purchased with an SPP administered payment plan shall be cancelled, and if such cancellation shall occur prior to SPP receiving three installment payments from the Purchaser, then the SPP Fee shall not be fully earned and shall be reduced, as more particularly described in the chart above. For example, if the SPP payment plan is for 12 monthly installment payments and the amount financed is less than $1,700 and at least $1,000, then the SPP Fee is $50 instead of $115. If the cancelled SPP payment plan is for 12 monthly installments but the amount financed is $1,700 or greater, then the SPP Fee is $100. In all instances, if the cancellation shall occur after three payments shall be received by SPP, then the SPP Fee is deemed fully earned.

    D.  Upon acceptance by Company of a Purchaser's application for an Extended Payment Term contract, Dealer shall request and obtain at the time of purchase a minimum down payment of 10% of the purchase price for each said Extended Payment Term Contract sold. The amount financed must be equal to or greater than the sum of the Dealer Cost and the SPP Fee described in paragraph 1(C).
    E.  All Extended Payment Term Contracts sold by Dealer shall be reported to Company on forms approved by Company, on a weekly basis.

8. **DUTIES OF COMPANY**

Upon its receipt of the executed copy of the addendum to the Service Contract and all forms required by paragraph 1(B), Company shall send documents to SPP to receive the Dealer Cost from SPP.

9. **MONEY DUE DEALER**

On or about the 10th day of the month following the month in which the Purchaser has made the second (2nd) installment due under the plan, SPP agrees to remit to Dealer a check made payable to Dealer for the remaining funds due Dealer after deduction of the service fee. Although advanced to Dealer, this money shall not be earned by Dealer until the Purchaser has paid his account in full and therefore must be returned to SPP if the Service Contract is cancelled at any time before payment in full is received. Dealer agrees to look solely to SPP for money due dealer and not to Company or Insurance Company should SPP fail to pay Dealer. In the event Company ceases accepting new business from Dealer, SPP has agreed to pay Dealer on or about the 10th day of the month following the month in which Purchaser has made the final payment due under the plan after deduction of the service charge. SPP reserves the right to offset against any amount due Dealer any amount due SPP by Company on accounts of Dealer as a result of SPP not receiving a pro rata refund of the Dealer Cost from Company or Insurance Company on cancelled service contracts.

10. **CANCELLATION**

In the event that an Extended Payment Term Contract is cancelled at the request of the Purchaser or SPP (for reasons of nonpayment of monies due and owing on said contract or any other valid reason affecting a termination), Dealer shall refund SPP, the amount advanced under paragraph 1(D) based on the following formula:

1) The amount financed and disbursed by SPP; less
2) Payments SPP received from the Purchaser; less
3) The unearned Dealer Cost received from Company; plus
4) The amount of Cancellation or Service Fee charged on the transaction, if any; plus
5) Unpaid Late Charges, if any.

Dealer hereby authorizes SPP to offset any cancellation refund due SPP from the amounts due Dealer under paragraph 4. Dealer shall be responsible for returning Purchaser's down payment should a refund be required.

11. **TERM/TERMINATION**

F. This Schedule shall commence as of the date shown, and shall continue for an indefinite period until terminated in the manner prescribed in this paragraph.

G. This Schedule may, at the option of Company, terminate immediately and without notice for cause upon the occurrence of any of the following events:

6) Dealer's assignment or attempted assignment of this Schedule or any portion of any interest in or any payment due under the Extended Payment Term Contracts without the expressed prior written consent of SPP and the Company;

7) The material breach of any provision contained within this Schedule; and

8) Dealer's acts of fraud, defalcation, dishonesty or intentional misrepresentation directed to Company, SPP, their agents or employees.

