Duane M. Geck
Cal. State Bar No. 114823
dmg@severson.com
Donald H. Cram
Cal. State Bar No. 160004
Tex. State Bar No. 05000300
dhc@severson.com
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Keith A. Langley
State Bar No. 11919500
Brandon K. Bains
State Bar No. 24050126
LANGLEY LLP
1301 Solana Blvd
Building 1, Suite 1545
Westlake, Texas 76262
Telephone:    214.722.7171
Facsimile:    214.722.7161
bbains@l-llp.com

Attorneys for Secured Creditor
FORD MOTOR CREDIT COMPANY LLC

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **REAGOR-DYKES MOTORS, LP** | § | Case No. 18-50214-rlj11[1] |
| | § | (Jointly Administered) |
| Debtor. | § | |

## BRIEF IN SUPPORT OF FORD MOTOR CREDIT COMPANY LLC'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

---

[1] The Debtors are Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo, LP (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), and Reagor-Dykes Floydada, LP (Case No. 18-50219).

## I. INTRODUCTION

Ford Motor Credit Company LLC ("Ford Credit") is Debtors' "floor plan" or "inventory" lender which financed Debtors' acquisition of its inventory of cars and trucks for resale to consumers. In the days before the August 1, 2018 filing of Debtors' bankruptcy petitions, Ford Credit discovered a massive $41 million loan payment default resulting from Debtors' sale of over 1,100 vehicles and failure to pay Ford Credit the loans it made for Debtors to acquire those vehicles. In an extraordinary effort to maximize the value of its remaining collateral, Ford Credit, as the primary secured creditor, has allowed Debtors' to use no less than $3.1 million of its cash collateral to support Debtors' efforts in pursuing a § 363 sale of assets. When it became apparent that Debtors had no further sources of cash, beginning October 25, 2018, Ford Credit took the unusual and risky step of allowing Debtors to sell seventy-two used vehicles and retain all net proceeds from those sales (approximately $1.38 million) to be utilized to continue operations and pay professionals in order to survive to a November 29, 2108 § 363 sale. However, the § 363 sale procedure failed. As a last ditch effort, Debtors advised the Court on November 29, 2018 that it had a framework for a Plan of Reorganization memorialized in a "Memorandum" dated November 28, 2018, a copy of which is attached hereto as **Exhibit A** ("Memorandum"). Although promised for some time now, as of the filing of this brief, no plan or disclosure statement have been filed.[2] At this late date, any plan of reorganization proposed by Debtors is certainly not in "prospect." Further, to the extent a proposed plan contains legally impermissible provisions consistent with the Memorandum, such as third-party releases of Bart Reagor and Rick Dykes, it is facially unconfirmable.

In light of the failed § 363 sale process and the lack of a confirmable plan of reorganization, Ford Credit seeks relief from the automatic stay pursuant to §§ 362(d)(1) and

---

[2] It is Ford Credit's expectation that a plan and disclosure statement consistent with the Memorandum attached as **Exhibit A** will be filed sometime prior to the January 8, 2019 hearings.

362(d)(2) of the Bankruptcy Code so that it may proceed with its state law remedies to take possession and dispose of its collateral. It is undisputed that the Debtors lack an equity interest in Ford Credit's collateral and that Ford Credit's vehicle collateral are depreciating assets. It is also undisputed that Debtors do not have Ford Credit's consent to continue to use Ford Credit's cash collateral beyond January 8, 2019.[3] After a failed § 363 sale process and at the eleventh hour, Debtors will likely file a plan of reorganization and disclosure statement ("Plan") consistent with the terms of the Memorandum. However, and proposed Plan is unconfirmable on its face because: 1) it contains impermissible third-party releases; 2) it is conditioned upon Ford Credit providing post-confirmation floorplan financing; and 3) it violates § 1129(b)(2)(B)(ii) of the Bankruptcy Code (the Absolute Priority Rule).

Ford Credit has done all it can do for over five months to support an outcome to maximize value and Ford Credit has taken risk and allowed over $3.1 million of cash collateral to be used while its collateral position diminished. Now, Ford Credit asks this Court to lift the stay because there is no reorganization that is in prospect and Ford Credit can no longer allow its collateral to be used and its losses to increase in pursuit of an unconfirmable Plan.

