Marcus A. Helt (TX 24052187)
C. Ashley Ellis (TX 00794824)
Melina Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: 214.999.3000
Facsimile: 214.999.4667

**COUNSEL FOR THE DEBTORS,**
**REAGOR-DYKES MOTORS, L.P.,** *et al.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **REAGOR-DYKES MOTORS, LP,** *et al.*[1] | § | Case No. 18-50214-rlj-11 |
| | § | Jointly Administered |
| Debtor. | § | |

**DEBTORS' OBJECTION TO FORD MOTOR CREDIT COMPANY LLC'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

Reagor-Dykes Motors, LP; Reagor-Dykes Imports, LP; Reagor-Dykes Amarillo, LP; Reagor-Dykes Auto Company, LP; Reagor-Dykes Plainview, LP; Reagor-Dykes Floydada, LP (collectively, "**Reagor-Dykes**" or the "**Debtors**"), as debtors and debtors-in-possession in the above-styled and captioned case, hereby file this *Objection to Ford Motor Credit Company, LLC's Motion for Relief from the Automatic Stay* ("**Objection**") to Ford Motor Credit Company, LLC's ("**Ford Credit**") Motion for Relief from the Automatic Stay (**"Motion"**) (Doc. No. 46). In support of the Objection, Reagor-Dykes states as follows:

---

[1] The Debtors are Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), Reagor-Dykes Floydada, LP (Case No. 18-50219).

# I. EXECUTIVE SUMMARY

Contrary to Ford Motor Credit Company LLC's ("**Ford Credit**") assertion that "there is no prospect for a reorganization,"[2] Reagor-Dykes is not dead. Reagor-Dykes is not out of money. Reagor-Dykes is not without a plan to restructure its debts and recapitalize its business, contrary to what is said by Ford Credit.

On November 29, 2018, Reagor-Dykes and the McDougal-Dykes-Ewing Group said that they were committed to trying to propose and have approved by this Court a plan of reorganization that, among other things, recapitalized the business, added jobs, repaid creditors some meaningful amount, helped consumers, and kept an important civic partner in West Texas. That is still the case.

To that end, Reagor-Dykes has secured a commitment from International Bank of Commerce (subject to certain terms and conditions) to lend up to $4.75 million to get Reagor-Dykes out of bankruptcy. This financing is the first step in a multi-step process to bring back a once-proud and productive business to West Texas. This financing will help stabilize operations and inject confidence into this Chapter 11 process and the future of Reagor-Dykes.

Another step in this process is the proposed Chapter 11 plan. Tomorrow Reagor-Dykes will file its proposed Chapter 11 plan (the "**Plan**") with this Court. Under the Plan, the McDougal-Dykes-Ewing Group will recapitalize the business with up to $20 million. That $20 million will be used to (a) revitalize/repair a business that was harmed by actions taken in early August 2018; (b) help pay unpaid taxes, title, and license fees and trade-in loans; (c) help make other payments to creditors on claims approved by this Court, including Ford Credit; and (d) provide sufficient working capital for Reagor-Dykes to exit from bankruptcy. Is there work still to be done to finalize

---

[2] *See Ford Motor Credit Company LLC's Motion for Relief from the Automatic Stay* ("**Motion**") (Doc. No. 46), pg. 4.


all of the moving parts related to this complicated situation and Chapter 11 plan and get binding commitments from all necessary parties? Yes. But Reagor-Dykes and the McDougal-Dykes-Ewing Group are committed to working hard to try to get that done.

Sadly, Ford Credit has chosen to try to take Reagor-Dykes into fire-sale liquidation, which Reagor-Dykes think helps no one, including Ford Credit itself. This forced liquidation will only make worse the damage caused by actions taken in early August 2018, which creates a fundamental question: If Ford Credit seeks to bury Reagor-Dykes, along with the hope of any recovery and resolution to claims and concerns of most – if not all – of the creditors, consumers whose taxes, title, and license fees have yet to be paid, current and future employees, landlords, future car buyers, manufacturers, and many others, including Lubbock and its surrounding communities, then why?

