Marcus A. Helt (TX 24052187)
C. Ashley Ellis (TX 00794824)
Melina T. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: 214.999.3000
Facsimile: 214.999.4667

**COUNSEL TO DEBTORS**
**REAGOR-DYKES MOTORS, LP, *et al.***

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **REAGOR-DYKES MOTORS, LP, *et al.*[1]** | § | **Case No. 18-50214-rlj-11** |
| | § | **Jointly Administered** |
| Debtors. | § | |

## EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO INCUR POSTPETITION FINANCING

Reagor-Dykes Motors, LP, Reagor-Dykes Imports, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Plainview, LP, Reagor-Dykes Floydada, LP, Reagor-Dykes Synder, L.P., Reagor-Dykes III LLC, Reagor-Dykes II LLC, Reagor-Dykes And Reagor Auto Mall I LLC (collectively, "**Reagor-Dykes**" or the "**Debtors**"), as debtors and debtors-in-possession in the above-styled and captioned case, hereby file this *Emergency Motion for Interim and Final Orders Authorizing the Debtors to Incur Postpetition Financing* (the "**Motion**"). In support of the Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors are Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), Reagor-Dykes Floydada, LP (Case No. 18-50219), Reagor-Dykes Snyder, L.P. (Case No. 18-50321), Reagor-Dykes III LLC (Case No. 18-50322), Reagor-Dykes II LLC (Case No. 18-50323) and Reagor Auto Mall I LLC (Case No. 18-50325).

## I.
## EXECUTIVE SUMMARY

1.      Yesterday, the Debtors filed a chapter 11 plan of reorganization (the "**Plan**"). Under the Plan, the McDougal-Dykes-Ewing Group (the "**Plan Sponsor**") will provide up to $20.0 million in equity financing to the reorganized entity. That equity financing will be used to recapitalize the business, add jobs, repay creditors a meaningful amount, help consumers, and keep an important civic partner in West Texas. To bridge from today to the plan confirmation, the Debtors secured a commitment from International Bank of Commerce ("**IBC Bank**") or the Plan Sponsor to lend up to $4.75 million. That $4.75 million will be used to pay ordinary and necessary operating expenses incurred from January 5, 2019, to plan confirmation, which is projected to be April 1, 2019. As shown on the attached term sheet, the $4.75 mm will be lent to the Debtors in three phases – $1.0 mm from the Plan Sponsor + $2.0 mm from IBC Bank + $1.75 mm from IBC Bank. As part of this proposed financing, IBC Bank will also agree to (a) certain "rent concession" that will benefit the bankruptcy estates and (b) "roll" this debtor-in-possession financing into a post-confirmation obligation of the reorganized debtors. To give the Debtors time to finalize the documentation on this proposed financing with the Plan Sponsor and IBC Bank, and while the Debtors also fight Ford Credit's attempt to shut down this case and the business, Bart Reagor and Rick Dykes have agreed to advance the first $1.0 mm to the Debtors on an administrative-expense basis as soon as this financing is approved by this Court. The remaining $3.75 mm will be funded by IBC after the $1.0 mm is exhausted and as outlined in the attached term sheet.

2.      Because this proposed financing is necessary for the Debtors to pay ordinary and necessary expenses incurred on the way to the proposed plan confirmation, it should be approved on an interim basis first and then on a final basis. The proposed debtor-in-possession financing is in the best interests of the bankruptcy estates and their stakeholders. It does not prime any lien on

assets of the bankruptcy estates, and will provide liquidity necessary to work toward plan confirmation. As a result, this Motion should be approved.

## II.
## JURISDICTION AND VENUE

3. The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1334 and 157. These matters concern the administration of these bankruptcy estates; accordingly, the matters are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The legal predicates for the relief requested in this Motion are §§ 105(a), 364, 502, 1107(a), and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**"), and rules 4001, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## III.
## BACKGROUND

### A. The Bankruptcy Case

5. On August 1, 2018 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), thereby initiating the above-captioned, jointly-administered bankruptcy cases (collectively, the "**Chapter 11 Case**") in the Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**") and creating their bankruptcy estates (the "**Estates**"). Together with two non-debtor entities, Reagor Auto Mall, Ltd. and Reagor Dykes Snyder, LP, the Debtors operate eight (8) dealerships with thirteen (13) locations – twelve (12) in West Texas and one (1) location in Dallas – as a consolidated group (collectively, the "**Dealerships**").

