

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 17, 2019**

**United States Bankruptcy Judge**

___

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| REAGOR-DYKES MOTORS, LP,[1] | § | CASE NO. 18-50214-rlj11 |
| | § | Jointly Administered |

## MEMORANDUM OPINION

On January 8, 2019, hearing was held on the motion of Ford Motor Credit Company, LLC ("Ford Credit") seeking relief from the automatic stay. Reagor-Dykes Motors, L.P. and the other affiliated debtors ("Reagor-Dykes") oppose the motion. Upon completion of the hearing, the Court took the matter under advisement.[2]

## I.

Reagor-Dykes filed their bankruptcy petitions on August 1, 2018. Ford Credit filed the

___

[1] The chapter 11 cases of Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo, LP (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), Reagor-Dykes Floydada, LP (Case No. 18-50219), Reagor-Dykes Snyder, L.P. (18-50321), Reagor-Dykes III LLC (18-50322), Reagor-Dykes II LLC (18-50323), Reagor Auto Mall, Ltd. (18-50324), and Reagor-Dykes Auto Mall I LLC (18-50325) are jointly administered in Case No. 18-50214-rlj-11.

[2] The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

1

stay motion on August 9, 2018.³  Ford Credit asked that any hearing on the motion be continued while Reagor-Dykes, under the guidance of an appointed chief restructuring officer, was attempting to sell the vehicle inventory under § 363 of the Bankruptcy Code.  Ford Credit thus agreed, under strict budgets imposed on Reagor-Dykes, to allow Reagor-Dykes to use "cash collateral"—funds realized through operations that became part of Ford Credit's collateral.  Six interim cash collateral orders have been approved by the Court.

But the sale process failed.  The failure was announced to the Court on November 29, 2018.  Then, however, Reagor-Dykes, through counsel, also announced that it had a new "global solution" that featured a $20 million equity contribution by the so-called "McDougal-Dykes-Ewing Group."  This "group" is actually three individuals, including Rick Dykes who, along with Bart Reagor, is one of the two owners of the Reagor-Dykes entities.  For their contribution, they would receive 90% of the reorganized dealerships.  The McDougal-Dykes-Ewing Group would serve as "plan sponsor" under a reorganization plan that would be filed, with a disclosure statement, within two weeks of the November 29 hearing.  This "solution" provided for a payment of $8 million to Ford Credit and the assumption of Ford Credit's floorplan debt (and debts of other secured creditors).  It had no provision for exit financing under a new floorplan loan.  Most important, the proposal was conditioned on Ford Credit's approval and, in particular, its agreement to release Rick Dykes and Bart Reagor from further liability to Ford Credit.  Ford Credit's counsel responded that the proposal, as then outlined, was not acceptable and asked that its stay motion be set for hearing as soon as possible.  The Court thus set the hearing for January 8, 2019.  Reagor-Dykes was not able, after the November 29 hearing, to obtain Ford Credit's

---

³ Ford Credit's motion concerns the following Reagor-Dykes bankruptcy estates: Reagor-Dykes Motors, LP (Case No. 18-50214), Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo, LP (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), and Reagor-Dykes Floydada, LP (Case No. 18-50219).

agreement and thus ultimately filed its plan of reorganization on January 7, 2019.

The plan, as filed, has similarities to the announced "global solution," but it also has significant differences. It states that Reagor-Dykes now disputes Ford Credit's claim and, barring agreement with Ford, simply reserves the right to treat Ford Credit's claim, if and how allowed. If allowed as partially secured, the plan states that the secured portion will be amortized or satisfied through surrender of the collateral or by "payment in full." Any unsecured portion would share pro rata in certain potential litigation proceeds. It still highlights the involvement of the McDougal-Dykes-Ewing Group and their contribution of $20 million, but it does not require that Ford Credit release Rick Dykes and Bart Reagor.

Significantly, the plan states that $3 million will be allocated to reimburse retail lenders that pay outstanding TT&L claims (for tax, title, and license fees) and liens on trade-ins. (The issue of unpaid TT&L and trade-in debt has plagued the case from the outset.)

## II.

Ford Credit seeks relief from the stay under § 362(d)(1) and (d)(2) of the Bankruptcy Code. Subsection (d)(1) states that the Court "shall" grant relief from the stay for "cause, including the lack of adequate protection" for a creditor's interest in estate property. Subsection (d)(2), which provides an alternative basis for stay relief, states that stay relief must be granted if (i) the debtor has no equity in estate property that, as here, secures the moving creditor's claim, and (ii) such property, the collateral, is "not necessary to an effective reorganization." The "property" at issue here is the inventory of vehicles (and other items) that secure Ford Credit's claim and that are held by the Reagor-Dykes bankruptcy estates.

Reagor-Dykes requests that the Court deny stay relief to Ford Credit. And it points to the plan of reorganization that it filed the day before the hearing. Apart from alleging that Ford

Credit's request is ill-conceived—that it "helps no one, including Ford Credit itself"—and an "attempt to obliterate Reagor-Dykes," Reagor-Dykes's substantive response to the motion is the plan and what it proposes. It argues that, pending confirmation of its plan, Ford Credit's collateral—the vehicle inventory—is secure, insured, and thus protected.

For the two grounds of stay relief, the moving party, here Ford Credit, has the burden of proof on the issue of the debtors' equity in the collateral. 11 U.S.C. § 362(g)(1). The opposing party, here Reagor-Dykes, has the burden on all other issues—specifically the adequacy of adequate protection under (d)(1) and, under (d)(2), whether the property is necessary to an effective reorganization. § 362(g)(2).

