THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **REAGOR-DYKES MOTORS, LP,** *et al.*[1] | § | **Case No. 18-50214-rlj-11** |
| | § | **Jointly Administered** |
| Debtors. | § | |

## FIRST AMENDED MODIFIED DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN OF REORGANIZATION FOR REAGOR-DYKES AUTO GROUP

(DATED: September 3, 2019)

MARCUS A. HELT
C. ASHLEY ELLIS
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Fax: (214) 999.4667
Email: mhelt@foley.com
aellis@foley.com

ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION

---

[1] The following Debtors are jointly administered: Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo, LP (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), and Reagor-Dykes Floydada, LP (Case No. 18-50219), Reagor-Dykes II, LLC (Case No. 18-50323), Reagor-Dykes III, LLC (Case No. 18-50322), Reagor Auto Mall I LLC (Case No. 18-50325), Reagor Auto Mall, Ltd. (Case No. 18-50324), Reagor-Dykes Snyder, L.P. (Case No. 18-50321).

## TABLE OF CONTENTS

Page

**DISCLAIMERS** ...........................................................................................................1

**Disclosure Regarding Forward-Looking Statements** ............................................3
  ARTICLE I INTRODUCTION..................................................................................4
    Section 1.1  Voting Procedure .............................................................................5
    Section 1.2  Explanation of Chapter 11 ..............................................................7
    Section 1.3  Rules of Interpretation ....................................................................9
    Section 1.4  Recommendation of the Proponents to Approve the Plan.................10
  ARTICLE II Summary.............................................................................................11
    Section 2.1  Alternative Paths to Confirmation .................................................11
    Section 2.2  Plan and Treatment of Claims – Restructuring Alternative.  Under the
    Restructuring Alternative, the Plan will effectuate a reorganization of the Dealerships, the
    business, and the operations.  Pursuant to the terms of the Plan and a Restructuring:................12
    Section 2.3  Plan and Treatment of Claims – Liquidation Alternative.  Under the Liquidation
    Alternative, the Plan will effectuate an orderly wind down of the Debtors' business operations,
    a controlled liquidation of all Collateral, and the transfer of all Causes of Action to the
    Liquidation Trust.  Pursuant to the terms of the Plan and the Liquidation Alternative:.............16
  ARTICLE III HISTORICAL BACKGROUND AND PREPETITION BUSINESS
  OPERATIONS.........................................................................................................27
    Section 3.1  GP Debtors.....................................................................................27
    Section 3.2  LP Debtors......................................................................................27

**Factors Precipitating the Filing of These Chapter 11 Cases** ...................................28
  ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN:  RESTRUCTURING
  ALTERNATIVE .......................................................................................................29
  ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN: LIQUIDATION
  ALTERNATIVE .......................................................................................................30
  ARTICLE VI ASSETS OF THE DEBTORS ON THE PETITION DATE..............................31
    Section 6.1  Debtors' Assets ..............................................................................31
    Section 6.2  Claims and Causes of Action of Debtors...........................................36
  ARTICLE VII LIABILITIES OF THE DEBTORS ........................................................40
    Section 7.1  Administrative Claims: All Debtors ................................................40
    Section 7.2  Scheduled and Known Secured and Priority Claims, Pending Litigation.............42
    Section 7.3  Unsecured Claims ..........................................................................47
  ARTICLE VIII SUMMARY OF KEY MATTERS ARISING DURING THE CHAPTER 11
  CASES ...................................................................................................................47
    Section 8.1  Commencement of the Debtors' Cases.............................................47
    Section 8.2  Employment of the Chief Restructuring Officer ...............................48
    Section 8.3  Auction of Assets Held by Original Debtors.....................................48
    Section 8.4  Consumer Protection Efforts............................................................48
    Section 8.5  Global Negotiations........................................................................48
  ARTICLE IX ACCEPTANCE AND CONFIRMATION OF THE PLAN ...............................49
    Section 9.1  Requirements for Confirmation.......................................................49
  ARTICLE X LIQUIDATION ANALYSIS.....................................................................52

ARTICLE XI VOTING PROCEDURES ...................................................................................54

    Section 11.1 Classes Entitled to Vote on the Plan ..........................................................54

    Section 11.2 Persons Entitled to Vote on the Plan .........................................................54

    Section 11.3 Vote Required for Class Acceptance ..........................................................55

    Section 11.4 Voting Instructions......................................................................................55

    Section 11.5 Disputed and Unliquidated Claims ............................................................56

    Section 11.6 Possible Reclassification of Creditors and Interest Holders ......................57

ARTICLE XII CRAMDOWN OR MODIFICATION OF THE PLAN ......................................57

    Section 12.1 "Cramdown:" Request for Relief under Section 1129(b) ...........................57

    Section 12.2 The Plan Meets the "Best-Interest-of-Creditors" Test ..............................58

    Section 12.3 The Plan Meets the Cramdown Standard with Respect to Any Impaired Class of Claims Rejecting the Plan .........................................................................................58

    Section 12.4 Modification or Revocation of the Plan; Severability.................................58

ARTICLE XIII RISK FACTORS...............................................................................................59

    Section 13.1 Factors Relating to Chapter 11 and Restructuring via the Plan................59

    Section 13.2 Insufficient Acceptances.............................................................................60

    Section 13.3 Lack of Material Recoveries on the Causes of Action ...............................61

ARTICLE XIV CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN61

ARTICLE XV RECOMMENDATION OF THE PLAN PROPONENTS .................................63

4842-6525-0690.16

# TABLE OF AUTHORITIES

Page(s)

**Federal Statutes**

United States Code Title 11.............................................................................................Page | 4

United States Code Title 28 Chapter 123.....................................................................Page | 32

Bankruptcy Code
    § 102.......................................................................................................................Page | 9
    § 326.....................................................................................................................Page | 40
    § 362.......................................................................................................................Page | 7
    § 506.....................................................................................................................Page | 21
    § 506(b)..............................................................................................Page | 21, Page | 45
    §§ 1101, 1107 and 1108......................................................................................Page | 7
    §§ 1107 and 1108.................................................................................................Page | 4
    § 1121(d)..............................................................................................................Page | 7
    § 1122................................................................................................Page | 37, Page | 43
    § 1123(b)...........................................................................................................Page | 30
    § 1124................................................................................................................Page | 41
    § 1126(g)...........................................................................................................Page | 41
    § 1127................................................................................................................Page | 45
    § 1129.................................................... Page | 7, Page | 10, Page | 37, Page | 44
    § 1129(a)............................................................................Page | 8, Page | 37, Page | 44
    § 1129(a)(9).....................................................................................Page | 21, Page | 38
    § 1129(b)....................................Page | 8, Page | 38, Page | 42, Page | 44, Page | 46

BANKRUPTCY CODE
    § 1145.................................................................................................................Page | 2

Code
    § 503(b)..............................................................................................................Page | 32
    § 507(a)(1)..........................................................................................................Page | 32
    § 1111(b)............................................................................................................Page | 38
    § 1129(b)(2).......................................................................................................Page | 45

Securities Act
    § 27A..................................................................................................................Page | 3

Securities Exchange Act of 1934
    § 21E..................................................................................................................Page | 3

UNDER THE SECURITIES ACT OF 1933.....................................................................Page | 2

**State Statutes**

Bankruptcy Rule 3018 ............................................................................................Page | 43

Bankruptcy Rule 3018(a)........................................................................................Page | 43

Bankruptcy Rule 9006(a).........................................................................................Page | 9

EXHIBITS

- EXHIBIT A – CHAPTER 11 PLAN
- EXHIBIT B – REORGANIZATION PROJECTIONS/POST-CONFIRMATION BUSINESS PLAN
- EXHIBIT C – LIQUIDATION ANALYSIS
- EXHIBIT D – FORM OF ORDER APPROVING DISCLOSURE STATEMENT
- EXHIBIT E – CAUSES OF ACTION
  - EXHIBIT F – LAWSUIT STYLED *INTERNATIONAL BANK OF COMMERCE V. FORD MOTOR CREDIT COMPANY, LLC A/K/A FORD MOTOR COMPANY*, CASE NO. 5:19-CV-00137-C FILED IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, LUBBOCK DIVISION
- EXHIBIT G – EXECUTIVE BIO OF RON BLAYLOCK
- EXHIBIT H – CURRENT BALANCE SHEET

## DISCLAIMERS

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN OF REORGANIZATION OF THE DEBTORS AND DEBTORS-IN-POSSESSION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A, PROPOSED BY THE DEBTORS IN THESE CHAPTER 11 CASES. THIS DISCLOSURE STATEMENT ALSO CONTAINS SUMMARIES OF CERTAIN OTHER DOCUMENTS RELATING TO THE CONSUMMATION OF THE PLAN OR THE TREATMENT OF CLAIMS AND INTERESTS AND CERTAIN FINANCIAL INORMATION RELATING THERETO.

THE DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN. THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN ARE ACCURATE AS OF ANY DATE OTHER THAN THE DATE SET FORTH ON THE COVER PAGE HEREOF. HOLDERS OF CLAIMS AND INTERESTS MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITTLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS CITED HEREIN AND THE PLAN ATTACHED HERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THE DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS AND INTERESTS TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN. MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE SUMMARY OF THE PLAN AND OTHER DOCUMENTS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE ACTUAL DOCUMENTS THEMSELVES AND THE EXHIBITS THERETO.

THE DEBTORS BELIEVE THAT THE INFORMATION HEREIN IS ACCURATE BUT ARE UNABLE TO WARRANT THAT THE INFROMATION IS WITHOUT ANY INACCURACY OR OMISSION. THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY

INFORMATION ABOUT OR CONCERNING THE PLAN OR THE DEBTORS OR THE VALUE OF THEIR PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY OTHER INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH OR REVIEWED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES LAW, THIS DISCLOSURE STATEMENT AND THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITY EXCHANGE COMMISSION ("**SEC**") OR ANY STATE SECURITIES COMMISSION. NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN OR THEREIN. NEITHER THE OFFER NOR THE SALE OF ANY SECURITIES PURSUANT TO THE PLAN HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR ANY SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. ANY SUCH OFFER OR SALE IS BEING MADE IN RELIANCE ON THE EXEMPTIONS FROM REGISTRATION THEREUNDER SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS OR FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN, OR SUCH OTHER DOCUMENTS, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

EACH HOLDER OF AN IMPAIRED CLAIM OR AN IMPAIRED INTEREST THAT IS ALLOWED TO VOTE SHOULD REVIEW THE ENTIRE PLAN BEFORE CASTING A BALLOT. NO PARTY IS AUTHORIZED BY THE BANKRUPTCY COURT TO PROVIDE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT.

INFORMATION INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT SPEAKS AS OF THE DATE OF SUCH INFORMATION OR THE DATE OF THE REPORT OR DOCUMENT IN WHICH SUCH INFORMATION IS CONTAINED OR AS OF A PRIOR DATE AS MAY BE SPECIFIED IN SUCH REPORT OR DOCUMENT. ANY STATEMENT CONTAINED IN A DOCUMENT INCORPORATED BY REFERENCE HEREIN SHALL BE DEEMED TO BE MODIFIED OR SUPERSEDED FOR ALL PURPOSES TO THE EXTENT THAT A STATEMENT CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY OTHER SUBSEQUENTLY FILED DOCUMENT WHICH IS ALSO INCORPORATED OR DEEMED TO BE INCORPORATED BY REFERENCE, MODIFIES

OR SUPERSEDES SUCH STATEMENT. ANY STATEMENT SO MODIFIED OR SUPERSEDED SHALL NOT BE DEEMED, EXCEPT AS SO MODIFIED OR SUPERSEDED, TO CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.

SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

*******

## DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"). All statements, other than statements of historical facts, included in this Disclosure Statement that address activities, events or developments that the Debtors expect, project, believe or anticipate will or may occur in the future are forward-looking statements. These statements can be identified by the use of forward-looking terminology including "may," "believe," "anticipate," "estimate," "continue," "foresee," "project," "could," or other similar words. These forward-looking statements may include, but are not limited to, references to procedures in connection with the Debtors' bankruptcy cases and the distribution of the Debtors' assets pursuant to the Plan, the Debtors' financial projections and liquidation analysis, and the Debtors' future operating results. Forward-looking statements are not guarantees of performance. The Debtors have based these statements on the Debtors' assumptions and analyses in light of the Debtors' experience and perception of historical trends, current conditions, expected future developments and other factors the Debtors believe are appropriate in the circumstances. No assurance can be given that these assumptions are accurate. Moreover, these statements are subject to a number of risks and uncertainties.

All subsequent written and oral forward looking information attributable to the Debtors is expressly qualified in its entirety by the foregoing. In light of these risks, uncertainties, and assumptions, the events anticipated by the Debtors' forward-looking statements may not occur, and you should not place any undue reliance on any of the Debtors' forward-looking statements. The Debtors' forward-looking statements speak only as of the date made and the Debtors undertake no obligation to update or revise their forward-looking statements, whether as a result of new information, future events or otherwise.

# ARTICLE I
# INTRODUCTION

Henry Resources is the primary investor in the Auto Investment Group, which will be the primary investor in the Plan Sponsor (defined in the Plan). The Henry Family and the Auto Investment Group care about the great people of West Texas and are excited about the opportunity to rebuild customer loyalty, creditor relationships, and employment opportunities in West Texas through the proposed chapter 11 plan. As a result, The Auto Investment Group led by Henry Resources and others has agreed to support the plan, subject to certain conditions precedent and approvals, and believes that a collaborative exit from bankruptcy is in the best interests of the bankruptcy estates, the creditors of the bankruptcy estates, the manufacturers, the retail lenders, the floorplan lenders, potential employees of the Reorganized Debtors, and the great people of West Texas.

The Auto Investment Group led by Henry Resources looks forward and is committed to using best efforts to work with the creditors and manufacturers (e.g., Ford Motor, General Motors, Toyota, and Mitsubishi) in these cases up to and past the confirmation hearing on a possible consensual bankruptcy for the benefit of all involved. At the same time, The Auto Investment Group will also work with its investors to receive approvals and capital commitments, subject to the conditions precedent to the Effective Date of the Plan, for the group's share of the equity financing proposed in the Plan. The Debtors will file a notice with the Bankruptcy Court when they receive word from the Auto Investment Group that it has such commitments.

This Disclosure Statement ("**Disclosure Statement**") and the accompanying Ballots are being furnished to you, the holders of Claims against and Interests in the Chapter 11 debtors Reagor Dykes Motors, LP, Reagor-Dykes Imports, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Floydada, LP, Reagor-Dykes Plainview, LP, Reagor-Dykes Snyder, L.P., Reagor Auto Mall, Ltd., Reagor-Dykes Auto Mall I LLC, Reagor-Dykes II, LLC, and Reagor-Dykes III, LLC (together, the "**Debtors**" or "**Plan Proponents**"), pursuant to Section 1125 of the United States Bankruptcy Code in connection with the solicitation of ballots for the acceptance of the Second Amended Plan of Reorganization (the "**Plan**") proposed by the Debtors under chapter 11 ("**Chapter 11**") of title 11 of the United States Code (the "**Bankruptcy Code**").

Capitalized terms used in this Disclosure Statement and not defined herein shall have their respective meanings as defined in the Plan or, if not defined in the Plan, as defined in the Bankruptcy Code.

On August 1, 2018, Debtors Reagor-Dykes Motors, LP, Reagor-Dykes Imports, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Floydada, LP, and Reagor-Dykes Plainview, LP (collectively, the "**Original Debtors**") filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, Northern District of Texas, Lubbock Division (the "**Bankruptcy Court**").

On November 2, 2018, Debtors Reagor-Dykes II, LLC, Reagor-Dykes III, LLC, Reagor Auto Mall , Ltd.("**RAM**"), Reagor Auto Mall I, LLC, and Reagor-Dykes Snyder, L.P. ("**Snyder**") (collectively, the "**New Debtors**") filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Both the Original Debtors' Chapter 11 cases and the New Debtors Chapter 11 cases are jointly administered under case number 18-50214 (collectively, the "**Chapter 11 Cases**").

The Debtors continue to operate and manage their estates (the "**Estates**") as debtors and debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. As of the date of the filing of this Disclosure Statement, no Official Committee(s) of Unsecured Creditors have been appointed by the Office of the United States Trustee in the Debtors' cases.

The purpose of this Disclosure Statement is to enable those persons whose Claims against and whose Interests in the Debtors are Impaired and entitled to vote under the Plan to make an informed decision on whether to vote for or against the Plan. Holders of Claims should read this Disclosure Statement and the Plan in their entirety before voting on the Plan. The Disclosure Statement contains a brief history of the Debtors, a summary of the Chapter 11 Cases, summary of material provisions of the Plan – including provisions relating to the Plan's treatment of Claims against and Interests in the Debtors – a discussion of Plan feasibility, administration of the Estates and Assets, the means of implementation of the Plan, and a liquidation analysis setting forth what Holders of a Claim against or Interest in the Debtors would recover if the Debtors were liquidated on the projected effective date under chapter 7 of the Bankruptcy Code. The Disclosure Statement also summarizes certain financial information concerning the Debtors and the Claims asserted against the Debtors in the Chapter 11 Cases.

### Section 1.1    <u>Voting Procedure</u>.

No solicitation of votes with respect to the Plan may be made except pursuant to this Disclosure Statement. No statement or information concerning the Debtors (particularly as to the results or financial condition of, or with respect to distributions to be made under the Plan) or any of the Debtors' assets, properties or business that is given for the purpose of soliciting acceptances or rejections of the Plan, is authorized other than as set forth in this Disclosure Statement. EXCEPT FOR THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED, NO REPRESENTATIONS CONCERNING THE DEBTORS, THE DEBTORS' ASSETS AND LIABILTIES, THE PAST OR FUTURE OPERATIONS OF THE DEBTORS, THE PLAN AND ITS TERMS OR ALTERNATIVES TO THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED ON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY INFORMATION REGARDING SUCH TOPIC AREAS THAT IS PROVIDED TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN AND THAT IS NOT CONTAINED IN THIS DISLOSURE STATEMENT AND THE EXHIBITS ATTACHED IS UNAUTHORIZED AND SHOULD BE REPORTED IMMEDIATELY TO THE DEBTORS' COUNSEL.

While the Debtors believe that the Disclosure Statement contains adequate information about the documents and information summarized, Holders of Claims and Holders of Interests should review the entire Plan and each document referenced therein and herein, and should seek the advice of their own counsel and other advisors before voting on the Plan. In the event of any inconsistencies between the provisions of the Plan and this Disclosure Statement, the provisions of the Plan shall control. A copy of the Plan is attached as **<u>Exhibit "A"</u>** to this Disclosure Statement. Certain provisions of the Plan—and, therefore descriptions and summaries contained in this Disclosure Statement—may be the subject of continuing negotiations among the Debtors and various parties, may not have been finally agreed, and may be modified. However, such modifications will not have a material effect on the distributions contemplated by the Plan.

