**Stephen P. Strohschein**
Louisiana Bar Roll #12541
MCGLINCHEY STAFFORD, PLLC
301 Main Street, 14th Floor
Baton Rouge, Louisiana 70801
Telephone: (225) 383-9000
Facsimile: (225) 343-3076
sstroh@mcglinchey.com

**R. Dwayne Danner**
State Bar No. 00792443
MCGLINCHEY STAFFORD, PLLC
Three Energy Square
6688 North Central Expressway, Ste. 400
Dallas, Texas 75206
Telephone: (214) 445-2445
Facsimile: (214) 445-2450
ddanner@mcglinchey.com

COUNSEL FOR AMERICREDIT FINANCIAL
SERVICES, INC., DOING BUSINESS AS
GM FINANCIAL

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

| | | |
|---|---|---|
| **IN RE:** | * | |
| | * | |
| **REAGOR-DYKES MOTORS, LP**[1] | * | **CASE NO. 18-50214-rlj-11** |
| | * | **(Jointly Administered)** |
| Debtor | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AMERICREDIT FINANCIAL SERVICES, INC. D/B/A GM FINANCIAL'S OBJECTION TO CONFIRMATION OF THE SECOND AMENDED PLAN

**NOW INTO COURT**, through undersigned counsel, AmeriCredit Financial Services, Inc.

d/b/a GM Financial ("**GM Financial**"), by and through undersigned counsel which respectfully

---

[1] The Debtors are Reagor-Dykes Motors, LP ("**RD Motors**") (Case No. 18-50214), Reagor-Dykes Imports, LP ("**RD Imports**") (Case No. 18-50215), Reagor-Dykes Amarillo, LP ("**RD Amarillo**") (Case No. 18-50216), Reagor-Dykes Auto Company, LP ("**RD Auto Co.**") (Case No. 18-50217), Reagor-Dykes Plainview, LP ("**RD Plainview**") (Case No. 18-50218), Reagor-Dykes Floydada, LP ("**RD Floydada**") (Case No. 18-50219), Reagor-Dykes Snyder, L.P. ("**RD Snyder**") (Case No. 18-50321), Reagor Dykes III LLC ("**RD III**") (Case No. 18-50322), Reagor-Dykes II LLC ("**RD II**") (Case No. 18-50323), Reagor-Dykes Auto Mall, Ltd. ("**RD Auto Mall Ltd**") (Case No. 18-50324) and Reagor-Dykes Auto Mall I LLC ("**RD Auto Mall I LLC**," and collectively as the "**Debtors**") (Case No. 18-50325).

files this Objection to Confirmation of the Debtors' Second Amended Joint-Plan of Reorganization

(the "**Objection**"). In support thereof, GM Financial represents as follows:

## PRELIMINARY STATEMENT

1.      GM Financial respectfully requests this Court enter an order denying confirmation of the Second Amended Joint-Plan of Reorganization (the "**Plan**"). Over the course of these proceedings, RD Snyder and the remaining Debtors have advanced a series of failed resolutions – this Plan is no different.  The Debtors have put the cart before the horse, again, by soliciting votes in favor of a Chapter 11 reorganization without a definitive Plan Sponsor, without a firm understanding of who and how the proposed Restructuring will work, without any franchise agreements and without a commitment from a manufacturer to support post-confirmation operations. Indeed, many of these deficiencies are proposed to be solved by the "Plan Supplement;" but as of this writing the Plan Supplement has not been filed.[2] As a fallback measure, the Plan purports to navigate the Bankruptcy Code's feasibility requirement by including a Liquidation Alternative should the reorganization fail. Nonetheless, a contingency liquidation under Chapter 11 cannot circumvent the Bankruptcy Code's express requirements and cure a hopeless reorganization. The Plan is infeasible and denial of plan confirmation is warranted.

2.      Additionally, the Plan violates other express requirements under the Bankruptcy Code and the Plan operates as a *de facto* substantive consolidation of the Debtors without attempting to address the rigorous requirements imposed by law to achieve that result. Although GM Financial is a creditor of each of the dealership Debtors, it has filed distinct proofs of claim in

---

[2] Section 2.1 of the Plan provides that that the Plan Supplemental Documents shall be included in a notice filed with the Bankruptcy Court not less than ten (10) days prior to the Voting Deadline (i.e., November 22, 2019). The Plan ("Plan Supplemental Documents") at § 2.1, Internal pg no. 22, (PDF 25). As of November 24, 2019, the Plan Supplemental Documents have not been filed.

each case in recognition of the distinct relationship with each dealership; its most significant claim relates to RD Snyder, for which it was the floorplan lender. Rather than recognize the distinction between the various Debtors, the Plan will pool all of the Debtors' assets and all unsecured claims will be consolidated into the Creditors Trust, irrespective of from whom their debt is owed or the relative leverage of each Debtor,[3] and there is no attempt to provide any rationale or justification for this result. For these reasons and others addressed more fully below, confirmation of the Plan should be denied.

## JURISDICTION AND VENUE

3.      This Court is vested with subject matter jurisdiction to grant the relief sought herein pursuant to 28 U.S.C. § 1334(b).

4.      Venue is proper in this district under 28 U.S.C. § 1409.

## CORE PROCEEDING

5.      This matter is a "core proceeding," and this Honorable Court may enter an appropriate final order or judgment herein, in accordance with 28 U.S.C. §§ 157(a), (b)(2)(L), and (O).

## PROCEDURE

6.      Procedurally, this matter is governed by 28 U.S.C. §§ 157 and 1334, Federal Rule of Bankruptcy Procedure 3020(b) and L.B.R. 3020-1.

---

[3] *See* Exhibit B to the Disclosure Statement, Doc. 1390-2, which reports the reorganization financial "projections" only on a consolidated basis.

## FACTS AND PROCEDURAL HISTORY

### A. The Debtors[4]

7.      The Debtors formerly operated new and used car dealerships spanning seventeen locations across Texas as "Reagor-Dykes Auto Group" ("**RDAG**")."[5] RDAG is comprised of eight limited partnerships ("**LP Debtors**"),[6] including RD Snyder, in which three of the Debtors are general partners ("**GP Debtors**")[7] and Bart Reagor ("**Reagor**") and Rick Dykes ("**Dykes**") are limited partners.[8] Moreover, Reagor and Dykes own fifty-percent interests in each GP Debtor.[9]

### B. Overview of GM Financial's Loan Facilities

8.      GM Financial provided a pre-prepetition floorplan facility to RD Snyder through which inventory purchases were financed. The floorplan facility is evidenced by, among other things, a Master Loan Agreement, dated January 23, 2018, with the Operative Schedule 1 (collectively the "**MLA**"), Continuing Guaranties, dated January 23, 2018, executed by Reagor, Dykes and RD Auto Mall I LLC, a UCC-1 Financing Statement, dated January 17, 2018, File No. 18-000191783, and such other standing lending documents executed by RD Snyder with regard to the floorplan.[10] RD Snyder's assets secured payment under GM Financial's floorplan loan

---

[4] The Debtors cases are being jointly administered, remain in possession of their assets, and operate their business as "debtors in possession."

