

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed March 18, 2020

**United States Bankruptcy Judge**

___

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| REAGOR-DYKES MOTORS, LP,[1] | § | CASE NO. 18-50214-rlj11 |
| | § | Jointly Administered |

## MEMORANDUM OPINION AND ORDER

Edward Mitchell moves to enforce the Court's order of April 26, 2019 [Doc. No. 1216]

---

[1] The following chapter 11 cases are jointly administered under Case No. 18-50214: Reagor-Dykes Motors, L.P., Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo, LP (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), Reagor-Dykes Floydada, LP (Case No. 18-50219), Reagor-Dykes Snyder, L.P. (Case No. 18-50321), Reagor-Dykes III LLC (Case No. 18-50322), Reagor-Dykes II LLC (Case No. 18-50323), Reagor Auto Mall, Ltd. (Case No. 18-50324), and Reagor Auto Mall I LLC (Case No. 18-50325).

   Six of the "Reagor-Dykes" entities—Reagor-Dykes Motors, LP, Reagor-Dykes Imports, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Plainview, LP, and Reagor-Dykes Floydada, LP—filed chapter 11 on August 1, 2018; the other five entities—Reagor-Dykes Snyder, L.P., Reagor-Dykes III LLC, Reagor-Dykes II LLC, Reagor Auto Mall, Ltd. (RAM), and Reagor Auto Mall I LLC—filed on November 2, 2018. The bankruptcy filings were precipitated by a suit filed by Ford Motor Credit Company LLC (FMCC) against various Reagor-Dykes entities in Federal District Court on July 31, 2018, in which FMCC charged Reagor-Dykes with having sold $40 million of vehicles "out of trust." FMCC was Reagor-Dykes's major "floorplan" lender for the purchase of new-car inventory for certain Reagor-Dykes dealerships. The $40 million-out-of-trust sales mean that FMCC was not paid as required on its financing. Reagor-Dykes submits that the FMCC suit and the bankruptcy filings caused, in some instances, certain retail lenders (to consumers) to fail to fund the loan proceeds to Reagor-Dykes; and, in other sales where the funds were deposited in Reagor-Dykes accounts, the banks froze the funds and "presumably applied such funds to debts that they say were allegedly owed to them by the Debtors." Doc. No. 1147 at 2. There were hundreds, perhaps thousands, of instances in which Reagor-Dykes failed to pay the tax, title, and license fees and the debt on vehicles traded-in by innocent consumers.

that approved an agreement between the Reagor-Dykes debtor entities and the Lubbock County Tax Assessor-Collector.[2] Mitchell only wants to register the 2018 Toyota Tundra (Tundra) that he is driving under a lease agreement he signed with Reagor Auto Mall, Ltd. d/b/a Prime Capital Auto Lease (RAM) four days before certain of the Reagor-Dykes entities filed bankruptcy.[3] Mitchell is unable to register the Tundra because Family Toyota Dealership Group, LLC d/b/a Family Toyota of Burleson (Family Toyota) refuses to release the Tundra's manufacturer's certificate of origin (MSO), which is needed for registration.

## I.

In late July 2018, Edward Mitchell leased the Tundra from RAM. The Closed End Motor Vehicle Lease is dated July 26, 2018. Mitchell's Ex. 2. As is common with consumer financing of vehicles, the "Lease and all rights and title to the Vehicle" were assigned, here to MUSA Auto Leasing (MUSA). *Id*. at 4. MUSA paid RAM $56,892.67 for the Tundra and the Lease. Mitchell's Ex. 1 at 2. But the purchase (or lease) of a vehicle by a consumer can be, as it is here, complicated. RAM did not have on its lot the particular Tundra that Mitchell wanted. To accommodate Mitchell, RAM obtained a Tundra for Mitchell as part of a "dealer trade" with Family Toyota. RAM sent Family Toyota a 2018 Toyota Tacoma at a cost of $27,025; and Family Toyota sent RAM the desired Tundra at a cost of $45,417.55. Family Toyota's Ex. 2. Rather than pay the difference, each of RAM and Family Toyota was obligated to pay the other the full purchase price for the vehicle obtained in the trade. Mitchell traded-in a 2017 Ram pickup as part of the deal. Mitchell's Ex. 2. The Lease reflects that the "Net Trade-In Allowance" is zero: both the balance of the debt owing on the Ram and its value were $39,530. *Id*. Mitchell paid $1,789.89 on the Lease at signing. *Id*.