H. Dealer hereby agrees to indemnify and hold SPP free and harmless against any and all claims, actions, demands or liabilities arising out of any and all claims, actions, or demands, whether well founded or not, that may be asserted against SPP or its employees, agents, successors, or assigns by any Purchaser, or any third party, regarding the Service Contracts and performance by Dealer there under, including but not limited to any and all claims, actions, demands, liabilities for fraud, defalcation, dishonesty or intentional misrepresentation to the extent the same are also directed to SPP, its agents, employees, successors or assigns.

I. Dealer agrees, warrants and represents as follows:

"Dealer agrees and understands that the Purchasers are intended to receive interest-free extended payment terms, and therefore, it is a strict condition of this Schedule that each and every Purchaser shall be offered a Service Contract at one and the same price regardless of whether or not the Purchaser elects the Extended Payment Plan option and that no discount under any circumstances may be offered or made in any manner by reason of the Purchaser electing to waive the plan option.

In the event of a breach of this condition, Company, Insurance Company or SPP shall have the right to cancel this Schedule and withhold from funds due the Dealer monies sufficient to reimburse the Purchaser(s) having claims resulting from such breach.

Dealer hereby indemnifies and holds Company, Insurance Company and SPP, free and harmless against any

and all claims, actions, demands or liabilities including reasonable attorney fees, whether well founded or not that may be asserted against all or any of them or their respective agents, employees, successors or its assignees due to the breach of this representation and warranty by Dealer."

## 12. DEALER HOLD HARMLESS REGARDING UNREPORTED CONTRACTS

Dealer shall hold harmless, indemnify and defend Company, its employees, its agents and assigns against all claims, demands and actions for loss, liability, damage, cost and expenses (including attorney fees) caused by the act or omission to act of Dealer or its employees, which arise from any plan which is not reported to Company.

## 13. WARRANTIES AND REPRESENTATIONS REGARDING ACCOUNTS

For purposes hereof, the term "Account" shall mean the debtor/creditor relationship created when a Purchaser of a Service Contract purchases the service contract under the plan. For each Account assigned to SPP, Dealer hereby warrants and represents for the benefit of SPP, its successors and assigns as follows:

J.  The Account represents an undisputed bona fide transaction completed in accordance with the terms and provisions contained in the plan and other documents relating thereof and the amount shown as the unpaid balance of the Account is correct;

K.  There are no set off, counter claims or disputes existing or asserted with respect to Purchaser and Dealer has not made any agreement with any Purchaser for any deduction there from except as disclosed on the plan; and

L.  The Account is not subject to any prior assignment by Dealer, claim, lien or security interest against Dealer and Dealer will not make any further assignment thereof or create any further security interest therein, nor permit its right therein to be reached by attachment, levy, garnishment, or other judicial process.

M.  The Account arises from the sale of a Service Contract having the following terms:

9)  the remaining term of the Service Contract is two (2) years or more and 24,000 miles or more if the 12 monthly payments plan is utilized and three (3) years or more and 36,000 miles or more if the 18 monthly payments plan is utilized; and

10)  the Service Contract is for a new or pre-owned automobile, truck, or van.

Dealer Initials: _____ Date: 06/09/2016

<u>Product Schedule</u>: **PREPAID MAINTENANCE**

The Product-specific terms and conditions set forth in this Product Schedule (hereinafter "Schedule") are in addition to, and not in lieu of, the terms and conditions of this Agreement. However, any language contained in the Agreement that specifically contradicts the language of the Schedule is amended to accommodate the language in this Schedule if possible or otherwise voided, for purposes of the specific product identified in this Schedule, but only to the most limited extent necessary and the language of this Schedule shall control.

The following additional terms and conditions apply if PREPAID MAINTENANCE was elected in Exhibit B of the Agreement:

1.  **COMPANY AGREES**
    A.  To provide Prepaid Maintenance customers with an identification card and schedule of services for the term and service interval selected under the Prepaid Maintenance Contracts sold by Dealer.
    B.  To reimburse the Dealer the value of redeemed services by Prepaid Maintenance customers submitted to the Company by the Dealer according to the Service Reimbursement amount elected by Dealer at the time of Contact sale.