## II. PERTINENT FACTS

1. On August 1, 2018 (the "Petition Date"), Debtors filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").

2. Debtors are automobile dealerships engaged in the business of selling and leasing vehicles to retail customers and servicing vehicles for customers.

3. Prior to the Petition Date, Ford Credit provided Debtors financing for Debtors' acquisition of vehicle inventory to be used in their dealership operations. Generally speaking,

---

[3] Even if Debtors had Ford Credit's consent, there is no cash collateral being generated by the business enterprises that can support Debtors' continued operations. As such, the bankruptcy estate is effectively administratively insolvent.

Debtors entered into wholesale financing agreements and other loan agreements with Ford Credit, as well as security agreements granting Ford Credit a lien in all Debtors' vehicle inventory, as well as the proceeds of such inventory, and all other tangible and intangible property. The financing agreements, security agreements and all related ancillary documents entered into in financing individual vehicles are hereafter referred to as the "Loan Documents". The collateral pledged to secure the obligations set forth in the Loan Documents is hereinafter referred to as the "Collateral". The titles and dates of the Loan Documents are identified and attached to the Declaration of Paul A. Boudreau in support of this motion filed August 9, 2018 [*Docket No. 55*].

4. The interests granted to secure the amounts financed by Ford Credit are perfected by UCC-1 Financing Statements filed in the State of Texas, and thus, Ford Credit holds a properly perfected lien in the Collateral. The filing numbers and dates of the UCC-1s are also attached to the Declaration of Paul A. Boudreau in support of this motion filed August 9, 2018 [*Docket No. 55*].

5. Debtors are indebted to Ford Credit in an amount that exceeds $112 million with interest and other charges continuing to accrue.[4] The indebtedness owing to Ford Credit is secured as Ford Credit holds a pre-petition lien, in first position, in the Collateral, including Debtors' franchises and goodwill, and any proceeds therefrom.

6. Debtors' operating revenue is primarily generated through the sales and leasing of the new and used vehicles.

7. Due to pre-petition events of default and other acts of Debtors, Ford Credit asserts, and Debtors does not dispute, that Ford Credit is undersecured.[5]

---

[4] Ford Credit filed Proof of Claims on December 4, 2018 in the six Debtor Cases in the amount of $112,041,555.00. No objections to these claims have been filed.

[5] Debtors filed Schedules of Assets and Liabilities on October 19, 2018 that list personal property assets of approximately $98 million (which includes outstanding notes owed to Debtors by Bart Reagor and Rick Dykes in the approximate amount of $7 million, amounts held in various bank accounts as well as goodwill value arising from the franchise agreements).

8. Debtors embarked on a § 363 sale process which culminated in an unsuccessful auction on November 27th and November 28th, 2018. On November 29, 2018,

9. Debtors tabled their § 363 sale motion in favor of pursuing a reorganization path as outlined in the Memorandum.

10. Due to Debtors' inability to generate sufficient cash from sales of vehicles or from other sources (such as contracts in transit) and in an effort to support continued operations through a § 363 sale, beginning October 25, 2018, Ford Credit allowed Debtors to sell approximately $1.38 million in used vehicles and retain all net proceeds from those sales to be utilized to continue operations and pay professionals. See paragraph 4 of the Fifth Interim Cash Collateral Order entered November 19, 2018 [*Docket No. 567*].

11. Although the filing of the Plan was promised shortly after the hearing on November 29, 2018, as of the filing of this brief, Debtors still have not filed a Plan of Reorganization and Disclosure Statement.

12. Under the terms of the Sixth Interim Cash Collateral Order entered December 31, 2018 [*Docket No. 764*], Debtors' ability to use Ford Credit's cash collateral expires January 5, 2019.

13. Debtors have no, or limited, sources of cash to enable Debtors to continue operations or to pay further professional fees and costs of administration.

### III. DISCUSSION

**A. Ford Credit is Entitled to Relief Because there is Little or No Equity in the Vehicles for the Estate and the Vehicles are not Necessary for an Effective Reorganization.**

**1. Debtors Lack An Equity Interest In Ford Credit's Collateral.**

Ford Credit is entitled to relief from stay pursuant to 11 U.S.C. § 362(d)(2). The total amount that Debtors owes Ford Credit is approximately $112 million.