No one knows but Ford Credit. Despite Reagor-Dykes' best efforts at a conciliatory attempt to resolve a path forward – one in which Reagor-Dykes has refrained from going on the offensive in hopes of reaching a consensual resolution – Ford Credit has shut the door. Thus far Reagor-Dykes has refrained from seeking (a) Ford Credit documents; (b) Ford Credit communications (including those between Shane Smith's long-time friend, Gary Byrd, who is the Ford Credit employee who managed Reagor-Dykes' account with Ford Credit); and (c) Ford Credit's audit results (which regularly praised the Reagor-Dykes and its operational performance). Reagor-Dykes has also not sought Mr. Byrd's private communications with Shane Smith; nor have the Debtors attempted to understand why Mr. Byrd's son worked for Reagor-Dykes without the ownership group's knowledge and how much was earned by this relationship.

But the path forward has now changed. Because of Ford Credit's attempt to obliterate Reagor-Dykes – perhaps in hopes that such an outcome will eliminate information relevant to the concerns noted above – Reagor-Dykes has no choice but to change course, and the Plan proposed

by Reagor-Dykes will reflect this change. Importantly, this changed path – at Ford Credit's insistence – should have no impact on Reagor-Dykes' ability to confirm a Chapter 11 plan of reorganization. Like the rights of all parties, Ford Credit's rights will be protected, but Ford Credit will be placed into the position of a disputed claimant until its rights and Reagor-Dykes' claims are reconciled.

The Plan proposed by Reagor-Dykes is confirmable, and the notion of a third-party non-consensual release is not a factor. Ford Credit will get what it wants, which is a litigated result. Ford Credit's creation of this litigated result, which will likely be the product of expensive, high-stakes, and public litigation, should not interfere with the combined goals of Reagor-Dykes, International Bank of Commerce, and the McDougal-Dykes-Ewing Group to bring this business back to a place where it is productive and meaningful to the place and people of West Texas.

For these reasons, this Court should deny Ford Credit's attempt to leave this case as a burned-out engine of a charred truck. Ford Credit's claims against the Debtors are disputed, pending further investigation of the alleged fraud and Ford Credit's involvement therein. They should not be the basis to grant relief requested by Ford Credit. The property in which Ford Credit asserts a lien is necessary for an effective reorganization, and the Plan proposed by Reagor-Dykes properly treats and adequately protects all of Ford Credit's alleged claims and liens against Reagor-Dykes and the collateral that secures such claims should this Court ultimately allow them.

## II. BACKGROUND

1. On August 1, 2018 (the **"Petition Date"**), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the **"Bankruptcy Code"**) thereby initiating the above-captioned, jointly-administered bankruptcy cases (the **"Chapter 11 Cases"**) in the Bankruptcy Court for the Northern District of Texas (the

"**Court**") and creating their bankruptcy estates (the "**Estates**"). On August 9, 2018, Ford Credit filed its Motion. On August 30, 2018, BlackBriar Advisors, L.L.P. ("**BlackBriar**") was approved on a final basis by the Court as Chief Restructuring Officer of the Debtors. Effective August 22, 2018, on the Court's approval, the Debtors hired the undersigned as counsel, replacing prior counsel.

### III. <u>GROUNDS FOR DENYING RELIEF FROM THE AUTOMATIC STAY</u>

2. Relief from the automatic stay is appropriately granted only if "(A) the debtor does not have any equity in such property; **and** (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2) (emphasis added). It is not sufficient to show that the debtor does not have any equity in the creditor's property if the debtor can show that the property is necessary to an effective reorganization. *See In re Couture Hotel Corp.*, 536 B.R. 712, 754 (Bankr. N.D. Tex. Sept. 2, 2015). In other words, "[c]ourts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization." *Canal Place Ltd. v. Aetna Life Ins. Co. (In re Canal Place Ltd.)*, 921 F.2d 569, 577 (5th Cir. 1991). Ultimately, if the party opposing relief lacks a "realistic prospect of effective reorganization," section 362 mandates that relief be granted. *Timbers*, 484 U.S. at 376.