6. The Debtors continue to operate and to manage their businesses as "debtors-in-possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code. However, on August 21,

2018, BlackBriar Advisors, L.L.P. ("**BlackBriar**") was approved on an interim basis by the Court as Chief Restructuring Officer to the Debtors [Docket No. 133].

7.　　On August 8, 2018, the Bankruptcy Court entered an order jointly administering the Chapter 11 Case [Docket No. 34].

8.　　On August 9, 2018, Ford Motor Credit Company filed its motion for relief from the automatic stay [Docket No. 46] ("**Ford Credit's Stay Relief Motion**"). At Ford Credit's request, Ford Credit's Stay Relief Motion has been passed or continued from time to time with the next hearing set for January 8, 2019.

9.　　No trustee or examiner has been appointed. No official committee of unsecured creditors has been established.

10.　　On September 10, 2018, the Debtors filed their *Motion for Entry of an Order (I) Authorizing and Approving: (A) Bid Procedures; (B) Stalking Horse Bidder and Overbid Protections; and (C) Form and Manner of Notices; (II) Scheduling an Auction and Sale Hearing; (III) Approving the Sale of Substantially All the Assets of the Debtors, Free and Clear of All Liens, Claims, Encumbrances and Interests; and (IV) Granting Related Relief* [Docket No. 230] (the "**Sale Motion**"). By the Sale Motion, the Debtors sought to sell substantially all of their assets (the "**Sale**").

11.　　The Debtors conducted a sale process and received sale offers during that process. The Debtors also received a proposal from the McDougal-Dykes-Ewing Group (the "**Plan Sponsor**") to recapitalize the business and provide a meaningful dividend to creditors. After consultation with Ford Motor Credit, the Debtors determined that the proposal made by the Plan Sponsor was materially better for the creditors than any outright sale offer. As a result, the Court entered an order abating the Sale Motion, pending further order of the Court [Docket No. 712] (the "**Abatement Order**"), and the Debtors started work on the Plan. The Plan was filed on January 7, 2019.

12. Since the entry of the Abatement Order, and consistent with the representations by the Debtors' counsel to the Court on November 29, 2018, the Debtors have worked diligently to secure financing and to draft the Plan, which sets for a viable path forward for the Debtors. The Debtors filed the Plan prior to filing this Motion.

**B.    Cash Collateral**

13. On August 2, 2018, the Debtors filed their *Joint Emergency Motion for Authority to Use Cash Collateral* [Docket No. 8] (the "**Cash Collateral Motion**"). By the Cash Collateral Motion, the Debtors sought authority to use the cash collateral of Ford Motor Credit Company ("**Ford Credit**"), which asserts a lien on the Debtors' inventory, as well as the proceeds, products, rents, issues, and profits of such inventory. The Debtors offered Ford Credit standard cash-collateral protections, including replacement liens.

14. On August 8, 2018, the Court entered the *Interim Order (I) Authorizing the Debtor to Use Cash Collateral of Ford Motor Company, (II) Granting Adequate Protection for Use Thereof, (III) Modifying the Automatic Stay to Allow for the Relief Requested Herein and (IV) Scheduling Final Hearing* [Docket No. 30].

15. The Court entered additional interim cash collateral orders, the most recent being the *Sixth Interim Order (I) Authorizing the Debtor to Use Cash Collateral of Ford Motor Company, (II) Granting Adequate Protection for Use Thereof, (III) Modifying the Automatic Stay to Allow for the Relief Requested Herein and (IV) Scheduling Final Hearing* [Docket No. 764] (the "**Sixth Interim Cash Collateral Order**"). The Sixth Interim Cash Collateral Order authorized the Debtors to use cash collateral until January 5, 2019.

16. On January 4, 2019, Ford Credit filed its Brief in Support of Ford Credit's Company LLC's Motion for Relief from the Automatic Stay [Docket No. 785].