### III.

Ford Credit satisfied its burden of proving that Reagor-Dykes does not have an equity in the inventory. *See* 11 U.S.C. § 362(d)(2), (g)(1). Ford Credit's debt exceeds $112 million; the inventory is worth much less. Ford Credit's witness, Paul Boudreau, testified that the vehicle inventory has a value of $60–70 million. Reagor-Dykes's schedules state that the value is in the $90 million range. That Reagor-Dykes has no equity in the inventory not only satisfies the first prong of the two-part test under § 362(d)(2), it also colors the analysis of whether Ford Credit is adequately protected under subsection (d)(1). First, there is no equity cushion to protect Ford Credit. Second, with a declining collateral value, *some* form of protection must be provided. Boudreau credibly testified that, though difficult to quantify, the inventory-collateral is declining in value. Perhaps as much as 1–2% per month. The extent of decline depends in part on whether the vehicles are used or new. Reagor-Dykes has both. The Court is convinced that new and used cars and trucks sitting on a lot will decline in value over time.

A debtor-in-possession must, during the pendency of a chapter 11 case, protect a secured

creditor's interest in its collateral. *See* § 361. Ford Credit is not being provided, and has not been offered, any form of adequate protection—not periodic cash payments, no additional collateral, and no other form of relief that would give Ford Credit the indubitable equivalent of its interest. *See id*. Reagor-Dykes instead argues that under its plan, Ford Credit will have a greater recovery than that realized from a "fire sale" of the inventory. But a bare proposal under a plan filed the day before the hearing, without an accompanying disclosure statement, does not satisfy the requirement of adequate protection.

As for relief under subsection (d)(2), the sole issue is whether the inventory is necessary to an effective reorganization. Of course, vehicles are necessary to an automobile dealership. The standard requires more than that, however. *Mercado v. Combined Invs., LLC (In re Mercado)*, 523 B.R. 755, 762–63 (B.A.P. 1st Cir. 2015). A debtor satisfies its burden under § 362(d)(2)(B) when it proves that the subject "property is essential for an effective reorganization *that is in prospect*. This means . . . that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 376 (1988) (internal citation omitted) (emphasis in original). Such proof may be required within the relatively early stages of a case. *Id*. (citing § 1121(b), (c)(2) and collecting cases in which the stay was lifted during the exclusivity period). To be in prospect, a plan must "do more than manifest unsubstantiated hopes for a successful reorganization." *Canal Place Ltd. P'ship v. Aetna Life Ins. (In re Canal Place Ltd. P'ship)*, 921 F.2d 569, 577 (5th Cir. 1991). A reorganization plan should have "reasonable assurances of commercial viability[,]" but guaranteed success is not a requirement. *In re Omni Lion's Run, L.P.*, 578 B.R. 394, 400 (Bankr. W.D. Tex. 2017) (citing *In re Geijsel*, 480 B.R. 238, 256 (Bankr. N.D. Tex. 2012)).

Reagor-Dykes's plan, as filed, has contingencies on issues that, frankly, make or break the viability of the plan. Reagor-Dykes has no prospective lender to provide floorplan financing going forward. Floorplan financing is complicated and requires a lender that has the ability to meet huge credit requests. Ford Credit's debt of $112 million is evidence of this. The plan provides for the so-called "assumption" of the Ford Credit debt. This does not mean that Ford Credit can be forced to continue to finance Reagor-Dykes going forward, however. Ford Credit has made it clear that it has no interest in doing so. Reagor-Dykes has not sought and thus does not have preliminary approval of manufacturers, commonly referred to as "OEMs," for its continued dealership-branding and purchase of new vehicles. And though the plan identifies the McDougal-Dykes-Ewing Group as its plan sponsor, Reagor-Dykes offered no evidence from any member of the group of their ability to provide the $20 million capital investment contemplated by the plan.

A chapter 11 plan when first proposed may indeed have contingencies and points of dispute. But when faced with the prospects of a major stay motion by its largest secured creditor, a debtor must provide *some* evidence that a plan "is in prospect." A bare proposal is not sufficient. A chapter 11 plan requires creditor and court approval. It is a complicated, process-driven endeavor. Given Reagor-Dykes's track record during this case—the chaos at filing and the extraordinary loss of employees, the lack of capital, the multiple extensions for filing schedules, the changing of counsel, the "pivots" from one concept to another for a plan—the Court concludes that Reagor-Dykes does not have a "reasonable possibility of a successful reorganization within a reasonable time."

Last, Ford Credit provided evidence of what it has alleged from the outset—that Reagor-Dykes sold approximately 1,100 vehicles "out of trust" and thus an approximate $40 million of

6

cars and trucks are now gone. And with this, it has hundreds of sales on which the TT&L fees and trade-in liens went unpaid. Ford Credit has, to a degree, cooperated with Reagor-Dykes during these bankruptcy proceedings. These cases need, and perhaps unrealistically so, a prompt resolution. The deferral of attorney's fees and rents and the incurrence of debt post-filing are driving-up administrative expenses. Sufficient cause exists to warrant relief.

## IV.

Section 362(d) of the Bankruptcy Code mandates that this Court grant relief from the automatic stay if the provisions of subsections (d)(1) or (d)(2) are established. Both are satisfied here. The Court grants Ford Credit's motion and hereby lifts the automatic stay as to Ford Credit and its collateral. The parties can obviously still reach an accord, despite the stay relief granted here. But if Ford Credit proceeds with enforcement of its rights of repossession, Reagor-Dykes is directed to cooperate with Ford Credit. And upon repossession, Ford Credit shall file with the Court a report that identifies the vehicles taken into its possession with the following information for each vehicle: the make, model, and year; whether it is new or used; and the vehicle identification number. The 14-day stay of Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure is waived.

### End of Memorandum Opinion ###