After carefully reviewing this Disclosure Statement and all exhibits and schedules attached hereto, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. The Debtors strongly urge each recipient entitled to vote on the Plan to review carefully the contents of this Disclosure Statement, the Plan, and the other documents that accompany or are referenced in this Disclosure Statement in their entirety before making a decision to accept or reject the Plan.

**IT IS OF THE UTMOST IMPORTANCE TO THE DEBTORS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN BY COMPLETING AND SIGNING THE BALLOT ENCLOSED HEREWITH AND RETURNING THE BALLOTS PROMPTLY SO THAT THEY ARE STAMPED AS HAVING BEEN RECEIVED BY NO LATER THAN 5:00 P.M., CENTRAL STANDARD TIME, ON _____, 2019 (THE "<u>VOTING DEADLINE</u>") AT THE FOLLOWING ADDRESS, AS SET FORTH ON THE ENCLOSED RETURN ENVELOPE:**

REAGOR DYKES BALLOTS
ATTN: MARCUS A. HELT AND ASHLEY ELLIS

C/O FOLEY GARDERE, FOLEY & LARDNER LLP
2021 MCKINNEY AVENUE, SUITE 1600
DALLAS, TX 75201

**THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF ALL CLAIMANTS OF THE DEBTORS; CONSEQUENTLY, THE DEBTORS URGE ALL CLAIMANTS TO VOTE TO ACCEPT THE PLAN.**

Ballots that are received after the Voting Deadline may not be used in connection with the Debtors' request for confirmation of the Plan or any modification thereof, except to the extent allowed by the Bankruptcy Court.

This Disclosure Statement has been compiled by the Debtors to accompany the Plan. The factual statements, projections, financial information, and other information contained in this Disclosure Statement have been taken primarily from documents prepared by the Debtors, including the Debtors' Schedules and Statement of Financial Affairs, the Debtors' Monthly Operating Reports, and pleadings filed in the Bankruptcy Case. Nothing contained in this Disclosure Statement shall have any preclusive effect against the Debtors (whether by waiver, admission, estoppel, or otherwise) in any cause or proceeding which may exist or occur in the future. This Disclosure Statement shall not be construed or deemed to constitute an acceptance of fact or an admission by the Debtors with regard to any of the statements made herein, and all rights and remedies of the Debtors are expressly reserved in this regard. This Disclosure Statement contains statements which constitute the Debtors' or other third parties' views of certain facts. All such disclosures should be read as assertions of such parties. To the extent any paragraph does not contain an express reference that it constitutes an assertion of a particular party, it should be read as an assertion of the party indicated by the context and meaning of such paragraph.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE EITHER AS OF THE PETITION DATE OR THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE

STATEMENT NOR ANY EXERCISE OF RIGHTS GRANTED IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BY ITS NATURE, IS FORWARD LOOKING, CONTAINS ESTIMATES AND ASSUMPTIONS WHICH MAY PROVE TO BE INACCURATE, AND CONTAINS PROJECTIONS WHICH MAY PROVE TO BE WRONG, OR WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. EACH CLAIMANT SHOULD INDEPENDENTLY VERIFY AND CONSULT ITS INDIVIDUAL ATTORNEY AND ACCOUNTANT AS TO THE EFFECT OF THE PLAN ON SUCH INDIVIDUAL CLAIMANT OR INTEREST HOLDER.

Pursuant to the Disclosure Statement Order ("**Exhibit D**"), the hearing on the Confirmation of the Plan is set for [_____]a/p.m., Central Standard Time, in the Courtroom of the Honorable Robert L. Jones, United States Bankruptcy Judge, United States Bankruptcy Court for the Northern District of Texas, Lubbock Division, 1205 Texas Ave., Room 306, Lubbock, Texas 79401. Objections to the Confirmation of the Plan must be filed with the Bankruptcy Court and received by counsel for the Debtors on or before [_____], 2019. Counsel for the Debtors will request Confirmation of the Plan at the Confirmation Hearing.

Counsel for the Debtors strongly urges each recipient entitled to vote on the Plan to review carefully the contents of this Disclosure Statement, the Plan, and the other documents that accompany or are referenced in this Disclosure Statement in their entirety before making a decision to accept or reject the Plan.

### Section 1.2     Explanation of Chapter 11.

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a person or entity attempts to reorganize its business and financial affairs for the benefit of its creditors, shareholders and other interested parties.

The commencement of a Chapter 11 case creates an estate comprising all of a debtor's legal and equitable interests in property as of the date the petition is filed. Unless the bankruptcy court orders the appointment of a Chapter 11 trustee, Bankruptcy Code sections 1101, 1107 and 1108 provide that a chapter 11 debtor may continue to operate its business and control the assets of its estate as a "debtor-in-possession" as the Debtors have done in these Chapter 11 Cases since the Petition Date.

The filing of a Chapter 11 petition also triggers the automatic stay under section 362 of the Bankruptcy Code. The automatic stay is an injunction that halts essentially all attempts to collect pre-petition claims from the Debtors or to otherwise interfere with a Debtors' business or their estates.

Formulation of a plan of reorganization is the principal purpose of a Chapter 11 bankruptcy case. The plan sets forth the means for satisfying the claims of creditors against, and interests of equity security holders in, the Debtors. Unless a trustee is appointed, only the Debtors may file a plan during the first 120 days of a Chapter 11 case (the "**Exclusive Period**"). Only after the Exclusive Period has expired or is terminated by the Bankruptcy Court, a creditor or any other interested party may file a plan, unless the Debtors file a plan within the Exclusive Period or receives an extension of such period by

order of the Bankruptcy Court. If the Debtors file a plan within the Exclusive Period, the Debtors are given sixty (60) additional days (the "**Solicitation Period**") to solicit acceptances of its plan. Bankruptcy Code section 1121(d) permits the Bankruptcy Court to extend or reduce the Exclusive Period and the Solicitation Period upon a showing of adequate "cause."

After the plan has been filed, the holders of impaired claims against, or interests in, a debtor are permitted to vote on whether to accept or reject the plan. Chapter 11 does not require that each holder of a claim against, or interest in, a debtor vote in favor of a plan in order for the plan to be confirmed. At a minimum, however, a plan must be accepted by a majority in number (i.e., more than 50%) and at least two-thirds (2/3) in amount of those claims actually voting, from at least one class of impaired claims under the plan, to the extent that there are any impaired classes. The Bankruptcy Code also defines acceptance of a plan by a class of interests (equity securities) as acceptance by holders of at least two-thirds of the number of interests that actually voted.

Classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan, and therefore are not entitled to vote. A class is "impaired" if the plan modifies the legal, equitable, or contractual rights attaching to the claims or interests of that class. Modification for purposes of impairment does not include curing defaults and reinstating maturity or payment in full in cash. Conversely, classes of claims or interests that receive or retain no property under a plan of reorganization are conclusively presumed to have rejected the plan, and therefore are not entitled to vote.

Even if all classes of claims and interests accept a plan of reorganization, a bankruptcy court may nonetheless still deny confirmation. Bankruptcy Code section 1129 sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interests" of impaired and dissenting creditors and interest holders and that the plan be feasible. The "best interests" test generally requires that the value of the consideration to be distributed to impaired and dissenting creditors and interest holders under a plan may not be less than those parties would receive if the debtor were liquidated under a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. A plan must also be determined to be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan and that the debtor will be able to continue operations without the need for further financial reorganization.

A bankruptcy court may confirm a plan of reorganization even though fewer than all of the classes of impaired claims and interests vote to accept such plan. A bankruptcy court may do so under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. In order for a plan to be confirmed under the "cramdown" provisions, despite the rejection of a class of impaired claims or interests, the plan proponent must show, among other things, that the plan does not discriminate unfairly and that it is "fair and equitable" with respect to impaired classes of claims or interests that have not accepted the plan.

A bankruptcy court must further find that the economic terms of the plan meet the specific requirements of Bankruptcy Code section 1129(b) with respect to the subject objecting class(es). If the plan proponent proposes to seek confirmation of the plan under the provisions of Bankruptcy Code section 1129(b), the plan proponent must also meet all applicable requirements of Bankruptcy Code section 1129(a) (except section 1129(a)(8)). Those requirements include, among other things,

that (i) the plan complies with applicable Bankruptcy Code provisions and other applicable law, and that (ii) the plan be proposed in good faith.

**Section 1.3**     **Rules of Interpretation**.

The following rules for interpretation and construction shall apply to the Disclosure Statement:

a)     all terms defined in the Plan shall carry the same definitions in the Disclosure Statement unless otherwise defined herein;

b)     whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

c)     unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

d)     unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented;

e)     any reference to a person or entity as a holder of a Claim or Interest includes that person or entity's successors and assigns;

f)     unless otherwise specified, all references in the Disclosure Statement to Articles are references to Articles of the Disclosure Statement;

g)     unless otherwise specified, all references in the Disclosure Statement to exhibits are references to exhibits to the Disclosure Statement;

h)     the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement;

i)     captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement;

j) unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

k) any term used in capitalized form in the Disclosure Statement that is not otherwise defined in the Disclosure Statement, Plan, or exhibits to the Disclosure Statement Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

l) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system;

m) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated;

n) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and,

o) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America.

**Section 1.4**      **Recommendation of the Debtors to Approve the Plan**.

The Debtors approved the solicitation of acceptances of the Plan and all of the transactions contemplated thereunder. In light of the benefits to be attained by the holders of Claims and Interests contemplated under the Plan, the Debtors recommend that such holders of Claims and Interests vote to accept the Plan. The Debtors reached this decision after considering the alternatives to the Plan that are available to the Debtors. These alternatives include liquidation under chapter 7 of the Bankruptcy Code or some alternative plan. The Debtors determined, after consulting with their advisors, that the transactions contemplated in the Plan would likely result in a distribution of greater value to creditors and stockholders than the alternatives.

THE DEBTORS BELIEVE THAT THE PLAN AND THE TREATMENT OF CLAIMS AND INTERESTS THEREUNDER IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS AND INTERESTS.

# ARTICLE II
## SUMMARY

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek Chapter 11 protection, significant events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Creditors in voting classes must follow for their votes to be counted. Certain provisions of the Plan, and thus the descriptions and summaries contained in this Disclosure Statement, may be the subject of continuing negotiations among the Debtors and various parties, may not have been finally agreed upon, and may be modified.

The Debtors are the proponents of the Plan within the meaning of Section 1129 of the Bankruptcy Code. The Plan contains separate Classes and proposes recoveries for holders of Claims against and Interests in the Debtors. After careful review of the Debtors' current business operations and estimated recoveries in a liquidation scenario under Chapter 7 of the Bankruptcy Code, the Debtors have concluded that the recovery to Creditors will be maximized by the reorganization or controlled liquidation of the Debtors as contemplated by the Plan. For your convenience, the following is a summary of certain material terms of the Plan. The Debtors encourage you to read the Plan in its entirety. The Plan is a comprehensive proposal by the Debtors that provides for the following:

### Section 2.1    Alternative Paths to the Effective Date

This Plan provides two (2) alternative paths to a successful exit from Chapter 11 for the Debtors: (a) the Restructuring Alternative, or (b) if the Plan does not go effective under the Restructuring Alternative within seventy-five (75) days of Confirmation,[2] a controlled liquidation of assets via the Liquidation Alternative. The Debtors believe that a Restructuring would yield the highest and best return for all creditors and parties in interest but, if the Debtors determine at any time – pre-Confirmation or post-Confirmation – that despite their best efforts the Plan cannot go effective under the Restructuring Alternative, the Liquidation Alternative shall take effect. The most likely circumstance that would cause the Plan to proceed under the Liquidation Alternative is if the Debtors are unable to reach an agreement for a New Equity Infusion with a Plan Sponsor within the timeframe to which the United States Trustee has agreed and that timeframe is not extended by agreement or further order of the Court.

---

[2] Under the Plan, the Restructuring Alternative must go effective within seventy-five (75) days of the Confirmation Date unless otherwise agreed by the United States Trustee or approved by the Court. Any request to extend this seventy-five (75) day deadline must be filed prior to the expiration of same. The timely filing of such a motion shall toll the expiration of the deadline until further ruling by the Court.

**FIRST AMENDED MODIFIED DISCLOSURE STATEMENT FOR SECOND AMENDED**
**PLAN OF REORGANIZATION FOR REAGOR-DYKES AUTO GROUP - PAGE | 11**

GM Financial raised the concern that inclusion of the Restructuring Alternative in the Plan is somehow confusing or not in the best interest of creditors. The Debtors disagree and would state in response that there can be no bona fide dispute that the Restructuring Alternative will generate more value for all creditors, especially Ford, Ford Credit, GM, and GM Financial. If the Restructuring Alternative is not attainable, the Plan contemplates a controlled Liquidation Alternative overseen by a Creditors Trustee with historical knowledge and experience with these Debtors (Lyndon James, a principal of the Debtors' CRO), which the Debtors believe is a better option than a liquidation under chapter 7.

**Section 2.2** **Plan and Treatment of Claims – Restructuring Alternative**. Under the Restructuring Alternative, the Plan will effectuate a reorganization of the Dealerships, the business, and the operations. Pursuant to the terms of the Plan and a Restructuring:

a) The Dealerships will be recapitalized by the Plan Sponsor or its designee. The Reorganized Debtors will retain their operating assets[3] together with Causes of Action not resolved by this Plan, and will continue to operate their business under a name selected by the Plan Sponsor.

b) The franchise agreements with Ford Motor, General Motors, Mitsubishi, and Toyota will be assumed in the Plan.

c) Post-confirmation, the Reorganized Debtors will benefit from the proven operational expertise of Fin Ewing and his consulting group (collectively, the "**Fin Ewing Group**"). The Fin Ewing Group will provide consulting services to the Reorganized Debtors. These consulting services will help the Reorganized Debtors accomplish their long-term business and financial goals as outlined in the Plan.

d) Directors and officers of the Reorganized Debtors will be identified in the Plan Supplement Documents.[4]

---

[3] To clarify the scope of this reference to "operating assets," under the Restructuring Alternative, the Debtors will retain all assets listed on the current balance sheet attached to this Disclosure Statement as Exhibit H. To the extent that a secured creditor has obtained relief from the stay and repossessed its collateral, such collateral has been excluded from the Plan and Post-Confirmation Business Plan and the cost of obtaining replacement collateral as/if needed is likewise accounted for in the reorganization projections. The lift-stay orders from the Court each contain a reporting requirement so that secured creditors are required to account for the value of liquidated collateral; the treatment of unsecured deficiency claims is set forth in the Plan.

[4] The Debtors believe that the timing for filing the Plan Supplement Documents is sufficient and adequate disclosure of the information contained therein, given the circumstances of this case. Unless otherwise ordered by the Court, the

e) The Reorganized Debtors are expected to receive up to $13 mm in cash (the "**New Equity Infusion**") from the Plan Sponsor. The New Equity Infusion may be a combination of (i) debtor-in-possession financing approved by the Bankruptcy Court and received by the Debtors before the Confirmation in a yet-to-be-determined amount and (ii) equity financing received by the Debtors after the Confirmation.[5]

f) The New Equity Infusion will be used as follows: (i) approximately $4.3 million as initial post-confirmation working capital on an as-needed basis; (ii) pay all allowed, administrative expenses of the Estates, which such expenses are estimated to be approximately $5 million; (iii) approximately $.700 million to Qualified Retail Lenders in Class 9; (v) up to approximately $2 million to Ford Credit if certain conditions are satisfied; and (v) up to approximately $1.5 million to GM Financial if certain conditions are satisfied, including if GM Financial provides floorplan financing to the Reorganized Debtors.[6]

g) The equity of the Reorganized Debtors will be owned (i) 90% by the Plan Sponsor or its designee and (ii) 10% by a Creditors Trust for the express benefit of creditors holding Allowed Class 11 General Unsecured Claims.[7]

h) Each Allowed Class 11 Claim will receive a beneficial interest in the Creditors Trust. In addition to the 10% equity interest in the Reorganized Debtors, the Creditors Trust Assets will include $1 million in cash contributed by Rick Dykes.

i) Each beneficial interest and the 10% equity will be subject to a redemption right that will allow the Reorganized Debtors to redeem this equity upon payment in full of the Allowed amount of Unsecured Claims converted to equity or such amount agreed by the holders of such Unsecured Claims and the Reorganized Debtors. After distributions to holders of Allowed Class 11

---

Debtors will file the appropriate Notice of the Plan Supplement Documents, as set forth in the Plan, not less than 10 days prior to the voting deadline.

[5] For clarity, "equity financing" as used in the term New Equity Infusion is the process of raising capital through the sale of shares of stock.

[6] The Plan contemplates up to $13 mm in equity financing, because $13 mm may not be necessary. If less than $13 mm is received and the Debtors still believe that the Restructuring Alternative is nonetheless feasible, then the Debtors will present that evidence to the Court at confirmation as evidence of feasibility. If not, the Debtors will proceed to Confirmation of the Plan via the Liquidation Alternative.

[7] The projections in the Post-Confirmation Business Plan show what the Debtors project the reorganized entity to generate on an EBITDA basis, which is an integral component to an overall enterprise-value calculation. How much of that value is paid to the equity stakeholders through dividends will be determined by the Reorganized Debtors' board, which is common in similar situations.

Unsecured Claims reach a total of $7.5 million, the Creditors' Trust will surrender this 10% equity interest to the Reorganized Debtors.

j) The Creditors Trust will make distributions to all Allowed Unsecured Claims in Class 11 pursuant to the terms and conditions of this Plan and a Creditors Trust Agreement.

k) The Reorganized Debtors will assume certain unsecured Assumed Trade Claims under this Plan. The identity of such assumed unsecured Assumed Trade Claims will be disclosed in the Plan Supplement. Such Assumed Trade Claims will be treated in Class 10 and will not participate in Class 11.

l) Ford Credit's secured claim will be paid in full by surrender of Collateral.

m) Ford Credit's unsecured claim will be paid from Excess Cash Flow and only after payment of all Allowed Administrative Expenses by (i) a $1 million cash payment in 2020, (ii) a $1 million cash payment in 2021 and (iii) a $5 million unsecured promissory note.[8]

n) The $5 million unsecured promissory note payable to Ford Credit will have the following terms: (i) 10-year amortization, (ii) 7-year balloon payment, (iii) 6.5% interest per annum, (iv) payment-in-kind interest for 12 months, and (v) payable thereafter from Excess Cash Flow.

o) Payment of the $2.0 million to Ford Credit is subject to and conditioned on (i) the assumption of the Debtors' franchise agreements with Ford Motor or issuance of a new franchise agreement(s), and (iii) implementation of the Restructuring Alternative under the Plan.

p) GM Financial's secured claim will be paid in full by surrender of Collateral.

q) GM Financial's unsecured claim will be paid as follows: As a settlement and full and final satisfaction and release of all unsecured claims, GM Financial will receive (i) $750,000 from Excess Cash Flow by the later of (x) 180 days after the Effective

---

[8] The Debtors will explain at the Confirmation Hearing why Ford Credit and GM Financial deserve the treatment provided in the Plan. That said, among other reasons, the Debtors identify the following two reasons. First, Ford Credit provided 10 to 20 times more floor-plan credit to the Debtors prior to bankruptcy than GM Financial provided to the Debtors during that same period. Second, the Reorganized Debtors contemplate a restructuring around two Ford dealerships and one General Motors dealership. As with GM Financial, any payment to Ford Credit is subject to and conditioned on meeting a number of criteria identified in the Plan. Meeting these criteria will aid in the restructuring, which will benefit all unsecured creditors.