[5] Doc. No. 1390 at §§ 3.1, 3.2, Internal pg. no. 27 (PDF 32 of 68) (First Amended Modified Disclosure Statement for Second Amended Plan of Reorganization (the "**Disclosure Statement**")).

[6] The LP Debtors are: RD Motors, RD Imports, RD Amarillo, RD Auto, RD Plainview, RD Floydada, and RD Snyder, RD Auto Mall  Ltd. *Id.* at § 3.2, Internal Pg. No. 27 (PDF 32-33 of 68).

[7] The GP Debtors are the following entities: RD Auto Mall I LLC, RD III, and RD III. *Id.* Each GP Debtor owns a one percent interests in the respective LP Debtor. *Id*. at § 3.1, Internal pg. no. 27 (PDF 32 of 68).

[8] *Id.* at Internal pg. no. 27 (PDF 32 of 68).

[9] *Id.*

[10] Claim No. 28-1, Case No. 18-50321-rlj11. In addition, RD Snyder executed that certain Joint Notice of Assignment and Demand for Payment (General Motors LLC) dated January 23, 2018, pursuant to which RD Snyder gave GM Financial the right to require, among other things, that all factory receivables owed or to be paid to RD Snyder by General Motors, such as rebates, holdback, warranty service work, etc., be paid directly to GM Financial. Further, RD Snyder executed that certain Deposit Account Control Agreement dated January 23, 2018 pursuant to which RD Snyder gave GM Financial a security interest in and over its deposit accounts at AimBank, which agreement also

documents, including inventory, equipment, accounts, cash, deposit accounts, general intangibles and all proceeds therefrom for each and every obligation of the Debtor to GM Financial.[11]

9.    Additionally, RD Snyder and the other dealership Debtors executed Dealer Agreements (the "**Retail Agreement**") pursuant to which GM Financial provided retail financing to the respective Debtors' customers, but for which the Debtors undertook certain obligations and made certain representations and warranties.[12] The proofs of claim filed by GM Financial against the dealership Debtors other than RD Snyder were based upon the various obligations owed to GM Financial under the Retail Agreement.[13]

### C.    The Debtors' Chapter 11 Petitions

10.    On August 1 and November 2, 2018, the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"). Filing Chapter 11 bankruptcy was part of a larger strategy to stay Ford Motor Credit Company, LLC's ("**FMCC**")[14] federal lawsuit to enforce its floorplan financing agreements, guaranties against Dykes and Reagor, and liens on inventory vehicles, Case No. 5:18-cv-00186, in the United States District Court for the Northern District of Texas.[15] FMCC determined after a July 2018 audit that the RDAG dealerships for which it provided floorplan financing were selling vehicles out of trust and double floorplanning vehicles to obtain additional financing.[16]

---

gives GM Financial the right to require, among other things, that all amounts on deposit owed to the Debtor be paid directly to GM Financial upon demand. *Id*; Claim No. 110-1, Case No. 18-50214-rlj-11.
[11] *Id.*
[12] *See, e.g.*, Case No. 18-50215-rlj11, Claim No. 46-1.
[13] *Id.*
[14] FMCC provided floorplan financing for all of the RDAG dealerships except for RD Snyder, for which GM Financial provided the floorplan financing, and Reagor Auto Mall, which obtained floorplan financing from local banks.
[15] *Ford Motor Credit Co. v. Reagor-Dykes Amarillo, L.P., et al.*, Case No. 5:18-cv-00186, (N.D. Tex. Jul. 31, 2018).
[16] *Id.* at Doc No. 1.

### D.    <u>Dykes and Reagor's Prepetition Obligations</u>

11.    Reagor and Dykes personally guaranteed a significant portion of the loan facilities for RDAG. According to the Schedule D filed in each of the Debtor's cases, Reagor and Dykes each owe approximately $137,348,373.93 to the creditors of RDAG.[17]

12.    Moreover, Dykes and Reagor have outstanding obligations to the Debtors which are not addressed by the Plan. The August Operating Reports reflected no less than seven of the shareholders' outstanding loans – the unpaid balance of which have remained constant since the onset of these proceedings: RD Motors, ($2,845,630.00); RD Imports, ($1,269,133.00), RD Amarillo ($450,000.00), RD Auto Co. ($1,948,947.00), RD Plainview, ($159,333.00), RD Floydada ($297,500.00); and RD Auto Mall, Ltd. ($2,495,322.00).[18]

### E.    <u>Chapter 11 Proceedings</u>

13.    On September 10, 2018, RD Motors, RD Imports, RD Amarillo, RD Auto, RD Plainview, and RD Floydada moved to sell substantially all of their assets pursuant to 11 U.S.C. § 363(b).[19] However, no viable offer materialized, the stalking horse died, and, thus, this Court abated the matter.[20]

14.    On November 29, 2018, the Debtors orally proposed a second strategy: a Chapter 11 reorganization under which Dykes and two third-parties would invest $20,000,000.00 in exchange for a 90% interest in the Debtors. However this proposal never materialized into a written plan as a result of FMCC's pursuit of its motion to lift the stay.

---

[17] Case No. 18-50214-rlj-11, Doc No.'s 421, 423, 425, 427, 429, 431, 731 at Schedule D.
[18] Doc No. No's 1490 – 1501 at pg. 2.
[19] Doc No.'s 222, 229, 230.
[20] Doc No.'s 712, 1151.

15.     A plan of reorganization was filed by the Debtors on January 7, 2019 in an attempt to stave off FMCC's lift stay motion being heard the next day.[21] However, no disclosure statement in support of that plan was filed, nor did the Debtors seek confirmation of that plan.

16.     During this time, RD Snyder and the Debtors moved for use of GM Financial's cash collateral.[22] On December 10, 2018, this Court entered the First Interim Order Authorized Use of Cash Collateral GM Financial (the "**Cash Collateral Order**") authorizing the Debtors' use of non-floored inventory proceeds on a limited basis as provided in Exhibit B to that Order.[23] The court also granted GM Financial adequate protection in the form of a super priority claim to the extent that any of the Collateral securing GM Financial decreased in value.[24]

17.     Shortly thereafter, FMCC obtained relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) and (2).[25] On January 17, 2019, this Court granted FMCC stay relief finding there was no reasonable possibility of a successful reorganization within a reasonable time.[26] FMCC then foreclosed on a substantial portion of RDAG's inventory.