---

[2] All "Doc. No." references herein are to Case No. 18-50214.
[3] *See supra* note 1.

The Tundra was delivered to RAM and then, per the terms of the Lease, to Mitchell. The Tacoma was delivered to Family Toyota; Family Toyota paid RAM the $27,025. RAM failed to pay Family Toyota for the Tundra. It also failed to deliver to Family Toyota the proper title document, the MSO, on the Tacoma. And though Mitchell testified that he has had no repercussions regarding the Dodge Ram that he traded-in, the Court surmises that RAM failed to pay the outstanding debt on it, as well.

Mitchell has been making the regular lease payments to MUSA, but neither MUSA nor RAM has properly registered the Tundra. Mitchell, therefore, has had to pay for temporary plates so that he can legally drive the Tundra. He testified that he has paid $30 a month for sixteen months. Family Toyota holds the documents of title but refuses to provide them to Mitchell. Family Toyota is disinclined to help because it has never been paid for the Tundra, it is not receiving lease payments, and it paid for the Tacoma that it could not sell given RAM's failure to provide the MSO.

Family Toyota filed its proof of claim in the RAM and Reagor-Dykes Motors, LP cases. Case No. 18-50214, Claim No. 146-1; Case No. 18-50324, Claim No. 58-1. The proof reflects it has an unsecured claim of $45,417.55 that arose from its sale of the Tundra to RAM.

## II.

Mitchell is asking that the Court require Family Toyota and RAM to provide the MSO to MUSA so that the Tundra can properly be registered and thus avoid his having to continue to pay for temporary plates. Family Toyota refuses to do so because, as it says, "**Family Toyota was never paid for the Vehicle**." Doc. No. 1579 at 3 (emphasis in original). Mitchell argues that Family Toyota consigned the Tundra to RAM or, alternatively, entrusted it with RAM. In either event, Mitchell argues that he has rights superior to Family Toyota's to the Tundra as an

innocent purchaser (or lessee) for value. Family Toyota says that the Tundra was neither consigned nor entrusted by Family Toyota to RAM. And, as Family Toyota was never paid for the Tundra, Family Toyota contends that the sale of the Tundra to RAM was never effected. Family Toyota presently holds the MSO or certificate of title. RAM says that it has a *copy* of an MSO but that such copy "is void because, upon information and belief, Family Toyota took action to have a duplicate MSO/title issued in the name of Family Toyota that supersedes the MSO in the possession of the Debtors and renders it void." Doc. No. 1581 at 2.

Mitchell asks the Court to require that Family Toyota comply with the following provision from the Court's April 26, 2019 order:

> [A]ll persons in possession of certificates of titles ("**Titles**") or manufacturer's certificates of origin ("**MSOs**") for vehicles (i) sold (arguably or inarguably) by Reagor-Dykes Auto Group and (ii) that still need to be registered for the buyer ("**Vehicles**") shall provide the Debtors with a list of all such Titles and MSOs in their possession within five (5) days from entry of this Order. Upon receipt of a copy of (i) the retail sales contract or lease and (ii) reasonably satisfactory proof of funding, all such persons identified in the preceding sentence shall surrender the Titles and MSOs to the Debtors within seven (7) business days of such receipt.

Doc. No. 1216 at 2 (emphasis in original).