2.  **DEALER AGREES**
    A.  To provide listed maintenance services for no additional charge to Prepaid Maintenance customers as prescribed by the Prepaid Maintenance Contract, including the use of only those products meeting the quality specifications of the vehicle manufacturer.
    B.  To submit repair orders to the Company for reimbursement as Prepaid Maintenance services are provided for Prepaid Maintenance customers.

In addition to Sections 1 and 2 of this Schedule, the following additional terms and conditions only apply if PAC PROGRAM was elected in Exhibit B of the Agreement:

3.  **AUTHORIZATION**
    Dealer acknowledges and agrees that Company may delegate certain administration services and hereby authorizes Performance Administration Corporation ("PAC") to perform certain services as determined by Company on its behalf.

4.  **COMPANY AGREES**
    A.  To pay the Dealer one hundred percent (100%) of the maintenance reserves established by Company to pay claims arising from Prepaid Maintenance Contracts issued that represents unclaimed and/or expired customer services thereunder ("forfeitures"). Such forfeitures will be solely determined by Company and paid within thirty (30) days after the end of each calendar quarter with respect to Prepaid Maintenance Contracts expiring during that calendar quarter.

5.  **DEALER AGREES**
    A.  To provide PAC with Prepaid Maintenance Contract holders' information and contract data in order to administer the Prepaid Maintenance services to Dealer's customers on its behalf.

Dealer Initials: _____ Date: 06/09/2016

**Product Schedule: GUARANTEED ASSET PROTECTION (GAP)**

The Product-specific terms and conditions set forth in this Product Schedule (hereinafter "Schedule") are in addition to, and not in lieu of, the terms and conditions of this Agreement. However, any language contained in the Agreement that specifically contradicts the language of the Schedule is amended to accommodate the language in this Schedule if possible or otherwise voided, for purposes of the specific product identified in this Schedule, but only to the most limited extent necessary and the language of this Schedule shall control.

The following additional terms and conditions apply if GUARANTEED ASSET PROTECTION was elected in Exhibit B of the Agreement:

1. **DEFINITION**
   Contract means a Guaranteed Asset Protection (hereinafter "GAP") agreement.

2. **AUTHORITY**
   Company shall administer the Contracts on behalf of the Dealer provided the vehicle and loan or lease meets Company's eligibility requirements prescribed by Company.

3. **DEALER AGREES**
   A. To appoint, and hereby does appoint, Company its attorney-in-fact for the purpose of obtaining and maintaining in force insurance protection to cover all sums the Dealer is legally obligated to pay under the terms of in force GAP Contracts issued by Dealer.
   B. To only enter into Contracts on the date which a vehicle is sold or leased.
   C. To advise and obtain necessary approval from any lending and/or leasing company it intends to assign the lease or loan agreement to which a Contract is attached.

Dealer Initials: _____ Date: 06/09/2016

**Product Schedule: ROAD HAZARD TIRE & WHEEL and ROAD HAZARD TIRE & WHEEL LIMITED WARRANTY**

The Product-specific terms and conditions set forth in this Product Schedule (hereinafter "Schedule") are in addition to, and not in lieu of, the terms and conditions of this Agreement. However, any language contained in the Agreement that specifically contradicts the language of the Schedule is amended to accommodate the language in this Schedule if possible or otherwise voided, for purposes of the specific product identified in this Schedule, but only to the most limited extent necessary and the language of this Schedule shall control.

The following additional terms and conditions apply if ROAD HAZARD TIRE & WHEEL was elected in Exhibit B of the Agreement:

1. **DEFINITION**
   Contract means a Road Hazard Tire & Wheel (hereinafter "Tire & Wheel") Service Contract.