Ford Credit maintains that, the value of Debtors' remaining vehicle inventory is approximately $62 million. Ford Credit estimates that the value of Debtors' non-vehicle assets is

approximately $2.5 million.[6] Debtors' Bankruptcy Schedules list personal property assets that total approximately $98 million (which includes outstanding notes owed to Debtors by Bart Reagor and Rick Dykes in the approximate amount of $7 million, amounts held in various bank accounts, and goodwill value associated with the franchises).

### 2. There Is No Reorganization That Is In Prospect.

Although Debtors will likely submit a Plan of Reorganization and Disclosure Statement consistent with the Memorandum, any such Plan is facially unconfirmable.

#### a. The Plan Impermissibly Calls For Third-Party Releases.

The Plan contemplates third-party releases of Bart Reagor and Rick Dykes by a number of creditors including Ford Credit. However, Ford Credit does not consent to any release of these individuals who have personally guaranteed the indebtedness owing to Ford Credit by Debtors. Fifth Circuit law is clear that the Bankruptcy Code prohibits third-party releases absent consent. 11 U.S.C. § 524(e) (the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt"); *In re Pacific Lumber Co.*, 584 F.3d 229, 251-252 (5th Cir. 2009); *In re Coho Resources, Inc.*, 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. National Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993); *Zale Corporation v. Feld*, 62 F.3d 746 (5th Cir. 1995).

The Fifth Circuit's position was confirmed in denying requested third-party releases in the context of a Chapter 15 Case in *In re Vitro SAB De CV*, 701 F.3d 1031 (5th Cir. 2012) where the Court stated,

> First, the relief Vitro seeks, a non-consensual, non-debtor release through a bankruptcy proceeding, is generally not available under United States law. Indeed, this court has explicitly prohibited such relief. *In re Pac. Lumber Co.*, 584 F.3d 229, 251-52 (5th Cir. 2009) (discharge of debtor's debt does not affect liability of other entities on such debt and denying non-debtor release and permanent injunction); *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995) ("Section 524 prohibits the discharge of debts of nondebtors.").

---

[6] Any value associated with the franchises or goodwill can be realized only if there is a sale.

*Id*. at 1059.

To be certain, prior to the bankruptcy filings, Debtors sold new and used cars financed by Ford Credit and, instead of honoring their promise and contractual obligations to repay Ford Credit the amount it lent Debtors to acquire those vehicles, Debtors sold over 1,100 vehicles with loans from Ford Credit in excess of $41 million and failed to repay those loans.

Debtors hid this massive breach from Ford Credit in several ways. First, Debtors fraudulently mispresented sales-reporting data to Ford Credit such that Ford Credit believed Debtors were timely paying off cars it sold to the public. In reality, Debtors had been engaging in a scheme whereby it actually sold vehicles on average 55 days before telling Ford Credit, thus allowing Debtors to "float" the debt it owed to Ford Credit. Second, Debtors fraudulently secured double-flooring from Ford Credit. Double-flooring refers to automobile dealers who receive acquisition funding twice for the same vehicle. This is a serious violation of any inventory financing agreement and represents a significant violation of a dealer's representations and warranties made to its lenders. *See U.S. v. Hoover*, 467 F.3d 496, 497 (5th Cir. 2006) (double flooring is "an illegal practice whereby a single vehicle is used as collateral for more than one loan."). Third, Debtors fraudulently obtained inventory financing for cars it had already sold. In other words, while Debtors no longer possessed and had no rights in the car, they would represent to Ford Credit that they still held the car as inventory and then obtained additional financing.

Bart Reagor and Rick Dykes are the sole shareholders of Debtors. The nature and extent of Mr. Reagor's and Mr. Dykes' involvement in the fraudulent activities of Debtors is being investigated. However, the prospect of a Plan provision forcing releases of any and all potential claims against Mr. Reagor and Mr. Dykes is not only contrary to the law, but simply unfair.

The third-party releases called for under the terms of the proposed Plan are impermissible under the Bankruptcy Code and Fifth Circuit law. As such, the Plan cannot be confirmed with the releases over the objection of Ford Credit.

        **b.**     **The Plan Requires Continued Floor Plan Financing By Ford Credit.**

The Plan requires continued floor plan financing by Ford Credit post-confirmation of the

Plan. Ford Credit will not agree to any floor plan financing with respect to the dealerships now or post-confirmation. The loan agreements between Debtors and Ford Credit are not executory contracts and therefore cannot be assumed and assigned under § 365 of the Bankruptcy Code in connection with the Plan. Even if they could be assumed and assigned, Debtors are not offering to cure the defaults under the loan agreements which would be a condition to assumption under § 365. As such, the Plan cannot be confirmed with any provision that requires Ford Credit to continue to lend to the reorganized entity over the objection of Ford Credit.