3. Courts have adopted a list of non-exhaustive requirements necessary to satisfy the burden under section 362(d)(2)(B):

   1. The debtor must be moving meaningfully to propose a plan;
   2. The plan must provide that the lender's allowed secured claim would be valued and payable from the debtor's net . . . income generated by . . . the ability to propose a plan based on the infusion of new capital, sale, or other viable means;
   3. The plan must have a realistic chance of confirmation;
   4. Without deciding the issue with the same scrutiny as a confirmation hearing, the debtor's proposed plan must not be obviously unconfirmable;
   5. The reorganization must occur in a reasonable period of time.

*In re Fennell*, Case No. 17-20095-rlj13, 2017 WL 7050633 at *4 (Bankr. N.D. Tex. 2017) *(quoting Mercado v. Combined Invs. LLC (In re Mercado)*, 523 B.R. 755, 762 (BAP 1st Cir. 2015)). Stated simply, the proposed plan must not be patently unconfirmable.

### A. The Vehicles Subject to Ford Credit's Security Interest Are Necessary to an Effective Reorganization.

4. Courts have noted that while the term "necessary" is not defined in the Bankruptcy Code, whether property is necessary to an effective reorganization depends largely "on the peculiar facts and posture of the case, and [courts] will not admit . . . a hard and fast rule." *In re Fields*, 127 B.R. 150, 154 (Bankr. W.D. Tex. 1991). In determining whether such property is necessary, courts "must examine the nature of the enterprise, the kind of reorganization contemplated, and the role this property plays in the enterprise and its reorganization." *Id.* Importantly, if the property "*contributes* to the income production process," such fact is significant in determining that property is necessary to an effective reorganization. *Id. (but see In re W.B.S.S., LP*, 366 B.R. 629, 632 (Bankr. E.D. Tex. 2007) (although debtor's utilization of property is necessary to continue its operations, if there is no reasonable possibility of a successful reorganization within a reasonable time, relief from stay must be granted).

5. The Debtors more than meet the burden under § 362(d)(2)(B). After extensive negotiations with various constituents, the Debtors have proposed the Plan that proposes to revitalize and recapitalize the Debtors' business operations, which necessarily includes maintaining and selling the Debtors' inventory as a going concern. In the Motion, Ford Credit argues that the vehicle inventory (as well as the Debtors' fixtures, equipment, and furniture) is not necessary for the Debtors' bankruptcy reorganization. There is no *bona fide* argument that this is true. The Debtors operate car dealerships. Car dealerships sell cars. Cars make up the Debtors' inventory. This inventory and the related business form the fundamental core of the Plan and the reasons behind

the Plan. The same is true for the alleged other collateral. That collateral is used to sell cars and run the dealerships. Therefore, it should be undisputed that the alleged collateral substantially "contributes to the income-production process."

6. Further, while Ford Credit may or may not like its proposed treatment under the Plan, the Plan is not patently unconfirmable. *See In re 499 W. Warren St. Assocs. Ltd. Partnership*, 151 B.R. 307, 310 (Bankr. N.D.N.Y. July 28, 1992). "[w]hile the plan confirmation standards of Bankruptcy Code § 1129(a) should generally not be analyzed in connection with a motion to lift stay, where a debtor submits a proposed plan before the lift stay hearing, Timbers requires a determination that such plan is not 'patently unconfirmable'"). A careful examination of the Plan shows that the Plan (a) is feasible, (b) has been proposed in good faith, and (c) is in compliance with all requirements of §§ 1122, 1123, and all applicable provisions of § 1129. It is too soon to represent to the Court that the Debtors will have enough votes to achieve a consensual plan under § 1129(a), or if the Plan will be confirmed under the "cramdown" requirements of § 1129(b). Either way, the burden under § 362(d)(2)(B) is met. Ford Credit's alleged collateral is necessary to an effective reorganization of the Debtors, the Plan is not patently unconfirmable, and the Motion must be denied.