17. On January 6, 2019, the Debtors filed its objection to Ford Credit's Stay Relief Motion [Docket No. 788] (the "**Lift Stay Objection**"), which was amended by the Debtors on

January 7, 2019. As set forth in the Lift Stay Objection, the Debtors assert that, among other things, the vehicles subject to Ford Credit's alleged security interests are necessary to an effective reorganization and that Ford Credit is adequately protected. Therefore, the Court should deny Ford Credit's Stay Relief Motion.

### IV.
### RELIEF REQUESTED AND BASIS THEREFOR

**A.     The DIP Facility**

18.     To get from today to plan confirmation, the Debtors need financing to operate and to confirm the Plan. Following a great deal of effort and diligence, the Debtors secured a commitment from (a) the Plan Sponsor or Bart Reagor[2] and Rick Dykes to lend up to $1.0 million (the "**Plan Sponsor DIP Facility**") and (b) IBC Bank to lend up to $3.75 million (the "**IBC DIP Facility**," together with the Plan Sponsor DIP Facility, the "**DIP Facility**") to allow the Debtors to emerge from bankruptcy. This lending is under the terms outlined herein and in the term sheet the "**Term Sheet**" attached as **Exhibit A** and will be used to sustain operations until plan confirmation.

19.     Ford Credit has refused use of cash collateral, and the Debtors have been unable, pursuant to sections 364(a) or (b) of the Bankruptcy Code, to obtain any unsecured credit or credit allowable under section 503(b)(1) of the Bankruptcy Code, respectively, other than outlined in this Motion. Therefore, the Debtors have been unable to obtain credit on terms more favorable than those summarized below and on **Exhibit A**.

20.     Accordingly, the Debtors have determined that, in the exercise of their sound business judgment and with the best interests of the Debtors' creditors and employees in mind, the postpetition financing represented by the DIP Facility is absolutely necessary. Bart Reagor, Rick Dykes, and IBC Bank have agreed to provide DIP Facility on an interim and final basis on the terms

---

[2] Bart Reagor has no role in the McDougal-Dykes-Ewing Group.

4829-3735-8469.1

outlined herein and **Exhibit "A"** and pursuant to an interim order in a form approved by Bart Reagor, Rick Dykes, and IBC Bank, to be submitted by the Debtors to the Court.

21.     Rick Dykes and Bart Reagor are willing to make the emergency $1.0 million loan on an administrative-expense basis to the Debtors so that they could secure the rest of the DIP Facility from IBC Bank. IBC Bank is willing to make loans and other financial accommodations to the Debtors but only in accordance with and on the terms and conditions set forth in the Term Sheet. Shortly before filing this Motion, the Debtors filed the Plan. The Plan shows how the Debtors will exit bankruptcy in a way that benefits West Texas, consumers, retail lenders, secured creditors, unsecured creditors, and other parties in interest. The DIP Facility will provide the Debtors with time to finalize and confirm the Plan.

22.     By this Motion, pursuant to sections 105, 361, 362, and 364 364 and to Bankruptcy Rules 2002, 4001, and 6004, the Debtors seek, among other things, the following:

    (a)     authorization to obtain the financing from Bart Reagor, Rick Dykes, and IBC Bank identified in the DIP Facility as described herein;

    (b)     authorization to execute and perform such other and further acts as may be required in connection with the DIP Facility;

    (c)     granting of the claims and rights under section 364(c)(1), (2), and (3) of the Bankruptcy Code as outlined in paragraph 26; and

    (d)     pursuant to Bankruptcy Rule 4001, that interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of a proposed order granting the relief requested herein on an interim basis and a final hearing (the "**Final Hearing**") on the Motion be held before this Court to consider entry of a proposed order granting the relief requested herein on a final basis.

**B.     Need for Emergency Relief**

23.     The Debtors bring this Motion on an emergency basis, given the immediate and irreparable harm that will be suffered by the Debtors if denied the ability to obtain credit as outlined in the Term Sheet. Such credit is necessary for the Debtors to sustain business operations, employ its employees, operate as a going concern, and confirm the Plan. The DIP Facility will permit the Debtors to, among other things, preserve the value of the Estates through Plan confirmation.

24.     Absent immediate use of such DIP Facility financing, the Debtors may be forced to immediately cease doing business, terminate employees, and shutter an important West Texas employer and civil partner. To avoid such an unnecessarily harsh result, the Debtors need to ensure the availability of such working capital now.