Date and (y) payment of all Allowed Administrative Expenses, and (ii) another $750,000 from Excess Cash Flow no later than twelve (12) months after the first payment of $750,000 to GM Financial.

r) Payment of the $1.5 million is subject to and conditioned on (i) GM Financial providing floorplan financing to the Reorganized Debtors on mutually agreed terms, (ii) the assumption of the Debtors' franchise agreement with General Motors or issuance of a new franchise agreement, and (iii) implementation of the Restructuring Alternative under the Plan.

s) First Capital Bank's secured claim will be paid as follows: In full and final satisfaction of all First Capital's secured claims against the Debtors, First Capital Bank will receive (a) the net proceeds from the liquidation of collateral after payment of (i) all fees incurred and (ii) expenses reimbursed related to the liquidation of such collateral, or (b) surrender of collateral.

t) First Capital Bank's unsecured claim is a Disputed Claim. To the extent Allowed, First Capital Bank's unsecured claim will be treated in Class 11 and paid as follows: In full and final satisfaction and release of all First Capital's unsecured claims against the Debtors, First Capital Bank will receive its Pro Rata Share of Creditors Trust Assets, which includes 10% equity securities of the Reorganized Debtors. All Causes of Action against First Capital Bank are reserved under this Plan.

u) FB&T's secured claim will be paid as follows: In full and final satisfaction of all secured claims against the Debtors, FB&T will receive (a) the net proceeds from the liquidation of collateral after payment of (i) all fees incurred and (ii) expenses reimbursed related to the liquidation of such collateral, or (b) surrender of collateral.

v) FB&T's unsecured claim is a Disputed Claim. To the extent Allowed, FB&T's unsecured claim will be treated in Class 11 and paid as follows: In full and final satisfaction and release of all FB&T's unsecured claims against the Debtors, FB&T will receive its Pro Rata Share of Creditors Trust Assets, which includes 10% equity securities of the Reorganized Debtors. All Causes of Action against FB&T are reserved under this Plan.

w) Pursuant to the Plan, the Dealerships or Locations will be operated on the same real estate where the Dealerships or Locations were operated prior to and during the bankruptcy case. That real estate is now owned by IBC Bank. IBC Bank has given Rick Dykes and his assigns both an option right and a right of first refusal to purchase the real estate at mutually-agreed and confidential "strike

prices." To facilitate the proposed Restructuring, Rick Dykes has agreed to assign his option and right of first refusal to the Reorganized Debtors to implement the Restructuring Alternative.

x) Each Qualified Retail Lender who (i) executes a TT&L Agreement, (ii) provides the Reorganized Debtors with proof of payment of a TT&L/Trade Liability, and (iii) agrees to provide future retail lending to the Reorganized Debtors on terms mutually acceptable to the Reorganized Debtors and said Retail Lender, thereby becoming a Qualified Retail Lender, will be reimbursed their Pro Rata Share for payment of the Debtors' TT&L/Trade Liability either (x) within sixty (60) days after the Effective Date if funds are immediately available or (y) via receipt of an unsecured promissory note payable by the Reorganized Debtors at 3% interest per annum with a two-year term.[9] Such reimbursement will be made from the Qualified Retail Lender Pool. This Qualified Retail Lender Pool will be up to $.700 million.

y) Allowed Administrative Claims will be paid at or before the Effective Date, or on such terms as the Reorganized Debtors and the holder of an Allowed Administrative Claim may otherwise agree.

**Section 2.3    Plan and Treatment of Claims – Liquidation Alternative**. Under the Liquidation Alternative, the Plan will effect an orderly wind down of the Debtors' business operations, a controlled liquidation of all Collateral, and the transfer of all Causes of Action to the Creditors Trust. Pursuant to the terms of the Plan and the Liquidation Alternative:

a) A Creditors Trust will be established and the Creditors Trustee will be appointed upon Confirmation.

b) All Assets, including Causes of Action, and all rights to challenge the extent, priority and validity of alleged liens, and all Collateral not surrendered under the terms of this Plan will be transferred to the Creditors Trust and the Creditors Trustee.

c) All Holders of Allowed Administrative Claims will be paid from liquidation proceeds in their relative priorities, all Holders of Allowed Unsecured Claims will receive a beneficial interest in the Creditors Trust equal to the *pro rata* amount of their Allowed Unsecured Claim, and the Creditors Trustee will make distributions to all Allowed Unsecured Claims in Class 11 pursuant

---

[9] The current intention of the Debtors is pay the Qualified Retail Lenders cash if the conditions stated in the Plan are satisfied. It is possible that the Qualified Retail Lenders will receive a note instead of cash. The decision on whether to pay cash or a note to the Qualified Retail Lenders will be based on the Reorganized Debtors' exercise of business judgment.

to the terms and conditions of this Plan and a Creditors Trust Agreement.

d) Ford Credit's Allowed Secured Claim will be paid in full by surrender of Collateral.

e) Ford Credit's Unsecured Claim is a Disputed Claim. To the extent Allowed, Ford Credit's Unsecured Claim will be treated in Class 12 and paid as follows: In full and final satisfaction and release of all Ford Credit's Unsecured Claims against the Debtors, Ford Credit will receive its Pro Rata Share of the Creditors Trust Assets. All Causes of Action against Ford Credit are reserved under the Liquidation Alternative in this Plan.

f) GM Financial's Allowed Secured Claim will be paid in full by surrender of Collateral.

g) GM Financial's Unsecured Claim is a Disputed Claim. To the extent Allowed, GM Financial's Unsecured Claim will be treated in Class 13 and paid as follows: In full and final satisfaction and release of all GM Financial's Unsecured Claims against the Debtors, GM Financial will receive its Pro Rata Share of the Creditors Trust Assets. All Causes of Action against GM Financial are reserved under the Liquidation Alternative in this Plan.

h) FB&T's secured claim is a Disputed Claim. To the extent Allowed, FB&T's Secured Claim will be paid as follows: In full and final satisfaction of all secured claims against the Debtors, FB&T will receive (i) the net proceeds from the liquidation of collateral after payment of (x) all fees incurred and (y) expenses reimbursed related to the liquidation of such collateral, or (ii) surrender of collateral.

i) FB&T's unsecured claim is a Disputed Claim. To the extent Allowed, FB&T's unsecured claim will be treated in Class 11 and paid as follows: In full and final satisfaction and release of all FB&T's unsecured claims against the Debtors, FB&T will receive its Pro Rata Share of the Creditors Trust Assets. All Causes of Action against FB&T are reserved under this Plan.

j) The Creditors Trust shall make distributions to Holders of Allowed Class 11 Unsecured Claims of their Pro Rata Share (calculated together with Allowed Claims in Classes 12, 13, 14 and 15) of the Creditors Trust Assets.

Regardless of the alternative under which the Plan proceeds to an Effective Date, all Causes of Action are hereby preserved.[10] Also upon the Effective Date, as more fully detailed in the Plan, the Released Parties (defined in the Plan as the Debtors, Professionals of the Estates, and the Plan Sponsor (inclusive of Rick Dykes) are released and discharged by the Releasing Parties[11] from any and all claims and Causes of Action related to, among other things as set forth in detail in the Plan, the Debtors, the Chapter 11 Cases, and the Plan.

With regard to executory contracts and unexpired leases, if the Restructuring takes place, the Plan operates as a motion under § 365 to assume all agreements, including sales and service agreements, under which the Debtors operate automotive/vehicle franchise agreements at the Dealerships, including such agreements with Mitsubishi, Toyota, General Motors, and Ford Motor Company. For all other Executory Contracts or Unexpired Leases, and for the foregoing automotive/vehicle franchise agreements in the event of the Liquidation Alternative, every Executory Contract and Unexpired Lease shall be deemed rejected unless it is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases. Specifically with regard to the real property lease with Patti Sue Noel as lessor, under the Restructuring Alternative such lease will be assumed pursuant to the terms and conditions set forth in the prior order of the Bankruptcy Court governing such assumption.

Creditors holding Allowed Claims shall receive the following treatment under the Plan:

| CLASS | CLAIMANT | TREATMENT: RESTRUCTURING ALTERNATIVE | TREATMENT: LIQUIDATION ALTERNATIVE |
|---|---|---|---|
| 1. | **ALLOWED PRIORITY NON-TAX CLAIMS** | Shall receive (i) Cash in an amount equal to the Allowed amount of such Priority Non-Tax Claim on the Effective Date or (ii) other treatment consistent with the provisions of § 1129(a)(9) of the Bankruptcy Code; *provided, however,* that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business. | Shall receive (i) Cash in an amount equal to the Allowed amount of such Priority Non-Tax Claim on the Effective Date or (ii) other treatment consistent with the provisions of § 1129(a)(9) of the Bankruptcy Code. |
| 1A. | **ALLOWED 9019 LUBBOCK COUNTY CLAIM** | Shall receive Cash as soon reasonably practicable when funds are available after the Effective | Shall receive Cash as soon reasonably practicable when funds are available after the Effective |

[10] Ford Credit asserts a "replacement" lien in certain assets, including non-Chapter 5 claims and causes of action. It is unclear whether Ford Credit in fact asserts a lien on tort claims held by the Debtors. The Debtors dispute any suggestion that (a) this replacement lien (x) covers Chapter 5 Causes of Action, commercial tort claims, or collateral different than collateral held by Ford Credit prior to the bankruptcy, and (y) is not limited to diminution in value and (b) that Ford Credit has an Allowed Claim to support any asserted lien.

[11] Please see footnote 9 for a discussion of Releasing Parties.

| CLASS | CLAIMANT | TREATMENT: RESTRUCTURING ALTERNATIVE | TREATMENT: LIQUIDATION ALTERNATIVE |
|---|---|---|---|
| | | Date consistent with the 9019 Order. Any amounts due to Lubbock County Tax Assessor will be paid before payment to General Unsecured Creditors. | Date consistent with the 9019 Order. |
| 2. | **SECURED CLAIM OF FORD CREDIT COMPANY, LLC** | Ford Credit's Class 2 Claim will be paid by surrender of the Collateral.

The amount, validity, extent, value, and priority of the Allowed Secured Class 2 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 2 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 2 Claim shall be treated in Class 12. | Ford Credit's Class 2 Claim will be paid by surrender of the Collateral.

The amount, validity, extent, value, and priority of the Allowed Secured Class 2 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 2 Claim shall be treated in Class 12. |
| 3. | **SECURED CLAIM OF GM FINANCIAL** | GM Financial's Class 3 Claim will be paid by surrender of the Collateral.

The amount, validity, extent, value, and priority of the Allowed Secured Class 3 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 3 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 3 Claim shall be treated in Class 13. | GM Financial's Class 3 Claim will be paid by surrender of the Collateral.

The amount, validity, extent, value, and priority of the Allowed Secured Class 3 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 3 Claim shall be treated in Class 13. |

| CLASS | CLAIMANT | TREATMENT: RESTRUCTURING ALTERNATIVE | TREATMENT: LIQUIDATION ALTERNATIVE |
|---|---|---|---|
| 4. | **SECURED CLAIM OF FIRST CAPITAL BANK** | The Class 4 Claim will be satisfied in full and final satisfaction, settlement, release, and discharge of such Class 4 Claim (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 4 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, (i) the net proceeds from the liquidation of collateral after payment of all fees incurred and expenses reimbursed related to the liquidation of such collateral, or (ii) surrender of collateral.<br><br>The amount, validity, extent, value, and priority of the Allowed Secured Class 4 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 4 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 4 Claim shall be treated in Class 11. | First Capital Bank's Class 4 Claim will be satisfied in full by surrender of the Collateral.<br><br>The amount, validity, extent, value, and priority of the Allowed Secured Class 4 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 4 Claim shall be treated in Class 11. |
| 5. | **CLAIM OF FIRST BANK & TRUST** | The Class 5 Claim will be satisfied in full and final satisfaction, settlement, release, and discharge of such Class 5 Claim (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 5 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, (i) the net proceeds from the liquidation of collateral after payment of all fees incurred and expenses reimbursed related to the liquidation of such collateral, or (ii) surrender of collateral. | FB&T's Class 5 Claim will be paid by surrender of the Collateral.<br><br>The amount, validity, extent, value, and priority of the Allowed Secured Class 5 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 5 Claim shall be treated in Class 11. |

| CLASS | CLAIMANT | TREATMENT: RESTRUCTURING ALTERNATIVE | TREATMENT: LIQUIDATION ALTERNATIVE |
|---|---|---|---|
| | | The amount, validity, extent, value, and priority of the Allowed Secured Class 5 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 5 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 5 Claim shall be treated in Class 11. | |
| 6. | **SECURED CLAIM OF AIM BANK** | The Class 6 Claim will be satisfied in full and final satisfaction, settlement, release, and discharge of such Class 6 Claim (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 6 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, (i) the net proceeds from the liquidation of collateral after payment of all fees incurred and expenses reimbursed related to the liquidation of such collateral, or (ii) surrender of collateral. <br><br> The amount, validity, extent, value, and priority of the Allowed Secured Class 6 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 6 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 6 Claim shall be treated in Class 11. | AIM Bank's Class 6 Claim will be paid by surrender of the Collateral. <br><br> The amount, validity, extent, value, and priority of the Allowed Secured Class 6 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 6 Claim shall be treated in Class 11. |

| CLASS | CLAIMANT | TREATMENT: RESTRUCTURING ALTERNATIVE | TREATMENT: LIQUIDATION ALTERNATIVE |
|---|---|---|---|
| 7. | **SECURED CLAIM OF VISTA BANK** | The Class 7 Claim will be satisfied in full and final satisfaction, settlement, release, and discharge of such Class 7 Claim (a) pursuant to an agreement between the Reorganized Debtors and the Holder of Class 7 Claim or (b) if no agreement is reached, at the Reorganized Debtors' sole and absolute option, (i) the net proceeds from the liquidation of collateral after payment of all fees incurred and expenses reimbursed related to the liquidation of such collateral, or (ii) surrender of collateral.<br><br>The amount, validity, extent, value, and priority of the Allowed Secured Class 7 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 7 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 7 Claim shall be treated in Class 11. | Vista Bank's Class 7 Claim will be paid by surrender of the Collateral.<br><br>The amount, validity, extent, value, and priority of the Allowed Secured Class 7 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 7 Claim shall be treated in Class 11. |
| 8. | **OTHER SECURED CLAIMS** | Holders of Allowed Class 8 Claims, if any, shall be designated as Class 8A, Class 8B *et seq.* and shall be satisfied at the Reorganized Debtors' option by (i) payment of such Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing such Allowed Secured Claim; or (iii) issuance of a restructured note with a present value equal to the amount of the value of each Holder's Collateral with interest payable at a rate of | Holders of Allowed Class 8 Claims, if any, shall be designated as Class 8A, Class 8B *et seq.* and will be paid by surrender of the Collateral.<br><br>The amount, validity, extent, value, and priority of the Allowed Secured Class 8 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 8 Claim shall be treated in Class 11. |

| CLASS | CLAIMANT | TREATMENT: RESTRUCTURING ALTERNATIVE | TREATMENT: LIQUIDATION ALTERNATIVE |
|---|---|---|---|
| | | 3% annually, and payable in full in ten (10) years.<br><br>The amount, validity, extent, value, and priority, of any asserted Class 8 Claim under § 506 of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Reorganized Debtors and the Holder of the Class 8 Claim. Any Deficiency Claim or other Unsecured Claim of the Holder of the Class 8 Claim shall be treated in Class 11. | |
| 9. | **CLAIMS OF QUALIFIED RETAIL LENDERS FOR PAYMENT OF TT&L/TRADE LIABILITY** | As full and final satisfaction, settlement, release, and discharge of such Class 9 Claim, each Qualified Retail Lender in Class 9 will receive its Pro Rata Share from the Qualified Retail Lender Pool for reimbursement for such Qualified Retail Lenders' payment of a TT&L/Trade Liability. | N/A under Liquidation Alternative |
| 10. | **ASSUMED TRADE CLAIMS** | As full and final satisfaction, settlement, release, and discharge of such Class 10 Claim, against each member of the Plan Sponsor, the Debtors, and the Reorganized Debtors, each Holder of a Class 10 Claim will receive payment in full, over time, through the assumption of the indebtedness underlying the Allowed Class 10 Claim payable on terms to be agreed by each Holder of an Assumed Trade Claim and the Reorganized Debtors. | N/A under Liquidation Alternative |
| 11. | | As full and final satisfaction, settlement, release, and discharge of each Class 11 Claim against the | As full and final satisfaction, settlement, release, and discharge of each Class 11 Claim against the |

| CLASS | CLAIMANT | TREATMENT: RESTRUCTURING ALTERNATIVE | TREATMENT: LIQUIDATION ALTERNATIVE |
|---|---|---|---|
| | **GENERAL UNSECURED CLAIMS**[12] | Debtors, each member of the Plan Sponsor, and the Reorganized Debtors, each Holder of a Class 11 Claim shall be satisfied by Pro Rata Share of Distributions from Creditors Trust Assets.[13] | Debtors, each Holder of a Class 11 Claim shall be satisfied by Pro Rata Share (calculated together with Allowed Claims in Classes 12, 13, 14 and 15) of Distributions from the Creditors Trust Assets. |
| 12. | | Ford Credit's Unsecured Claim will be paid from Excess Cash Flow and only after payment of all Allowed Administrative Expenses by (i) a $1 million cash | Ford Credit's Unsecured Claim is a Disputed Claim. To the extent Allowed, Ford Credit's Unsecured Claim will be treated in Class 12 and paid as follows: In full and |

---

[12] General Unsecured Creditors are included within the definition of "Releasing Parties" as set forth in the Plan. Releasing Parties is defined, in relevant part, as Holders of Claims who vote to accept the Plan but do not "opt out" of the releases on the Ballot, Holders of Claims whose vote to accept or reject the Plan is solicited but who do not vote to either accept or reject this Plan; and Holders of Claims who vote to reject the Plan but do not "opt out" of the releases on the Ballot. The Office of the United States Trustee has expressed the opinion that (i) non-consensual third party releases violate 5th Circuit precedent set in *Bank of N.Y. Trust Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009), (ii) Creditors who do not vote to accept or reject the Plan should not be deemed to be Releasing Parties, and (iii) the ability of a Creditor to "opt out" of the releases on the Ballot is insufficient to create a consensual release. The Office of the US Trustee has advised that it will object to the releases set forth in section 13.4 of the Plan unless the Debtors (i) eliminate non-voting Creditors from the definition of Releasing Parties and (ii) change the "opt out" feature to an affirmative "opt in" feature such that voting Creditors must affirmatively choose to be a Releasing Party. The dialogue between the Debtors and the Office of the United States Trustee continues and, if no consensual resolution is reached, the Court will rule on the scope of Releasing Parties and efficacy of the releases at Confirmation.