18.     Facing more financial pressure, RD Snyder and the Debtors jointly proposed a third strategy: global mediation.[27] On February 5, 2019, the Debtors moved to compel mediation on an emergency basis.[28] This Court obliged ordering limited mediation[29] after which the Debtors

---

[21] Doc No.'s 795.
[22] *See, e.g.*, Doc. No. 673.
[23] *Id.*
[24] *Id.* at Internal pg. no. 7 of 19.
[25] Doc. No.'s 865, 890.
[26] Doc No 865 at pg. 6 of 7.
[27] Doc. No.'s 941, 943.
[28] *Id.*
[29] Doc No. 989.

continually pursued this resolution.[30] Yet, nothing materialized; no formal agreements were reached by RD Snyder, the Debtors, and other parties-in-interest.

19. By this time, GM Financial and nearly all of the secured lenders began moving for stay relief pursuant to 11 U.S.C. § 362.[31] As with FMCC, this Court granted the relief allowing GM Financial and other creditors to foreclose on RDAG's assets and allowing the manufacturers to terminate the dealership franchise agreements.[32]

F. **Operational and Financial Performance**

20. Over the course of these proposals, RD Snyder and the Debtors' financial and operational performances have obviously failed to evidence any meaningful prospect of a successful reorganization. Indeed, the Debtors' estates are administratively insolvent as total administrative expenses have reached approximately $4,500,000.00,[33] while accumulated post-petition losses now total millions of dollars: RD Motors, ($3,060,266.00),[34] RD Imports ($2,240,173.00),[35] RD Amarillo ($1,895,513),[36] RD Auto Co. ($2,658,783.00),[37] RD Plainview ($1,387,360.00),[38] RD Floydada ($1,895,370.00),[39] RD Snyder, ($692,415.00),[40] and RD Auto

---

[30] Doc No. 1387.
[31] Doc. Nos. 332, 548, 692, 740, 741, 763, 819, 858, 864, 869, 891, 907, 908, 917, 982, 983, 1022, 1023, 1035, 1082, 1097, 1120, 1173, 1177, 1213, 1251 & 1327.
[32] *See e.g.*, Doc. No. 1233.
[33] The Plan at § 1.2, at Internal pg. no. 13 (PDF 15 of 65).
[34] Doc. No. 1500 at pg. 4 of 9.
[35] Doc. No. 1491 at pg. 4 of 9.
[36] Doc. No. 1490 at pg. 4 of 9.
[37] Doc. No. 1494 at pg. 5 of 10.
[38] Doc. No. 1496 at pg. 4 of 36.
[39] Doc. No. 1495 at pg. 4 of 9.
[40] Doc. No. 1499 pg. 4 of 9.

Mall, Ltd,. ($2,606,717.00).[41] Moreover, RD Snyder and most of the Debtors are still operating at a monthly deficit.[42]

21.     All of this is a clear indicator of post-confirmation performance. With no franchise agreements in place, post-confirmation operations will continue generating losses at the expense of creditors.

        **G.**      **The Plan's Terms**

22.     The crux of the Plan is its dual nature. It is a "catchall" proposal under which two global contingencies exist: (a) the Restructuring Alternative;[43] or (b) the Liquidation Alternative.[44] However, none of the creditors know which alternative will be implemented; in truth, as of this writing perhaps even the Debtors are clueless about which alternative will prevail.

23.     The Plan affords the Reorganized Debtors unilateral authority to implement either alternative at any time.[45] The Restructuring Alternative is triggered by the Effective Date; the date on which all Plan conditions are met or waived:

> [I]f the Debtors determine ***at any time*** – pre-Confirmation or post-Confirmation – . . . the Plan cannot go effective under the Reorganization Alternative, the Liquidation Alternative shall take effect.[46]

24.     This authority is critical: the Restructuring and Liquidation Alternative are two global resolutions the terms and implications of which are vastly different. Under the Liquidation

---

[41] Doc No. 1493 at pg. 4 of 9.
[42] *Id.*
[43] Capitalized terms shall have the meaning as provided in the Plan.
[44] The Plan at Internal pg. no. 1 (PDF 3 of 65), ¶3.
[45] *Id.*
[46] *Id.*.  Emphasis added.

Alternative, all Assets, including Causes of Action, vest in the Creditor Trust and can be pursued by the Creditor Trustee.[47]

25.    In comparison, the Restructuring Alternative is contingent on a New Equity Infusion of *up to* $13,000,000.00 by the Plan Sponsor[48] without a binding commitment or certainty as to who that is – except that Mr. Dykes may participate.[49] In exchange, the Plan Sponsor will receive ninety percent (90%) of the New Equity in the Reorganized Debtors pursuant to the New Equity Infusion Documents, none of which the Debtors have disclosed.[50] Meanwhile, only ten percent (10%) of the New Equity in the Reorganized Debtors will be awarded to the Creditor Trust under which general unsecured creditors will receive pro-rata distributions not to exceed $7,500,000.00.[51] This ten percent (10%) under the Creditor Trust is also subject to a New Equity Redemption Right pursuant to which the Plan Sponsor – in his sole discretion – may redeem the New Equity.[52]

26.    Moreover, Plan treatment will differ based on which alternative is implemented. For example, under the Restructuring Alternative, distributions for GM Financial's unsecured claim is comprised of two installments of $750,000.00 from Excess Cash flow, the last of which will be paid twelve months after the later of 180 days following the Effective Date or payment of Allowed Administrative Expenses.[53] This treatment, however, is wholly contingent on several requirements, including: (1) the Effective Date occurs; (2) GM Financial provides floorplan

---

[47] *Id.* at § 2.1, Internal pg. no. 21 (PDF 23 of 65); § 7.4, Internal pg. no.43 (PDF 46 of 65); § 8.3 at Internal pg. no. 46 (PDF 48 of 65).
[48] *Id.* at § 7.3(a), Internal pg. no. 40 (PDF 42 of 65).
[49] *Id.* at § 2.1 Internal pg. no. 22 (PDF 24 of 65).
[50] *Id.* at § 2.1, Internal pg. no. 21 (PDF 23 of 65).
[51] *Id.* at § 7.3(b) at Internal pg. no. 40 (PDF 42 of 65).
[52] *Id.* at § 2.1, Internal pg. no. 21 (PDF 23 of 65); § 7.3(b) at Internal pg. no. 40 (PDF 42 of 65).
[53] *Id.* at § 5.13(a), Internal pg. no. 37, (PDF 39 of 65).

financing to all of the dealership Debtors on terms and conditions reasonably acceptable to the Reorganized Debtors; and (3) General Motors – an entity separate from GM Financial – assumes the Dealer Agreement or issues a New Dealer Agreement with equivalent terms.[54]