Family Toyota counters, arguing that the settlement is simply an agreement to remove the non-payment of motor vehicle tax as an impediment to the registration of purchased vehicles by consumers. Further, given that Family Toyota was never paid for the Tundra, the sale of the Tundra never took place. So, the order cannot apply to Family Toyota, it submits.

Mitchell contends that he is an innocent consumer, which is not disputed, and that he leased the Tundra from a dealer, here RAM. And, given his circumstances, his right to at least get the Tundra registered trumps any right of Family Toyota to refuse to provide the title documents to allow registration of the Tundra.

The Court addresses first the relative rights between Family Toyota and Mitchell. It then

considers whether the Court's April 26, 2019 order applies to and is enforceable against Family Toyota.

### III.

#### A.

Under Texas's Certificate of Title Act, a subsequent sale by an owner of a car is void unless "the owner designated on the title submits a transfer of ownership of the title." Tex. Transp. Code § 501.071(a). It is clear by case law, and under the Certificate of Title Act, that an "owner" is not a licensed dealer. *See In re Dota*, 288 B.R. 448, 458 (S.D. Tex. 2003). Additionally, when a new car with an MSO passes between dealers, the sale by the second dealer to a buyer is not considered a subsequent sale that requires the second dealer to possess the title and pass the title to the buyer. *Id*. As such, the transaction between Family Toyota and RAM is not void under the Certificate of Title Act.[4]

Family Toyota argues that the sale was not complete and title did not pass to RAM because, as a practical course of performance and understanding, the sale was not complete until RAM paid for the Tundra. The Texas Business and Commerce Code specifically states that "[u]nless otherwise explicitly agreed[,] title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place." § 2.401(b). Additionally, "[a]ny retention or reservation by the seller of

---

[4] Even if the Certificate of Title Act did cover the transaction, there is a provision that states the Texas Business and Commerce Code controls when in conflict with the Certificate of Title Act. Tex. Transp. Code § 501.005. The state courts, though, are split as to whether the Certificate of Title Act conflicts with the Texas Business and Commerce Code under this situation. *Compare, e.g.*, *Vibbert v. PAR, Inc.*, 224 S.W.3d 317, 322 (Tex. App.—El Paso 2006, no pet.) (Business & Commerce Code controls because conflicts with Certificate of Title Act); *with Allstate Ins. Co. v. Troy's Foreign Auto Parts*, No. 05-00-01239-CV, 2001 WL 840613, at *5 (Tex. App.—Dallas July 26, 2001, pet. denied) (Certificate of Title Act controlled and not Business & Commerce Code because the two provisions could be reconciled).

the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." § 2.401(a).

There was no written agreement or other evidence presented of the terms of the sale between Family Toyota and RAM. With no explicit agreement, the default provisions of the Texas Business and Commerce Code control. Title and ownership of the vehicle passed between Family Toyota and RAM at the time Family Toyota allowed RAM to take possession of the car. Additionally, Family Toyota knew that RAM had already "sold" the car to one of its customers.

Generally, "equity dictates that as between two innocent parties, the party that must suffer the loss is the one who mistakenly created the situation and was in the best position to have avoided it." *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 514 (Tex. App.—Fort Worth 2012, no pet.) (quoting several other Texas cases); *see also Borg-Warner Acceptance Corp. v. Massey-Ferguson, Inc.*, 713 S.W.2d 351, 357 (Tex. App.—Dallas 1985, writ denied) (as between retail lender purchasing chattel paper in the ordinary course of its business and an inventory lender, the inventory lender was in a better position to protect itself against the dealer's misdeeds and the loss fell on the inventory lender even though the retail lender did not "inquire into the factual circumstances surrounding the transaction on which the paper [was] based"). Family Toyota was in a better position to prevent RAM's nonpayment than the ultimate purchaser. Family Toyota could have prevented RAM's possession of the Tundra until Family Toyota was paid.

Mitchell is a lessee in the ordinary course. To determine whether a person is a lessee in the ordinary course of business "is a mixed question of law and fact." *In re Dota*, 288 B.R. at 461 (applying this standard to a buyer in the ordinary course).