2. **DEALER PROVIDED REPAIRS AND REPLACEMENT**
   A. When it has been determined that required repairs or replacements may be covered by a Contract, and the repairs or replacements are to be made by Dealer, Dealer will:
      1) permit an inspection by Company before repairs are completed if requested by Company;
      2) determine that all claims submitted are for repairs to or replacement of only those covered items which have failed in accordance with the provisions of the Contract;
      3) determine the nature of repair and obtain Company authorization prior to commencing the repair work for any claim covered under the terms of the Contract. Dealer acknowledges that it is not entitled to any reimbursement for non-covered claims of any amount that have not been pre-authorized by Company;
      4) perform repairs and replacements in accordance with the instructions of the manufacturer of the vehicle;
      5) collect deductible, applicable taxes, and any charges not covered under the Contract, if any, from the Contract holder;
      6) send Company claim documentation within thirty (30) days after date of repair or replacement, attaching thereto the signed repair order, service receipts showing the recommended maintenance, and any receipts for substitute transportation and/or towing; and
      7) act in accordance with the rules, standards or regulations issued by Company.

   Company shall have the right to refuse reimbursement for any claim when the procedures described above have not been followed.

   B. LABOR AND PARTS COSTS. Dealer stipulates that the customer labor rate for which reimbursement is sought from Company under this Agreement shall be the ordinary and customary labor rate of the repair facility and that such rate shall not exceed the customary labor rate charged by comparable repair facilities in Dealer's trade area.
      1) Dealer agrees that, subject to coverage limits stated in the Contract, reimbursement for any repair or replacement for losses covered will be made on the following basis:
         Parts – The Manufacturer's Suggested Retail Price as published by the Manufacturer ("MSRP").
         Labor – Dealer's normal customer rate for labor, multiplied by the labor time not to exceed the time established by the publisher of a national labor estimate time guide previously approved by Company.
      2) Any request from Dealer to change the retail labor rate will be made in writing to Company and will become effective only upon written acceptance by Company.

   C. SUBROGATION. In the event of any payment under this Agreement, Company shall be subrogated to all the Dealer's rights of recovery therefor against any person or organization, and the Dealer shall execute and deliver instruments and papers and do whatever else is reasonably necessary to secure such rights. Dealer shall do nothing to prejudice such rights.

3. **SURVIVAL**
   For as long as there shall be any unexpired term of Contracts sold pursuant to this Agreement, Section 1 of this Schedule shall survive termination of this Agreement.

In addition to Sections 1, 2 and 3 of this Schedule, the following additional terms and conditions only apply if ROAD HAZARD TIRE & WHEEL LIMITED WARRANTY was elected in Exhibit B of the Agreement:

4. **DEALER AGREES**

A. To appoint, and hereby does appoint, Company its attorney-in-fact for the purpose of obtaining and maintaining in force reimbursement insurance protection to cover all sums the Dealer is legally obligated to pay under the terms of in force Tire & Wheel Limited Warranties issued by Dealer.

B. To provide Tire & Wheel Limited Warranty at no extra charge to all customers purchasing a vehicle prescribed by company as eligible.

C. To endeavor to upgrade every Tire & Wheel Limited Warranty to a Tire & Wheel Contract. Dealer shall have the sole discretion whether or not to offer a Tire & Wheel Contract to a customer.

D. To use only the Contract forms supplied by the Company for the Tire & Wheel Limited Warranty program and to make no alterations on these forms, without written approval from Company.

E. To endeavor to comply with any applicable state and federal laws, regulations, or other authority relating to the repair of used motor vehicles.

F. To acknowledge that Tire & Wheel Limited Warranties are non-cancelable once the sale of the vehicle is completed and warranty coverage begins.

Dealer Initials: _____ Date: 06/09/2016

**Product Schedule: UNIVERSAL SECURITY GUARD**

The Product-specific terms and conditions set forth in this Product Schedule (hereinafter "Schedule") are in addition to, and not in lieu of, the terms and conditions of this Agreement. However, any language contained in the Agreement that specifically contradicts the language of the Schedule is amended to accommodate the language in this Schedule if possible or otherwise voided, for purposes of the specific product identified in this Schedule, but only to the most limited extent necessary and the language of this Schedule shall control.