### c. The Plan Violates The Absolute Priority Rule.

The absolute priority rule provides that "a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988) (quoting *Norwest Bank Worthington v. Ahlers*, 794 F.2d 388, 401 (8th Cir. 1986)); see also *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 116, 60 S.Ct. 1, 7, 84 L.Ed. 110 (1939). The rule was codified in 11 U.S.C. § 1129(b)(2)(B)(ii) of the Bankruptcy Code, which provides in part:

> [T]he holder of any claim or interest that is junior to the claims of ... [the dissenting class] will not receive or retain under the plan on account of such junior claim or interest any property. . .

11 U.S.C. § 1129(b)(2)(B)(ii). The rule stems from the requirement that a plan must be fair and equitable before it can be confirmed over the objection of dissenting creditors. See 11 U.S.C. § 1129(b)(2); *Ahlers*, 485 U.S. at 202, 108 S.Ct. at 966; *In re Bryson Properties, XVIII*, 961 F.2d 496, 503 (4th Cir. 1992).

The Plan contemplates that one of Debtors' shareholders, Rick Dykes, maintain some ownership interest in the reorganized entity. However, unsecured and under-secured creditors, like Ford Credit, are not being paid in full. An equity interest holder cannot retain an ownership interest in the reorganized entity without payment of the unsecured class of creditors in full. As such, the Plan cannot be confirmed over the objection of Ford Credit as it violates the Absolute Priority Rule.

**B.     Ford Credit is Entitled to Relief from Stay for Cause, Including Lack of Adequate Protection.**

Relief from stay may be granted "for cause, including lack of adequate protection of an interest in property." 11 U.S.C. § 362(d)(1). In other words, the continuation of the automatic stay depends upon whether a secured creditor's interest in property is adequately protected. *See In re Stembridge*, 394 F.3d 383, 387 (5th Cir. 2004).

Ford Credit is entitled to relief from stay for cause and lack of adequate protection pursuant to 11 U.S.C. § 362(d)(1). Ford Credit's vehicle collateral consist of depreciating assets that lose value every day. Debtors' permission to use cash collateral will expire on January 5, 2019. As such, Debtors have no source of income to operate their business. Income is generated only through the sales of vehicles and parts which all represent the cash collateral of Ford Credit. Once Debtors sell a vehicle or part to a consumer, Ford Credit loses its security interest in the item sold and can look only to the proceeds of the item sold to satisfy its loan balance. Debtors carry the burden of proof on the issue of adequate protection. 11 U.S.C. §§ 362(g) and 363(p). The assets of the Debtors have insufficient value to generate operating capital and to pay Ford Credit the amounts that Debtors owe it while Debtors continue to operate. Ford Credit is not adequately protected and relief from stay should be granted pursuant to 11 U.S.C. § 362(d)(1). At this point, the estate is administratively insolvent and Debtors should not be permitted to further erode Ford Credit's Collateral.

### III. CONCLUSION

For the reasons set forth above, Ford Credit respectfully requests that this Court:

1.     Issue an order granting relief from the automatic stay authorizing Ford Credit to enforce its security interests in its Collateral including but not limited to taking possession and disposing of Ford Credit's vehicle and non-vehicle collateral pursuant to applicable law;

2.     Waive the 14 day waiting period under Bankruptcy Rule 4001(a)(3);

3.     Issue an order directing Debtors to turnover and surrender the Collateral to Ford Credit; and

4.     Enter such other and further relief as this Court deems necessary and proper.

DATED: January 4, 2019

SEVERSON & WERSON
A Professional Corporation

By:    /s/ Donald H. Cram
           Donald H. Cram
Cal. State Bar No. 160004
Tex. State Bar No. 05000300
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439
dhc@severson.com

Attorneys for Secured Creditor
FORD MOTOR CREDIT COMPANY LLC

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing has been served electronically by the Court's ECF System on all parties registered to receive such service on the 4th day of January 2019.

        /s/ Donald H. Cram\_\_\_
        Donald H. Cram