**B. The Debtors Are Providing Ford Credit with Adequate Protection.**

7. The continued operation of the Debtors' businesses as a going concern constitutes adequate protection of Ford Credit's interests. The Plan establishes a viable means to treat Ford Credit's secured claim, if it is allowed by this Court, through income generated by the reorganized enterprise and equity contributed by the plan sponsor. The Plan also affords that the priority and treatment of all creditors' interests – not just Ford Credit's interests – will be considered in a single, controlled process. More importantly, Ford Credit is a floor-plan lender, not a dealership. While it

may be accurate that some depreciation in the value of the vehicles alleged to be Ford Credit's collateral is inevitable on a go-forward basis, the extent of that depreciation is not a constant and is offset by the value maximized for existing inventory through the operations up to confirmation. The vehicles in Ford Credit's possession would be, at best, worth liquidation value. However, if the Debtors remain in possession of the vehicles and sell them in the ordinary and orderly course of the Debtors' business – maybe over a longer period of time – Ford Credit will receive the going-concern value for the alleged collateral. This going-concern value will exceed the forced fire-sale value to be received upon an immediate liquidation. Allowing the Chapter 11 process to proceed through Plan confirmation constitutes adequate protection for Ford Credit. Lifting the stay for the alleged benefit of Ford Credit above all other creditors, before the Plan can be confirmed and effected, and while Ford Credit's claims and liens are in dispute would result, in all likelihood, not only in a diminished return to Ford Credit but to all other creditors and interested parties, including employees, West Texas communities, and consumers.

## IV. CONCLUSION

The Debtors' business is viable and worth reorganizing. The Plan provides a global resolution that will prove to be in the best interest of all stakeholders. It should be undisputed that the Debtors operate car dealerships by selling cars; thus, having access to inventory to liquidate is necessary to an effective reorganization under the proposed Plan or any other plan of reorganization. It is essential that the automatic stay remain in place and Ford Credit be prohibited from forcing a premature "turnover and surrender" of vehicles in which Ford Credit alleges a disputed first-priority security interest. Lifting the automatic stay at this critical juncture is antithetical to all of the Debtors' efforts as well as the contributions of creditors and investors toward effectuating the Plan and yielding a positive outcome in this case for all stakeholders. No

DEBTORS' OBJECTION TO FORD MOTOR CREDIT COMPANY LLC'S
MOTION FOR RELIEF FROM THE AUTOMATIC STAY    Page 8
4835-7899-0722.4

single creditor should be allowed to disrupt the orderly process to be implemented by the Debtors for the benefit of all creditors and parties in interest. No matter the motivation behind Ford Credit's attempt to go nuclear despite any real urgency, the reality is that allowing the Chapter 11 process to proceed and offer the second chance it was designed to provide will produce an outcome that will be far more beneficial for Ford Credit and all other creditors than the outcome produced by Ford Credit's requested relief. Granting relief from the stay at this time would destabilize the proposed Plan and upend the Debtors' plans for and efforts toward a regulated, equitable process supervised by this Court in favor of haphazard and piecemeal proceedings that ultimately benefit no one.

## V. PRAYER

**WHEREFORE**, the Debtors respectfully request that the Court deny the relief requested in the Motion and grant the Debtors such other and further relief as the Court deems just and proper.

DATED: January 6, 2019                    Respectfully submitted:

By: /s/ Marcus A. Helt
    Marcus A. Helt (TX 24052187)
    C. Ashley Ellis (TX 00794824)

**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: 214.999.3000
Facsimile: 214.999.4667
mhelt@foley.com
aellis@foley.com

**COUNSEL FOR DEBTORS,**
**REAGOR-DYKES MOTORS, LP *et al.***

## CERTIFICATE OF SERVICE

I hereby certify that, on January 6, 2019, a true and correct copy of the foregoing document was served on all parties consenting to electronic service of this case *via* the Court's *ECF system* for the Northern District of Texas.

/s/ C. Ashley Ellis
    C. Ashley Ellis