25.     The Debtors, Bart Reagor and Rick Dykes, and IBC Bank have engaged in good-faith and extensive arm's-length negotiations that culminated in the agreement by such financiers to provide the DIP Facility on the terms and conditions set forth in the Term Sheet.

26.     In summary, the DIP Facility provides for an initial $1 million infusion of capital into the Debtors. Upon exhaustion of such $1 million, another $2 million will be infused into the Debtors (the "**IBC Phase I DIP Facility**"), subject to and consistent with weekly budgets approved by IBC Bank and the Term Sheet. IBC Bank will thereafter fund up to an additional $1.75 million (the "**IBC Phase II DIP Facility**"), also subject to and consistent with weekly budgets approved by IBC Bank and consistent with other terms and conditions set forth in the Term Sheet. From and after funding until the Effective Date of the Plan pursuant to the Term Sheet, interest will accrue monthly at 6% fixed per annum and be payable by the Debtors monthly. As outlined herein and in the Term Sheet, the DIP Facility will be secured under Bankruptcy Code section 364(c) with (a) a super-priority administrative expense claim, (b) liens on property of the estate not already subject to liens other than commercial torts and avoidance actions (provided that such exclusion is

only to the extent such claims and actions end up being encumbered pursuant to the Court granting an adequate protection lien in favor of Ford Credit),[3] and (c) a junior lien on encumbered property, all subject to a carve-out for allowed professional fees (the "**Carve-Out**") not to exceed $900,000. The DIP Facility is subject to certain conditions, including Plan confirmation on or before May 1, 2019, granting IBC Bank an allowed unsecured claim for approximately $2.6 million for overdraft liability, a prohibition against any material adverse change, and a prohibition against the granting of any stay-relief motion.

## C. Applicable Authority

### *(i)* *Postpetition Financing*

27. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis under section 364(a) or (b) of the Bankruptcy Code, then the court may authorize that debtor to obtain credit or to incur debt that is entitled to superpriority administrative-expense status, secured by a senior lien on unencumbered property, a junior lien on encumbered property, or a combination of the foregoing pursuant to section 364(c).

28. Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization to obtain postpetition financing. That section provides, in relevant part, the following:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

---

[3] If this Court grants Ford Credit an adequate-protection to the extent of diminution in value, then IBC Bank, the Plan Sponsor, Bart Reagor, and Rick Dykes all object to any such lien on commercial torts against Ford Credit (or any affiliates thereof). The Debtors also so object.

Fed. R. Bankr. P. 4001(c)(2). Accordingly, the Court is authorized to grant the relief requested herein.

### (ii)     Approval Under Section 364(c)

29.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and a hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." *See In re Babcock and Wilcox Co.*, 250 F.3d 955, 957 (5th Cir. 2001); *In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir. BAP 1980); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (opining that a debtor seeking unsecured credit under section 364(c) must prove that it was unable to obtain unsecured credit pursuant to § 364(b)); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under section 364(a) and (b)).

30.     The Debtors were unable to obtain postpetition financing on the terms and of the type required in this Chapter 11 case on an unsecured basis or on any terms other than those contained in the Term Sheet.

31.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "a good-faith effort that credit was not available" without the protections afforded to potential lenders by section 364(c). *Bray v. Shenandoah Federal Savings & Loan Assn. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.; see also Ames*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd, Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

32.    At the hearing to approve this Motion, the Debtors will show that they contacted lending institutions as well as non-traditional sources of financing to see if they could receive terms more favorable than the terms outlined in the Term Sheet. However, none of these institutions were willing to make a post-petition loan on an unsecured basis or otherwise. Therefore, the Debtors sought to borrow money from IBC Bank as set forth in the Term Sheet.

33.    The Debtors' efforts to seek necessary postpetition financing from other sophisticated lending institutions satisfy the statutory requirements of section 364(c). *See, e.g., Ames,* 115 B.R. at 40 (approving section 364(c) financing facility and holding that the debtor made reasonable efforts to obtain less onerous terms when it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (requiring demonstration that less onerous financing was unavailable); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 n.9 (D. Del. 1984).