For much of the bankruptcy, the Debtors had no other source of financing to pay pre-confirmation ordinary and necessary operating expenses of the estates, including expenses incurred to resolve consumer tax, title and license claims on inventory sales that were pending and not completed as of the petition date. As a result, administrative-expense treatment for these advances was requested by Dykes. Given the below resolution, the Debtors believe that Mr. Dykes deserves administrative-expense treatment for his pre-confirmation advances.

If the Plan goes effective under the reorganization alternative and the reorganized debtor emerges as an operating entity, Mr. Dykes will waive payment of his administrative-expense claim against from the Estates. In return for that waiver and his efforts in creating and partially funding the reorganized debtor for the benefit of the Estates and their creditors, the Estates will waive all claims against Mr. Dykes, and he will convert his administrative claim into increased equity ownership in the reorganized debtor or its affiliates.

If the Plan goes effective under the liquidation alternative, Mr. Dykes will retain his administrative claim and receive no release from the Estates. Instead, the estates will retain all claims, causes, and defenses against Mr. Dykes, including rights to assert that such a claim could be paid by offset any NR or other obligations owed by Rick Dykes to the Estates.

[13] Percentage Distribution to Holders of Allowed Class 11 Claims is dependent on a variety of risks and factors, including the success of the Reorganized Debtors' post-confirmation business operations, value of the Creditors Trust Assets, the administration costs of the Creditor Trust, and whether the Restructuring or Liquidation Alternative proceeds.

| CLASS | CLAIMANT | TREATMENT: RESTRUCTURING ALTERNATIVE | TREATMENT: LIQUIDATION ALTERNATIVE |
|---|---|---|---|
| | **UNSECURED CLAIMS OF FORD CREDIT**[14] | payment in 2020, (ii) a $1 million cash payment in 2021, and (iii) a $5 million unsecured promissory note.<br><br>The $5 million unsecured promissory note will have the following terms: (i) 10-year amortization, (ii) 7-year balloon payment, (iii) 6.5% interest per annum, (iv) payment-in-kind interest for 12 months, and (v) payable thereafter from Excess Cash Flow. | final satisfaction and release of all Ford Credit's Unsecured Claims against the Debtors, Ford Credit will receive its Pro Rata Share (calculated together with Allowed Claims in Classes 11, 13, 14 and 15) of Distributions from the Creditors Trust Assets. All Causes of Action against Ford Credit are reserved under this Plan. |
| 13. | **UNSECURED CLAIMS OF GM FINANCIAL** | GM Financial's unsecured claim will be paid as follows: As a settlement and full and final satisfaction and release of all unsecured claims, GM Financial will receive (i) $750,000 from Excess Cash Flow by the later of (x) 180 days after the Effective Date and (y) payment of all Allowed Administrative Expenses and (ii) another $750,000 from Excess Cash Flow no later than twelve (12) months after the first payment of $750,000 to GM Financial. | GM Financial's Allowed Unsecured Claim will be treated in Class 13 and paid as follows: In full and final satisfaction and release of all GM Financial's Unsecured Claims against the Debtors, GM Financial will receive its Pro Rata Share (calculated together with Allowed Claims in Classes 11, 12, 14 and 15) of Distributions from the Creditors Trust Assets. All Causes of Action against GM Financial are reserved under the Liquidation Alternative in this Plan. |

[14] Classes 12 and 13 Claims are held by Ford Credit and GM Financial, respectively. Each is an affiliate of Original Equipment Manufacturers or "franchisors" that are parties to franchise or "dealer" agreements with one or more of the Debtors. The Class 12 and 13 Claims asserted by Ford Credit and GM Financial arise, in whole or in part from money loaned for the purchase of vehicles from the Original Equipment Manufacturers, and in Ford Credit's case from allegations of out-of-trust sales or double floor-planned inventory as stated in pleadings in this Chapter 11 Case and the Ford Litigation. For those reasons, the Claims in Classes 12 and 13 are qualitatively dissimilar to Assumed Trade Claims in Class 10 or General Unsecured Claims in Class 11.

| CLASS | CLAIMANT | TREATMENT: RESTRUCTURING ALTERNATIVE | TREATMENT: LIQUIDATION ALTERNATIVE |
|---|---|---|---|
| 14. | **UNSECURED CLAIMS OF IBC BANK** | All prepetition claims of IBC Bank against the Debtors, held directly or indirectly, will be forgiven, and there will be no Distributions to Claims in Class 14. | Allowed Claims in Class 14 will receive their Pro Rata Share of the Creditors Trust Assets. |
| 15. | **UNSECURED CLAIMS OF BART REAGOR AND RICK DYKES**[15] | There will be no Distributions to Claims in Class 15. | Allowed Claims in Class 15 will receive their Pro Rata Share of the Creditors Trust Assets. |
| 16. | **INTERCOMPANY CLAIMS** | There will be no Distributions to Claims in Class 16. | There will be no Distributions to Claims in Class 16. |
| 17. | **UNSECURED SUBORDINATED CLAIMS** | There will be no Distributions to Claims in Class 17. | There will be no Distributions to Claims in Class 17. |
| 18. | **INTERESTS IN THE DEBTORS** | All Interests will be cancelled and discharged on the Effective Date, and no holder of an Interest shall receive a Distribution on account of such Interest. | All Interests will be cancelled and discharged on the Effective Date, and no holder of an Interest shall receive a Distribution on account of such Interest. |

[15] Class 15 includes Claims, if any, held by Insiders against the Debtors. The books and records of the Debtors show a note receivable in the amount of $9.5 million due from certain Insiders. Preliminarily, Messrs. Dykes and Reagor assert that the N/R balance in the Debtors' books and records was not updated prior to the bankruptcy, because the Reagor-Dykes audit report for 2017 was in process when the initial bankruptcy cases were filed and was never completed. They assert that Messrs Dykes and Reagor raised over $18 million in new equity from savings and debt that they personally guaranteed from March 2017 to March 2018, and put at least $8.4 mm of cash into the Debtors during that time. As a result, Messrs Dykes and Reagor deny that they owe the bankruptcy estate any funds in connection with the above-described accounting entry. The Debtors will continue to investigate this situation and report to the Court. The estimated amount of the Class 15 Claims is unknown at this time. As part of a Restructuring under this Plan, the Holders of the Class 15 Claims have agreed to waive and forego all Unsecured Claims they hold against the Debtors and will receive no Distribution under this Plan.

## ARTICLE III
## HISTORICAL BACKGROUND AND PREPETITION BUSINESS OPERATIONS

The Debtor entities are comprise of eight (8) limited partnerships and three (3) general partners. The limited partnership Debtors are: Reagor-Dykes Motors, LP, Reagor-Dykes Floydada, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Plainview, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Imports, LP, Reagor-Dykes Snyder, L.P., and Reagor Auto Mall, Ltd. (the "**LP Debtors**"). The Debtors with general partnership interest in the LP Debtors are: Reagor Auto Mall I LLC, Reagor-Dykes II LLC, and Reagor-Dykes III LLC (the "**GP Debtors**"). Bart Reagor and Rick Dykes own fifty percent (50%) respectively in each GP Debtor.  The organizational structure of the Debtors is as follows:



### Section 3.1   GP Debtors.

The GP Debtors are each Texas limited liability companies. Each GP Debtor owns one percent (1%) interest in their respective LP Debtors.

### Section 3.2   LP Debtors.

The LP Debtors are each Texas limited partnerships. The LP Debtors limited partners are Rick Dykes and Bart Reagor. Prepetition, the LP Debtors operated eight (8) Dealerships with seventeen (17) Locations—sixteen in West Texas and one (1) in Dallas—as a consolidated group known as the Reagor-Dykes Auto Group. The following are the Dealerships with their corresponding Locations:

| Debtor | Location |
|--------|----------|
| Reagor-Dykes Auto Company, LP | Reagor-Dykes Plainview Ford Lincoln |
| Reagor-Dykes Amarillo, LP | Reagor-Dykes Mitsubishi Amarillo |

|  | Reagor-Dykes Auto Mall Amarillo |
|  | Reagor-Dykes Luxury |
| Reagor-Dykes Floydada, LP | Reagor-Dykes Chevrolet |
| Reagor-Dykes Imports, LP | Reagor-Dykes Mitsubishi Lubbock |
| Reagor-Dykes Motors, LP | Spike Dykes Ford Lincoln |
|  | Reagor-Dykes Auto Mall Midland West |
|  | Reagor-Dykes Auto Mall Midland East |
| Reagor-Dykes Plainview, LP | Reagor-Dykes Toyota |
| Reagor-Dykes Snyder, LP | Reagor-Dykes Chevy Buick GMC |
| Reagor Auto Mall Ltd. | Reagor Auto Mall Dallas |
|  | Reagor Auto Mall Downtown |
|  | Reagor Auto Mall |
|  | Reagor Auto Mall Imports |
|  | Reagor Auto Mall West |
|  | Reagor Leveland |

## FACTORS PRECIPITATING THE FILING OF THESE CHAPTER 11 CASES

### A.    Original Debtors

The RAM, Snyder and the Original Debtors' business centers around selling used and new vehicles. Historically, RAM, Snyder and the Original Debtors owned or operated Dealerships that sold new and/or used vehicles from various original equipment manufacturers including but not limited to Ford, General Motors, Gulf States Toyota, Lincoln, and Mitsubishi. Although downsizing during the Chapter 11 Cases was unavoidable, prepetition the Debtors' business employed hundreds of people in and around the Lubbock area.

The Original Debtors required floor plan financing to maintain inventory to sell. Essentially, floor plan financing provided the funds where by the Original Debtors acquired vehicles for resale to consumers. The Original Debtors' primary floor plan financing came from Ford Motor Credit Company ("**Ford Credit**"). Ford Credit extended six loans to the Original Debtors with respective line limits on new and used vehicles. As a condition of the floor plan financing, Ford Credit was entitled to conduct periodic audits of the Original Debtors' dealerships to confirm that the dealerships were in compliance with the terms of the financing agreements.

Ford Credit conducted an audit in June of 2018. Consistent with prior audits, the Original Debtors received a clean bill of health and Ford Credit even commended the Original Debtors on their performance. Despite that positive audit in June, Ford Credit conducted another audit of the Original Debtors' operations on July 26, 2018. Ford Credit claims that the July audit reflected that the Original Debtors failed to meet certain standards under their floor financing requirements. Based on these allegations, Ford Credit suddenly and immediately stopped funding the Original Debtors' floor plan lines on July 30, 2018.

The consequences of this abrupt cessation in funding from Ford Credit were catastrophic. The Original Debtors did not anticipate the sudden withdrawal of a substantial portion of its floor plan lending. Due to the lack of financing from Ford Credit and the resulting freezing of the Original Debtors' bank accounts, the Original Debtors did not have sufficient cashflow to sustain their business operations. In an effort to halt the damaging domino effect on consumers and employees and stabilize their business, the Original Debtors filed for protection under chapter 11 of the Bankruptcy Code.

## B. New Debtors

The New Debtors and the Original Debtors managed the dealerships and locations in a semi-integrated manner. Once the Original Debtors were operating as debtors-in-possession under the Bankruptcy Code, it became increasingly challenging for the New Debtors to operate their business unimpacted by the filing. Due to the public nature of the Original Debtors' bankruptcy cases, the New Debtors' floor plan lenders also became skeptical of the New Debtors' ability to continue operations. Negotiations ensued with First Bank & Trust ("**FBT**"), the floor plan lender for RAM, and AmeriCredit Financial Services, Inc. d/b/a GM Financial ("**GM Financial**"), the floor plan lender for Snyder. Ultimately, FB&T applied for a writ of sequestration whereby FB&T could foreclose on its collateral – that collateral being the vehicles FB&T had "floored" pursuant to a floor plan financing agreement it had with RAM. The United States District Court for the Northern District of Texas, Lubbock Division, entered an agreed order allowing FB&T to sequester the vehicles after a fourteen-day stay lapsed. The stay was set to expire on October 29, 2018. Because RAM could not operate without the collateral vehicles as inventory, and because discussions with GM Financial remained contentious, the New Debtors filed for relief under Chapter 11 of the Bankruptcy Code.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN: RESTRUCTURING ALTERNATIVE

On the Effective Date, the Reorganized Debtors will receive up to $13 million in cash from the Plan Sponsor to be used as working capital and to pay Allowed Claims pursuant to the Plan. In exchange for this Cash, the Reorganized Debtors will cancel all Interests in the Debtors, and issue 90% of the New Equity in the Reorganized Debtors to the Plan Sponsor. The Reorganized Debtors will issue the other 10% of the New Equity to the Creditors' Trust. As set forth in the Plan, the Plan Sponsor is the entity(ies) owned by Auto Investment Group, SLJ Company or other investor identified in the Plan Supplement or at the Confirmation Hearing if SLJ Company declines to participate/invest into

the Reorganized Debtors, Rick Dykes, and Ron Blaylock.[16] The initial equity percentages of ownership in the Plan Sponsor are as follows: (a) The Auto Investment Group = 65%; (b) SLJ Company = 20%; and (c) Ron Blaylock = 5%. Henry Resources is the primary investor in The Auto Investment Group.[17]

THE DEBTORS, WITH THE SUPPORT AND INPUT OF THE PLAN SPONSOR, HAVE PREPARED THE POST-CONFIRMATION BUSINESS PLAN INCLUSIVE OF THREE (3) YEAR PROJECTIONS OF THE INCOME AND OPERATIONAL EXPENSES OF THE REORGANIZED DEBTORS, INCLUSIVE OF ALL PAYMENTS DUE TO ALLOWED ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND PRIORITY NON-TAX CLAIMS PURSUANT TO THE PLAN. THE DEBTORS AND THE PLAN SPONSOR BELIEVE THAT THESE PROJECTIONS ARE CONSERVATIVE, REASONABLE AND ACHIEVABLE. THE PROJECTIONS AND THE PLAN DO NOT REQUIRE THE CONTINUED PARTICIPATION OF FORD CREDIT, FB&T OR GM FINANCIAL AS A FLOOR PLAN LENDER. IF FORD CREDIT, FB&T AND/OR GM FINANCIAL DO NOT WISH TO PROVIDE FLOOR PLAN FINANCING TO THE REORGANIZED DEBTORS, THEN THE REORGANIZED DEBTORS WILL PROCURE AN EXIT LENDER. THE DEBTORS ARE CONFIDENT AND OPTIMISTIC THAT THE BUSINESS CONTACTS AND RELATIONSHIPS THE PLAN SPONSOR MAINTAINS IN THE INDUSTRY WILL YIELD A LENDER TO PROVIDE FLOOR PLAN FINANCING SUFFICIENT FOR THE REORGANIZED DEBTORS TO CONTINUE OPERATIONS. THE PROJECTIONS ARE ATTACHED AS EXHIBIT B.

## ARTICLE V
## MEANS FOR IMPLEMENTATION OF THE PLAN: LIQUIDATION ALTERNATIVE

Under the Liquidation Alternative, the Plan will effect an orderly wind down of the Debtors' business operations, a controlled liquidation of all Collateral, appointment of the Creditors Trustee, and the transfer of all Causes of Action to the Creditors Trust. Ford Credit asserts a "replacement" lien in certain assets, including non-Chapter 5 claims and causes of action. It is unclear whether Ford Credit in fact asserts a lien on tort claims held by the Debtors. But there is no *bona* fide argument that such "replacement" lien covers any commercial tort claim or causes of action. As a result, the Debtors dispute any suggestion that this replacement lien (a) covers more collateral than Ford Credit's lien covered pre-bankruptcy, (b) is not limited to diminution in value, and (c) has any value given Ford Credit's believed involvement in the pre-bankruptcy business. All Assets and all Causes of Action, inclusive of all rights to challenge the extent, priority and validity of alleged liens thereon, and all Collateral not surrendered under the terms of the Plan will be transferred to the Creditors Trust. All Holders of Allowed Unsecured Claims will receive a beneficial interest in the Creditors Trust equal to the Pro Rata amount of their Allowed Unsecured Claim, and the Creditors Trustee will make

---

[16] Rick Dykes is not an investor in Auto Investment Group or SLJ Company. Henry Resources is the primary investor in the Auto Investment Group. Both Auto Investment Group and SLJ Company will continue their respective diligence up to the Confirmation Hearing.

[17] The Plan Sponsor Superpriority Claim, if any, **may** be converted to its Pro Rata Share or other amount agreed by the Reorganized Debtor and Plan Sponsor of the 90% of New Equity in the Reorganized Debtors allocated to the Plan Sponsor.

distributions to all Allowed Unsecured Claims pursuant to the terms and conditions of the Plan and a Creditors Trust Agreement.

## ARTICLE VI
## ASSETS OF THE DEBTORS ON THE PETITION DATE

The following is a summary description of each of the Debtors' known principal assets as of the Petition Date. The information has been compiled from the Debtors' audited and unaudited records as reflected in the Debtors' Schedules, Statements of Financial Affairs and Monthly Operating Reports. As a result of developments during the Chapter 11 Case, the asset base of the Debtors has changed substantially. The Debtors have attached as Exhibit H, which is a current balance sheet reflecting the Debtors' current assets on a consolidated basis as of March 31, 2019.

**Section 6.1** **Debtors' Assets**.

**Reagor-Dykes Motors, LP**

a) **Personal Property**: As of the Petition Date, Reagor-Dykes Motors, LP had personal property in the amount of $32,076,136.31 based on: (i) accounts receivable[18] amounting to $4,078,162.00; (ii) cash and cash equivalents amounting to $3,078,898.64; (iii) deposits and prepayments amounting to $1,300; (iv) inventory amounting to $21,896,597.00; (v) office furniture, fixtures, and equipment amounting to $98,330.25; (vi) machinery, equipment, and vehicles amounting to $53,294.67.

b) **Real Property**: As of the Petition Date, Reagor-Dykes Motors, LP had real property in the amount of $609,871.17.

c) **Intellectual Property**: As of the Petition Date, Reagor-Dykes Motors, LP had intellectual property amounting to $23,923.75.

d) **Other Property**: As of the Petition Date, Reagor-Dykes Motors, LP had other property (including notes receivable from Bart Reagor and Rick Dykes) amounting to $2,845,630.00.