## ARGUMENT

### A.    The Plan is not proposed in good faith under 11 U.S.C. § 1129(a)(3).

27.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed in good faith.[55] In the Fifth Circuit, good faith "should be evaluated 'in light of the totality of the circumstances surrounding the establishment of [the] plan,' mindful of the purposes underlying the Bankruptcy Code."[56] The plan must be "mindful of the purposes of bankruptcy"[57] – including: (1) promoting a debtor's successful rehabilitation and (2) maximizing the value of a bankruptcy estate.[58]

### 1.    The Plan does not promote the successful rehabilitation of the Debtors.

28.    The Plan promotes neither RD Snyder's nor the remaining Debtors' rehabilitation because their post-petition operations (or lack thereof) and financial performances indicate a Chapter 11 reorganization is not possible.[59] Neither RD Snyder nor the remaining Debtors disclosed the proposed directors and officers of the reorganized entities to oversee post-confirmation operations.[60] Nor have the Debtors disclosed the Plan Sponsors' identities as

---

[54] *Id.*
[55] 11 U.S.C. § 1129(a)(3).
[56] *See In re Vill. at Camp Bowie I, L.P. (Bowie II)*, 710 F.3d 239, 247 (5th Cir. 2013); quoting *In Re T-H New Orleans P'ship*, 116 F.3d 503, 519 (5th Cir. 1997).
[57] *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 262 (Bankr. S.D. Tex. 2015) ; *In re Couture Hotel Corp.*, 536 B.R. at 734.
[58] *In re Capital West Investors,* 186 B.R. 497, 499 (N.D. Cal. 1995).
[59] *See* August's Monthly Operating Reports at Doc. No.'s 1490-1501.
[60] The Plan. at § 7.3(j) at Internal pg. no. 42 (PDF 44 of 65). For this reason, the Plan also violates 11 U.S.C. § 1129(a)(5).

1287788.2

negotiations are apparently on-going;[61] instead, the Debtors proposed that they would provide this critical information ten days prior to the ballot deadline, and *after* the deadline for objecting to the Plan.[62]  As noted above, the Plan Supplement Documents have not been filed as of November 24, 2019.

29.    Moreover, the Plan plays "loose" with the unknown Plan Sponsors' obligations – including the investment of a "New Equity Infusion" to facilitate the Restructuring Alternative.[63] No definitive value for the investment is provided; the "New Equity Infusion" is defined as "*up to* $13 million.*"[64] Nor is it clear how this infusion will be distributed.[65] GM Financial and FMCC could receive "*up to* approximately" $1,500,000.00 and $2,000,000.00 respectively;[66] however, this vague provision is undermined by Sections 5.12 and 5.13, which provide that distributions to GM Financial and FMCC will derive from the "Excess Cash Flow," not the new capital infusion.[67]

30.    Likewise, the Plan fails to evidence any commitment from a franchisor or a floorplan financer to facilitate post-confirmation operations. Instead, the Debtors propose a "quid pro quo" in which GM Financial's treatment is contingent on: (1) General Motor's assumption or execution of a Franchise Agreement in favor of the Reorganized Debtors with satisfactory terms; and (2) GM Financial's commitment to a global floorplan facility for all post-confirmation operations.[68] However, GM Financial has no ability to control the actions of General Motors – a

---

[61] *Id.* at § 2.1, Internal pg. no. 22 (PDF 24 of 65).
[62] *Id.* at § 2.1 ("Plan Supplemental Documents"), Internal pg. no. 22 (PDF 24 of 65).
[63] *Id.* at § 2.1, Internal pg. no. 21 (PDF 23 of 65).
[64] *Id.* Emphasis added.
[65] *Id.* at Summary of Plan, Internal pg. no. 1 (PDF 3 of 65), ¶4(f).
[66] *Id.* Emphasis added.
[67] *Id.* at § 5.12(c), Internal pg. no. 36 (PDF 38 of 65); *Id.* at § 5.13(a), Internal pg. no. 37 (PDF 39 of 65).
[68] *Id.* at § 5.13(a), Internal pg. no. 37 (PDF 39 of 65).

separate corporate entity with its own goals and objectives.[69] Nor should the Debtors' treatment hinge on a creditor providing financing significantly beyond what it provided prepetition.

31.    If anything, this disparate condition relative to FMCC's treatment in Section 5.12 underscores the Debtors' last-ditch effort to secure a floorplan facility, but does so in an inequitable manner.[70] GM Financial and FMCC's treatment in Sections 5.12 and 5.13 are largely identical except for one major difference: GM Financial must provide "[f]loor-plan financing *to the Reorganized Debtors* on terms and conditions reasonably acceptable to the Reorganized Debtors."[71] No obligation to provide floorplan financing is imposed upon FMCC to receive *more* money than that provided GM Financial.  GM Financial only provided floorplan financing to RD Snyder; Ford Credit provided it for the other six new car dealers.[72] To impose a global floorplan facility on GM Financial and for no similar obligation to be imposed on FMCC is not explained and is imminently unfair.

32.    In any event, it must be because the Debtors are well-aware of the glaring deficiencies within the Restructuring Alternative that the Reorganized Debtors grant themselves unilateral authority to convert from the Restructuring Alternative to the Liquidation Alternative at any time for any reason.[73]  Section 10.2(i) of the Plan provides that the Restructuring Alternative "must go effective on or before seventy-five (75) days after the Confirmation Date" or the Liquidation Alternative will occur.[74] However, Paragraph 3 of the Plan Summary states that if the Debtors "determine at any time – pre-Confirmation or post-Confirmation – that despite their best

---

[69] *Id.*
[70] *Id.* at § 5.12(c), Internal pg. no. 36 (PDF 38 of 65); *Id.* at § 5.13(a), Internal pg. no. 37 (PDF 39 of 65).
[71] *Id.*
[72] Claim No. 28-1 in Case No. 18-50321-rlj11; the Plan at § 2.1 ("Ford Credit") at Internal pg. no. 19 (PDF 21 of 65).
[73] *Id.* at Summary of Plan, Internal pg. no. 1 (PDF 3 of 65), ¶3.
[74] *Id.* at § 10.2, Internal pg. no. 48 (PDF 50 of 65).

efforts the Plan cannot go effective under the Reorganization Alternative, the Liquidation Alternative shall take effect."[75]  As a result, a creditor cannot determine for what it is voting.  But more importantly, the Plan is clearly not promoting a successful rehabilitation; instead, it is a poor attempt to postpone an inevitable shutdown of what was once a viable automobile dealership group.