The Texas Business and Commerce Code provides that a lessee may benefit from the

protection afforded a buyer in the ordinary course of business. A lessee of goods in the ordinary course of business takes free of all security interests created by the lessor, even if perfected. *See* § 9.321(c) ("A lessee in ordinary course of business takes its leasehold interest free of a security interest in the goods created by the lessor, even if the security interest is perfected and the lessee knows of its existence."). There is no dispute that the transaction between Mitchell and RAM was a lease in the ordinary course of RAM's business and "when a transaction is structured as a 'lease,' there is no passing of title; the lessee receives a 'transfer of the right to possession and use of [the] goods for a term in return for consideration.'" *Prestige Ford Garland Ltd. P'ship v. Morales*, 336 S.W.3d 833, 838–39 (Tex. App.—Dallas 2011, no pet.) (citing Tex. Bus. & Comm. Code § 2A.103(10)). Mitchell, therefore, has possessory and usage rights to the Tundra.

RAM was the owner of the Tundra, and Mitchell leased the Tundra from RAM. As a lessee in the ordinary course of business, Mitchell holds rights superior to the rights of Family Toyota in the Tundra. Family Toyota is an unsecured creditor of RAM's—as it itself asserted by its proof of claim.

## B.

### 1.

The Court turns to whether the April 26, 2019 order applies to Family Toyota. Lubbock County, at the behest of Reagor-Dykes, agreed to waive the requirement that the sales taxes be paid as a condition to allowing the registration of purchased or leased vehicles from Reagor-Dykes. In return, Lubbock County was granted a priority unsecured claim against the bankruptcy estates for the unpaid sales-tax amounts. The affected consumers are innocent parties. Lubbock County recognized this and, to its credit, agreed to accommodate the affected consumers. The Court appreciates Lubbock County for doing this.

But in addition to waiving the non-payment of sales taxes as an impediment to registration, the arrangement "also streamline[d] the registration and title-transfer process by allowing Lubbock County to handle all vehicle registrations for Texas consumers." Doc. No. 1147 at 2. Family Toyota was provided with notice of the motion. The motion contained the language that was carried forward to the order that requires the cooperation of persons in possession of title documents—that they provide the title documents to the Reagor-Dykes debtors for consumer-registration purposes.

**2.**

Generally, for a party to be bound to orders issued by the bankruptcy court, the party must receive adequate notice of the proceedings for due process reasons. *In re Grumman Olson Indus., Inc.*, 467 B.R. 694, 706 (S.D.N.Y. 2012); *see also Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 799 (1996) ("Additionally, where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate, legal proceedings may terminate pre-existing rights if the scheme is otherwise consistent with due process."). The Code provides for due process protection for settlements under Rule 9019(a) by requiring that a debtor in possession give creditors and parties in interest "adequate notice and opportunity to be heard *before* their interests may be adversely affected."[5] *W. Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*, 43 F.3d 714, 720 (1st Cir. 1994) (emphasis in original). Rule 9019(a) further protects interested parties "[b]y requiring court approval following a hearing before any compromise or settlement may be enforced" to ensure a transparent settlement process and provide "other creditors an opportunity to voice their concerns." *In re Big Apple Volkswagen, LLC*, 571 B.R. 43, 57 (S.D.N.Y. 2017). Although

---

[5] All "Rule" references are to the Federal Rules of Bankruptcy Procedure unless otherwise stated.

notice and an opportunity to be heard is required, "every affected creditor need not consent to a settlement for it to be binding on all creditors." *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 249 (Bankr. M.D. Fla. 2006). Rather, before the settlement can bind other creditors, a bankruptcy court considers several factors before determining whether to approve a settlement.

The Court approved the debtors' settlement motion on April 26, 2019, after notice, hearing, and considering the necessary factors. Family Toyota, as a creditor and party-in-interest, received notice of the settlement motion, the amended settlement motion, and the order approving the amended settlement motion. It had an opportunity to be heard on the matter at the time it came before the Court.