The following additional terms and conditions apply if UNIVERSAL SECURITY GUARD was elected in Exhibit B of the Agreement:

1. **DEFINITION**
   Universal Security Guard (hereinafter "Security Guard") Theft Deterrent System (hereinafter "System"), consists of the proper installation of a uniquely numbered retro-reflective labeling system or etching (engraving) the complete Vehicle Identification Number (VIN) in specific locations on the vehicle, and is accompanied by a limited warranty.

2. **DEALER AGREES**
   A. To ensure that the System has been properly installed on eligible vehicles pursuant to the System's installation instructions and proper implementation of the Program.
   B. To pay Company within thirty (30) days upon receipt of invoice for all orders of the retro reflective labeling supplies. Unless agreed otherwise, all orders, once submitted to Company, are non-returnable, non-refundable and non-cancelable. Dealer shall be responsible for all payments once orders are submitted to Company regardless of Dealer's refusal to accept such orders.
   C. To make no representations, warranties or guarantees whatsoever to its customers with respect to the specifications, characteristics, features and capabilities of the System that are inconsistent with the System's Registration forms and marketing materials.

3. **DISCLAIMER WITH RESPECT TO SECURITY GUARD**
   Company makes no warranties or representations to System except as set forth herein or pursuant to the terms of the System Limited Warranty. All implied warranties and conditions, including but not limited to, implied warranties of merchantability, fitness for a particular purpose and noninfringement, are hereby expressly disclaimed.

Dealer Initials: _____ Date: 06/09/2016

**Product Schedule: SELECT PROTECTION**

The Product-specific terms and conditions set forth in this Product Schedule (hereinafter "Schedule") are in addition to, and not in lieu of, the terms and conditions of this Agreement. However, any language contained in the Agreement that specifically contradicts the language of the Schedule is amended to accommodate the language in this Schedule if possible or otherwise voided, for purposes of the specific product identified in this Schedule, but only to the most limited extent necessary and the language of this Schedule shall control.

The following additional terms and conditions apply if SELECT PROTECTION was elected in Exhibit B of the Agreement:

1. **DEFINITIONS**

    Contract means a Select Protection Service Contract that bundles together for sale as a package of products to the purchasing consumer, any or all of the ancillary F&I products available for sale in the Dealer's state.

    Service Provider means Vehicle Administrative Services (VAS) and its affiliate SafeRide Motor Club, Inc. (SafeRide) to which Company has delegated certain repair services to administer on Company's behalf.

2. **DEALER PROVIDED REPAIRS AND REPLACEMENT**

    A. When it has been determined that required repairs or replacements may be covered by a Contract, and the repairs or replacements are to be made by Dealer, Dealer will:

    1) permit an inspection by Company before repairs are completed if requested by Company;

    2) determine that all claims submitted are for repairs to or replacement of only those covered items which have failed in accordance with the provisions of the Contract;

    3) determine the nature of repair and obtain Company authorization prior to commencing the repair work for any claim covered under the terms of the Contract. Dealer acknowledges that it is not entitled to any reimbursement for non-covered claims of any amount that have not been pre-authorized by Company;

    4) perform repairs and replacements in accordance with the instructions of the manufacturer of the vehicle;

    5) collect deductible, applicable taxes, and any charges not covered under the Contract, if any, from the Contract holder;

    6) send Company claim documentation within thirty (30) days after date of repair or replacement, attaching thereto the signed repair order, service receipts showing the recommended maintenance, and any receipts for substitute transportation and/or towing; and

    7) act in accordance with the rules, standards or regulations issued by Company.

    Company shall have the right to refuse reimbursement for any claim when the procedures described above have not been followed.