34.    Without the financing provided by the DIP Facility, the going-concern value of the Estates will immediately and irreparably plummet in value as the Debtors may be forced to quickly cease business operations. The value being preserved through the use of the DIP Facility clearly shows that all stakeholders of the Estates will benefit. Accordingly, the requirement of section 364(c) is met, and this Court should authorize the DIP Facility.

      ***(iii)    Bart Reagor, Rick Dykes, and IBC Bank Should be Deemed Good-Faith Lenders under Bankruptcy Code Section 364(e)***

35.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of

the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

36.     Section 364(e) of the Bankruptcy Code was designed to "encourage the extension of credit" to debtors by allowing lenders to "rely on a bankruptcy court's authorization of the transaction." *In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of section 364(e) is to "overcome people's natural reluctance to deal with a bankrupt firm whether as a purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge."). *See also In re North Atlantic Millwork Corp.*, 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of section 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankrupt entities.").

37.     As explained above, the DIP Facility is the result of the Debtors' reasonable and informed determination that the terms offered were the most favorable terms on which to obtain needed post-petition financing, and of extended arm's-length, good-faith negotiations between the Debtors and Bart Reagor and Rick Dykes and IBC Bank. The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds under the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Facility other than as described herein.

4829-3735-8469.1

38.     Accordingly, the Court should find that Bart Reagor, Rick Dykes, and IBC Bank are all "good-faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

**D.      The DIP Facility is Necessary to Preserve the Estates**

39.     It is essential that the Debtors immediately instill their employees with confidence in the Debtors' ability to continue meeting payroll obligations in order to retain the remaining essential employees that are vital to the continued operation of the Debtors' business.     Without the employees, the Debtors cannot operate.

40.     The continuation of the Debtors' operations as a going concern is the only hope of a meaningful recovery for the Debtors' creditors.     Accordingly, the Debtors submit that their need for approval of the DIP Facility is immediate.

**E.      The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate**

41.     The terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arms' length.     In the reasonable exercise of the Debtors' business judgment, the DIP Facility is the best financing option available under the Debtors' present circumstances.     The purpose of the DIP Facility is to enable the Debtors to continue to operate and to emerge from Chapter 11.     Further, the DIP Facility does not, directly or indirectly, materially deprive the Debtors' estates or other parties-in-interest of possible rights and powers by restricting the services for which professionals may be paid in this case.     *See Ames*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "absent such protection, the collective rights and expectation of all parties-in-interest are sorely prejudiced").

42.     The proposed DIP Facility generally provides that the protections granted to Bart Reagor, Rick Dykes, and IBC Bank herein and in the Term Sheet for the obligations under the DIP Facility are subject to the Carve-Out Expenses, as described above.     *In Ames Dept. Stores*, the

bankruptcy court found that such "carve-outs" for professional fees are not only reasonable but necessary to ensure that official committees and the debtor's estates are adequately assisted by counsel. *See Ames*, 115 B.R. at 40.

43.     Likewise, the various fees and charges required under the DIP Facility are reasonable and appropriate under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

44.     The fairness and reasonableness of the terms of the DIP Facility will further be demonstrated at the Interim Hearing.

E.     **Application of the Business-Judgment Standard**

45.     After appropriate investigation and analysis, the Debtors have concluded that the DIP Facility is the only alternative available under the circumstances of these cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment, . . . [and were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); *In re Simasko Prods. Co.*, 47 B.R. 444, 449 (D. Conn. 1985) ("[B]usiness judgments should be left to the board room and not to this Court."). Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

46. The Debtors have exercised sound business judgment in determining that the DIP Facility is appropriate and have satisfied the legal prerequisites to incur debt on the terms and conditions set forth herein and in the Term Sheet. The terms of the DIP Facility are in the best interests of the Debtors, their creditors, and the Estates. Accordingly, the Debtors should be granted authority to enter into the DIP Facility and to obtain funds thereunder on the bases described above pursuant to section 364(c).

## F. Interim Approval Should Be Granted

47. Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), a final hearing on the Motion may not be commenced before 14 days after service of that Motion. Fed. R. Bankr. P. 4001. This Court may, however, conduct a preliminary hearing before the expiration of that 14-day period and likewise authorize the incurrence of DIP Facility as provided in the Term Sheet to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.