**Reagor-Dykes Auto Company, LP**

a) **Personal Property**: As of the Petition Date, Reagor-Dykes Auto Company, LP had personal property in the amount of $19,296,940.86 based on: (i) accounts receivable amounting to $2,178,854.00; (ii) cash and cash equivalents amounting to $1,686,931.89; (iii) deposits and prepayments amounting to $740.00; (iv) inventory amounting to $12,686,580.00; (v) office

---

[18] As explained in the Global Notes filed with the Bankruptcy Schedules, the Bankruptcy Schedules were unaudited.

furniture, fixtures, and equipment amounting to $428,214.92; (vi) machinery, equipment, and vehicles amounting to $167,949.05.

b) **Real Property**: As of the Petition Date, Reagor-Dykes Auto Company, LP had real property in the amount of $930,352.34.

c) **Intellectual Property**: As of the Petition Date, Reagor-Dykes Auto Company, LP had intellectual property amounting to $16,723.00.

d) **Other Property**: As of the Petition Date, Reagor-Dykes Auto Company, LP had other property (including notes receivable from Bart Reagor and Rick Dykes) amounting to $1,948,948.00.

**Reagor-Dykes Amarillo, LP**

a) **Personal Property**: As of the Petition Date, Reagor-Dykes Amarillo, LP had personal property in the amount of $8,270,334.33 based on: (i) accounts receivable amounting to $989,443.00; (ii) cash and cash equivalents amounting to $670,650.00; (iii) deposits and prepayments amounting to $850; (iv) inventory amounting to $5,983,952.00; (v) office furniture, fixtures, and equipment amounting to $81,310.83; (vi) machinery, equipment, and vehicles amounting to $94,128.50.

b) **Real Property**: As of the Petition Date, Reagor-Dykes Amarillo, LP had real property in the amount of $332,190.25.

c) **Intellectual Property**: None.

d) **Other Property**: As of the Petition Date, Reagor-Dykes Amarillo, LP had other property (including notes receivable from Bart Reagor and Rick Dykes) amounting to $450,000.

**Reagor-Dykes Floydada, LP**

a) **Personal Property**: As of the Petition Date, Reagor-Dykes Floydada, LP had personal property in the amount of $12,379,837.00 based on: (i) accounts receivable amounting to $1,026,592.00; (ii) cash and cash equivalents amounting to $326,208.00; (iii) deposits and prepayments amounting to $1,683.00; (iv) inventory amounting to $9,745,042.00; (v) office furniture, fixtures, and equipment amounting to $31,287.00; (vi) machinery, equipment, and vehicles amounting to $177,150.00.

b)  **Real Property**: As of the Petition Date, Reagor-Dykes Floydada, LP had real property in the amount of $285,352.00.

c)  **Intellectual Property**: As of the Petition Date, Reagor-Dykes Floydada, LP had intellectual property amounting to $66,223.00.

d)  **Other Property**: As of the Petition Date, Reagor-Dykes Floydada, LP had other property (including notes receivable from Bart Reagor and Rick Dykes) amounting to $297,500.

## Reagor-Dykes Imports, LP

a)  **Personal Property**: As of the Petition Date, Reagor-Dykes Imports, LP had personal property in the amount of $12,194,433.91 based on: (i) accounts receivable amounting to $1,694,378.00; (ii) cash and cash equivalents amounting to $1,435,812.16; (iii) inventory amounting to $7,659,216.00; (v) machinery, equipment, and vehicles amounting to $107,643.75.

b)  **Real Property**: As of the Petition Date, Reagor-Dykes Imports, LP had real property in the amount of $232,190.08.

c)  **Intellectual Property**: As of the Petition Date, Reagor-Dykes Imports, LP had intellectual property amounting to $28,250.00.

d)  **Other Property**: As of the Petition Date, Reagor-Dykes Imports, LP had other property (including notes receivable from Bart Reagor and Rick Dykes) amounting to $1,269,134.00.

## Reagor-Dykes Plainview, LP

a)  **Personal Property**: As of the Petition Date, Reagor-Dykes Plainview, LP had personal property in the amount of $14,168,106.35 based on: (i) accounts receivable amounting to $1,414,088.00; (ii) cash and cash equivalents amounting to $2,196,118.68; (iii) inventory amounting to $10,296,320.00; (v) office furniture, fixtures, and equipment amounting to $38,623.67; (vi) machinery, equipment, and vehicles amounting to $63,622.00.

b)  **Real Property**: As of the Petition Date, Reagor-Dykes Plainview, LP had real property in the amount of $174,897.08.

c)  **Intellectual Property**: As of the Petition Date, Reagor-Dykes Plainview, LP did not have any intellectual property.

d)  **Other Property**: As of the Petition Date, Reagor-Dykes Plainview LP had other property (including notes receivable from Bart Reagor and Rick Dykes) amounting to $159,334.00.

**Reagor-Dykes Snyder, LP**

a)  **Personal Property**: As of the Petition Date, Reagor-Dykes Snyder, LP had personal property in the amount of $15,674,302.00 based on: (i) accounts receivable amounting to $2,065,745.00; (ii) cash and cash equivalents amounting to $8,918.00; (iii) deposits and prepayments amounting to $465.00; (iv) inventory amounting to $13,319,142.00; (v) office furniture, fixtures, and equipment amounting to $77,048.00; (vi) machinery, equipment, and vehicles amounting to $202,984.00.

b)  **Real Property**: As of the Petition Date, Reagor-Dykes Snyder, LP did not have any real property.

c)  **Intellectual Property**: As of the Petition Date, Reagor-Dykes Snyder, LP did not have any intellectual property.

d)  **Other Property**: As of the Petition Date, Reagor-Dykes Snyder, LP did not have any other property.

**Reagor Auto Mall, Ltd.**

a)  **Personal Property**: As of the Petition Date, Reagor Auto Mall, Ltd. had personal property in the amount of $12,582,918.21 based on: (i) accounts receivables amounting to $1,915,270.55; (ii) cash and cash equivalents amounting to $1,047,402.91; (iii) deposits and prepayments amounting to $5,786.19; and (iv) inventory amounting to $7,119,136.56.

b)  **Real Property**: As of the Petition Date, Reagor Auto Mall, Ltd. did not have any real property.

c)  **Intellectual Property**: As of the Petition Date, Reagor Auto Mall, Ltd. did not have any intellectual property.

d)  **Other Property**: As of the Petition Date, Reagor Auto Mall, Ltd. had other property (including notes receivable from Bart Reagor and Rick Dykes) amounting to $2,495,322.00.

**Reagor-Dykes II LLC**

As noted elsewhere in this Disclosure Statement, Reagor-Dykes II LLC is the general partner of Debtor Reagor-Dykes Auto Company, LP. Reagor-Dykes II LLC owns a 1%

interest in Debtor Reagor-Dykes Auto Company, LP's outstanding equity partnership units. Other than the above, the Schedules reflect the following as to Reagor-Dykes II LLC:

a) **Personal Property**: As of the Petition Date, Reagor-Dykes II LLC did not have any personal property.

b) **Real Property**: As of the Petition Date, Reagor-Dykes II LLC did not have any real property.

c) **Intellectual Property**: As of the Petition Date, Reagor-Dykes II LLC did not have any intellectual property.

d) **Other Property**: As of the Petition Date, Reagor-Dykes II LLC did not have any other property.

### Reagor-Dykes III LLC

As noted elsewhere in this Disclosure Statement, Reagor-Dykes III LLC is the general partner of Debtor Reagor-Dykes Plainview, LP. Reagor-Dykes III LLC owns a 1% interest in Debtor Reagor-Dykes Plainview, LP's outstanding equity partnership units. Other than the above, the Schedules reflect the following as to Reagor-Dykes III LLC:

a) **Personal Property**: As of the Petition Date, Reagor-Dykes III LLC did not have any personal property.

b) **Real Property**: As of the Petition Date, Reagor-Dykes III LLC did not have any real property.

c) **Intellectual Property**: As of the Petition Date, Reagor-Dykes III LLC did not have any intellectual property.

d) **Other Property**: As of the Petition Date, Reagor-Dykes III LLC did not have any other property.

### Reagor Auto Mall I LLC

As noted elsewhere in this Disclosure Statement, Reagor Auto Mall I LLC is the general partner of Debtors Reagor-Dykes Motors, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Floydada, LP, Reagor-Dykes Imports, LP, Reagor Auto Mall, Ltd. and Reagor-Dykes Snyder, LP. Reagor Dykes II LLC owns a 1% interest in each of these listed debtor's outstanding equity partnership units. Other than the above, the Schedules reflect the following as to Reagor Auto Mall I LLC:

a) **Personal Property**: As of the Petition Date, Reagor Auto Mall I LLC did not have any personal property.

b) **Real Property**: As of the Petition Date, Reagor Auto Mall I LLC did not have any real property.

c) **Intellectual Property**: As of the Petition Date, Reagor Auto Mall I LLC did not have any intellectual property.

d) **Other Property**: As of the Petition Date, Reagor Auto Mall I LLC did not have any other property.

**Section 6.2** **Claims and Causes of Action of Debtors**.

a) The Debtors held the following claims and causes of action that were pending as of the Petition Date:

| Style of Case | Status |
|---|---|
| *Reagor Auto Mall, Ltd. v. Heather Morris* | Pending |
| *Reagor Auto Mall v. Monica Rosendo* | Pending |
| *Reagor Dykes Imports, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Plainview, LP v. Vista Bank* | Ongoing adversary in bankruptcy case no. 18-50214 |

b) As detailed in the Plan and except as otherwise compromised and settled pursuant to the Plan, pursuant to § 1123(b) of the Bankruptcy Code, all Causes of Action are preserved under the Plan and the Reorganized Debtors or the Creditors Trustee, as the case may be, shall, on behalf of the Debtors, retain the exclusive authority and all rights to enforce, commence, and pursue, as appropriate, any and all Causes of Action, including, without limitation, (i) any potential Cause of Action arising from or related to any transfer or other actions or omissions referenced in each of the Debtors' Schedules or Statement of Financial Affairs, as same may be amended (ii) any potential Causes of Action against any past or present insider of the Debtors, (iii) any causes of action related to the extent, validity, and priority of any liens, (iv) any actions for breach of contract, (v) any actions arising in tort, (vi) any actions against retail lenders who have failed to fund vehicle purchases to the Debtors – sometimes called "contracts in transit," and (vi) any action listed on attached Exhibit E. Without limiting the generality of the foregoing, the Debtors retain and preserve any and all Causes of Action, except as otherwise compromised and settled pursuant to the Plan, against some or all of the Debtors' prepetition lenders, including but not limited to Ford Credit, GM Financial, First Capital Bank, FB&T, IBC Bank, and Vista Bank (collectively, the "Lenders") and against the Debtors' prepetition independent auditor Lane Gorman Trubitt, LLC ("Auditor"):

(i)     **Claims Against Lenders:** The Estates' claims against the Lenders include, but are not limited to: (1) claims for wrongful setoff or seizure of estate funds and damages for the expense of preserving bank collateral during the chapter 11 case, namely (i) section 506 surcharge claims and other claims arising from status as prepetition floor plan lender against, among others, GM Financial, Ford Credit, FirstCapital, and FB&T, which provided floor-plan financing to several Debtors that the Debtors secured by inventory collateral without compensation, (ii) a security claim against IBC Bank, which provided real-estate financing to Reagor-Dykes through a Reagor-Dykes affiliate that leased real estate to the Reagor-Dykes dealerships (and the Estates preserved this real estate collateral during the Bankruptcy Cases), (iii) section 553 avoidance claims for millions of dollars of the Estates' cash deposits that were "trapped" at one or more of the Lenders who have not provided an accounting of the cash deposits, (iv) section 553 avoidance claims against the banks that froze money paid into the Debtors' accounts by retail lenders who financed cars sold by the Debtors and then setoff against debts owed by the Debtors to the Lenders, and (v) section 548 fraudulent transfer claims against the Lenders that held certificates of deposit as collateral even though not all of the Debtors owed money to those Lenders; and (2) damages claims, including but not limited to those against (i) First Capital Bank, FB&T, and Vista Bank, who knew or should have known that the Debtors' former chief financial officer was using accounts at FB&T in an illegal check-kiting scheme but still charged the Debtors exorbitant bank charges related to the scheme and helped hide the practices of the former CFO that drove the company into bankruptcy, and (ii) First Capital Bank, who failed to fulfill a $2.1 million extension of floor-plan financing to RAM during the bankruptcy cases of the Original Debtors despite receiving more than $7.5 million in additional security from the Reagor-Dykes owners.

(ii)    **Claims Against Ford Credit:** The Estates' additional claims against Ford Credit include, without limitation, (a) lender-liability claims regarding whether Ford Credit (which provided floor-plan financing to Reagor-Dykes and rated its two previous audits of Reagor-Dykes as exemplary) knew, or should have known, on

or before July 30, 2018, about the selling-out-of-trust sales or double-pledged inventory for which the Debtors' former CFO has now taken responsibility, and whether Ford Credit had a special duty to notify the Debtor's owners of its CFO's misconduct and given the owners a reasonable opportunity to correct the problems before withdrawing its financing and filing its lawsuit on July 31, 2018; (b) tort claims regarding whether Ford Credit tortiously interfered with RAM's floor-plan loan agreement with First Capital Bank when Ford Credit's lawyers notified First Capital Bank that Ford Credit was asserting a priming lien on certain RAM inventory that took priority over First Capital Bank's lien securing floor-plan financing which interference deterred First Capital Bank from fulfilling $2.1 million in floor-plan financing to RAM, for which RAM had pledged $7.5 million in collateral to FirstCapital; (c) the section 506 surcharge claims described above; and (4) any section 547 or 548 avoidance actions against Ford Credit, because Ford Credit may have received payments from non-collateral and received payments while an unsecured creditor and outside of the ordinary course of business. The lawsuit filed against Ford Credit by IBC, which outlines some of the causes of action that the Debtors expect to bring against Ford Credit and maybe others if the restructuring option is not implemented, is attached as Exhibit F.[19]

(iii)     **Claims Against Auditor**:  The Estates' claims against the auditor include, without limitation, all Causes of Action arising from or related to Auditor's written reports and opinions regarding the financial position of the Debtors in 2015 and 2016, whether sounding in contract or tort, and specifically including negligence, gross negligence and/or negligent misrepresentation in performing its audit work, breach of warranty; claims under the Texas Deceptive Trade Practices Act; and/or breach of the duty to exercise reasonable care in rendering professional services as an independent auditor via the failure to detect accounting irregularities and/or in excess of $5.9 million in fraudulent

---

[19] The Debtors are not parties to "guaranty litigation" between Bart Reagor and Ford Motor Credit and have not been made aware of such litigation by Ford Credit.  But, to the extent any party believes the status of such litigation is relevant, the Debtors advise that it understands Ford Credit received summary judgment on guaranty liability against Bart Reagor and a jury trial on damages, offset, etc. is set for October 2019.

accounting entries, the failure to comply with generally accepted auditing standards, failure to obtain reasonable assurance regarding whether the Debtors' 2015 balance sheets and 2016 financial statements were free from material misstatements, and the failure to detect and disclose a $25 million material debt repayment prior to the issuance of the 2016 audit report.

c)     As with most large and complex Chapter 11 cases, the Debtors' Causes of Action (including Chapter 5 Causes of Action) have not yet been analyzed. The failure to list or describe any Cause of Action herein is not intended to limit the rights of the Reorganized Debtors to pursue any known or unknown Cause of Action. Unless Causes of Action against a Person or Entity are expressly waived, relinquished, released, compromised or settled herein or any Final Order, the Debtors or the Estates (before the Effective Date) and the Debtors and the Reorganized Debtors (as applicable), expressly reserve all Causes of Action (including the unknown Causes of Action) for later adjudication and therefore, no preclusion doctrine or other rule of law, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a result of the confirmation or Effective Date of the Plan, or the Confirmation Order. In addition, the Debtors and the Estates, and the Reorganized Debtors, expressly reserve the right to pursue or adopt any Claims not so waived, relinquished, released, compromised, or settled that are alleged in any lawsuit in which one of the Debtors or Estates is a defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs and co-defendants in such lawsuits. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement Documents, or the Disclosure Statement to any Cause of Action against them as any indication that the Trustee, on behalf of the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action other than Causes of Action settled, resolved or released pursuant to this Plan.

d)     For the avoidance of doubt, the Reorganized Debtors reserve and shall retain all Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease and will continue to review payments made

by and transactions involving the Debtors prior to the Petition Date to determine whether preference and other actions to avoid such payments and transactions should be brought. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. The Reorganized Debtors shall have the right to identify any additional Causes of Action prior to the Effective Date of the Plan.

**IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, HOLDERS OF CLAIMS AND INTERESTS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTORS WITHIN NINETY (90) DAYS PRIOR TO THE PETITION DATE) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES ALL CAUSES OF ACTION, AND THAT THE PLAN AUTHORIZES THE REORGANIZED DEBTORS TO PROSECUTE THE SAME.**

All rights, if any, of a defendant to assert a claim arising from relief granted in any Cause of Action, together with the Reorganized Debtors' right to oppose such claim are fully preserved.

## ARTICLE VII
## LIABILITIES OF THE DEBTORS

**Section 7.1    Administrative Claims: All Debtors**. Administrative Claims are any claims defined in §503(b) of the Code as "administrative expenses" and granted priority under § 507(a)(1) of the Code, including:

a)     Claim for any cost or expense of administration in connection with the Case, including, without limitation, any actual, necessary cost or expense of preserving the Debtor's estate and of operating the business of the Debtors incurred on or before the Effective Date;

b)     the full amount of all Claims for compensation for legal, accounting and other services or reimbursement of costs under §§330, 331 or 503 of the Bankruptcy Code;

c)     all fees and charges assessed against the Debtors' estates under Chapter 123 of Title 28 of the United States Code; and

d)     a Claim for post-petition taxes and related items, including any interest and penalties on such post-petition taxes.