### 2.      The Plan fails to maximize the value of the Debtors' estates.

33.      Without question, the Plan falls short of maximizing value for RD Snyder and the remaining Debtors' estates. Incorporating global alternatives is merely an attempt to circumvent the feasibility requirement under § 1129(a)(11), notwithstanding the absence of a commitment by the Plan Sponsor to support operations.[76] In doing so, the alternatives and authority to waive contingencies implements a platform through which RD Snyder and the remaining Debtors can leverage the Causes of Action against creditors to pay outstanding administrative expenses and the Plan Sponsorship Superpriority Claim.[77]

34.      Indeed, any marginal value under the Plan is generated at the expense of creditors by reallocating the value stemming from proposed distributions to the Reorganized Debtors, the Plan Sponsors, and Dykes. For example, under the Restructuring Alternative, all Assets, including Causes of Action against creditors, will vest in the Reorganized Debtors of which Plan Sponsors will receive ninety-percent and unsecured creditors will receive a pro-ration of ten-percent.[78] However, the creditors' Claims are subject to a preemptive right of set-off based on a Cause of

---

[75] Id. at Summary of Plan, Internal pg. no. 1 (PDF 3 of 65), ¶3.
[76] The Plan, at Summary of the Plan, ¶3, Internal pg. no. 1 (PDF 3 of 65); Id. at § 2.1 ("Plan Sponsor"), Internal pg. no. 22 (PDF 24 of 65).
[77] Id. at § 2.1 ("Plan Sponsor Super Priority Claim"), Internal pg. no. 22 (PDF 24 of 65); Id. at § 7.8, Internal pg. no. 44 (PDF 46 of 65); The Disclosure Statement at Ex. E.
[78] Id. at § 7.8, Internal pg. no. 44 (PDF 46 of 65); Id. at Summary of Plan, ¶4(g), Internal pg. no. 2 (PDF 4 of 65).

Action's purported value, while at the same time, the ten-percent interest is subject to a right of redemption limiting aggregate distributions to $7,500,000.00.[79] As a result, RD Snyder and the Reorganized Debtors can leverage the Plan structure to reduce or withhold creditor-distributions by leveraging the threat of post-confirmation litigation to facilitate a settlement.[80]

35.     Meanwhile, the Plan purports to change the terms on which creditors offered cash collateral for RD Snyder and the Debtors' operations. For example, Section 5.3 of the Plan provides that any deficiency claim of GM Financial will be treated as an unsecured claim under Section 5.13 for which GM Financial will receive distributions in full and final satisfaction of its claim.[81] However, nothing is provided for payment of GM Financial's super-priority claim resulting from the Debtor's use of its cash collateral as provided in the Cash Collateral Order.[82] Rather, the Plan violates the Court's order and eliminates GM Financial's superiority status.[83]

**B.      The Plan fails the feasibility requirement under 11 U.S.C. § 1129(a)(11).**

36.     The Bankruptcy Code imposes a feasibility requirement for plan confirmation in Chapter 11 cases.[84] Under § 1129(a)(11), a court cannot confirm a plan unless it is unlikely "to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ."[85] The inquiry focuses on "the existence of a reasonable possibility that a successful rehabilitation . . . can be accomplished within a reasonable period of time."[86] Courts have traditionally analyzed

---

[79] *Id.* at § 11.4, Internal pg. no. 54 (PDF 55 of 65).

[80] For this very reason, the Plan also violates the "best interests" of the creditors test under 11 U.S.C. § 1129(a)(7)(A)(ii). Even if the Plan converts to a Chapter 11 liquidation, the Creditors are limited to pro-rata distributions of $7,500,000.00 under the New Equity Right of Redemption. *Id.* at 21. However, a Chapter 7 liquidation would not impose this limitation on their recovery from the Causes of Action *Id.*

[81] *Id.*; *Id.* at § 5.13, Internal pg. no. 37 (PDF 39 of 65).

[82] *Id.*

[83] For this reason, the Plan violates 11 U.S.C. § 1129(a)(1) as well.

[84] 11 U.S.C. § 1129(a)(11).

[85] *See, e.g.*, *In re Anderson Oaks (Phase I) Ltd. P'ship*, 77 B.R. 108, 110 (Bankr. W.D. Tex. 1987).

[86] *Id.*

feasibility under five factors: (i) the debtor's capital structure, (ii) the earning power of the business, (iii) economic conditions, (iv) the ability of debtor's management, (v) the probability of continuation of management, and (vi) any other related matters—and pertinent factors.[87]

> **1. RD Snyder and the Debtors' capital structures and earning potentials indicate that the post-confirmation operations will fail.**

37. There is no surprise that neither RD Snyder nor the remaining Debtors' post-petition financial performance indicate the Plan is feasible. Over the course of the proceedings, RD Snyder has sustained net-accumulated losses totaling almost $700,000.00,[88] while the remaining Debtors have each incurred losses averaging approximately $2,250,166.14.[89]

38. But the Plan also fails to establish that their respective financial performances will improve post-confirmation. The Reorganization Projections presuppose[90] that floorplan facilities, the New Equity Infusion, and franchise agreements are foregone conclusions.[91] Nonetheless, the Plan does not list or otherwise evidence an agreement by the Plan Sponsor to provide the New Equity Infusion.[92] Nor have RD Snyder or the remaining Debtors secured Franchise Agreements or floorplan facilities to support post-confirmation operations.[93] Accordingly, the Debtors' earning power and capital structure are insufficient to support a feasible Chapter 11 plan.

---

[87] *Save Our Springs All., Inc. v. WSI (II)-COS, L.L.C.*, 632 F.3d 168, 173 n.6 (5th Cir. 2011).

[88] Doc No. 1495 at pg. 4 of 9.

[89] Doc No. 1500 at pg. 4 of 9; Doc. No. 1491 at pg. 4 of 9; Doc No. 1490 at pg. 4 of 9; Doc No. 1494 at pg. 5 of 10; Doc No. 1496 at pg. 4 of 36; Doc No. 1499 pg. 4 of 9; Doc No. 1493 at pg. 4 of 9.

[90] The Plan at Ex. B.

[91] *In re Ralph C. Tyler, P.E., P.S., Inc.*, 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993) ("At the point of confirmation, this source of funding must be shown to be firm as it goes directly to feasibility.").

[92] The Plan at § 10.2(a), Internal pg. no. 47 (PDF 49 of 65).

[93] *Id.* at § 10.2(c), Internal pg. no. 48 (PDF 48 of 65).

### 2. The Liquidation Alternative will not render the Plan feasible.

39.     Proposing the Liquidation and Reorganization Alternatives under the Plan is undoubtedly an attempt by the Debtors to circumvent the feasibility requirement under § 1129(a)(11).[94] The "catch all" proposal presupposes the Liquidation Alternative ensures compliance with the feasibility requirement to the extent the Plan contains a safety-valve if the Debtors' reorganization fails. In short, the Plan can never fail because the reorganization will merely convert into a liquidation under Chapter 11.

40.     Nevertheless, the incorporation of a wholesale liquidation cannot cure an infeasible reorganization.[95] To hold otherwise, would subvert the safeguards under § 1129(a)(11), the purpose of which "is to *prevent* confirmation of visionary schemes."[96] Allowing "global-contingency" liquidations to render plans feasible would effectively eviscerate the feasibility requirement by allowing any "drop dead" provision to render a plan feasible as a matter of law.[97] However, the Liquidation Alternative only underscores the improbability of a successful reorganization.[98] Accordingly, the Plan violates the feasibility requirements under § 1129(a)(11).