**3.**

Family Toyota argues that the order does not apply to dealership disputes for unpaid cars and that it never received proof of funding as required by the order. The order states "that all persons in possession of . . . manufacturer's certificates of origin ("MSOs") for vehicles (i) sold (arguably or inarguably) by Reagor-Dykes Auto Group and (ii) that still need to be registered for the buyer ("Vehicles") shall . . . surrender the Titles and MSOs . . . solely for consumer-registration purposes." Doc. No. 1216 at 2. Family Toyota is in possession of an MSO for the Tundra that was sold by RAM. The Tundra still needs to be registered for the buyer, MUSA and/or RAM, so that Mitchell can get permanent license plates. The only exception to this procedure is "Titles or MSOs that relate to Vehicles for which unpaid trade liens exist." *Id*. Disputes with dealerships that were never paid for cars sold by the Reagor-Dykes debtors do not fit within this exception. Additionally, other creditors holding MSOs and titles for unpaid cars were aware of the applicability of this settlement to their circumstances. *See, e.g.*, AmeriCredit Financial Services, Inc. Limited Objection, Doc. No. 1142 (stating that it held MSOs and titles to

9

69 cars sold by Reagor-Dykes but had not been paid the floorplan balance due to it out of the proceeds of those sales and sought to continue to hold possession of those MSOs and titles to protect its legal rights).

Even if the plain language of the settlement motion and the order did not indicate to Family Toyota that the settlement applied to it, the object of this dispute, the Tundra, was specifically addressed in an objection to this settlement. MUSA, the assignee and lessor, filed a limited objection to the settlement motion regarding the "preservation of MUSA's ownership interest and/or lien on the various Titles for the MUSA Leases that are to be issued after registration" and specifically requested that its lien on Mitchell's 2018 Toyota Tundra (with its VIN number included) be maintained. Doc. No. 1159. Family Toyota received notice of this objection.

As for Family Toyota's funding argument, there would be no need for the order to set-up a procedure for titles and MSOs to be surrendered if the appropriate parties received funding for unregistered cars; proof of funding is satisfied if the Reagor-Dykes debtor received the funding. Other creditors, as indicated above, understood this. Family Toyota's argument that it never received funding and therefore is not required to surrender the Tundra's MSO fails. Family Toyota has received a copy of the retail lease contract between RAM and Mitchell, as well as proof of funding from MUSA. Based on the order's requirements, once these items have been received, the document holder has seven days to surrender the MSO.

Family Toyota was involved in this settlement as an interested party and received adequate notice of the settlement provisions and application of the settlement to its own claim. The plain language of the order invokes application of this registration procedure to Family Toyota.

**4.**

Given Mitchell's rights as an innocent lessee for value and the applicability of the Court's April 26, 2019 order to Family Toyota, the doctrine of res judicata bars Family Toyota's challenge here to the order. Res judicata is a judicially created doctrine with the purpose of both giving finality to parties who have already litigated a claim and promoting judicial economy; it also bars claims that could have been litigated. *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). "[R]es judicata encompasses two separate but linked preclusive doctrines: (1) true res judicata or claim preclusion and (2) collateral estoppel or issue preclusion." *Hous. Prof'l Towing Ass'n v. City of Hous.*, 812 F.3d 443, 447 (5th Cir. 2016) (quoting *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 466–67 (5th Cir. 2013)). Res judicata is appropriate when the following four elements are present: (1) a final judgment on the merits; (2) rendered by a court of competent jurisdiction; (3) the parties must be the same in the two actions; and (4) the same cause of action must be involved in both cases. *Eubanks v. F.D.I.C.*, 977 F.2d 166, 169 (5th Cir. 1992). "If the elements of res judicata are met, then in the words of the Restatement (Second) of Judgments, 'in an action upon the judgment, the defendant cannot avail himself of defenses he might have interposed, or did interpose, in the first action.'" *In re McGrew*, No. 13-5009, 2014 WL 2760828, at *6 (Bankr. E.D. Tex. June 18, 2014) (quoting Restatement (Second) of Judgments § 18 (1982)).