    B. Dealer stipulates that the customer labor rate for which reimbursement is sought from Company under this Agreement shall be the ordinary and customary labor rate of the repair facility and that such rate shall not exceed the customary labor rate charged by comparable repair facilities in Dealer's trade area.

    1) Dealer agrees that, subject to coverage limits stated in the Contract, reimbursement for any repair or replacement for losses covered will be made on the following basis:

        Parts – The Manufacturer's Suggested Retail Price as published by the Manufacturer ("MSRP").

        Labor – Dealer's normal customer rate for labor, multiplied by the labor time not to exceed the time established by the publisher of a national labor estimate time guide previously approved by Company.

    2) Any request from Dealer to change the retail labor rate will be made in writing to Company and will become effective only upon written acceptance by Company.

    C. In the event of any payment under this Agreement, Company shall be subrogated to all the Dealer's rights of recovery therefor against any person or organization, and the Dealer shall execute and deliver instruments and papers and do whatever else is reasonably necessary to secure such rights. Dealer shall do nothing to prejudice such rights.

3. **CLAIMS**

Company agrees to process all undisputed Road Hazard Tire & Wheel claims within a reasonable time upon the receipt of claim documentation as prescribed in Section 2 A. and any other documentation that Company may reasonably request.

Service Provider will administer all Contract claims, except Road Hazard Tire & Wheel, provided to them in accordance with the established procedures.  If Dealer receives any requests for service from a contract holder who has purchased a Contract, Dealer will contact Service Provider to report the claim.

Dealer Initials: _____  Date: 06/09/2016

Product Schedule: **LEASE WEAR AND USE PROTECTION**

The Product-specific terms and conditions set forth in this Product Schedule (hereinafter "Schedule") are in addition to, and not in lieu of, the terms and conditions of this Agreement. However, any language contained in the Agreement that specifically contradicts the language of the Schedule is amended to accommodate the language in this Schedule if possible or otherwise voided, for purposes of the specific product identified in this Schedule, but only to the most limited extent necessary and the language of this Schedule shall control.

The following additional terms and conditions apply if Lease Wear and Use was elected in Exhibit B of the Agreement:

---

SERVICE CONTRACT

1.  **DEFINITION**
    "Contract" means a Lease Wear and Use Protection Service Contract.

2.  **DEALER AGREES**
    A.  To only enter into Contracts on the date which a vehicle is leased.
    B.  To advise and obtain any necessary approval from any lending and/or leasing company it intends to assign the lease agreement to which a Contract is applicable.

3.  **CLAIMS**
    Company and Dealer agree that claims submitted for this Contract type will be processed and handled by American Risk Services, LLC (ARS), as the claims administrator and that Company shall make arrangements with ARS to process any such claims within standards consistent with Company's direct claim handling standards.

---

LIMITED WAIVER

1.  **DEFINITION**
    "Contract" means a Lease Wear and Use Protection Limited Waiver Agreement.

2.  **AUTHORITY**
    Company shall administer the Contracts on behalf of the Dealer/Lessor provided the vehicle and lease meets eligibility requirements prescribed by Company.

3.  **DEALER AGREES**
    A.  To appoint, and hereby does appoint, Company its attorney-in-fact for the purpose of obtaining and maintaining in force insurance protection to cover all sums the Dealer/Lessor is legally obligated to waive under the terms of in force Lease Wear and Use Protection Limited Waiver Agreements issued by Dealer.
    B.  To only enter into Contracts on the date which a vehicle is leased.
    C.  To advise and obtain necessary approval from any lending and/or leasing company it intends to assign the lease agreement to which a Contract is attached.

4.  **CLAIMS**
    Company and Dealer agree that claims submitted for this Contract type will be processed and handled by American Risk Services, LLC (ARS), as the benefit request administrator and that Company shall make arrangements with ARS to process any such claims within standards consistent with Company's direct claim handling standards.

Dealer Initials: _____ Date: 06/09/2016