48. Subsequent to the filing of this Motion, and subject to the terms of the Term Sheet, the Debtors, Bart Reagor, Rick Dykes, the Plan Sponsor, and IBC will draft, negotiate, finalize, and file with this Court appropriate documentation as required by the Bankruptcy Code and the Rules, to set forth in detail the terms of the DIP Facility.

49. In examining requests under this Bankruptcy Rule, courts apply the same business-judgment standard as is applicable to other business decisions. *See Ames*, 115 B.R. at 38. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *Id.* at 36. The Debtors submit that they need the funding provided by the DIP Facility on an interim basis to avert immediate and irreparable harm to its business and to preserve the necessary operations.

50. The Debtors request that the Court conduct an expedited interim hearing on the Motion and authorize the Debtors from and after the entry of the Interim DIP Order to obtain credit under the DIP Facility. As part of the Motion, but subsequent to the Court's expedited hearing on the Motion on the first $1.0 million of the DIP Facility, the Debtors request the Court to conduct a preliminary hearing on the Motion and the remaining $3.75 million and authorize the Debtors to such the DIP Facility from and after entry of the order approving such financing as provided in the final documentation related to the DIP Facility, subject to and consistent with Term Sheet.

## V.
## CHECKLIST

51. Given the emergency nature of this Motion, the Debtors have not yet prepared the *Attorney Checklist Concerning Motions and Orders Pertaining to the Use of Cash Collateral* in a format conforming to Appendix H of the Bankruptcy Local Rules (the "**Checklist**"). However, the Checklist will be prepared and filed by the Debtors as expeditiously as possible, and before any final hearing scheduled on this Motion.

## VI.
## NOTICE

52. Notice of this Motion will be given to the following: (a) the Office of the United States Trustee; (b) the Prepetition Lenders; (c) all creditors known to the Debtors who have or may assert liens against the Debtors' assets; (d) the United States Internal Revenue Service; (e) the twenty (20) largest unsecured creditors of the Debtors; and (f) all parties in interest who have filed a notice of appearance or on whom service must be effected under the Federal Rules of Bankruptcy Procedure. Given the nature of the relief requested herein, the Debtor submits that no further notice is required.

4829-3735-8469.1

WHEREFORE, the Debtors respectfully request the entry of an order granting the relief requested herein, and granting such other and further relief as is just and proper.

DATED: January 8, 2019

Respectfully submitted by:

*/s/ Marcus A. Helt*
Marcus A. Helt (TX 24052187)
C. Ashley Ellis (TX 00794824)
Melina T. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: 214.999.3000
Facsimile: 214.999.4667

**COUNSEL TO DEBTORS REAGOR-DYKES MOTORS, LP, *et al.***

## CERTIFICATE OF SERVICE

I hereby certify that, on January 8, 2019, a true and correct copy of the foregoing document was served electronically by the Court's PACER system.

*/s/ Marcus A. Helt*
Marcus A. Helt

**TERM SHEET**

The following is IBC's proposed terms with respect to IBC DIP Facility (defined below) and the Chapter 11 Plan of Reorganization of the Reagor-Dykes debtor entities ("plan" or "Plan"):