Allowed Administrative Claims will be paid as follows: under the Restructuring as soon as reasonably practicable following the later to occur of: (a) the Effective Date and (b) the date on which such Administrative Claim becomes an Allowed Administrative Claim The following are the asserted outstanding Administrative Claims owed by the Debtors:

a) **Professionals**. Under the Plan, all professionals employed pursuant to §§ 327 and 330 shall be required to file with the Bankruptcy Court a final fee application within sixty (60) days after the Effective Date. As of June 30, 2019, accrued but unpaid professional fees and expenses against the Estates are in the aggregate approximate amount of $5 million. Nothing in the Plan or this Disclosure Statement is intended to restrict the ability of any party in interest or the U.S. Trustee to object to any final fee applications.

b) **SAWCO Industries, LLC Administrative Claim**. SAWCO Industries, LLC filed a request for administrative claim in the amount of $31,500.00 for post-petition goods, accessories, and equipment described in its application for compensation.

c) **Earl Owen Co. Administrative Claim**. Earl Owen Co. filed an application for allowance and payment of administrative expense claim in the amount of $92,312.97 for automotive goods and accessories delivered to the Debtors 20 days prior to the petition date.

d) **Covenant Health System**. Covenant Health System filed its application for administrative expenses amounting to $147,407.86, but after negotiation with the Debtors have agreed to the reduced amount of $82,247.77.

e) **Reagan National Advertising of Austin**. Reagan National Advertising of Austin filed its application for administrative expenses amounting to $9,716.43.

f) **CDK Global, LLC**. CDK Global, LLC has filed multiple proofs of claim against the Debtors in the aggregate amount of $129,029.61 asserting, in addition to unsecured claims, entitlement to an alleged administrative claim in an unspecified amount. Representations in CDK Global's objection to the Disclosure Statement indicate that any request for administrative claim will be properly and timely filed by CDK Global. The Debtors have not verified or agreed to CDK Global's alleged entitlement to an administrative claim. Both the Debtors and CDK Global reserve all rights incident to this alleged administrative claim.

g) **Eighty Second Street Investments, LLC and Lubbock Windmill Investments, LLC.** Eighty Second Street Investments, LLC and Lubbock Windmill Investments, LLC asserts that it holds an administrative claim against the Debtors in the amount of $351,553.14 for postpetition unpaid rent. Eighty Second Street Investments, LLC and Lubbock Windmill Investments, LLC have filed a proof of claim, claim number 142 setting forth this amount but have not yet filed a request for payment of administrative-expense claim as required by section 503(a) of the Code although Eighty Second Street Investments, LLC and Lubbock Windmill Investments, LLC do intend to do so timely. The Debtors have not verified or agreed to the asserted amount of Eighty Second Street Investments, LLC and Lubbock Windmill Investments, LLC's alleged administrative-expense claim. Both the Debtors and Eighty Second Street Investments, LLC and Lubbock Windmill Investments, LLC reserve all rights incident to this alleged administrative-expense claim.

h) **Ford Credit.** Ford Credit has indicated that it believes that it is entitled to assert an administrative claim in the amount of approximately $3.5 million under the various cash collateral orders entered during the Case. The Debtors have not verified or agreed to the asserted amount of Ford Credit's alleged administrative-expense claim. As a result, the Debtors expect to object to any such asserted claim by Ford Credit, especially given the circumstances of the cases.

i) **Other Asserted Administrative Claims.** A review of the docket on June 28, 2019, reveals that no other requests for administrative expense payments have been filed in this case.

**Section 7.2** **Scheduled Secured and Priority Claims, Pending Litigation**.

The scheduled and filed Claim amounts listed below do not include the accrual of interest after the filing of the Cases, to the extent such post-petition interest may be applicable.

a) **Secured Claims: Scheduled:** The Schedules reflect the following Secured Claims, listed below by the respective Debtor:

| Debtor | Secured Lender | Amount |
|---|---|---|
| Reagor-Dykes Auto Company, LP | AIM Bank | $357,915.06 |
| | First Capital Bank | $2,442,093.00 |

| | Ford Credit | $16,223,320.17 |
|---|---|---|
| | Vista Bank | $792,500.00 |
| | Vista Bank | $367,500.00 |
| Reagor-Dykes Motors, LP | Ford Credit | $31,983,007.90 |
| | Ford Credit | $3,916,674.00 |
| Reagor-Dykes Plainview, LP | AIM Bank | $457,166.57 |
| | First Capital Bank | $2,442,093.00 |
| | Ford Credit | $15,964,252.12 |
| | Vista Bank | $848,443.89 |
| | Vista Bank | $596,880.00 |
| Reagor-Dykes Amarillo, LP | Ford Credit | $9,287,555.82 |
| | First Capital Bank | $2,442,093.00 |
| Reagor-Dykes Floydada, LP | Ford Credit | $18,821,873.00 |
| | First Capital Bank | $2,580,498.00 |
| Reagor-Dykes Imports, LP | First Capital Bank | $2,442,093.00 |
| | Ford Credit | $12,894,777.94 |
| | Vista Bank | $359,056.11 |
| | Vista Bank | $992,847.52 |
| Reagor Auto Mall, Ltd. | First Bank & Trust | $3,257,100.00 |
| | First Capital Bank | $9,575,238.80 |
| | First Capital Bank | $308,850.00 |
| | Liberty Capital Bank | $431,150.00 |
| Reagor-Dykes Snyder, LP | GM Financial Commercial Lending Service | $14,662,298.00 |

**Secured Claims: Claims Register:** The claims register reflects the following secured claims filed against each Debtor: Reagor-Dykes Motors, LP in the amount of $44,742,592.60, Reagor-Dykes Auto Company, LP in the amount of $30,039,843.26, Reagor-Dykes Plainview, LP in the amount of $24,447,326.74, Reagor-Dykes Floydada, LP in the amount of $22,708,430.64, Reagor-Dykes Imports, LP in the amount of $22,652,073.83, Reagor-Dykes Amarillo, LP in the amount of $18,049,369.10, Reagor-Dykes Snyder, L.P. in the amount of $28,555,095.50, Reagor Auto Mall, Ltd. in the amount of $19,966,237.30.

b) **Priority Claims:** The Schedules reflect the following Priority Claims, listed below by the respective Debtor:

| Debtor | Amount |
|---|---|
| Reagor-Dykes Auto Company, LP | $171,185.00 |
| Reagor-Dykes Motors, LP | $212,107.00 |
| Reagor-Dykes Plainview, LP | $91,027.00 |
| Reagor-Dykes Amarillo, LP | $76,175.00 |
| Reagor-Dykes Floydada, LP | $75,526.00 |
| Reagor-Dykes Imports, LP | $146,189.00 |
| Reagor Auto Mall, Ltd. | $442,382.55 |
| Reagor-Dykes Snyder, LP | $29,839.00 |

c) **Claims Asserted by the Texas Attorney General's Office**: The Texas Comptroller asserts that the below-referenced tax obligations of Debtors Reagor Auto Mall Ltd. and Reagor-Dykes Snyder, L.P. are secured by tax liens, notices of which were filed in Lubbock County on October 29, 2018. The Comptroller further states that although the lien notices refer to a specific

**FIRST AMENDED MODIFIED DISCLOSURE STATEMENT FOR SECOND AMENDED PLAN OF REORGANIZATION FOR REAGOR-DYKES AUTO GROUP - PAGE | 44**
4842-6525-0690.16

obligation, each lien secures all taxes, penalty, and interest owed to the Comptroller which may have accrued before or after the filing of the notice pursuant to Tex. Tax Code §§ 113.001 and 113.006(b), and that each tax lien continues until such time as the taxpayer owes nothing to the Comptroller per Tex. Tax Code §113.105(a). Because each referenced Debtor continuously owed outstanding taxes to the Comptroller since the lien notice filing, the Comptroller asserts, all tax obligations owed by these two Debtors are secured by the tax liens. The priority of these liens is determined by the timing of filing of the tax lien notices, vis-à-vis other secured creditors, in accordance with the time frames for objections to claims as set forth in the Plan.

| Case No. | Debtor | Amount | Tax Type | Asserted Claim Type | Date | Claim No. |
|---|---|---|---|---|---|---|
| 18-50214 | Reagor-Dykes Motors LP | $138,244.18 | Sales | Admin Exp | 3/25/2019 | 145-1 (amending 34) |
| | | $12,840.39 | Sales | Prepetition | 3/25/2019 | 33-2 (amending33-1) |
| | | $2,000.00 | Franchise | Prepetition | 10/25/2018 | 32-1 |
| | | **$153,084.57** | | | | |
| 18-50215 | Reagor-Dykes Imports LP | $3,052.34 | Sales | Prepetition | 3/25/2019 | 11-2 (amending 11-1) |
| | | $36,041.85 | Sales | Admin Exp | 3/25/2019 | 12-2 (amending 12-1) |
| | | **$39,094.19** | | | | |
| 18-50216 | Reagor-Dykes Amarillo, LP | $8,037.55 | Sales | Admin Exp | 3/25/2019 | 54-1 |
| | | $687.31 | Sales | Prepetition | 3/26/2019 | 13-2 (amending 13-1) |
| | | $2,000.00 | Franchise | Prepetition | 10/18/2018 | 12/1 |
| | | **$10,724.86** | | | | |
| 18-50217 | Reagor-Dykes Auto Company LP | $68,693.60 | Sales | Admin Exp | 3/25/2019 | 25-2 (amending 25-1) |
| | | $3,587.76 | Sales | Prepetition | 3/25/2019 | 24-2 |
| | | $2,000.00 | Franchise | Prepetition | 10/26/2018 | 23-1 |
| | | **$74,281.36** | | | | |
| 18-50218 | Reagor-Dykes Plainview, LP | $20,364.34 | Sales | Admin Exp | 3/25/2019 | 10/2 |
| | | $1,652.90 | Sales | Prepetition | 3/25/2019 | 9/2 |
| | | $2,000.00 | Franchise | Prepetition | 10/24/2018 | 8/1 |
| | | **$24,017.24** | | | | |
| 18-50219 | Reagor-Dykes Floydada, LP | $21,338.55 | Sales | Admin Exp | 3/26/2019 | 11/2 |
| | | $2,190.72 | Sales | Prepetition | 3/26/2019 | 10/2 |
| | | $2,000.00 | Franchise | Prepetition | 10/25/2018 | 9/1 |
| | | **$25,529.27** | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 18-50321 | Reagor-Dykes Snyder, LP | $11,114.94 | Sales | Prepetition | 1/24/2019 | 23-1 [secured] |
| | | $24,043.16 | Sales | Admin Exp | 3/25/2019 | 24-2 (amending 24-1) |
| | | $1,000.00 | Franchise | Prepetition | 1/24/2019 | 25-1 [secured] |
| | | **$36,158.10** | | | | |
| 18-50322 | Reagor-Dykes III, LLC | | | | | |
| 18-50323 | Reagor-Dykes II, LLC | | | | | |
| 18-50324 | Reagor Auto Mall, Ltd | $74,032.42 | Sales | Admin Exp | 3/22/2019 | 46-1 |
| | | $27,454.78 | Sales | Prepetition | 3/22/2019 | 45-1 |
| | | $1,442,427.49 | Franchise | Prepetition | 3/22/2019 | 43-1 |
| | | $4,077.55 | IFTA | Prepetition | 3/22/2019 | 42-1 |
| | | **$1,547,992.24** | | | | |
| 18-50325 | Reagor Auto Mall I, LLC | **$95,189.13** | Sales | Prepetition | 4/18/2019 | 19-1 |

        d)      **Pending Litigation:** The Debtors list the following litigation filed against one or more of the Debtors that was pending as of the Petition Date:

| Style of Case | Status |
|---|---|
| *Zigler Motors, Inc. v. Reagor Auto Mall, Ltd. & Reagor Auto Mall I, LLC* | Administratively closed; Suggestion of bankruptcy filed. |
| *James Wood Autopark v. Reagor Auto Mall, Ltd.* | Pending; Suggestion of bankruptcy filed. |
| *Citizens State Bank v. Texas Department of Motor Vehicles and Reagor-Dykes Snyder, L.P.* | Pending; Suggestion of bankruptcy filed. |
| *First Bank and Trust v. Reagor Auto Mall, Ltd., et. al.* | Pending; Suggestion of bankruptcy filed. |
| *Nyle Maxwell of Taylor, LLC v. Reagor Auto Mall, Ltd. et. al.* | Pending; Suggestion of bankruptcy filed. |

| Style of Case | Status |
|---|---|
| *World Motors, LLC v. Reagor-Dykes Dallas, LP, Reagor Auto Mall, Ltd., et. al.* | Pending; Suggestion of bankruptcy filed. |
| *MUSA Auto Leasing and Edward Lee Mitchell v. Family Dealership Group, LLC and Reagor Auto Mall* | Pending |
| *ND Auto Sales, LLC v. Reagor Auto Mall, Ltd.* | Pending |
| *Vandergriff v. Reagor Auto Mall, Ltd., et. al.* | Pending |

**Section 7.3**    <u>Unsecured Claims</u>.

The Schedules of each individual Debtor reflect Unsecured Claims in the following amounts: Reagor-Dykes Motors, LP in the amount of $2,171,246.74, Reagor-Dykes Auto Company, LP in the amount of $1,798,097.23, Reagor-Dykes Plainview, LP in the amount of $1,194,015.63, Reagor-Dykes Floydada, LP in the amount of $628,889.03, Reagor-Dykes Imports, LP in the amount of $2,138,876.83, Reagor-Dykes Amarillo, LP in the amount of $1,458,492.84, Reagor-Dykes Snyder, L.P. in the amount of $2,926,075.80, Reagor Auto Mall, Ltd. in the amount of $13,858,386.07.

The claims registers for each individual Debtor reflect Unsecured Claims asserted in the following amounts: Reagor-Dykes Motors, LP in the amount of $140,182,189.64,Reagor-Dykes Auto Company, LP in the amount of $ 144,744,831.79, Reagor-Dykes Plainview, LP in the amount of $ 148,555,514.12, Reagor-Dykes Floydada, LP in the amount of $ 149,151,071.06, Reagor-Dykes Imports, LP in the amount of $153,007,764.29, Reagor-Dykes Amarillo, LP in the amount of $154,947,354.34, Reagor-Dykes Snyder, L.P. in the amount of $ 41,286,253.33, Reagor Auto Mall, Ltd. in the amount of $ 60,097,393.15.

The bar date for filing additional proofs of claim against the Original Debtors was December 5, 2018; however, the bar date for the New Debtors was March 28, 2019.

**Section 7.4**    <u>Intercompany Claims</u>.

Due to the intertwined nature of the Debtors' prepetition business operations, the state of the books and records when BlackBriar assumed its role as CRO, and in an effort to equitably maximize the recovery to creditors, all intercompany claims that the Debtors hold against one another are separately classified under the Plan and will receive no distribution.

## ARTICLE VIII
## SUMMARY OF KEY MATTERS ARISING DURING THE CHAPTER 11 CASES

**Section 8.1**    <u>Commencement of the Debtors' Cases</u>. Each Chapter 11 Case was commenced by the filing of a voluntary petition under chapter 11 on the dates identified as each Petition Date. Shortly after these cases were commenced, the Debtors filed several motions incident to the management of the Bankruptcy Cases that were granted by the Court, including the authority

to retain certain professionals and the joint administration of the Debtors' cases under one case number.

**Section 8.2    Employment of the Chief Restructuring Officer**. The Debtors employed BlackBriar LLC to assist with restoring confidence in consumers, employees, and the community. BlackBriar assist the Debtor with stabilizing operations and acted as an objective intermediary that has pursued a path in the best interest of all parties in interest.

**Section 8.3    Auction of Assets Held by Original Debtors**. On September 10, 2018, the Original Debtors filed a Motion for Entry of an Order (I) Authorizing and Approving: (A) Bid Procedures; (B) Stalking Horse Bidder and Overbid Protections; and (C) Form and Manner of Notices [Doc. No. 222]. The Original Debtors were successful in procuring a stalking horse bidder and held an auction on the sale of the Original Debtors' Assets. However, during the sale process, the New Debtors filed for bankruptcy protection. Around the time of the auction, the Debtors were apprised of certain potential investors seeking to reorganize the Debtors as opposed to a sale. After further negotiations and discussion, the Debtors believed that it was in the best interest of the stakeholders and the Estates to pursue a plan of reorganization as opposed to a sale of assets. On November 28, 2018, the Debtors asked that the Court table the sale indefinitely so that the Debtors can pursue the plan of reorganization. The Court granted the Debtors' request.

**Section 8.4    Consumer Protection Efforts**. Motion for Order Authorizing and Directing Retail Lenders to Pay Outstanding Tax, Title, and License Fees and Trade-Lien Payoffs. Understanding that innocent consumers were facing difficult circumstances, on October 9, 2018, the Debtors filed a *Motion for Order Authorizing and Directing Retail Lenders to Pay Outstanding Tax, Title, and License Fees and Trade-Lien Payoffs* ("**TT&L Motion**") [Doc. No. 349]. The TT&L Motion required subsequent retail lenders to pay off any outstanding tax, title, and license fees or trade-lien payments so that impacted consumers could then receive their titles and/or registration stickers on their car. The Debtors have engaged in extensive discussion with prior retail lenders, current retail lenders, and consumers in an attempt to reach agreements that resolve the consumer's tax, title, license fees or trade-lien payoffs. The Debtors have reach multiple agreements with retail lenders and are continuing to engage retail lenders in negotiations and, to date, the Debtors have successfully addressed issues incident to vehicle titles, trade in liens and TT&L for approximately 480 consumers. With that continued cooperation among the retail lenders, the Debtors withdrew the TT&L Motion without prejudice. Under the Restructuring Alternative in the Plan, retail lenders may choose to become Qualified Retail Lenders and take advantage of the TT&L reimbursement provisions.

**Section 8.5    Global Negotiations**. The Debtors have been proactive in actively negotiating with floor plan lenders, dealers, retail lenders and other parties in interest on myriad complex issues and have had success resolving most substantive motions for relief without consuming the Court's time. The Debtors have negotiated in good faith with opposing counsel on matters concerning everything from the use of cash collateral to motions to lift the automatic stay, and have

made every effort to expend the Debtors' limited resources judiciously. The Debtors have been successful in reaching agreements and filing agreed orders with the Court in many instances.

## ARTICLE IX
## ACCEPTANCE AND CONFIRMATION OF THE PLAN

**Section 9.1** **Requirements for Confirmation**. At the Confirmation Hearing, the Court will determine whether the provisions of section 1129 of the Bankruptcy Code have been satisfied. Upon the showing that all such requirements are satisfied, and that all other conditions to confirmation set forth in the Plan are met, the Debtors will request that the Bankruptcy Court enter an Order confirming the Plan under §1129(a).

a)     **Provisions of Section 1129**. Section 1129 of the Bankruptcy Code, as applicable here, provides as follows:

(i)     The Plan must comply with the applicable provisions of the Bankruptcy Code, including section 1123 which specifies the mandatory contents of a plan and section 1122 which requires that Claims and Interests be placed in Classes with "substantially similar" Claims and Interests (section 1129(a)(1)).

(ii)     The proponents of the Plan must comply with the applicable provisions of the Code (section 1129(a)(2)).

(iii)     The Plan must have been proposed in good faith and not by any means forbidden by law (section 1129(a)(3)).

(iv)     Any payment made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, must be disclosed to the Court and approved or be subject to the approval of the Court as reasonable (section 1129(a)(4)).