### C.     The Plan provides for a discharge in violation 11 U.S.C. § 1141(d)(3).

41.     Because a confirmed Plan will likely convert to the Liquidation Alternative, none of the Debtors, including RD Snyder, are entitled to a discharge under Section 13 of the Plan.[99] Under 11 U.S.C. § 1141(d)(3), confirmation of a plan cannot discharge a debtor if: (1) the plan

---

[94] *Danny Thomas Props. II Ltd. Pshp. v. Beal Bank, S.B.B. (In re Danny Thomas Props. II Ltd. Pshp.)*, 241 F.3d 959, 963 (8th Cir. 2001) ("To require the court to confirm a reorganization plan merely because it allows future liquidation would eliminate the courts' duty under § 1129(a)(11) to protect creditors against '"visionary schemes.").
[95] *Danny Thomas*, 241 F.3d at 963.
[96] *In re Pizza of Haw., Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (emphasis added).
[97] *In re Trans Max Techs., Inc.*, 349 B.R. 80, 95 (Bankr. D. Nev. 2006).
[98] *See In re Save Our Springs (S.O.S.) All., Inc.*, 388 B.R. 202, 242 (Bankr. W.D. Tex. 2008) ("Such a provision, rather than curing the Debtor's failure to show the Plan is feasible, merely highlights that failure.").
[99] The Plan at § 13.3, Internal pg. no. 54 (PDF 58 of 65).

1287788.2

17

liquidates substantially of the estate's property; (2) the debtor does not engage in business after consummation; and (3) the debtor would be denied a discharge under § 727(a).[100] Under the Liquidation Alternative, all three factors are indisputably occurring for these non–individual debtors. Moreover, because the Debtors were engaged in a fraudulent scheme consisting of (1) double floorplanning, (2) out-of-trust sales, and (3) check kiting, the Debtors should not expect to be discharged by confirmation of any plan.[101] Accordingly, the discharge under Section 13 of the Plan violates § 1141(d)(3) and should not be allowed.

### D. The Plan violates the absolute priority rule under 11 U.S.C. § 1129(b)(2)(B)(ii).

42. The absolute priority rules requires that "creditors . . . be paid before the stockholders [can] retain [equity interests] for any purpose."[102] Under 11 U.S.C. § 1123(b)(2)(B)(ii), a dissenting, impaired class of creditors must be paid in full before any junior class can receive or retain any property under a reorganization plan.[103] Only one exception to this rule exists: a junior interest holder may receive property under a plan upon contribution of new value to the reorganized debtors.[104] The new value corollary requires that a junior interest holder offer value under the Plan that is (1) new, (2) substantial, (3) in money or money's worth, (4) necessary for successful reorganization, and (5) reasonably equivalent to the value or interest received.[105]

---

[100] 11 U.S.C. § 1141(d)(3).
[101] *See, e.g., Ford Motor Credit Co. v. Reagor-Dykes Amarillo, L.P., et al.*, Case No. 5:18-cv-00186, (N.D. Tex. Jul. 31, 2018).
[102] *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 444 (1999).
[103] 1 U.S.C. § 1123(b)(2)(B)(ii).
[104] *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. Pshp. (In re Ambanc La Mesa Ltd. Pshp.)*, 115 F.3d 650, 654 (9th Cir. 1997).
[105] *Id.*

1287788.2

43. In the present case, the Plan violates the absolute priority rule to the extent that Dykes receives equity in the Reorganized Debtors. Dykes' role as a member of the Plan Sponsor is less than clear – his name is included within the defined term of "Plan Sponsor," but he is not included within the "initial equity percentages of ownership."[106] Further, the Disclosure Statement provides that Dykes may convert his administrative expense claim into an "increased equity ownership in the reorganized debtor"[107] so an equity position for Dykes appears contemplated. If Dykes participates to some extent in the *up to* $13,000.000.00 cash infusion, and if he makes the $1,000,000.00 contribution to the Creditor Trust,[108] this contribution by Dykes would still fall outside the purview of the new value corollary because any contribution he would make would be neither new nor substantial, and this is because the contribution must be placed within the context of all of the benefits Dykes would be receiving from the Plan, not the least of which includes being released from the notes receivable he owes the Debtors and being released from the approximately $100,000,000.00 in consolidated debt he has guaranteed.[109] As a result, the capital contributions would be merely a small down payment on preexisting obligations.

**E. Substantive consolidation is unwarranted under 11 U.S.C. § 1123(a)(5)(C).**

44. As drafted, the Plan operates as a de facto substantive consolidation of the Debtors.[110] The Plan will pool the Debtors' assets, and all unsecured claims will be consolidated into the Creditors Trust, irrespective of to whom their debt is owed or the relative leverage of each

---

[106] The Plan at § 2.1 ("Plan Sponsor"), Internal pg. no. 22 (PDF 24 of 65).
[107] The Disclosure Statement at Internal pg. no. 24 n. 12 (PDF 29 of 68).
[108] The Plan, at Plan Summary, ¶ 4(h), Internal pg. no. 2 (PDF 4 of 65); *Id.* at § 2.1 ("New Equity Infusion"), Internal pg. no 21 (PDF 23 of 65).
[109] Doc No.'s 421, 423, 425, 427, 429, 431, 731 at Schedule D; The Plan at § 13.4, Internal pg. no. 57 (PDF 59 of 65).
[110] *See* The Plan at § 8, Internal pg. no's 45-47 (PDF 47-49).

Debtor.[111] This occurs despite the fact that the Plan provides that each Debtor shall "continue to exist after the Effective Date as Reorganized Debtors."[112]

45.    Yet again, the Debtors put the cart before the horse. Substantive consolidation is not a foregone conclusion;[113] it is an extreme remedy for which a proponent must show entitlement.[114] Indeed, this Court cannot confirm the Plan because neither RD Snyder nor the Debtors sought prior court approval.[115] While this Court authorized the joint-administration of the Debtors' Chapter 11 proceedings pursuant to Fed. R. Bank. P. 1015, substantive consolidation has never been requested or approved.[116]

46.    Neither the Disclosure Statement nor the Plan describe, let alone evidence, the Debtors' heavy burden that creditors dealt with RD Snyder and the Debtors as a single economic unit or that they did not rely on the Debtors' separate identities. If anything, the evidence suggests the contrary. For example, GM Financial executed separate Retail Agreements with each Debtor, and has filed unique proofs of claim against each Debtor as a result of its distinct relationship with each.[117] Furthermore, the Debtors' Schedules and Statements of Financial Affairs evidence that the Debtors' creditors dealt with the Debtors on an individual basis – not as a single economic unit.[118]