Although Mitchell did not raise res judicata as a means to bar Family Toyota's continued defiance of the order, "res judicata belongs to courts as well as to litigants" and a court may invoke res judicata sua sponte. *Stanton v. D.C. Court of Appeals*, 127 F.3d 72, 77 (D.C. Cir. 1997); *see also Fordham v. Fannie Mae*, 49 F. Supp. 3d 77, 83 (D.D.C. 2014). This is because res judicata is in the interest of judicial economy and is appropriate especially where both actions

are before the same court. *Carbonell v. La. Dep't of Health & Human Res.*, 772 F.2d 185, 189 (5th Cir. 1985).

Res judicata is met here. An order approving a settlement under Rule 9019 has res judicata effect as a final order. *See In re Licking River Mining, LLC*, 605 B.R. 153, 159 (Bankr. E.D. Ky. 2019); *In re Reeves*, 521 B.R. 827, 833 (Bankr. E.D. Tenn. 2014) ("An order approving compromise and settlement under Fed. R. Bankr. P. 9019 has the same res judicata effect as any other final order with respect to the subject matter of the order." (citations omitted)); *see also In re Gibraltar Res., Inc.*, 210 F.3d 573, 576 (5th Cir. 2000) ("A bankruptcy court's approval of a settlement order that brings to an end litigation between parties is a 'final' order.") (citations omitted); *In re Prospector Offshore Drilling S.à R.L.*, No. 17-11572, 2019 WL 1150563, at *5 (D. Del. Mar. 12, 2019) (same). The order is a final order that the Court had jurisdiction to enter. The first two elements of res judicata are therefore met.

This enforcement motion involves the same parties that were involved in connection with the settlement motion. A creditor and party in interest is required to receive notice of a settlement before approval pursuant to Rule 9019 and is considered a party to the settlement for res judicata purposes. *See Red River Res., Inc. v. Collazo*, No. 14-cv-04961, 2015 WL 1846498, at *9 (N.D. Cal. Apr. 8, 2015) (for res judicata purposes, a party in interest to the bankruptcy court's global settlement order is still an identical party to the claims resolved in the order because "declin[ing] to be a settling party to the Global Settlement does not free [the creditor/party in interest] of all court-approved terms of the agreement, which bind him whether he was a party to the settlement or not, because he was a party in interest to the Bankruptcy Court's order" (citations omitted)); *In re Licking River Mining, LLC*, 605 B.R. at 159–60. Family Toyota received notice of the motion, the amended motion, and the order approving the

amended motion via electronic service on its counsel. Doc. Nos. 1129, 1147, 1216. Mitchell was also involved in the settlement in privity with MUSA as MUSA was a party in interest to the settlement and the settlement involved the registration of the Tundra which Mitchell and MUSA each have a right to. *See Fouke v. Schenewerk*, 197 F.2d 234, 236 (5th Cir. 1952) (lessor and lessee are in privity of estate); *Shore Expl. and Prod. Corp. v. Exxon Corp.*, 976 F. Supp. 514, 523 (N.D. Tex. 1997) (privity of estate is generally defined as a mutual or successive relationship to the same rights in property).

Last, the same cause of action exists here because this is an enforcement motion. Mitchell is asking the Court to make Family Toyota comply with the registration procedure set forth in the settlement motion so that he can get his car registered. As stated above, the retention of MSOs of unregistered cars that were sold (arguably or inarguably) by the debtors was at issue in April 2019 in connection with the settlement motion and the order approving the settlement. Further, the settlement order's plain language confirms that it impacted Family Toyota's rights; it expressly stated: "*all persons* in possession of . . . MSOs for vehicles (i) sold (arguably or inarguably) by Reagor-Dykes Auto Group and (ii) that still need to be registered for the buyer . . . *shall surrender* [the MSO] to the Debtors within seven (7) business days." Doc. No. 1216 (emphasis added). It was apparent from the settlement motion that the proposed settlement involved registration of vehicles and turnover of MSOs and titles, and Family Toyota had a full and fair opportunity to object to the settlement motion to assert its interest in retaining the MSO. The same cause of action is involved in this enforcement action as the 9019 motion. The order is entitled to res judicata effect against any of Family Toyota's defenses to enforcement.