1. **DIP Facility:**
   a. <u>Principal Amount</u>: $4.75 million
   b. <u>Lenders and Amounts</u>:
      i. IBC Bank - $2 million initially ("<u>IBC Phase I DIP Facility</u>") and with the potential of an additional $1.75 million ("<u>IBC Phase II DIP Facility</u>" and together with IBC Phase I DIP Facility, "<u>IBC DIP Facility</u>").
         1. IBC DIP Facility supported by appropriate credit support to be determined later by IBC and McDougal Group Entity(ies) ("<u>Plan Sponsor</u>") or individual members of the Plan Sponsor, as applicable.
         2. IBC Phase II DIP Facility is not based on the sale of Amarillo dealership, including real estate. If such assets are sold, IBC must consent to release price for real estate and proceeds of same being paid to IBC.
         3. Funding of IBC DIP Facility, is conditioned upon all terms set forth herein.
      ii. Plan Sponsor - $1 million ("<u>Plan Sponsor DIP Facility</u>").
         1. Plan Sponsor DIP Facility will be first DIP loan proceeds in and to be documented by debtors and Plan Sponsor, subject to terms being consistent with this term sheet and IBC's review and approval (with such approval not being unreasonably withheld, conditioned or delayed).
         2. Plan Sponsor DIP Facility shall be fully subordinated and junior to IBC DIP Facility immediately upon the first funding of the IBC DIP Facility.
         3. Upon plan confirmation,[1] the Plan Sponsor DIP Facility may be (i) paid in full; (ii) assumed by reorganized debtors or Plan Sponsor; (iii) refinanced by reorganized debtors or Plan Sponsor; or (iv) addressed in any other manner acceptable to reorganized debtors and Plan Sponsor. Under any scenario, all on terms acceptable to Plan Sponsor and the other parties involved.
   c. <u>General Structure</u>: Existing Debtors become DIP borrowers. IBC's funding of IBC Phase I DIP Facility will commence upon exhaustion of Plan Sponsor DIP Facility, provided that IBC's funding on IBC Phase I DIP Facility is subject to and consistent with weekly budgets approved by IBC. IBC funding of IBC Phase II DIP Facility will commence upon exhaustion of IBC Phase I DIP Facility, provided that IBC's funding of IBC Phase II DIP Facility is subject to and consistent with weekly budgets approved by IBC.
   d. <u>General Terms of IBC DIP Facility Revolver</u>:
      i. Initial term of IBC DIP Facility to be the period from date of execution of IBC DIP Facility loan documents through confirmation of a plan. During the initial period, interest will accrue monthly at 6% fixed per annum on the IBC DIP Facility and be paid monthly.
      ii. Upon plan confirmation, one of the following shall occur (1) the IBC DIP Facility shall be paid in full, (2) the Plan Sponsor will assume the IBC DIP Facility or (3)

---

[1] The use of "upon plan confirmation" throughout this Term Sheet refers to and means for all purposes the "Effective Date" of the confirmed chapter 11 plan of the Debtors.

**EXHIBIT**

A

tabbies®

the reorganized debtors will assume the IBC DIP Facility (items (2) and (3) are collectively, "<u>Assumed IBC DIP Facility</u>").

    iii. Upon plan confirmation, the terms of the Assumed IBC DIP Facility will be on a 5-year amortization and term and accrue interest at a fixed rate of interest of 6% per annum.

    iv. In the event plan confirmation does not occur, the IBC DIP Facility will be an obligation of the debtors' bankruptcy estate with IBC having such rights provided for in any orders of the U.S. Bankruptcy Court for the Northern District of Texas (Lubbock Division) granting and authorizing the IBC DIP Facility, the underlying loan documents documenting the IBC DIP Facility, or by applicable law.

  e. <u>Liens/Rights Bankruptcy Code</u>: IBC DIP Facility secured by rights under Section 364(c) of the Bankruptcy Code—super priority administrative expense claim, liens on property of estate not already subject to a lien, and a junior lien ("<u>364(c) Rights</u>"), subject to a carve-out for allowed professional fees not to exceed $900,000.

2. **Real Estate - IBC Existing 3 Loans**:

  a. <u>Three Real Estate Loan Amounts</u>: As of 1-4-19, principal balance is $33,966,954.19[2] with combined accrued interest as of 1-4-19 of $407,099.58 and a per diem of $5,540.24 thereafter. All accrued and unpaid interest to be paid upon plan confirmation/assumption.

  b. <u>Assumption</u>: As part of the chapter 11 plan, the Plan Sponsor (or a special purpose entity of the Plan Sponsor) (in either case "<u>Assumed Borrower</u>") will be obligated to assume the IBC Real Estate Loans secured by the real estate currently pledged to IBC as collateral ("<u>IBC Real Estate Loans</u>"). In the event a plan is not confirmed, neither the debtors nor the Plan Sponsor will have any obligation to assume the IBC Real Estate Loans.

  c. <u>General Terms of Assumption</u>: Upon plan confirmation, the assumed IBC Real Estate Loans will have the following terms: a 20-year amortization; 6.5-year balloon (monthly interest only for first 18 months after plan confirmation followed by 5 years of principal and interest payments); the Assumed Borrower and IBC will enter into a rate-swap transaction whereby Assumed Borrower will pay a fixed rate based on IBC receiving a floating rate of 30 day LIBOR plus 250 basis points per annum using the fixed rate offered by IBC's counterparty.