(v)     The Debtors must disclose the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the reorganized debtor, of an affiliate of the Debtors participating in the Plan with the Debtors, or of a successor to the Debtors under the Plan. The appointment to, or continuance in, such office of such individual must be consistent with the interests of the Debtors' creditors, equity holders, and with public policy. The Debtors must also disclose the identity of any insider that will be employed or retained by the reorganized debtor and the nature of any compensation for such insider (section 1129(a)(5)).

(vi)     The Plan must meet the "best-interest-of-creditors" test, which requires that each holder of a Claim or Interest of a Class of Claims or Interests that is impaired under the Plan either accept the Plan or receive or retain under the Plan on account of such Claim or Interest property of a value as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Code. If the holders of a Class of Secured Claims make an election under section 1111(b) of the Code, each holder of a Claim in such electing Class must receive or retain under the Plan on account of its Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of its interest in the Debtors' interest in the property that secures its Claim (section 1129(a)(7)). To calculate what non-accepting holders would receive if the Debtors were liquidated under chapter 7, the Court must determine the dollar amount that would be generated upon disposition of the Debtors' assets and reduce such amount by the costs of liquidation. Such costs would include the fees of a Trustee (as well as those of counsel and other professionals) and all expenses of sale.

(vii)    Each Class of Claims or Interests must either accept the Plan or not be impaired under the Plan (section 1129(a)(8)). Alternatively, as discussed herein, the Plan may be confirmed over the dissent of a Class of Claims or Interests if the "cramdown" requirements of section 1129(b) of the Bankruptcy Code are met.

(viii)   Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan must provide that holders of Administrative Claims and Priority Claims (other than tax claims) will be paid in full in cash on the Effective Date of the Plan, and that holders of priority tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding six (6) years after the date of assessment of such tax, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim (section 1129(a)(9)).

(ix)     At least one impaired Class must accept the Plan, determined without including the acceptance of the Plan by any insider holding a Claim of such Class (section 1129(a)(10)).

(x)      The Plan must be "feasible". In other words, it cannot be likely that confirmation of the Plan will be followed by the liquidation, or the need for further financial reorganization, of

the Debtors or any successor to the Debtors under the Plan, unless such liquidation is proposed in the Plan (section 1129(a)(11)).

(xi)    All fees required to be paid under the Bankruptcy Code have been paid or the Plan provides for such payment on its Effective Date (section 1129(a)(12)).

b)    **The Plan Meets All of the Requirements for Confirmation**. The Debtors believe that the Plan satisfies all statutory requirements of chapter 11 of the Code and should be confirmed. More specifically:

(i)    The Plan complies with all of the applicable provisions of the Bankruptcy Code;

(ii)    The Debtors have complied with the Bankruptcy Code and have proposed the Plan in good faith;

(iii)    All disclosure requirements concerning payments made or to be made for services rendered in connection with the Chapter 11 Cases or the Plan have been, or will be met prior to or at the Confirmation Hearing; and

(iv)    Administrative Claims, Priority Claims, and fees required to be paid under the Code are appropriately treated under the Plan.

c)    **The Plan is Feasible: Restructuring Alternative:** Furthermore, the Plan is feasible. The Bankruptcy Code requires that, as a condition to Confirmation of a plan, the Court find that Confirmation is not likely to be followed by a liquidation or a need for further financial reorganization except as proposed in that plan. The Debtors believe the Plan is feasible as it, under the Restructuring Alternative, provides for payment of creditors in accordance with the waterfall provisions of the Code, and for the continuation of the Debtors' business pursuant to the Post-Confirmation Business Plan. Initially, the Plan provides for the payment in full of all Allowed Administrative Claims and Priority Claims by the Reorganized Debtors on or promptly after the Effective Date except for Priority Tax Claims which will be paid over time in accordance with the Bankruptcy Code. Next, Confirmation of the Plan shall effect the formation of the Creditors Trust. The Creditors' Trust Assets shall consist of (a) under the Restructuring Alternative, 10% of the New Equity of the Reorganized Debtors that will be issued to the Creditors Trust pursuant to a Restructuring under this Plan for the express benefit of creditors holding Allowed Class 11 Claims against the Debtors, subject to the New Equity Redemption Right, and (b) under the Liquidation Alternative, all Causes of Action and the Litigation Proceeds for the express benefit of creditors holding Allowed Class 11, 12, 13, 14, and 15 Claims.

With regard to the Reorganized Debtors' future business operations, the Post-Confirmation Business Plan, which consists of the three year projections of the income and expenses of the Debtors, including payroll, professional fees, operational

expenses, and payments due to Allowed Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims pursuant to the Plan, is attached as Exhibit B. The Post-Confirmation Business Plan includes various alternative business models on which the Restructuring Alternative may be achieved, labeled as B-1, B-2, and B-3. Upon confirmation of the Plan, the Dealerships will be recapitalized by the $13 million New Equity Infusion from the Plan Sponsor, the Debtors will benefit from the proven operational expertise of the Fin Ewing Group including Mr. Ron Blaylock as Chief Executive Officer, and will be well-positioned to accomplish their long-term business and financial goals as outlined in the Plan.[20] The Debtors believe that the projections set forth in the Post-Confirmation Business Plan are conservative and achievable; the Plan is feasible.

d) **The Plan is Feasible: Liquidating Alternative**: If the Restructuring Alternative is unsuccessful, the Plan will instead go effective via the orderly and controlled disposition of all Assets by the Creditors Trustee under the Liquidation Alternative with Dennis Faulkner of Lain, Faulkner & Co. LLC as the proposed Creditors Trustee. To address an objection raised by a creditor regarding the need to engage a new and independent trustee, the Debtors suggested Mr. Faulkner and the objecting creditor agreed. Mr. Faulkner has served as a post-confirmation plan trustee in numerous large and complex Chapter 11 cases, and is well-qualified for this role. Mr. Faulkner will be assisted as necessary by Lyndon James, a principal of BlackBriar Advisors, LLC. BlackBriar is the duly employed Chief Restructuring Officer of the Debtors since the inception of these cases; as such, BlackBriar and Mr. James have irreplaceable institutional knowledge compared to any chapter 7 trustee. With Mr. James's assistance and his own significant experience, Mr. Faulkner will be best positioned to oversee an orderly liquidation of assets that will result in the highest and best return to all creditors and parties in interest. In addition, Mr. Faulkner will not earn fees for such liquidation in excess of the fees that would have been earned by a chapter 7 trustee.

## ARTICLE X
## LIQUIDATION ANALYSIS

The Debtors believe that the Plan, which either provides for the continued business operations of the Debtors, or a controlled orderly liquidation of assets, affords creditors the potential for the greatest realization from the Debtors' assets, and, therefore, is in the best interests of creditors. As noted above, the value of the Debtors is in their Dealer Agreements, proven commitment to Lubbock and surrounding towns in West Texas, and – post-confirmation - the proven operational experience and expertise of the Fin Ewing Group including Mr. Ron Blaylock. If the Plan goes effective pursuant to the Restructuring Alternative, then maintaining the Debtors' deep-seated commitment to the community of Lubbock and continuity of business operations pursuant to the Dealer Agreements will

---

[20] Mr. Blaylock's Executive Biography is attached as Exhibit G. The Post-Confirmation Business Plan includes all proposed compensation to Mr. Blaylock and the Fin Ewing Group for consulting services. If the proposed compensation is increased in a material way, the Debtors will include that increase in the Plan Supplement Documents. Exhibit G complies with §1129(a)(5)(A)(i), but neither Mr. Blaylock nor anyone currently employed with the Fin Ewing Group is an insider of the Debtors implicating §1129(a)(5)(B).

be the focus of the Debtors' post-confirmation business, all as set forth in the Restructuring Alternative of the Plan and the Post-Confirmation Business Plan.

If the Plan is instead confirmed via the Liquidation Alternative, same is still preferable to a chaotic Chapter 7. As stated above, the proposed Trustee, Mr. Faulkner as assisted by Mr. James, will accomplish the dual goals to ensure a fresh look by an independent third party and simultaneously to preserve the irreplaceable institutional knowledge compared to a Chapter 7 trustee. To address any concerns regarding the comparative cost of a Creditors Trustee, the compensation to be paid to the Creditors Trustee under the Liquidation Alternative will not exceed the compensation that would be paid to a Chapter 7 trustee if the Chapter 11 Cases were converted to administration under Chapter 7 of the Bankruptcy Code. For that reason and others set forth below and to be explained at the Confirmation hearing, the Debtors believe that a controlled liquidation under Chapter 11 of the Bankruptcy Code through the Liquidation Alternative will generate more value to all general unsecured creditotrs.

The key benefits to confirmation of the Plan with Mr. Faulkner as Creditors Trustee with BlackBriar's assistance as opposed to conversion include: BlackBriar has already invested significant time and resources investigation the Debtors' Claims and Causes of Action (including Chapter 5 Causes of Action), BlackBriar is best positioned to oversee the continued redress of TT&L issues for the benefit of consumers, and BlackBriar is familiar with the Debtors' dealerships, books and records and business operations. By contrast, a Chapter 7 trustee likely would not have the wide-ranging experience that Mr. Faulkner has in large and complex Chapter 11 cases, would incur significant cost and delay in "catching up" on all aspects of the Debtors and the Causes of Action with which BlackBriar is already well-versed, and liquidation of the remaining inventory vehicles by a Chapter 7 trustee at a "fire sale" would yield little comparative value to the Debtors' secured lenders and no value for General Unsecured Creditors. Relatedly and to that point, the auction of the new and used vehicles currently in the Debtors' possession would not raise nearly enough funds necessary to pay off their respective floor plan lenders that claim superior liens – Ford Credit, GM Financial, First Capital Bank and FB&T. A liquidation analysis depicting the likely results of a fire-sale liquidation is attached hereto as Exhibit "C."

In a Chapter 7 liquidation scenario, a trustee would be appointed to administer the Estates, to resolve pending controversies against the Debtors and claims of the Estates against other parties, and to make distribution to Creditors. If the Cases were converted to cases under Chapter 7, significant additional Administrative Expenses would be incurred, and any distributions to holders of Claims would be substantially delayed and, in all likelihood, reduced as compared to the anticipated results of Confirmation of the Plan. A Chapter 7 trustee would be entitled to compensation in accordance with the scale set forth in § 326 of the Bankruptcy Code, and might also seek to retain new professionals, including attorneys and accountants, in order to resolve any disputed Claims and possibly to pursue claims of the Estates against other parties. There is a strong probability that such Chapter 7 trustee would not possess any particular knowledge of the Debtors' industry. The trustee and any such new professionals retained by the trustee would need to expend time familiarizing themselves with the Debtors' operations specifically and the industry generally, resulting in a duplication of effort, increased expense, and delay in payment to Creditors. Under the Bankruptcy Rules, a new bar date for the filing of proofs of claim would have to be set, and additional Claims against the Estates that will soon be time-barred (because they were not filed before the applicable bar dates set in the Cases) could be asserted.

Further, Ford Credit objects to the Liquidating Alternative. The Debtors believe that objection is a confirmation objection. The Debtors also believe that Ford Credit opposes the Liquidating Alternative because it wants to control any liquidation through the election of a chapter 7 trustee. The Debtors do not believe that control over the liquidation or trustee election by ***any potential litigation target*** is proper or in the best interests of the Estates, given Ford Credit's or other party's potential litigation risk under any liquidation scenario. Further, a trustee-election fight will be expensive, which gives Ford Credit or other potential litigation target an advantage over the Estates. For a lot of reasons, including that the Creditor Trustee (with the assistance of BlackBriar) will be free from any influence by a potential litigation target and will not earn more than a chapter 7 trustee would in liquidation through chapter 7 of the Bankruptcy Code, the Debtors believe that a controlled liquidation under the Liquidating Alternative is in the best interests of the Estates.

**THE DEBTORS BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED HEREIN BECAUSE IT SHOULD PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN A CHAPTER 7 LIQUIDATION TO THE HOLDERS OF SECURED AND UNSECURED CLAIMS WHO WOULD LIKELY RECEIVE LESS IN A CHAPTER 7 LIQUIDATION. IN ADDITION, OTHER ALTERNATIVES WOULD INVOLVE DELAY, UNCERTAINTY, AND SUBSTANTIAL ADMINISTRATIVE COSTS.**

**ARTICLE XI**
**VOTING PROCEDURES**

**ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DETERMINED, PURSUANT TO THE BANKRUPTCY CODE, BASED UPON THE ALLOWED CLAIMS AND ALLOWED INTERESTS THAT ACTUALLY VOTE ON THE PLAN. THEREFORE, IT IS IMPORTANT THAT CLAIMANTS EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**Section 11.1** **Classes Entitled to Vote on the Plan**. All members of Impaired Classes who hold Allowed Claims are entitled to vote to accept or reject the Plan. Section 1124 of the Bankruptcy Code generally provides that a class of claims or interests is considered to be impaired under a plan unless the plan does not alter the legal, equitable, and contractual rights of the holders of such claims or interest. For purposes of Plan solicitation, Holders of Allowed Claims in Class 1 are Unimpaired; therefore, they are presumed to accept the Plan. Holders of Claims in Classes 1A, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15 are Impaired under the Plan; therefore, they are entitled to vote to accept or reject the Plan. Holders of Allowed Claims in Class 15 will receive no Distributions under the Plan on account of said Claims if the Plan is Confirmed under the Restructuring Alternative, and Holders of Allowed Claims in Class 16 and 17 and Interests in Class 18 are Impaired and will receive no Distributions under the Plan on account of said Claims or Interests; therefore, Classes 16, 17 and 18 are presumed to reject the Plan under § 1126(g) of the Bankruptcy Code.

**Section 11.2** **Persons Entitled to Vote on the Plan**. Only holders of Allowed Claims and holders of Disputed Claims which have been temporarily allowed for voting purposes are entitled to vote on the Plan. For purposes of the Plan, an Allowed Claim is (i) a Claim against or Interest in a Debtor, proof of which, if filed on or before the Bar Date, which is not a Disputed Claim or Disputed Interest, (ii) if no proof of claim or interest was so filed, a Claim against or Interest in a Debtor that

has been or hereafter is listed by a Debtor in the Schedules as liquidated in amount and not disputed or contingent, or (iii) a Claim or Interest allowed hereunder or by Final Order. An Allowed Claim or Allowed Interest does not include any Claim or Interest or portion thereof which is a Disallowed Claim or Disallowed Interest which has been subsequently withdrawn, disallowed, released or waived by the holder thereof, by this Plan, or pursuant to Final Order. Unless otherwise specifically provided in the Plan, an Allowed Claim or Allowed Interest shall not include any amount for punitive damages or penalties. Therefore, although the holders of Disputed Claims will receive ballots, these votes will not be counted unless such Claims become Allowed Claims as provided under the Plan or are temporarily allowed for voting purposes by the Court.

**THE CLAIMS IN CLASSES 1A, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 AND 15 UNDER THE PLAN ARE IMPAIRED AND ARE ENTITLED TO VOTE WITH RESPECT TO ACCEPTANCE OR REJECTION OF THE PLAN. HOLDERS OF ALLOWED CLAIMS IN CLASS 15 WILL RECEIVE NO DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF SAID CLAIMS IF THE PLAN IS CONFIRMED UNDER THE RESTRUCTURING ALTERNATIVE, AND HOLDERS OF ALLOWED CLAIMS IN CLASS 16 AND 17 AND INTERESTS IN CLASS 18 ARE IMPAIRED AND WILL RECEIVE NO DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF SAID CLAIMS OR INTERESTS; THEREFORE, THEY ARE PRESUMED TO REJECT THE PLAN. INTERESTS IN CLASS 18 WILL BE EXTINGUISHED.**

**Section 11.3      Vote Required for Class Acceptance**. During the Confirmation Hearing, the Bankruptcy Court will determine whether the Classes voting on the Plan have accepted the Plan by determining whether sufficient acceptances have been received from the holders of Allowed Claims actually voting in such Classes. A Class of Claims will be determined to have accepted the Plan if the holders of Allowed Claims in the Class casting votes in favor of the Plan (i) hold at least two-thirds of the total amount of the Allowed Claims of the holders in such Class who actually vote and (ii) constitute more than one-half in number of holders of the Allowed Claims in such Class who actually vote on the Plan.

As a condition to Confirmation, the Bankruptcy Code requires that each impaired Class of Claims or Interests accept the Plan, subject to the "cramdown" exception of §1129(b) described herein. To effectuate the §1129(b) exception, at least one impaired Class of Claims must accept the Plan.

**Section 11.4      Accepting Vote Is a Vote For Confirmation Under Either Alternative.**

As stated throughout this Disclosure Statement, the Debtors believe that the Plan is confirmable under either the Restructuring or Liquidation Alternative. A vote to accept the Plan is a vote in favor of Confirmation regardless of under which alternative the Plan ultimately proceeds to an Effective Date. If the Debtors are unable to go "effective" on the Restructuring Alternative, they will notify the Court and go "effective" on the Liquidation Alternative.

**Section 11.6      Voting Instructions**.

a)      **Ballots and Voting.** Holders of Allowed Claims entitled to vote on the Plan have been sent a Ballot, together with instructions for voting, with this Disclosure Statement. Claimants should read the Ballot carefully and follow the

instructions contained therein. In voting for or against the Plan, please use only the Ballot that accompanies this Disclosure Statement.

**EACH CREDITOR WILL RECEIVE A SINGLE BALLOT ONLY. IF YOU HAVE MORE THAN ONE CLAIM AGAINST ONE OF THE DEBTORS, OR YOU HAVE CLAIMS AGAINST MORE THAN ONE DEBTOR, YOU MAY REPRODUCE THIS BALLOT AS MANY TIMES AS NECESSARY TO PROPERLY VOTE YOUR CLAIMS. IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT OR VOTING PROCEDURES, YOU SHOULD CONTACT COUNSEL FOR THE DEBTORS:**

C. ASHLEY ELLIS
FOLEY GARDERE, FOLEY & LARDNER LLP
2021 MCKINNEY AVENUE, SUITE 1600
DALLAS, TX 75201
(214) 999-3000
AELLIS@FOLEY.COM

b) **Returning Ballots and Voting Deadline.** You should complete and sign each Ballot that you receive and return it either via email to aellis@foley.com or in the pre-addressed envelope enclosed with each Ballot to the counsel for the Debtor in the self-addressed envelope provided, by the Voting Deadline.

**THE VOTING DEADLINE IS 4:00 P.M., CENTRAL STANDARD TIME, ON [_____, 2019]. TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED BY COUNSEL FOR THE DEBTOR VIA EMAIL OR VIA U.S. MAIL OR OTHER COURIER ON OR BEFORE 4:00 P.M., CENTRAL STANDARD TIME, ON THE VOTING DEADLINE AT THE ADDRESS SET FORTH IN THE BALLOT INSTRUCTIONS WHICH ACCOMPANY THE ENCLOSED BALLOT. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT, BALLOTS RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE ACCEPTED OR USED IN CONNECTION WITH THE DEBTORS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.**

c) **Incomplete or Irregular Ballots.** Ballots which fail to designate the Class to which they apply shall be counted in the appropriate Class as determined by the Debtors, subject only to contrary determinations by the Bankruptcy Court.

d) **Changing Votes.** Bankruptcy Rule 3018(a) permits a Claimant, for cause, to move the Bankruptcy Court to permit such claimant to change or withdraw its acceptance or rejection of a plan of reorganization.