---

[111] *Id.*
[112] The Plan at §7.1.
[113] *In re AHF Dev., Ltd.*, 462 B.R. 186, 198 (Bankr. N.D. Tex. 2011).
[114] *Wells Fargo Bank v. Sommers (In re Amco Ins.)*, 444 F.3d 690, 696 n. 5 (5th Cir. 2006) (noting in a non-plan context that substantive consolidation "is an extreme and unusual remedy"); B*ank of New York Trust Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber, Co.)*, 584 F.3d 229, 249 (5th Cir. 2009); *In re AHF development, Ltd.*, 462 B.R. 186, 195 (Bankr. N.D. Tex. 2011).
[115] *In re CRB Partners, LLC*, Nos. 11-11924-CAG, 11-11915-CAG, 11-11924, 2013 Bankr. LEXIS 800, at *43 (Bankr. W.D. Tex. Mar. 4, 2013)
[116] *See, e.g.*, Doc. No. 658.
[117] *See, e.g.*, Claim No. 28-1, Case No. 18-50321-rlj11.
[118] *See* Doc No.'s 421, 423, 425, 427, 429, 431, 731.

1287788.2
20

47.     Whether or not the Debtors are substantively consolidated, the Plan treats them as such and the treatment has a very significant and objectionable impact upon GM Financial, which is scheduled to receive $1.5 million out of "Excess Cash Flow" as defined in Section 2.1 of the Plan.[119] The definition of Excess Cash Flow is on a consolidated basis and discusses netting out payments on an undefined "Note" in the calculation.[120] As the pre-petition floorplan lender for RD Snyder, which is the only dealership GM Financial will entertain financing on a post-petition basis, if the money to be paid to GM Financial is based upon excess cash flow, it should be based upon RD Snyder's excess cash flow, not the excess cash flow of the entire group.  Additionally, if the undefined "Note" is the $5 million note to be given Ford Credit under the Plan, the provision is doubly objectionable as the payments to GM Financial would be subordinated to the payments due Ford Credit.[121]  Any plan which fails to recognize each of the Debtors as distinct entities with distinct creditor bodies should be denied confirmation unless and until the Debtors obtain an order granting a request for substantive consolidation.

F.     **The Plan's third-party releases are invalid under 11 U.S.C. § 1129(a)(1).**

48.     It well settled that the Bankruptcy Code prohibits nonconsensual third-party releases.[122] Section 524(e) effectively prohibits a non-consensual third-party releases by limiting the scope of a discharge: "the discharge of the debt of the debtors does not affect the liability *of any other entity* on, or the property of any other entity for, such debt."[123] Indeed, bankruptcy is a two-

---

[119] The Plan at § 2.1 ("Excess Cash Flow"), Internal pg. no. 18 (PDF 20).
[120] *Id.*
[121] *Id.* at § 2.1 ("Ford Credit Note"), Internal pg. no. 19 (PDF 21).
[122] *See, e.g., Feld v. Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995) ("Section 524(e) prohibits the discharge of debts of non-debtors"); *Hall v. Natl. Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997) (citing *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993).
[123] 11 U.S.C. § 524(e) (emphasis added).

way street: Only those who have submitted to the Bankruptcy Code's burdens are entitled to its benefits.[124]

49. In *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), the Fifth Circuit reaffirmed this principle holding that § 524(e) only released the debtor – not third-parties:[125]

> In a variety of contexts, this court has held that Section 524(e) only releases the debtor, not co-liable third parties. *[citations omitted]*. These cases seem to broadly foreclose non-consensual non-debtor releases and permanent injunctions.[126]

50. Sections 13.4 (the "**Third-Party Releases**") and 13.5 (the "**Professional Releases**") of the Plan afford broad releases in favor of the Professionals of the Estate, the Plan Sponsors, and Dykes, by the Releasing Party[127] in violation of the Bankruptcy Code.[128] Moreover, the broad language under Section 13.2 ("Compromise of Controversies") and 13.3 ("Discharge of Claims") purports to release claims against third parties.[129] However, because § 524(e) affords a discharge to only a debtor, confirmation of a plan with these provisions must be denied.

      1. **Even if the Bankruptcy Code authorizes consensual third-party releases, these releases are still unenforceable under principles of contract law.**

51. Even assuming the Third-Party and Professional Releases are consensual, the releases are still invalid under principles of contract law.[130] Consensual nondebtor releases must

---

[124] *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009).

[125] *Id.* at 252.

[126] *Id.* at 252.

[127] The Plan defines Releasing Parties is defined as: (a) Holders of Claims who vote to accept the Plan but do not opt out of the releases on the Ballot, (b) Holders of Claims that are Unimpaired under this Plan; (c) Holders of Claims whose vote to accept or reject this Plan is solicited but who do not vote to either accept or reject this Plan; and (d) Holders of Claims who vote to reject the Plan but do not opt out of the releases on the Ballot. The Plan at § 2.1 ("Releasing Parties"), Internal pg. no. 24, (PDF 26).

[128] *Id.* at 13.4, Internal pg. no. 57 (PDF 59); *Id.* at § 13.5(a), Internal pg. no. 57 (PDF 59).

[129] *Id.* at 13.2, Internal pg. no. 56 (PDF 58); *Id.* at § 13.3, Internal pg. no. 56 (PDF 58).

[130] *FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 912 (5th Cir. 2007) (enforcing a nondebtor release where "the release of claims was an integral part of the bankruptcy order [and] was not simply boilerplate language that was inserted into the [reorganization plan], but rather a necessary part of the [reorganization plan] itself").

be specific in language, integral to the plan, a condition of the settlement, and given for consideration.[131]

52.    However, the Third Party and Professional Releases fail all four of these requirements. The Third Party Release's language is not specific enough for a creditor to be able to readily identify the Released Parties. For example, under Section 2.1 of the Plan, Released Parties includes the Debtors, Professionals of the Estate, the Plan Sponsor, and Dykes.[132] Likewise, the defined term Plan Sponsor only provides a list of potential financers – none of which have committed to do so.[133] Nor is the term Professionals of the Estate defined.[134] The Plan only generally identifies Professionals by referencing the manner in which they were compensated under the Bankruptcy Code.[135]

53.    Moreover, the Third Party and Professional Releases are not an integral part of the Plan given for consideration. In *In re Sandridge Energy, Inc.*, for example, the court held that a third party release was an integral part of the plan, in part, because the release "was a core negotiation point" through which the parties maximized value and kept the Debtors intact as a going concern.[136] However, nothing in the Plan indicates that the New Equity Infusion hinges on the availability of these releases. To be clear, the Plan has a commitment from neither Dykes nor any other proposed sponsor.[137]

---

[131] *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).
[132] The Plan at § 2.1 ("Releasing Parties"), Internal pg. no. 24, (PDF 26).
[133] *Id.* at § 2.1 ("Professional"), Internal pg. no. 23, (PDF 25).
[134] *Id.* at § 2.1 ("Plan Sponsor"), Internal pg. no. 22, (PDF 24).
[135] *Id.*
[136] No. 16-32488 (DRJ), 2016 Bankr. LEXIS 4622, at *46 (Bankr. S.D. Tex. Sep. 20, 2016). Moreover, in *FOM P.R. S.E. v. Dr Barnes Eyecenter Inc.*, 255 F. App'x 909, 912 (5th Cir. 2007), the Fifth Circuit held that a third-party release was integral to a Chapter 11 plan because, among things, the Plan stated that the guarantor voluntarily subordinated its claims against the debtor in favor of other creditors.
[137] *See Id.* at § 2.1 ("Plan Sponsor"), Internal pg. no. 22, (PDF 24).