One other court has similarly held a party-in-interest creditor is bound to a settlement agreement based on res judicata. In *In re Licking River Mining, LLC*, the bankruptcy court held

13

that an approved settlement had a res judicata effect against a creditor that was not a party to the settlement where the settlement was a final order on the merits by a court of competent jurisdiction, the subsequent action was between the same parties or their privies, and the issue was or should have been litigated in the prior action. Res judicata applied to this creditor because the creditor received adequate notice, was represented by counsel, did not object to or appeal the settlement, and the settlement was unambiguous as to the impact it could have on creditors' rights. In this case, one group of lenders (JAD Lenders) and another group of lenders (Licking River Lenders) both had secured liens on the debtors' equipment. The JAD Lenders entered into a settlement agreement with the debtors to settle and release all potential claims against the JAD Lenders, and the JAD Lenders agreed to release and transfer their liens on all equipment to the debtors' estates, which was approved by the court pursuant to Rule 9019. The settlement order provided that "[t]he JAD Lenders shall release and transfer their liens on [the equipment collateral] to the Debtors' estates . . . . All [equipment collateral] and proceeds thereof shall be retained by the Debtors' Estates for disposition in the sole discretion of the Debtors' Estates." *Id*. at 157. The case was later converted to chapter 7, and the appointed chapter 7 trustee sold the equipment for over $600,000. The Licking River Lenders then claimed a superior lien on the proceeds to the trustee, and the trustee sought declaratory judgment that the Licking River Lenders' lien was not superior. The court held that the settlement motion was entitled to res judicata effect and Licking River Lenders' claim of superior interest in the equipment collateral proceeds was a collateral attack on a final order, which was impermissible based on the doctrine of res judicata. The court went through the four factors of res judicata and found that the language in the settlement was clear that "[a]ll [equipment collateral] and proceeds thereof" were vested with the debtors and if Licking River Lenders did not want to be bound by

the order that gave the debtors the right to possession and disposition, they had an obligation to object to the settlement in order to preserve their rights.

Like the non-party creditor in *In re Licking River Mining, LLC*, if Family Toyota did not want to be bound by an order that permitted the debtors' estates to obtain possession of the MSO for registration purposes, it had an obligation to object to the settlement motion to preserve its perceived rights. It did not. Family Toyota also did not appeal the settlement order and may not now collaterally attack it. *See In re Licking River Mining, LLC*, 605 B.R. at 160.

Mitchell is an innocent purchaser (or lessee) of a vehicle from what was then the highest-profile car dealership in Lubbock, Texas. His rights to the Tundra under the law and in equity exceed Family Toyota's. Family Toyota's claim against RAM, as reflected by its filed proof of claim, is an unsecured claim of $45,417.55 for the sale of a vehicle.

The Court's April 26, 2019 order applies to and binds Family Toyota. Family Toyota (as well as the Reagor-Dykes debtors and MUSA) must accommodate Mitchell's simple request to register the Tundra so he can legally drive it without continually paying $30.00 a month for temporary tags. It is, therefore,

ORDERED that Family Toyota shall provide the title documents for the Tundra to RAM. RAM shall hold the title documents solely for consumer-registration purposes, and Family Toyota's release of the title documents does not prejudice any rights it may have against RAM (or any of the Reagor-Dykes debtors) or its assignee, MUSA Auto Leasing.

### End of Memorandum Opinion and Order ###