  d. <u>Rent Concession, Collateral, Credit Support and Recourse</u>:

    i. IBC will continue to provide rent concessions on IBC Real Estate Loans until May 1, 2019. Upon confirmation, IBC will agree that it has no administrative expense against the debtors' bankruptcy estates with respect to unpaid or deferred rent related to the IBC Real Estate Loans.

    ii. Assumed Borrower becomes the borrower of IBC Real Estate Loans upon confirmation and liens on real estate currently pledged to IBC remain in place and are amended or ratified, as necessary, by Assumed Borrower.

---

[2] Note, IBC's loan documents create all "Obligations" owed by D and R Acquisitions to IBC to include, among other things, overdrafts by D and R Acquisitions and the guarantors. IBC has elected as part of this term sheet to not include the approx. $2 million of overdraft attributable to D and R Acquisitions.

**TERM SHEET**

    iii. Assumed IBC Real Estate Loans will be with recourse on (i) real estate and (ii) against Assumed Borrower, but no other credit support or guaranties will exist on the IBC Real Estate Loans except as provided in <u>sub-section (iv)</u> below.

    iv. Because of Assumed Borrower's assumption of the IBC Real Estate Loans, D and R Acquisitions, L.L.C. will transfer the real estate securing IBC's Real Estate Loans to Assumed Borrower. Upon such transfer and assumption of the IBC Real Estate Loans, all currently existing borrowers, co-borrowers, and guarantors shall be released, provided that any current guarantor of such loans that is a member of or otherwise has a financial or ownership interest, whether directly or indirectly, in the Plan Sponsor (or affiliates thereof) will remain a guarantor of the assumed IBC Real Estate Loans.

3. **Miscellaneous and Conditions:**

    a. Assumes plan confirmation on or before May 1, 2019.

    b. In connection with IBC DIP Facility and/or the Plan, Debtors will grant IBC an allowed unsecured claim for approximately $2.6 million for overdraft liability ("<u>IBC Unsecured Claim</u>").

    c. For the avoidance of doubt, in the event plan confirmation does not occur on or by May 1, 2019, IBC's rights and remedies with respect to the IBC DIP Facility or the IBC Real Estate Loans are preserved and unaffected and IBC shall be entitled to exercise any and all available remedies.

    d. IBC's obligations, including but not limited to funding any part of IBC DIP Facility, are subject to all of the following conditions being satisfied (in IBC's sole discretion):

        i. Full due diligence, approval and underwriting by IBC, including Plan Sponsor or individuals of Plan Sponsor for credit support on IBC DIP Facility, Assumed IBC DIP Facility, as applicable, and assumption of IBC Real Estate Loans;

        ii. Acceptable credit support from Plan Sponsor or individual members of Plan Sponsor for IBC DIP Facility (as decided in 1(b)(i)(1) above) and, for the avoidance of doubt, credit support for the IBC DIP Facility shall carry over and pertain to the Assumed IBC DIP Facility;

        iii. Plan Sponsor DIP Facility being fully funded and exhausted pursuant to weekly budgets approved by IBC;

        iv. Bankruptcy Court Order approving IBC DIP Facility on interim and final basis, including granting IBC 364(c) Rights, and entry of order allowing the IBC Unsecured Claim;

        v. Debtors' Plan being consistent and structured in accordance with the terms set forth herein, including appropriate plan modifications, amendments or supplements in form and content acceptable to IBC to address any differences between terms herein and in Plan to be filed by debtors on or before 1-8-19. No further plan modifications, amendments or supplements without IBC's prior written consent, which shall not be unreasonably withheld or given;

        vi. Documentation and terms of IBC DIP Facility, assumption of IBC Real Estate Loans, and Plan acceptable to IBC, including events of default provisions for IBC DIP Facility, benchmarks/milestones being met, no further or other debt being incurred by debtors;

        vii. Final approval by IBC Bank;

**TERM SHEET**

    viii. No material adverse changes, as determined by IBC, in debtors' operations or debtors' bankruptcy cases, including, but not limited to, material creditors obtaining relief from automatic stay; and

    ix. All other terms set forth herein.