**Section 11.7** **Disputed and Unliquidated Claims**. Disputed Claims are not entitled to vote to accept or reject the Plan. If you are the holder of a Disputed Claim, you may ask the Bankruptcy

Court pursuant to Bankruptcy Rule 3018 to have your Claim temporarily Allowed for the purpose of voting.

**Section 11.8** **Possible Reclassification of Creditors and Interest Holders**. The Debtors are required pursuant to §1122 of the Bankruptcy Code to place Claims and Interests into Classes that contain substantially similar Claims or Interests. While the Debtors believe that all Claims and Interests are classified in the Plan in compliance with §1122, it is possible that a Claimant or Interest holder may challenge the classification of its Claim or Interest. If the Debtors are required to reclassify any Claims or Interests of any Claimants or Interest holders under the Plan, the Debtors, to the extent permitted by the Bankruptcy Court, intend to continue to use the acceptances received from such Claimants or Interest holders pursuant to the solicitation of acceptances using this Disclosure Statement for the purpose of obtaining the approval of the Class or Classes of which such Claimants or Interest holders are ultimately deemed to be a member. Any reclassification of Claimants or Interest holders should affect the Class in which such Claimants or Interest holders were initially a member, or any other Class under the Plan, by changing the composition of such Class and the required vote thereof for approval of the Plan.

## ARTICLE XII
## CRAMDOWN OR MODIFICATION OF THE PLAN

**Section 12.1** **"Cramdown:" Request for Relief under Section 1129(b)**. If any Impaired Class of Claims does not accept the Plan in accordance with § 1129(a) of the Bankruptcy Code, the Debtors shall request the Bankruptcy Court to confirm the Plan in accordance with the provisions of § 1129(b) of the Bankruptcy Code as to that non-accepting Impaired Class.

The Court may confirm a plan, even if it is not accepted by all impaired Classes, if a plan has been accepted by at least one impaired Class of Claims and the plan meets the "cramdown" provisions set forth in § 1129(b) of the Code. The "cramdown" provisions require that the Court find that a plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting impaired Class. In the event that all impaired Classes do not vote to accept the Plan, the Debtors will request that the Bankruptcy Court nonetheless confirm the Plan pursuant to the provisions of § 1129(b) of the Code.

The Court may find that the Plan is "fair and equitable" with respect to a Class of non-accepting impaired Interests only if (a) the holder of an Interest will receive or retain under the Plan property of a value as of the Plan's Effective Date equal to the greatest of any fixed liquidation preference or redemption price or the value of such Interest or (b) the holder of any Interest that is junior to such Interest will not receive or retain any property under the Plan.

The Court may find that the Plan is "fair and equitable" with respect to a Class of non-accepting impaired Unsecured Claims only if (a) each impaired unsecured Creditor receives or retains under the Plan property of a value as of the Effective Date of such Plan equal to the amount of its Allowed Claim, or (b) the holder of any Claim or Interest that is junior to the Claims of the dissenting Class will not receive or retain any property under the Plan.

The Court may find that the Plan is "fair and equitable" with respect to a Class of non-accepting Secured Claims, only if, under the Plan, (a) the holder of each Secured Claim in such Class retains such holder's lien and receives deferred cash payments totaling at least the Allowed amount of

such Secured Claim and having a value, as of the Effective Date of the Plan, equal to or in excess of the value of such holder's interest in the estate's interest in the collateral for the Secured Claim, (b) the collateral for such Secured Claim is sold, the lien securing such Claims attached to the proceeds, and such liens on proceeds are afforded the treatment described under clause (a) or (c) of this sentence, or (c) the holders of such Secured Claims realize the "indubitable equivalent" of their claims.

If all of the provisions of section 1129 are met, the Court may enter an order confirming the Plan.

**Section 12.2** **The Plan Meets the "Best-Interest-of-Creditors" Test**. The "best interest of creditors" test requires that the Court find that the Plan provides to each non-accepting holder of a Claim or Interest treated under the Plan a recovery which has a present value at least equal to the present value of the distribution that such person would receive from the Debtor if the Debtor were liquidated under Chapter 7 of the Code. An analysis depicting the likely recoveries and effect on Creditors in the event of a liquidation under Chapter 7 of the Code, including references to the likely increase in administrative expenses, is contained on Exhibit C.

**Section 12.3** **The Plan Meets the Cramdown Standard with Respect to Any Impaired Class of Claims Rejecting the Plan**. The Plan satisfies the provisions for cramdown under §1129(b)(2) of the Code. Secured Creditors are, at a minimum, receiving (i) payment of their Allowed Secured Claim in full in cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code; (ii) delivery of the Collateral securing their Allowed Secured Claim; or (iii) issuance of a restructured note with a present value equal to the amount of the value of their Collateral with interest, all in accordance with §1129(b)(2)(A). Interest Holders are not receiving or retaining any property under the Plan on account of their Interests, thus the Plan satisfies §1129(b)(2)(B)(ii) should a Class of Unsecured Claims reject the Plan. In the event that an impaired Class rejects the Plan, the Plan shall be deemed a motion for cramdown of such Class under §1129(b)(2) of the Code.

**Section 12.4** **Modification or Revocation of the Plan; Severability**. Subject to the restrictions on modifications set forth in §1127 of the Bankruptcy Code and any applicable notice requirements, the Debtors reserve the right to alter, amend or modify the Plan before its substantial consummation. The Debtors also reserve the right to withdraw the Plan prior to the Confirmation Date. If the Debtors withdraw the Plan, or if Confirmation does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan will prejudice in any manner the rights of the Debtors.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, has the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.

## ARTICLE XIII
## RISK FACTORS

**Section 13.1** **Factors Relating to Chapter 11 and Restructuring via the Plan**. The following is intended as a summary of certain risks associated with the Plan, but is not exhaustive and must be supplemented by the analysis and evaluation of the Plan and this Disclosure Statement made by each Claimant as a whole in consultation with such Claimant's own advisors. In the event of a Restructuring, it is unlikely, although possible, that the Reorganized Debtors will not be able to procure necessary space for the dealerships or floor plan financing, will be unable to procure the services of an adequate number of new or returning employees, and/or will face challenges restoring systems and controls to sell a high volume of cars, that the parties to the Dealer Agreements will seek termination despite Confirmation, that consumers may be resistant to doing business with the Reorganized Debtors due to negative press coverage and/or unfavorable attitudes toward the Debtors among those in the Lubbock community, or the projections set forth in the Post-Confirmation Business Plan will not be met. The fact remains, however, that in order for General Unsecured Creditors to be paid, and for Ford Credit, GM Financial, First Capital Bank or FB&T, to maximize recovery for the Debtors' business operations must continue post-confirmation. The value of the Debtors' estates is inexorably tied to the value that may be realized from continued/revived operations of the Dealerships at the Locations, whether the Plan is confirmed or not. In this regard, the Debtors' proposed Restructuring is dependent on the existence of valid dealer license(s) and franchise agreement(s) with what is known in the industry as "OEMs," which stands for Original Equipment Manufacturers. As relevant here, the OEMs include Ford Motor, General Motors, Mitsubishi and Gulf States Toyota. At this time, disputes exist with each of OEM about the Debtors' ability to assume the respective franchise agreements pursuant to the Bankruptcy Code. Therefore, the Post-Confirmation Business Model attached as Exhibit B includes various alternative business models on which the Restructuring Alternative may be achieved, labeled as B-1, B-2, and B-3. As indicated thereon, model B-1 contemplates reorganized operations under franchise agreements with all Dealerships; model B-2 contemplates reorganized operations under franchise agreements with Ford, Toyota, and Mitsubishi; and model B-3 contemplates reorganized operations under franchise agreements with Ford and Mitsubishi.

Ford Credit has approved Mr. Dykes's involvement, including ownership, in the Reorganized Debtors. At this time, no OEM has approved Mr. Dykes's future involvement in the Reorganized Debtors. The Debtors believe that, unless they reach agreement with the OEMs prior to Confirmation, the issue of Mr. Dykes's future involvement in the Reorganized Debtors will be resolved by the Plan Sponsor or the Court at or after Confirmation. At the request of the OEMs, the Debtors make, but do not agree with the representations stated, the following additional disclosures:

*Statement by Toyota*: The Toyota Dealer Agreement with Reagor-Dykes Plainview, LP d/b/a Reagor-Dykes Toyota is a twenty-four month term agreement. That agreement was set to expire on November 8, 2017. Gulf States Toyota ("GST") issued two six month extensions. The second extension letter set November 8, 2018 as the expiration date. On October 17, 2018, GST and Reagor-Dykes Toyota agreed to the entry of that certain Agreed Order Granting Gulf States Toyota, Inc.'s Motion for Relief From The Automatic Stay [Docket No. 401] pursuant to which. GST sent a non-renewal notice on December 5, 2018. GST asserts that under Chapter 2301 of the Texas Occupations Code, Reagor-Dykes Toyota had until February 8, 2019 to file a protest with the Texas Department of Motor Vehicles to challenge the non-renewal of its Toyota Dealer Agreement. In January 2019,

GST and Reagor-Dykes Toyota agreed to the entry of that certain Agreed Order Granting Gulf States Toyota, Inc.'s Motion for Relief From the Automatic Stay [Docket No. 864] pursuant to which GST sent a separate notice to terminate the Toyota Dealer Agreement on fifteen days' notice, based on GST's allegations that the dealership had failed to conduct customary sales and service operations for seven consecutive business days on January 24, 2019. Reagor-Dykes Toyota notified the Texas Department of Motor Vehicles that it protested GST's January 24, 2019 termination notice. GST and Reagor-Dykes Toyota have engaged in a statutorily-required mediation before the Texas Department of Motor Vehicles (MVD Docket No. 19-0020-LIC; Reagor-Dykes Plainview LP dba Reagor-Dykes Toyota, Protestant v. Gulf States Toyota, Inc., Respondent). GST informed Reagor-Dykes Toyota at the mediation that it intends to pursue non-renewal and/or termination to its conclusion. Likewise, Reagor-Dykes Toyota informed GST at the mediation that it intends to pursue assumption and assignment of the Toyota Dealer Agreement in connection with confirmation of the Plan. Reagor-Dykes Toyota disputes both the non-renewal and termination notices and reserves all rights and remedies that may be afforded by 11 U.S.C. §108 and all other applicable provisions of the Bankruptcy Code vis a vis the Toyota Dealer Agreement and disputes with GST; GST likewise reserves all rights and remedies against Reagor-Dykes Toyota incident to same.

_Statement by General Motors_: GM asserts that the dealerships at Floydada and at Snyder have been terminated. GM obtained a prior order from this Court lifting the automatic stay to permit GM to take action before the Texas Department of Motor Vehicles related to the franchises. By letters dated April 29, 2019 as to Snyder and April 11, 2019 as to Floydada, the Texas Department of Motor Vehicles confirmed the termination of the applicable Dealer Sales and Services Agreements, but the Debtors intend to contest such termination pursuant to all applicable bankruptcy and non-bankruptcy law. GM further maintains that neither dealership is conducting operations, and the lender to the Debtor affiliate which owned these properties foreclosed on them and has placed them for sale with a broker. The Debtors dispute all non-renewal/termination notices and reserves all rights and remedies that may be afforded by 11 U.S.C. §108 and all other applicable provisions of the Bankruptcy Code vis a vis the Dealer Sales and Services Agreements and disputes with GM; GM likewise reserves all rights and remedies against the Debtors incident to same.

Discussions with the OEMs are ongoing. If no agreement is reached with the OEMs, the Debtors will request the Court to decide the core issues of assumption and assignment of the franchise agreements as executory contracts pursuant to §365 of the Bankruptcy Code. The Debtors further believe that the Business Plans attached as Exhibit B are reasonable, feasible and achievable. If the Plan is confirmed, the Debtors believe that they will achieve at the least the projections outlined in Exhibit B, and the risk that the effective Business Plan will not be realized is well within the range of acceptable risk for the hypothetical investor, given the projected return.

**Section 13.2    Insufficient Acceptances**. The Plan may not be confirmed without sufficient accepting votes. Each impaired Class of Claims and Interests receiving a distribution under the Plan is given the opportunity to vote to accept or reject the Plan. The Plan will be accepted by a Class of impaired Claims if the Plan is accepted by Claimants in such Class actually voting on the Plan who hold _at least_ two-thirds (2/3) in amount and _more than_ one-half (1/2) in number of the total Allowed Claims of that Class which actually vote. The Plan will be accepted by a Class of impaired Interests if it is accepted by holders of Interests in such Class actually voting on the Plan who hold _at least_ two-thirds (2/3) in amount of the total Allowed Interests of the Class which actually vote. However, an Interest Holder is deemed to have rejected the Plan and is therefore not entitled to vote on the

Plan. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes. If any impaired Class of Claims under the Plan fails to provide acceptance levels sufficient to meet the minimum Class vote requirements but at least one impaired Class of Claims accepts the Plan, then, subject to the provisions of the Plan, the Debtors intend to request confirmation of the Plan under Section 1129(b) of the Bankruptcy Code.

**Section 13.3    Lack of Material Recoveries on the Causes of Action**. There is a risk that the litigation intended to be brought by the Creditors' Trust or the Creditors Trust, as the case may be, under the Plan will not yield any material net recoveries for the payment of creditors. Risk is an inescapable part of any litigation, and exists independent of Chapter 11 and the Plan. The Debtors cannot guarantee that the net proceeds from the Causes of Action will exceed a certain amount under either a Restructuring or Liquidation.

**ARTICLE XIV**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion summarizes certain possible federal income tax consequences of the Plan to the Debtors, and to the holders of Claims and Interests. It is based on the Bankruptcy Code, Treasury Regulations, and administrative and judicial interpretations thereof that are now in effect, but which could change, even retroactively, at any time. This disclosure is provided for informational purposes only. Moreover, this Disclosure Statement summarizes only certain of the federal income-tax consequences associated with the Plan's confirmation and implementation. This discussion does not address all aspects of federal, state, and local tax laws that could impact the various classes of Claimants, the holders of Interests or the Debtors.

**NO RULING HAS BEEN SOUGHT OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OBTAINED BY THE DEBTORS WITH RESPECT THERETO. NO REPRESENTATIONS OR ASSURANCES ARE BEING MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES AS DESCRIBED HEREIN. CERTAIN TYPES OF CLAIMANTS AND INTEREST HOLDERS MAY BE SUBJECT TO SPECIAL RULES NOT ADDRESSED IN THIS SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES. FURTHER, STATE, LOCAL, OR FOREIGN TAX CONSIDERATIONS MAY APPLY TO A HOLDER OF A CLAIM OR INTEREST WHICH ARE NOT ADDRESSED HEREIN. BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES, EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN MUST CONSULT, AND RELY UPON, HIS OR HER OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER'S CLAIM OR INTEREST. THIS INFORMATION MAY NOT BE USED OR QUOTED IN WHOLE OR IN PART IN CONNECTION WITH THE OFFERING FOR SALE OF SECURITIES.**

Under the IRC, a taxpayer generally must include in gross income the amount of any discharge of indebtedness income realized during the taxable year. A Creditor who receives cash or other consideration in satisfaction of any Claim may recognize ordinary income. The impact of such ordinary income, as well as the tax year for which the income shall be recognized, shall depend upon

the individual circumstances of each Claimant, including the nature and manner of organization of the Claimant, the applicable tax bracket for the Claimant, and the taxable year of the Claimant. Each Creditor is urged to consult with its tax advisor regarding the tax implications of any payments or distributions under the Plan.

In general, the principal federal income tax consequences of the Plan to holders of Claims will be (a) recognition of loss or a bad debt deduction to the extent that the total payments received under the Plan with respect to the Claim are less than the adjusted basis of the holder in such Claim, or (b) recognition of taxable income by the holder of the Claim to the extent of the excess of the amount of any payments made under the Plan in respect of the Claim over the holder's adjusted basis therein.

Common examples of holders of Claims who may recognize taxable income upon receipt of payments under the Plan include (a) former employees with Claims for services rendered while serving as employees of a Debtor, (b) trade creditors whose Claims represent an item not previously reported in income (including Claims for lost income upon rejection of leases or other contracts with a Debtor), (c) holders of Claims who had previously claimed a bad debt deduction with respect to their Claims in excess of their ultimate economic loss, and (d) holders of Claims that include amounts of pre-petition interest that had not previously been reported in income. Common examples of Claims who may recognize a loss or deduction for tax purposes as a result of implementation of the Plan, provided that such holders are not paid in full, include holders of Claims that arose out of cash actually loaned or advanced to a Debtor, and holders of Claims consisting of items that were previously included in income of such holders on the accrual method of accounting, to the extent, in both cases, that the economic loss to such holders has not been allowed as a tax deduction in a prior year.

The amount and character or any resulting income or loss recognized for federal income tax consequences to a holder of any Claim as a result of implementation of the Plan will, however, depend on many factors. The most significant of these factors include (a) the nature and origin of the Claim, (b) whether the holder is a corporation (c) the extent to which the Plan provides for payment of the particular Claim, (d) the extent to which any payment made is allocable to pre-petition interest which is part of such Claim, and (e) the prior tax reporting positions taken by the holder with respect to the item that constitutes the Claim. As to the last factor, relevant tax reporting positions include whether the holder had to report under its method of accounting any portion of the Claim (including accrued and unpaid interest) as income prior to receipt and whether the holder previously claimed a bad debt or worthlessness deduction with respect to the Claim, which would affect the adjusted basis of the holder in the Claim.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR CONSULTATION WITH A TAX ADVISOR. THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, THE DEBTOR INFROMS ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT THAT ANY U.S. TAX INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING THE EXHIBITS HERETO) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE, OR (B) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.**

## ARTICLE XV
## RECOMMENDATION OF THE DEBTORS

The Debtors believe the Plan is in the best interests of all Creditors. Accordingly, the Debtors recommend that you vote for acceptance of the Plan and hereby solicit your acceptance of the Plan.

DATED: August \_\_\_, 2019                    Respectfully submitted,

Reagor-Dykes Motors, LP *et al.*

By:      */s/ Robert Schleizer*
                    Chief Restructuring Officer

Prepared by:

Marcus A. Helt (TX 24052187)
C. Ashley Ellis (TX 00794824)
**FOLEY GARDERE**
**FOLEY & LARDNER**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667

**COUNSEL FOR DEBTORS AND**
**DEBTORS-IN-POSSESSION**