54. Nor does the Plan indicate that these releases are supported by consideration. Section 7.13(b) of the Plan provides that the Reorganized Debtors will cancel all Interests in exchange for the New Equity infusion from the Plan Sponsor.[138] But, Dykes cannot receive distributions under the Plan based upon his equity interests as it would violate the absolute priority rule. Regardless, a capital infusion under the Plan cannot constitute consideration because Dykes was already under a preexisting duty to pay the obligations as a guarantor for the Debtors.[139] Likewise, neither the Plan nor the Disclosure Statement indicates what consideration supports the Professional Releases. Accordingly, the Third Party and Professional Releases are unenforceable.

55. The inequity of the breadth and depth of the releases being proposed in favor of those parties associated with the Debtors in this case is particularly revealed in the comparison to the release proposed for creditors who vote in favor of the Plan. The third party release in Section 13.4 contains about sixteen lines of text; however, in Section 5.13 and subject to the conditions set out in that section and discussed previously, there is a suggestion that GM Financial might be entitled to a release with the single word, *release*: "GM FINANCIAL ONLY GETS A RELEASE AND THE $1.5 MM PAYMENT IF . . ."

> **2.** **The Compromise of Controversy under Section 13.2 is Not Enforceable.**

56. Under § 1123(b)(3)(A) of the Bankruptcy Code, a Chapter 11 plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[140]

---

[138] *Id.* at § 7.3(b), Internal. pg. no. 40 (PDF 42).
[139] *Ramaker v. Abbe*, No. 03-10-00713-CV, 2013 Tex. App. LEXIS 8831, at *22 (Tex. App. July 18, 2013) ("When a party agrees to do no more than that which she is already bound to do under an existing contract, the original consideration for the existing contract is not sufficient to support a modification.").
[140] 11 U.S.C. § 1123(b)(3)(A); *In re Bigler LP*, 442 B.R. 537, 543 n.6 (S.D. Bankr. Tex. 2010).

Approval "should only be given if the settlement is 'fair and equitable and in the best interest of the estate.'"[141] "In determining whether a settlement is fair and equitable, [courts] apply [a] three-part test . . . with a focus on comparing 'the terms of the compromise with the likely rewards of litigation.'"[142]  Specifically,

> [a] bankruptcy court must evaluate: (1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise. These "other" factors—the so-called *Foster Mortgage* factors—include: (i) "the best interests of the creditors, 'with proper deference to their reasonable views'"; and (ii) "'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.'"[143]

57.     Section 13.2 of the Plan is written broadly enough to purport to encompass claims against third-parties held by the creditors which ostensibly includes GM Financial's suit against its guarantors, Reagor and Dykes.[144]  However, as discussed, *supra*, whether couched as a release or as a compromise, the provisions are unenforceable.

58.     Moreover, the "compromise" is neither in the best interests of creditors nor a result of arms-length bargaining. The proposed "settlement" is a slight-of-hand transaction, which seeks to provide ammunition to parties associated with one of the largest automotive floorplan frauds in history to be used against unsuspecting creditors. Accordingly, § 1123(b)(3)(A) of the Bankruptcy Code does not authorize the compromise of controversy under Section 13.2 of the Plan.

---

[141] *In re Cajun Elec. Power Co-op, Inc.*, 119 F.3d 349, 355 (5th Cir. 1997).
[142] *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015) (quoting *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980); *Cajun Elec. Power Co-op, Inc.*, 119 F.3d at 355.
[143] *Id.* (citing *Jackson Brewing*, 599 F.2d at 602 and quoting *Cajun Elec. Power Co-op*, 119 F.3d at 356; *Foster Mortg.*, 68 F.3d at 917–18). "[I]t is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement." *Cajun Elec. Power Co op*, 119 F.3d at 356.
[144] *Id.* at 13.2, Internal pg. no. 56 (PDF 58).

**G.** **The Plan violates 11 U.S.C. § 1129(a)(9)(A) because it fails to pay administrative expenses in full, including tax, title, and license fee and outstanding trade lien payments by GM Financial.**

59.    Section 1129(a)(9)(A) requires payment of administrative priority claims equal to the allowed amount of such claim on the effective date of the plan.[145] This should include, among other things, the entirety of the tax, title, and license fees ("**TT&L**") and trade-in lien ("**Trade Liens**") payments made by GM Financial during the course of this case. As this Court noted, the consumer title issues relating to the outstanding TT&L and Trade Lien plagued these proceedings at the expense of innocent consumers, requiring creditors like GM Financial to pay these expenses for the second time.[146]    Likewise, as previously argued, the Plan does not purport to pay GM Financial's superpriorty claim provided in the Cash Collateral order in violation § 1129(a)(9)(A).[147].

## PRAYER

**WHEREFORE**, Creditor AmeriCredit Financial Services, Inc. d/b/a GM Financial requests this Court deny confirmation of the Second Amended Plan of Reorganization and award such further relief as this Court deems just and proper just and proper.

Respectfully submitted:

_/s/ Stephen P. Strohschein_
Stephen P. Strohschein, LA Bar Roll #12541
**McGlinchey Stafford, PLLC**
301 Main Street, 14th Floor
Baton Rouge, Louisiana  70801
Telephone:  (225) 383-9000
Facsimile:   (225) 343-3076
Email:  sstroh@mcglinchey.com

---

[145] 11 U.S.C. § 1129(a)(2)(A).
[146] Doc. No. 865 at pg. 3.
[147]

1287788.2

and

Dwayne Danner
**McGlinchey Stafford, PLLC**
Three Energy Square
6688 North Central Expressway, Ste. 400
Dallas, Texas 75206
Telephone: (214) 445-2445
Facsimile: (214) 445-2450
Email: ddanner@mcglinchey.com

ATTORNEYS FOR AMERICREDIT FINANCIAL SERVICES, INC., DOING BUSINESS AS GM FINANCIAL